## UNITED STATES DISTRICT COURT

## MIDDLE DISTRICT OF LOUISIANA

**JUNE MEDICAL SERVICES, LLC**
**d/b/a HOPE MEDICAL GROUP FOR WOMEN,**
**on behalf of its patients, physicians, and staff;**
**BOSSIER CITY MEDICAL SUITE, on behalf of**
**its patients, physicians, and staff;**
**CHOICE, INC., OF TEXAS d/b/a CAUSEWAY**
**MEDICAL CLINIC, on behalf of its patients,**          **CIVIL ACTION**
**physicians, and staff; JOHN DOE 1, M.D.**
**and JOHN DOE 2, M.D.**

**VERSUS**

**JAMES DAVID CALDWELL, in his official**
**capacity as Attorney General of Louisiana;**          **NO.: 3:14-cv-00525-JWD-RLB**
**JIMMY GUIDRY, in his official capacity as**
**Louisiana State Health Officer & Medical**
**Director of the Louisiana Department of Health**
**and Hospitals; and MARK HENRY DAWSON,**
**in his official capacity as President of the**
**Louisiana State Board of Medical Examiners**

## TEMPORARY RESTRAINING ORDER

Before the Court is Plaintiffs' Application for Temporary Restraining Order and Motion for

Preliminary Injunction (Doc. 5) seeking to enjoin Defendants from enforcing Section (A)(2)(a) of

La. House Bill 388, Regular Session (La. 2014), Act 620 (hereinafter "Act 620" or the "Act"). (Doc.

5-2, p.1.) This Act is codified at La. Rev. Stat. § 40:1299.35.2. Plaintiffs' Application is filed in

accordance with Fed. R. Civ. P. ("Rule") 65 and this Court's Local Rules, *see* M.D. La. LR65.

Defendants oppose Plaintiffs' Application. (Docs. 17, 18, 19, 20.)

For reasons explained below, the Court **GRANTS** Plaintiffs' Application for Temporary

Restraining Order as to Defendants Kathy Kleibert and Dr. Mark Henry Dawson to the extent that

any enforcement of § A(2)(a) of Act 620, amending La. R.S. 40:1299.35.2, is enjoined until a

hearing is held for the purpose of determining whether a preliminary injunction should issue.

Plaintiffs will continue to seek admitting privileges. The Act will be allowed to take effect but Plaintiffs will not be subject to the penalties and sanctions allowed in the statute at this time or in the future for practicing without the relevant admitting privileges during the applications process. Plaintiffs will be allowed to operate lawfully while continuing their efforts to obtain privileges.

In accordance with Rule 65, this Temporary Restraining Order shall be effective as of **Sunday, August 31, 2014, 11:59 p.m.** and shall remain pending until the hearing on Plaintiffs' Motion for Preliminary Injunction. *See* Fed. R. Civ. P. 65(b)(2)-(3).

Plaintiffs' Motion for Preliminary Injunction is **DEFERRED.** A status conference to monitor the progress of Plaintiffs' applications and set a hearing date for the preliminary injunction shall be held on a date to be set by the Court not longer than 30 days following the issuance of this Order.

For the reasons set forth below, the Motion to Dismiss filed by Defendant Attorney General James David Caldwell is hereby **GRANTED** and Louisiana State Health Officer and Medical Director, Dr. Jimmy Guidry, is hereby **DISMISSED.**

I.      Facts, Procedural History and Contentions of the Parties

Plaintiffs are June Medical Services, LLC d/b/a Hope Medical Group for Women (hereinafter "Hope"), Bossier City Medical Suite ("Bossier"), Choice, Inc., of Texas d/b/a Causeway Medical Clinic ("Choice") and Drs. John Doe 1 and 2. Defendants are James David "Buddy" Caldwell, sued in his official capacity of the Attorney General of Louisiana; Dr. Jimmy  Guidry, sued in his official capacity as the Louisiana State Health Office and Medical Director; Kathy Kliebert sued in her official capacity as the Secretary of the Louisiana Department of Health and Hospitals ("DHH");[1] and Dr. Mark Dawson, sued in his official capacity as the President of the Louisiana State Board of Medical Examiners ("Board").

_____

[1] Secretary Kliebert was added as a defendant in an Amended Complaint. (Doc. 14.)

On August 22, 2014, Plaintiffs filed a Complaint for Declaratory and Injunctive Relief (Doc. 1) and an Application for Temporary Restraining Order and Motion for Preliminary Injunction (Doc. 5) seeking to enjoin Defendants from enforcing Section (A)(2)(a) of La. House Bill 388, Regular Session (La. 2014), Act 620 (hereinafter "Act 620" or the "Act"). (Doc. 5-2, p.1.) This Act is codified at La. Rev. Stat. § 40:1299.35.2. Section A(2)(a) requires every doctor who performs abortions in Louisiana to have "active admitting privileges" at a hospital within 30 miles of the facility where abortions are performed. (Doc. 5-2, p. 3.) While this Act contains other requirements, this provision is the only one being challenged. (Doc 5-1, p. 8, note 1.) Act 620 was signed into law on June 12, 2014. Its effective date is September 1, 2014. (Doc. 5-2, p. 6.)

Plaintiffs Hope, Bossier and Choice are three of five licensed abortion clinics in Louisiana. They are located in Shreveport, Bossier City and Metairie respectively. Drs. Doe 1 and 3 perform abortions at Hope, Dr. Doe 2 performs abortions at Bossier and Choice and Dr. Doe 4 performs abortions at Choice.[2]

Plaintiffs allege that, following June 12, 2014, the date the Act was signed into law by the Governor, Drs. Doe 1, 2 and 4 applied for admitting privileges at nearby hospitals in an effort to comply with the Act. However, their applications are pending and, because the admission process can take several months, there will have been no action taken on the applications at the time Act 620 becomes effective on September 1, 2014.  Dr. Doe 3 has admitting privileges at a hospital within 30 miles of where he performs abortions but claims that, if the applications of Drs. 1, 2 and 4 are denied and he is the only physician performing abortions at any of the three facilities, he will discontinue performing abortions due to fears for his personal safety.

---

[2] Drs. Doe 1 and 2 are plaintiffs; Drs. Doe 3 and 4 are not. A Protective Order was issued protecting the identity of these doctors. (Doc. 24.)

Because it is impossible for Drs. 1, 2 and 4 to comply with the admitting privileges requirement before the Act's effective date, they allege that, without an order enjoining enforcement of the Act, they will be exposed to a $4,000 per violation penalty[3] and possible suspension or revocation of their medical licenses by the Board[4] despite the fact that they are attempting to comply with the Act. Hope, Bossier and Choice argue that, for the same reason, they will be exposed to suspension or loss of their clinic licenses.[5] This, Plaintiffs argue, constitutes a violation of their constitutional right to due process.

In addition, Plaintiffs allege that they have received some informal indication that the applications for active admitting privileges of some of the doctors may be denied[6] and, if they are denied, enforcement of the Act against them "will either drastically reduce or completely eliminate the availability of legal abortion in the state..." (Doc 5-1, p. 22);  "will result in every doctor currently providing abortions at a clinic in Louisiana to stop providing those services..." (Doc. 5-1, p. 6) and that "no other doctor in Louisiana would be able to provide abortion services as of September 1..." (Doc 5-1, p. 18). Furthermore, Plaintiffs contend that enforcement would result in "the majority if not all" abortion clinics being unable to render services (Doc. 5-1, p. 25) and would "effectively eliminate all access to legal abortion in Louisiana" (Doc. 5-1, p. 26).

---

[3] La. R.S. 40:1299.35.2(A)(2)(c).

[4] At the hearing on the Application for Temporary Restraining Order, counsel for Dr. Mark Dawson, President of the Board, conceded that a physician's violation of state law might be considered "unprofessional conduct," a grounds for the suspension or revocation of the physician's license. See LSA-R.S. Sections 37:1261.1 and  LSA-R.S. 37:1285(A)(13).

[5] LSA-R.S. 40:1299.35.2(A)(1) and LSA-R.S. 40:2175.6.

[6] Dr. Doe 1 states that he has been told by the Chairman of the Family Medicine Department of one of the hospitals where he has applied that his application for privileges has been "met with resistence." (Decl. Dr. John Doe 1 Doc. 5-5, p. 2-3, ¶ 7.) The application is still pending.

Attorney General Caldwell filed a Motion to Dismiss Pursuant to Fed. R. Civ. P. 12 (B)(1) arguing that he has no connection with the enforcement of the Act. (Doc. 16.) Defendants Dr. Jimmy Guidry and Dr. Mark Dawson make similar arguments in their memoranda. (Docs. 18, 20.)

On the merits, Defendants first argue that a TRO is not warranted because they do not intend to enforce the new law against any physician whose applications for privileges is pending. Specifically, Secretary of DHH Kliebert pledges that she will abide by the instructions of the U.S. 5th Circuit in *Planned Parenthood of Greater Texas v. Abbott*, 748 F.3d 583, 600 (5th Cir. 2014) that an admitting privileges requirement cannot be enforced "against a physician who [has] applied for admitting privileges during the law's grace period but who [has] not yet received a response on that application before the effective date of the law." (Doc. 27, p. 3-4.)

Similarly, Dr. Dawson has filed a Declaration pledging that he will abide by *Abbot's* instructions not to enforce Act 620 but, in any event, the Board has no enforcement authority regarding this Act. Because Secretary Kliebert and President Dawson are pledging not to enforce the Act against anyone whose application is pending, they argue there is no need nor justification for a TRO since there is no "substantial threat of irreparable harm" from an authority attempting to enforce the Act.

Second, Defendants argue that even if the doctors' applications are denied and Plaintiff doctors are unable to perform abortions, there are two other abortion facilities and other doctors performing abortions in Louisiana. Thus, Plaintiffs have failed to demonstrate that the enforcement of the Act would put an undue burden on or create a substantial obstacle to the Constitutional right of Louisiana women to receive abortions.

On August 28, 2014, a hearing was held on the Plaintiffs' Motion for Temporary Restraining Order. All parties were present and participated. No evidence was offered by Plaintiffs other than

the submission made with Plaintiffs' Application. (Doc. 5.) No evidence was offered by Defendants prior to the hearing other than the Declaration of Kathy Kliebert. (Doc. 25.) After the hearing, Secretary Kliebert submitted a supplemental Declaration (Doc. 27) and Dr. Dawson submitted a Declaration (Doc. 26).

II. Proper Parties, Article III Standing and 11th Amendment Immunity

All Defendants other than Secretary Kliebert[7] have raised the issue of whether they are properly before the Court and whether there is Article III standing and/or Eleventh Amendment immunity. Before a district can issue a TRO, it must first determine that it has Article III jurisdiction to do so. *See, e.g., Doe v. Jindal*, 2011 WL 3664496, *2 (M.D. La. 2011) (noting in the TRO context that "jurisdiction 'is a threshold issue that must be resolved before any federal court reaches the merits of the case before it'") (quoting *Perez v. U.S.*, 312 F.3d 191, 194 (5th Cir. 2002)).

In its Motion to Dismiss, the Attorney General argues that he is not a proper party based on his immunity under the Eleventh Amendment.[8] He claims that the exception to this immunity provided in *Ex Parte Young*[9] does not apply because the Attorney General has "no connection" with the enforcement of Act 620.[10] Plaintiffs argue, on the other hand, that he has at least "some

---

[7] Secretary Kliebert concedes that, as the Secretary of DHH, she "is responsible by law for enforcing Louisiana's recently passed admitting privileges law, Act 620...." (Doc. 27, p. 2.)

[8] The Attorney General concedes that it received notice of this constitutional challenge to Act 620 for purposes of 28 U.S.C. Section 2403(b) and Fed. R. Civ. P. 5.1 and that he has the discretion to intervene in this case (Doc. 16-1, *3-4). However, during the the TRO hearing, counsel for Mr. Caldwell stated that he did not intend to exercise that discretion. While Mr. Caldwell did not raise the issue of the Court's lack of Article III jurisdiction, the Court finds that jurisdiction is lacking because, for the reasons stated herein, the Attorney General lacks the power to enforce Act 620. *Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992); *Doe v. Jindal. supra* *2.

[9] 209 U.S. 123, 155-56 (1908).

[10] *Id.*, at 158-59. *Okpalobi v. Foster*, 244 F.3d 405 (5th Cir. 2001). Secretary of DHH Kathy Kliebert states in her declaration that DHH has the "primary authority" for enforcing the

connection"[11] by virtue of the broad powers granted to him in the Louisiana Constitution as the State's chief legal officer. (Doc. 23, p. 10.) This argument was rejected in *Doe v. Jindal*, *supra*, where the Court found this broad power to be too "indirect and remote" to qualify the Attorney General for the *Ex Parte Young* exception.[12] This Court agrees.

Plaintiffs contend that the Attorney General is given the right to prosecute regulatory violations which, arguably, includes the violation of Act 620. Mr. Caldwell responds that the Attorney General only performs this task when asked to do by the regulatory body or when empowered to do so by statute or regulation. (Doc. 30.) Since he has not been asked by DHH to represent that agency and Act 620 does not empower the Attorney General to act on behalf of DHH in carrying out its mandate, the Court finds that the Attorney General does not have sufficient connection to the enforcement of Act 620 to make applicable the *Ex Parte Young* exception. The Court therefore grants the Attorney General's Motion to Dismiss.

Defendant Dr. Jimmy Guidry was sued in his capacity as Louisiana State Health Officer and Medical Director of the DHH. Based on the representation of counsel for Dr. Guidry that Dr. Guidry has no decision making authority as to Act 620 which is independent from that of Secretary Kliebert, counsel for Plaintiffs stated at the TRO Hearing that Plaintiffs did not object to Guidry's dismissal.[13] Accordingly, the Court orders that Dr. Jimmy Guidry be dismissed.

Defendant Dr. Dawson, the President of the Board, argues that he too has no power of enforcement of Act 620 and therefore should be dismissed.  The Board is authorized under a

---

Act. (Doc. 27, p. 2.)

[11] *Ex Parte Young,* 209 U.S. at 157.

[12] 2011 WL 3664496 at *3.

[13] To the same effect, see Plaintiffs' Reply Brief. ( Doc. 23, p.11.)

separate section of Act 620 (La. R.S. 40:1299.35.2.1, regulating the use of drugs or chemicals in an abortion) to "take disciplinary action as authorized in R.S. 37:1261 et seq. or any other provision of law against a physician who violates any provision of this Section."

While there is no comparable provision in § 1299.35.2(A), the Board is empowered under La. R.S. 37:1285A(13) to revoke or suspend a physician's license for "unprofessional conduct." At the TRO Hearing, counsel for Dr. Dawson conceded that, under this provision, the Board could suspend or revoke a doctor's license for the violation of any statute, including Act 620. The Court finds that the ability to suspend or revoke a physician's license is therefore a mechanism of enforcement of the Act and one not "so indirect and remote" as to render the *Ex Parte Young* exception inapplicable.

Furthermore, under the Art. III standing analysis,[14] the Court finds that the Board's ability to suspend or revoke the license of Drs. Doe 1 and 2 could cause these Plaintiffs to suffer an "injury in fact," that there is a causal connection between such Board action and the injury, and finally, that the injury would be redressed by granting the injunction. See *K.P. v. LeBlanc*, 627 F.3d 115, 122-125 (5th Cir. 2010), which held that plaintiffs met all three elements of the test for Art. III standing against the Louisiana Patients' Compensation Fund although the potential harm from not enjoining the law was "not as concrete as some might be" and "not yet materialized." 627 F.3d at 122. Whether the enforcement connection "arises out of the general law, or is specially created by the act itself, is not material so long as it exists." *Ex Parte Young*, 209 U.S. 123, 157 (1908) (quoted in *LeBlanc*, 627 F.3d at 124). Accordingly, Dr. Dawson's 11th Amendment and Art. III challenges are denied.

---

[14] See *Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992); *Okpalobi v. Foster*, 244 F.3d 405, 425 (5th Cir. 2001)

III. Temporary Restraining Order

A.     The Standard

A temporary restraining order "is an extraordinary and drastic remedy, and should only be granted when the movant has clearly carried the burden of persuasion." *Anderson v. Jackson*, 556 F.3d 351, 360 (5th Cir. 2009) (quotations omitted); *Lakedreams v. Taylor,* 932 F.2d 1103, 1107 (5th Cir.1991) (citing *Miss. Power & Light Co. v. United Gas Pipe Line Co.,* 760 F.2d 618, 621 (5th Cir.1985)).

The movant "must satisfy a cumulative burden of proving each of the four elements enumerated before a temporary restraining order … can be granted." *Clark v. Pritchard*, 812 F.2d 991, 993 (5th Cir. 1987). The four elements are well known: the movant bears the burden of clearly proving: (1) a substantial likelihood that plaintiff will prevail on the merits, (2) a substantial threat that plaintiff will suffer irreparable injury if the injunction is not granted, (3) that the threatened injury to plaintiff outweighs the threatened harm the injunction may do to defendant, and (4) that granting the preliminary injunction will not disserve the public interest. *Janvey v. Alguire,* 647 F.3d 585, 595 (5th Cir.2011)*; Women's Med. Center of Nw. Houston v. Bell,* 248 F.3d 411, 419, n. 15 (5th Cir. 2001); *Jackson Women's Health Organization v. Currier*, 2014 WL 3730467, *5 (5th Cir., July 29, 2014), (quoting *Hoover v. Morales*, 164 F.3d 221, 224 (5th Cir. 1998)); *see also generally Doe v. Jindal*, 2011 WL 3664496, *2 (M.D. La. Aug. 19, 2011) (unpublished); *Scott v. Livingston Parish Sch. Bd.*, 548 F. Supp. 2d 265, 266-67 (M.D. La. 2008).

B.     Analysis

"[F]or more than 40 years, it has been settled constitutional law that the Fourteenth Amendment protects a woman's basic right to choose an abortion." *Jackson Women's Health Organization v. Currier*, ___ F.3d ____, 2014 WL 3730467, *4, (5th Cir. July 29, 2014), Petition

for Rehearing *en Banc* pending, No. 13-60599 (5th Cir. August 13, 2014), citing *Roe v. Wade*, 410 U.S. 113, 153 (1973) (hereinafter "*Currier IV*"[15]). The Supreme Court has also held that this right can be regulated by a state consistent with the state's interest in protecting potential life and health as long as the regulation does not place an "'undue burden' on the basic right to terminate a pregnancy by abortion prior to the fetus's viability." *Id.,* citing *Planned Parenthood of S.E. Penn. v. Casey*, 505 U.S. 833, 877 (1992).

Act 620 attempts to regulate this right by requiring a physician who performs abortions to obtain active admitting privileges within thirty miles of the facility where the abortions are performed. The question before the Court is whether the Plaintiffs have shown a substantial likelihood of proving that enforcement of the Act will violate the Constitution's guarantee of due process or a woman's right to choose an abortion.

Plaintiffs' first challenge the statute on the basis that the 81 days given the doctors to apply for admitting privileges is simply not enough time to complete the application process before the September 1, 2014 effective date. Despite the attempt by the doctors to comply with the Act by applying for privileges, they will be in violation of the Act after September 1 and subject to its sanctions while their applications are still pending. This, they contend, is a denial of their right to due process.

Louisiana has no time limit for hospitals to act upon an application for admitting privileges. La. Rev. Stat. § 40:211(C) only requires that a doctor meet the "reasonable criteria for membership

---

[15] There are four *Currier* opinions. The District Court's decision granting a TRO,  2012 WL 2510953 (S.D. Miss. July 1, 2012) ("*Currier I*"); the District Court's granting of the preliminary injunction, 878 F.Supp.2d 714 (S.D. Miss. July 12, 2012) ("*Currier II*"); the District Court's granting plaintiffs' second Motion for Preliminary Injunction, 940 F. Supp. 2d 416 (S.D. MS April 15, 2013) ("*Currier III*") and *Currier IV,* __ F. 3d __, 2014 WL 3730467 (5th Cir. July 29, 2014) in which the Court of Appeal (Judge Garza, dissenting) affirmed but modified the District Court's preliminary injunction.

of a hospital," and 40:2114(E) only requires that hospitals "establish rules, regulations and procedures" for admitting privileges. The statute establishes no time limit for doing so.

Defendants do not contest Plaintiffs allegations that the process for applying for and receiving hospital admitting privileges varies from hospital to hospital and can last many months.[16] This means that the physician who has applied for privileges in an effort to comply with the law but whose application is still pending on September 1, 2014 will be subject to a fine of $4,000 per violation and possible loss or suspension of license if he continues to perform abortions after this date.

The Declarations in this case show that Drs. Doe 1, 2 and 4 have applied for active admitting privileges at hospitals within 30 miles of where they perform abortions. Dr. Doe 1 applied for admitting privileges at three nearby hospitals on June 17, July 25 and August 15, 2014 (Dr. Doe 1 Decl., Doc. 5-5, ¶ 6) and, as of the time of the hearing, had not received a formal response from any of the hospitals. Dr. Doe 2 applied for privileges at one nearby hospital on May 12, 2014 (Dr. Doe 2 Decl., Doc. 5-6, ¶ 7,) and another on an undisclosed date prior to his Declaration of August 21, 2014 (Dr. Doe Decl., Doc. 5-6, ¶ 8). As of the time of hearing, he had received no formal action on his applications. Dr. Doe 4 is not a plaintiff and has not provided a Declaration. However, according to the Declaration of Robert Gross, Dr. Doe 4 applied for active admitting privileges at Ocshner-Kenner Medical Center on August 4, 2014 and has received no response. (Gross Decl., Doc. 5-4, ¶ 5.) It is therefore impossible for these doctors, notwithstanding their best efforts, to comply with the law before the effective date of the statute.

---

[16] Attached to Plaintiffs' Application are the rules for granting admitting privileges at five separate hospitals, (Declaration of Kathleen Pittman, Doc. 5-3, p.1-112) as well as a summary of same (Doc. 5-9, p.1-8). These documents show that the process can last as long as 240 days or longer.

This issue was recently considered in *Planned Parenthood of Greater Texas Surgical Health Services v. Abbott*, 748 F.3d 583 (5th Cir. 2014), Petition for Rehearing *en Banc* pending, No. 13-51088 (5th Cir. April 10, 2014). There the Court considered the constitutionality of 2013 Texas House Bill No. 2 which, much like Act 620, required a physician performing or inducing an abortion to have admitting privileges at a hospital no more thirty miles from the location where the abortion was to be provided. Texas House Bill No. 2 offered a 100 day grace period within which to comply with the admitting privileges requirement. While the Court held that this grace period was sufficient on its face, it stated that:

> ...it would be absurd to enforce [Texas House Bill No. 2] against physicians who *timely* applied for admitting privileges but have not heard back from the hospital.\*\*\*Obviously, it would be unreasonable to expect that all abortion providers will be able to comply the admitting-privileges requirement within 100 days where receiving a response from a hospital processing an application for admitting privileges can take 170 days.[17] Accordingly, we conclude that, pursuant to [Texas House Bill No. 2]'s severability provision, the admitting privileges provision may not be enforced against abortion providers who applied for admitting privileges within the grace period allowed...but are awaiting a response from a hospital. *Abbott*, 748 F.3d at 600 (emphasis the Court's).

The Court in *Abbott* upheld the constitutionality of the Texas law but ordered that "it may not be enforced against abortion providers who timely applied for admitting privileges under the statute but are awaiting a response." *Abbott*, 748 F.3d at 604.

Defendant Kliebert concedes in her Declaration[18] that *Abbott* set forth "instructions regarding the proper enforcement of an admitting privileges law" and "instructed the government defendants

---

[17] TEX. HEALTH & SAFETY CODE, Section 241.101 sets a 170 day deadline by which hospitals must act on admitting-privileges applications. *Abbott*, 748 F.3d at 600. As stated above, Louisiana sets no such limit and the Declarations submitted show that the process can take as long as 240 days.

[18] Secretary Kiebert's initial Declaration (Doc. 25), pledging not to attempt to enforce Act 620 was filed on August 28, 2014, the morning of the TRO hearing. A second and more detailed Declaration (Doc 27) was filed after the hearing.

that they could not enforce the admitting-privileges law against a physician who applied for admitting privileges during the law's grace period but who had not yet received a response on that application before the effective date of the law." (Doc. 27, p. 3-4.) Defendant Dawson makes essentially the same statement in his Declaration. (Doc. 26, p. 2.)

The question before the Court is whether, under these circumstances, the Plaintiffs have carried their burden in establishing the four elements required in order for the Court to issue a TRO. The first element (whether there a substantial likelihood that plaintiffs will prevail on the merits) is easily met by turning to *Abbott*, *supra,* and the concessions of the parties regarding same. This is a case challenging the constitutionality of Act 620. In their Declarations, Defendants Kliebert and Dawson concede that Act 620 as applied against Drs. Doe 1, 2 and 4 or any other physician who has applied for active admitting privileges not yet acted upon would constitute a violation of the doctors' due process rights.

Thus, the Court finds that Plaintiffs have shown that irreparable injury would occur if the Act were enforced against them. It is well settled that, in cases challenging laws based on a violation of constitutional rights, once a constitutional violation is demonstrated, no further showing of irreparable injury need be shown. *Elrod v. Burns*, 427 U.S. 347, 373 (1976); *Deerfield Medical Center v. City of Deerfield Beach*, 661 F.2d 328, 338 (5th Cir. 1981); *Springtree Apartments, APLC v. Livingston Parish Council*, 207 F.Supp.2d 507, 515 (M.D. La. 2001).

Defendants argue, however,  that there is no *substantial threat* of irreparable harm to the doctors because they have pledged not to enforce Act 620 while the applications are pending. (Kliebert Decl., Doc. 27, p. 4; Dawson Decl., Doc. 26, p. 2.)

Plaintiffs counter first, that Secretary Kliebert's promise that DHH will not prosecute doctors for violations of Act 620 is an empty one since the Act only gives the DHH the right to prosecute

the *clinics* for hiring a doctor who is not admitted. The Act is silent as to who has the authority to pursue the *doctor* for this violation.[19] Furthermore, Secretary Kliebert's Declaration that DHH has the "primary" authority for enforcement of the Act does not preclude the possibility that some other State or local authority (who has made no pledge not to enforce) might attempt to enforce the Act against them.[20]

Defendant Dawson's assurances are more tentative than those of Kliebert. Dr. Dawson's Declaration does not pledge that the Board will not initiate proceedings to revoke or suspend the license of any doctor technically violating the statute while his or her application is pending. Rather, it states only that "[t]he Board does not have any current or planned administrative or enforcement action against any physician based on his compliance or non-compliance with Act 620." (Doc. 26, p. 2.)

A similar situation faced the Court in *Currier I* and *II*. There, a Mississippi abortion clinic and others challenged a Mississippi law that required, among other things, all doctors associated with an abortion clinic to have admitting and staff privileges at a local hospital. *Currier II*, 878 F.Supp.2d at 715.  Unlike the Louisiana statute under consideration, the Mississippi law gave Plaintiffs a "reasonable time" to comply. *Currier II* at 717. However, like here, various state officials

---

[19] Section A(1) states, in pertinent part, "Any outpatient abortion facility that knowingly or negligently employs, contracts with, or provides any valuable consideration for the performance of an abortion in an outpatient abortion facility by any person who does not meet the requirements of this Section is subject to having its license denied, non-renewed, or revoked by the Department of Health and Hospitals in accord with R.S. 40:2175.6." There is no comparable provision specifying who has the enforcement responsibility as regards the doctor and the fine of $4,000 per violation. Section A(2)(c).

[20] During the TRO hearing, the Court suggested that Secretary Kliebert might clarify this issue and give greater reassurance to the Plaintiffs if she were to represent that DHH was the sole authority to enforce Act 620. Secretary Kliebert's second Declaration did not do that, only saying  that DHH had the "primary" enforcement authority.

gave assurances that the Plaintiffs would not be prosecuted at the time of the proceedings. *Currier II*, at 716.

Under these circumstances, the Court found that there was an "imminent threat" of a Constitutional violation and granted a limited TRO:

> Defendants, while saying that they will not prosecute now, have never promised to abstain from future prosecution for the days of non-compliance that will begin when the Act takes effect.***Given the highly charged political context of this case and the ambiguity still present, the Court finds that there would be a chilling effect on the Plaintiffs' willingness to continue to operate the Clinic until they obtained the necessary privileges. Therefore, an irreparable injury currently exists. *Currier II* at 719.

The Court finds that a very similar situation exists in this case. Secretary Kliebert's Declaration does not promise to abstain from future prosecution for days of non-compliance that would begin on September 1, 2014. Rather, her Declaration states, "I have no intention of enforcing the Act against the physicians in this matter *until their admitting-privileges have been acted on finally by the respective hospitals. Only at that time, and not before, will I instruct the Department to enforce the Act against physicians in this position*." (Doc. 27, p. 4, emphasis added.)

Defendant Dawson's affidavit does not promise to abstain from initiating proceedings to revoke or suspend the doctors' licenses; rather, he only says that there are no "current or planned" actions underway at this time. (Doc. 26, p. 2.)

The Plaintiffs have also clearly proved the remaining two elements. Exposing the Plaintiffs to potential fines of $4,000 per violation and possible loss of license outweighs any possible injury to Defendants from maintaining the status quo. This is especially true given the assurances made by the Defendant Kliebert that she does not intend to enforce Act 620 while applications are pending and that of Dr. Dawson who states the Board has no present intention to pursue disciplinary action. *Currier II*, at 720. Finally, the grant of this injunction will not disserve the public interest since this

element is generally considered met when the injunction is designed to protect against a constitutional violation. *Currier II*, at 720.

Under the facts presented, the Court finds that a temporary restraining order is needed to avoid placing Plaintiffs "between the Scylla of flouting state law and the Charybdis of foregoing what (they believe) to be constitutionally protected activity in order to avoid being enmeshed in...a criminal proceeding." *Concerned Citizens v. Sills*, 567 F. 2d 646, 651 (5th Cir. 1978) (citing *Wooley v. Maynard*, 430 U.S. 705, 710 (1977), quoting *Steffel v. Thompson*, 415 U.S. 452, 462 (1974)). The Application for TRO is therefore granted to the limited extent that Plaintiffs will not be subject to the risk of the fines and sanctions called for or allowed under the Act now or in the future for performing abortions without the relevant admitting privileges during the application process. This will maintain the status quo since Defendants do not now contemplate or intend to enforce the Act while Plaintiffs pursue the application process. Plaintiff doctors will continue to pursue their applications and will be permitted to operate lawfully while doing so.

But Plaintiffs argue that the TRO should be granted for broader reasons as well. They argue that if, as they fear, the doctors' applications are denied, the effect will be to place an "undue burden" on the rights of their patients to get an abortion by creating "substantial obstacles" to the exercise of those rights thus rendering the statute unconstitutional as applied. Specifically, Plaintiffs argue that this would result in an unconstitutional denial of the right of women in this state to choose to have an abortion. In support of that position, Plaintiffs point to the recently decided *Currier IV*, *supra*, finding Mississippi's admitting-privileges requirement placed an undue burden on a woman's right to an abortion and was therefore unconstitutional.

In support of this contention, Plaintiffs argue that the denial of the applications will "either drastically reduce or completely eliminate the availability of legal abortion in the state..." (Rec. Doc

5-1, p. 22); that enforcement "will result in every doctor currently providing abortions at a clinic in Louisiana to stop providing those services..." (Rec. Doc. 5-1, p. 6) and that "no other doctor in Louisiana would be able to provide abortion services as of September 1..." (Rec. Doc 5-1, p. 18). Plaintiffs contend that enforcement would result in "the majority if not all" of the abortion clinics in Louisiana being unable to render services (Rec. Doc. 5-1, p. 25) and that this would "effectively eliminate all access to legal abortions in Louisiana" (Rec. Doc. 5-1, p. 26).

The Court finds that the evidence currently before it cannot carry the weight of these allegations. It is possible that the applications of one or more of the doctors will be granted. The Plaintiffs could not point out to the Court any constitutional violation that would exist if the applications of Drs. 1, 2 and 4 were granted. Because the applications of the doctors have not been acted upon at this time, the Court believes any undue burden that might occur if they were denied is speculative. While the doctors point to some preliminary indications that their applications may not be granted,[21] the Court finds this evidence insufficient to carry their burden.

In *Currier IV*, unlike the present case, the preliminary injunction based on potential 14th Amendment violations was granted and affirmed at a time when the hospitals at which all seven doctors had applied for privileges had *denied* their applications. *Currier IV*, 2014 WL 3730467 at *2. Here, none of the applications have been denied.

Furthermore, even if the applications of all Plaintiffs doctors were to be denied in this case, the overall impact on the right of women to have an abortion in Louisiana is unclear. According to Plaintiffs' Application, the Plaintiffs' facilities are only three of five which operate in Louisiana. (Decl. of Kathaleen Pittman, Doc. 5-3, p. 3,¶ 7.) How many patients do these other two facilities treat? How many doctors practice there? How many of these doctors have applied for admitting

---

[21] See, e.g. Dr. Doe 1 Decl. ¶ 7, Doc. 5-5, *2-3

privileges and what is the status of their applications? If these other two facilities remain open (or don't), what would be the overall effect in terms of the time and distance patients would need to travel in order to receive their care? This, and other information not currently before the Court, would be relevant in measuring the impact on the Constitutional right. *See, e.g. Abbott*, 748 F.3d 583 (5th Cir. 2014). Based on the record before it at this time, the Court finds that Plaintiffs have not shown a substantial likelihood of success on this ground.

For the reasons stated above, IT IS ORDERED that

1.  The Motion to Dismiss filed by Defendant Attorney General James David Caldwell is hereby **GRANTED** and Louisiana State Health Officer and Medical Director, Dr. Jimmy Guidry, is hereby **DISMISSED.**

2.  The Plaintiffs' Application for Temporary Restraining Order is GRANTED to the extent that any enforcement of § A(2)(a) of Act 620, amending La. R.S. 40:1299.35.2, is enjoined until a hearing is held for the purpose of determining whether a preliminary injunction should issue. Plaintiffs will continue to seek admitting privileges. The Act will be allowed to take effect but Plaintiffs will not be subject to the penalties and sanctions allowed in the statute at this time or in the future for practicing without the relevant admitting privileges during the applications process. Plaintiffs will be allowed to operate lawfully while continuing their efforts to obtain privileges.

3.  Plaintiffs' Application for a Preliminary Injunction will remain pending. All parties indicated at the TRO Hearing that, if a TRO was granted, additional time was needed to conduct discovery and prepare for the hearing on the preliminary injunction. Thus, in accordance with Fed. R. Civ. P. 65(b)(2), a status conference will be set no later than 30 days hence for the purpose of receiving a status report regarding the pending applications for admitting

privileges, determining the amount of time needed by the parties to prepare for the hearing on the preliminary injunction, setting a date for the preliminary injunction hearing, discussing the scope of the issues and nature of the proof which will be presented and discussing all additional issues which the parties and the Court deem relevant. The Court understands that the events in this case are fluid. Should circumstances change, the parties are free to seek any other relief as they may deem appropriate.

4.      Given the nature of the relief sought and because there is no risk of monetary loss to the defendant by virtue of the granting of this injunction, it is unnecessary for Plaintiffs to post a bond in this matter.

Baton Rouge, La., this 31 day of August, 2014.

_____
JOHN W. deGRAVELLES, JUDGE
UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF LOUISIANA