UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF LOUISIANA

JUNE MEDICAL SERVICES LLC, et al.,
                        *Plaintiffs,*

v.

                                              No. 14-cv-525-JWD-RLB

KATHY KLIEBERT,  et al.,
                        *Defendants*

---

**DEFENDANTS' MEMORANDUM IN OPPOSITION TO PLAINTIFFS'
MOTION FOR PRELIMINARY INJUNCTION**

Don S. McKinney (La. Bar No. 26685)
Philip O. Bergeron (La. Bar. No. 2988)
ADAMS AND REESE LLP
4500 One Shell Square
New Orleans, LA  70139
Main: 504.581.3234
Direct:  504.585.0134
Cell:  504.813.9662
Fax:  504.566.0210
Email:  don.mckinney@arlaw.com

*Counsel for Defendant Dr. Mark Henry
Dawson, in his official capacity as President
of the Louisiana Board of Medical
Examiners*

S. Kyle Duncan (La. Bar No. 25038)
DUNCAN PLLC
1629 K Street NW, Suite 300
Washington, DC 20006
Phone: 202.714.9492
Fax: 571.730.4429
Email: kduncan@duncanpllc.com

J. Michael Johnson
KITCHENS LAW FIRM, APLC
2250 Hospital Drive
Beene Office Park, Suite 248
Bossier City, LA 71111
Phone: 318.658.9456
Email: mjohnsonlegal@gmail.com

*Counsel for Defendant Kathy Kliebert, in her
official capacity as Secretary of the
Louisiana Department of Health and
Hospitals*

TABLE OF CONTENTS

Table of Authorities ...................................................................................iii

Factual and Procedural Background ............................................................ 1

Legal Standard ........................................................................................... 2

Argument ................................................................................................... 4

   I.    Plaintiffs are not substantially likely to succeed on the merits. ....................... 4

        A.    The Fifth Circuit has already decided that admitting privileges laws identical to Act 620 are medically reasonable. .............................. 4

        B.    Plaintiffs' claim that Act 620 has an unlawful purpose fails as a matter of law. .................................................................................... 4

        C.    Plaintiffs have failed to clearly show that Act 620 will likely impose an undue burden on women's access to abortion. ...................... 5

                1.    Plaintiffs have not demonstrated that abortion physicians in general, or any physician in particular, are unlikely to obtain qualifying privileges. ........................................................ 6

                2.    Plaintiffs have not demonstrated that any difficulty in getting admitting privileges is likely attributable to the Act. ..................................................................................... 13

                3.    Even assuming any reduction in abortion availability is attributable to the Act, plaintiffs have not shown that the reduction will likely amount to an undue burden. ..................... 19

        D.    The remaining equitable factors do not favor a preliminary injunction. ............................................................................................ 26

Conclusion ................................................................................................. 27

Certificate of Service ................................................................................. 29

**EXHIBITS**

Excerpts from deposition of Dr. John Doe #5 [CONFIDENTIAL / NOT FILED ELECTRONICALLY] .............................................................................. 1

Excerpts from deposition of Dr. John Doe #4 [CONFIDENTIAL / NOT FILED ELECTRONICALLY]...................................................................................... 2

Declaration of Dr. Tumulesh K.S. Solanky ................................................... 3

Excerpts from Touro Infirmary By-Laws .................................................... 4

TABLE OF AUTHORITIES

**Cases**

*Anderson v. Jackson,*
  556 F.3d 351 (5th Cir. 2009) ..................................................... 3

*Greenville Women's Clinic v. Bryant,*
  222 F.3d 157 (4th Cir. 2000) ................................................... 21

*Greenville Women's Clinic c. Comm'r,*
  317 F.3d 357 (4th Cir. 2002) ..................................................... 9

*Gonzales v. Carhart,*
  550 U.S. 124 (2007) ................................................... 3, 4, 5, 23

*Harris v. McRae,*
  448 U.S. 297 (1980) ............................................................ 13, 25

*Jackson Women's Health Org. v. Currier,*
  760 F.3d 448 (5th Cir. 2014) ........................................ 5, 24, 27

*K.P. v. LeBlanc,*
  729 F.3d 427 (5th Cir. 2013) ........................................... 13, 25

*Ledet v. Fischer,*
  548 F.Supp. 775 (M.D. La. 1982) ........................................... 3

*Maryland v. King,*
  137 S.Ct 1 (2012) .................................................................. 27

*Mazurek v. Armstrong,*
  520 U.S. 968 (1997) ............................................................... 3

*Planned Parenthood of Greater Tex. Surgical Health Servs. v. Abbott,*
  734 F.3d 406 (5th Cir. 2013) ..................................... passim

*Planned Parenthood of Greater Tex. Surgical Health Servs. v. Abbott,*
  748 F.3d 583 (5th Cir. 2014) ..................................... passim

*Planned Parenthood of Se. Pa. v. Casey,*
  744 F.Supp. 1323 (E.D. Pa. 1990) .................................... 21, 25

*Planned Parenthood of Se. Pa. v. Casey,*
  505 U.S. 833 (1992) ............................................... 4, 5, 21

*Planned Parenthood of Wisconsin, Inc. v. Van Hollen*,
   738 F.3d 786 (7th Cir. 2013) ............................................................. 9, 10, 24

*Vaughn v. St. Helena Parish Police Jury*,
   192 F.Supp.2d 562 (M.D. La. 2001) ...................................................... 2

*Washington v. Glucksberg*,
   521 U.S. 702 (1997) ................................................................................ 4

*Wisconsin Right to Life v. F.E.C.*,
   546 U.S. 410 (2006) ................................................................................ 3

*Women's Medical Ctr. of N.W. Houston v. Bell,*
   248 F.3d 411 (5th Cir. 2001) ................................................................. 2

**Statutes**
42 U.S.C. § 300a-7(c) ................................................................................. 10

La. Rev. Stat. § 40:1299.35.2 ..................................................................... 1

**Rules**
Fed. R. Civ. P. 10 ....................................................................................... 4

**Treatises**
11A Wright, Miller, & Kane, Federal Practice and Procedure § 2948 ........................ 3

**Other Authorities**
National Abortion Federation, *Having an Abortion? Your Guide to Good Care* ......... 9

U.S. Dep't of Commerce, U.S. Census Bureau Factfinder, *available at:*
   http://factfinder.census.gov/faces/tableservices/jsf/pages/productview.xhtm
   l?src=bkmk ............................................................................................. 26

U.S. Dep't of Commerce, United States Summary 2010, Population and
   Housing Counts, *available at:* http://www.census.gov/prod/cen2010/cph-2-
   1.pdf ...................................................................................................... 26

**FACTUAL AND PROCEDURAL BACKGROUND**

1. Plaintiffs are three Louisiana outpatient abortion clinics and two physicians who provide abortions at those clinics. Doc. 14 at 3-4.[1] On August 22, 2014, they filed suit challenging the Louisiana admitting privileges law, Act 620 ("Act 620" or the "Act") (codified at La. Rev. Stat. § 40:1299.35.2), which requires physicians to obtain "active admitting privileges" at a hospital within 30 miles of the facility where abortions are performed. Doc. 1, 14. Plaintiffs claim the Act is unconstitutional because it imposes a "medically unnecessary" requirement which has the "unlawful purpose and effect of imposing an undue burden on women's right to choose abortion before viability." Doc. 14, ¶¶ 25, 41. They seek declaratory and preliminary injunctive relief. *Id.* at 10; Doc. 5-1.

2. On August 31, 2014, the Court issued a temporary restraining order enjoining enforcement of the Act against those physicians who had privileges applications pending at hospitals as of the Act's September 1, 2014 effective date. Doc. 31.

3. On September 19, 2014, another set of plaintiffs sued and moved to consolidate with the original lawsuit. Doc. 1, 2, 5 (No. 14-597). These plaintiffs ("the Women's Health Plaintiffs") represented the remaining two outpatient abortion clinics in Louisiana (Women's Health Care Center and Delta Clinic) and two

---

[1]   Those plaintiffs (sometimes referred to as the "original plaintiffs") are Hope Medical Group for Women ("Hope"), Bossier City Medical Suite ("Bossier"), and Causeway Medical Clinic ("Causeway"). Over Defendant Kliebert's objection, the plaintiff physicians have been allowed to proceed anonymously. Doc. 24. The two original plaintiff physicians are proceeding as John Doe 1 and 2 ("Doe 1" and "Doe 2"). Two additional physicians affiliated with the plaintiff clinics but not named as plaintiffs are Doe 3 and Doe 4.

physicians (Doe 5 and Doe 6) who provide abortions there. Doc. 5-1 (No. 14-597), at 4. The Court consolidated the lawsuits on September 24, 2014. Doc. 39.

4. On November 3, 2014, the Court issued an order clarifying the scope of the August 31 TRO, and also granting the Women's Health Plaintiffs leave to move for a TRO. Doc. 57. On November 6, the Court established a briefing schedule and set the TRO for hearing on December 16. Doc. 60. Before briefs were filed, however, the Women's Health plaintiffs moved to voluntarily dismiss their claims on December 5, Doc. 70, which the Court granted on December 11. Doc. 77. On January 15, 2015, the Court further clarified that the August 31 TRO was unaffected by the dismissal of the Women's Health Plaintiffs. Doc. 84.

5. The parties engaged in extensive discovery during December 2014 and January 2015. Trial on the original plaintiffs' motion for preliminary injunction is scheduled to begin on March 30, 2015.

## Legal Standard

1. To obtain a preliminary injunction, plaintiffs must show: (1) they are substantially likely to succeed on the merits; (2) absent the injunction, there is a significant risk of irreparable harm; (3) the balance of hardships weighs in their favor; and (4) granting the preliminary injunction will not adversely affect the public interest. *Vaughn v. St. Helena Parish Police Jury*, 192 F.Supp.2d 562, 575 (M.D. La. 2001) (citing *Women's Medical Ctr. of N.W. Houston v. Bell,* 248 F.3d 411, 419 (5th Cir. 2001)).

2. "[T]he burden of proving the unconstitutionality of abortion regulations falls

2

squarely on the plaintiffs." *Planned Parenthood of Greater Tex. Surgical Health Servs. v. Abbott*, 748 F.3d 583, 597 (5th Cir. 2014), *reh'g en banc denied*, 769 F.3d 330 (5th Cir. 2014) ("*Abbott II*"). Here, plaintiffs' burden is especially onerous.

a. First, a preliminary injunction is "an extraordinary and drastic remedy which should not be granted unless the movant clearly carries the burden of persuasion on all four (4) pre-requisites[.]" *Ledet v. Fischer*, 548 F.Supp. 775, 784 (M.D. La. 1982) (citations omitted); *see also, e.g., Anderson v. Jackson,* 556 F.3d 351, 360 (5th Cir. 2009) (movant must "clearly carr[y]" burden to obtain "extraordinary and drastic remedy" of preliminary injunction). This heavy burden applies when plaintiffs seek to enjoin regulations that may impact abortion access. *See Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (in challenge to requirement that abortion providers be licensed physicians, observing that "'a preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion'") (quoting 11A Wright, Miller, & Kane, Federal Practice and Procedure § 2948, pp. 129-30 (2nd ed. 1995)).

b. Second, the Fifth Circuit has upheld on its face an identical admitting privileges requirement in Texas. *See Abbott II*, 748 F.3d at 593-600. Consequently, only an as-applied challenge is open to plaintiffs. *See, e.g., Wisconsin Right to Life v. F.E.C.*, 546 U.S. 410, 411-12 (2006) (distinguishing facial from as-applied challenges). This requires plaintiffs to show that application of the Act "in discrete and well-defined instances" will unduly burden women's access to abortion. *Gonzales v. Carhart*, 550 U.S. 124, 167 (2007).

ARGUMENT

## I.   PLAINTIFFS ARE NOT SUBSTANTIALLY LIKELY TO SUCCEED ON THE MERITS.

For numerous reasons, plaintiffs have failed to clearly show they are substantially likely to succeed on the merits of any of their claims.[2]

### A.   The Fifth Circuit has already decided that admitting privileges laws identical to Act 620 are medically reasonable.

1. Plaintiffs' claims that Act 620 is medically unreasonable, *see* Doc. 5-1, at 9, 17, 19; Doc. 14, ¶ 25, are foreclosed by Fifth Circuit law. *See Abbott II*, 748 F.3d at 593-96. Therefore, Defendants have simultaneously moved for partial summary judgment on this claim. For the reasons stated in that motion, plaintiffs' claims that the Act is unreasonable cannot serve as a basis for a preliminary injunction.

### B.   Plaintiffs' claim that Act 620 has an unlawful purpose fails as a matter of law.

1. Plaintiffs' claim that Act 620 has the unlawful purpose of impeding access to abortion, Doc. 14, ¶ 14, also fails as a matter of law. The text and legislative history of Act 620 demonstrate that it was passed with the legitimate purpose of safeguarding patient safety by regulating the credentials of physicians who provide abortions in outpatient clinics. *See, e.g., Gonzales*, 550 U.S. at 157 ("There can be no doubt the government 'has an interest in protecting the integrity and ethics of the medical profession.'") (quoting *Washington v. Glucksberg*, 521 U.S. 702, 731 (1997)); *Planned Parenthood of Se. Pa. v. Casey*, 505 U.S. 833, 846 (1992) (part of *Roe*'s

---

[2]   Pursuant to Federal Rule of Civil Procedure 10(c), defendants hereby incorporate by reference all pleadings (and exhibits thereto) filed in opposition to the original plaintiffs' motion for temporary restraining order.

"essential holding" is "the principle that the State has legitimate interests from the outset of the pregnancy in protecting the health of the woman"). Moreover, the Fifth Circuit has twice recognized that substantively identical privileges laws in other states further "the desirable protection of abortion patients' health," validly "regulate the medical profession by heeding … patient-centered concerns," and legitimately "'assist in preventing patient abandonment.'" *Abbott II*, 748 F.3d at 594-95; *Jackson Women's Health Org. v. Currier*, 760 F.3d 448, 454 (5th Cir. 2014) ("*JWHO*") (quoting *Abbott II*, 748 F.3d at 594-95). Since plaintiffs have failed to raise any genuine factual issue as to the legislative purpose of Act 620, Defendants have simultaneously moved for summary judgment on this claim. For the reasons stated in that motion, plaintiffs' claims are foreclosed as a matter of law and cannot serve as a basis for a preliminary injunction.

### C.   Plaintiffs have failed to clearly show that Act 620 will likely impose an undue burden on women's access to abortion.

Plaintiffs' principal claim is that Act 620 will have the *effect* of imposing an undue burden on women's access to abortion. *See Gonzales*, 550 U.S. at 146 (undue burden exists if regulation's "'effect is to place a substantial obstacle in the path of a woman seeking [a pre-viability] abortion'" (quoting *Casey*, 505 U.S. at 878)). The premise of this claim is that, because of the plaintiff physicians' alleged difficulty in obtaining admitting privileges, the Act will force some or all of Louisiana's abortion clinics to close and thereby "either drastically reduce or completely eliminate the availability of legal abortion in [Louisiana]." Doc. 5-1, at 17; *see also id.* at 21 (asserting the Act "will effectively eliminate all access to legal abortion in

Louisiana"). For three separate reasons, plaintiffs have not clearly shown a substantial likelihood of success on this claim.

1.    *Plaintiffs have not demonstrated that abortion physicians in general, or any physician in particular, are unlikely to obtain qualifying privileges.*

a. The basic factual premise of plaintiffs' claim is that physicians who provide abortions in Louisiana will not be able to obtain admitting privileges that meet the Act's requirements. Plaintiffs, however, have not made any showing—much less the clear showing required for a preliminary injunction—that those physicians in general, or any physician in particular, are unlikely to obtain privileges.

b. The record shows six identified physicians in Louisiana (known for purposes of this litigation as Does 1-6) who provide abortions in five outpatient abortion clinics. *See* Doc. 5-1, at 4-5 (identifying Does 1-4, who provide abortions at the Hope, Bossier, and Causeway clinics); Doc. 5-1 (No. 14-597), at 4 (identifying Does 5 and 6, who provide abortions at the Women's and Delta clinics).

i. Two of those physicians—Doe 3 and Doe 5—already have privileges that qualify under the Act. Doe 3's affidavit states that he "currently h[as] privileges at Willis-Knighton Bossier City and Christus Schumpert hospitals, both of which are within 30 miles of Hope." Doc. 5-7, ¶ 6. Doe 5's affidavit states that he "ha[s] been granted admitting privileges at Touro Infirmary" and therefore "will be able to continue providing abortion services at Women's Clinic." Doc. 5-4 (No. 14-597), ¶ 19; *see also* Doc. 5-3 (No. 14-597), ¶ 34 (clinic administrator statement that "Dr. Doe 5 has received a response from Touro Infirmary that the hospital is granting him admitting privileges"). Confirming that, a chart submitted by Doe 5's counsel in

October 2014 states he was granted "Courtesy Admitting Privileges" at Touro on July 30, 2014. Doc. 51, at 2. Touro's by-laws provide that "courtesy" medical staff have admitting privileges.[3] In his deposition, Doe 5 further confirmed that he "do[es] currently have privileges here in New Orleans … at Touro Hospital." Ex. 1, at 6.[4]

   ii. Furthermore, three of those physicians—Doe 3, Doe 4, and Doe 6—have previously held admitting privileges while providing outpatient abortion services. Doe 3 held privileges at University Hospital, also within 30 miles of Hope, until "[a]pproximately three years ago." Doc. 5-7, ¶ 8. Doe 4 held privileges at four Baton Rouge area hospitals, apparently for several decades. Ex. 2, at 3-5.[5] Doe 6, "from approximately 1973 to 2005, … had admitting privileges at various hospitals in New Orleans, including Tulane University Hospital, Hotel Dieu Hospital, and Methodist Hospital." Doc. 5-5 (No. 14-597), ¶ 13.

---

[3]   Touro divides medical staff into "Active," "Courtesy," and "Honorary" categories. Ex. 4, § 4.1. Both "Active" and "Courtesy" staff have admitting privileges, whereas "Honorary" staff do not. *See id.* § 4.1.1.2.1 (Active staff may "[a]dmit, treat or perform services on Hospital and clinic patients"); *id.* § 4.1.2 ("Courtesy Medical Staff … shall have admission privileges, but may not vote and may not hold office."); *id.* § 4.1.2.2.1 (Courtesy staff have "[a]dmitting privileges and performance of procedures … restricted to a maximum of eleven [11] patient contacts per year of appointment."); *id.* § 4.1.3.2 ("Members of the Honorary Medical Staff … shall not have privileges to admit or treat patients in Touro Infirmary[.]")

[4]   Doe 5's deposition is marked "Confidential – Subject to Protective Order." Therefore, in accordance with the agreed Protective Order in this case, defendants have not electronically filed Exhibit 1, which contains those deposition excerpts. Instead, defendants will provide hard copies of Exhibit 1 to the Court and to opposing counsel (as well as courtesy copies by separate email) via mail. Additionally, because of the compressed discovery schedule, defendants are able to refer only to uncorrected copies of the deposition transcripts. If witnesses provide corrected copies of the transcripts that affect the referenced material, defendants will provide corrected excerpts to the Court and to opposing counsel.

[5]   Doe 4's deposition is also marked "Confidential – Under Protective Order" and will be treated in the same way as Doe 5's deposition excerpts, *supra. See supra* note 4.

iii. Finally, five of those physicians (the four who currently do not have privileges, as well as Doe 5) have privileges applications pending at qualifying hospitals that have not yet been acted on. *See* Docs. 50, 51 (plaintiffs' charts reflecting status of privileges applications); *see also* Doc. 5-1, at 6 ("Each of Plaintiffs clinics' doctors who do not have privileges has at least one application pending at hospitals within 30 miles of their practice."). The Act may not be enforced against those physicians under the existing TRO. *See* Doc. 31, 57, 84.

c. In light of all this, plaintiffs have not clearly established the most basic factual predicate for their claim—namely, that abortion physicians in general, or any physician in particular, will be unable to obtain qualifying privileges.

i. The plaintiff physicians have not claimed it is impossible for them to obtain privileges.[6] Nor could they, given that Does 3 and 5 *now* hold privileges, Does 4 and 6 previously held them, and Doe 3 previously held them at another hospital besides the ones where he holds privileges today. They assert only that hospitals "have broad discretion" to grant privileges, and that hospitals "may" consider factors such as faculty membership, lack of need, or expected admissions. Doc. 5-1, at 7-8; *see also id.* at 5-6 ("Hospitals generally have wide discretion as to both the criteria considered and the decisions made in the application process."). That is a far cry from clearly establishing that any particular physician is likely to be denied

---

[6]   Plaintiffs have claimed only that it is "impossible" to obtain privileges "*before [the Act's] September 1 effective date.*" Doc. 5-1, at 6 (emphasis added). But no plaintiffs are in danger of having the Act applied to them while privileges applications are pending. *See* Doc. 31 (TRO); *Abbott II*, 748 F.3d at 600 (concluding privileges requirement "may not be enforced against abortion providers who applied for admitting privileges within the [law's] grace period … but are awaiting a response from a hospital").

privileges. Plaintiffs cannot deny that abortion providers in other States have obtained privileges.[7] Moreover, the National Abortion Federation has advised that "abortion patients searching for a doctor should find one who '[i]n the case of an emergency' can 'admit patients to a nearby hospital (no more than 20 minutes away).'" *Abbott II*, 748 F.3d at 595 (quoting National Abortion Federation, *Having an Abortion? Your Guide to Good Care* (2000)). That recommendation would make little sense if abortion providers are generally unable to obtain admitting privileges.

ii. To be sure, some of the plaintiff physicians speculate they will be denied privileges. *See* Doc. 5-5, ¶ 7 (Doe 1 claiming he had been "advised" his application had "met with resistance" and speculating "this 'resistance' is based on my affiliation with Hope"); Doc. 5-7, ¶ 8 (Doe 3 claiming he "has learned" that University will deny privileges to non-faculty); Doc. 5-5 (No. 14-597), ¶ 12 (Doe 6 claiming he "was told" that Tulane would deny privileges because he had not held them since 2005). These statements are based on hearsay, however, and are not the clear proof required to meet plaintiffs' burden. *See, e.g., Abbott II*, 748 F.3d at 597 n.12 (noting "hearsay" statements that could not support plaintiffs' claim).

iii. In one instance, plaintiffs' speculation is contradicted by their own pleadings. Plaintiffs assert that Christus Schumpert is "unlikely" to grant privileges to abortion providers because it is a "Catholic hospital," *see, e.g.,* Doc. 5-1, at 7 n.4;

---

[7]   *See, e.g., Abbott II*, 748 F.3d at 598 ("In a number of areas in Texas, physicians who are performing abortions already have admitting privileges."); *Planned Parenthood of Wisconsin, Inc. v. Van Hollen*, 738 F.3d 786, 807 (7th Cir. 2013) (Manion, J., concurring) ("The notion that abortion doctors will be unable to obtain admitting privileges is a fiction. Some already have them."); *Greenville Women's Clinic c. Comm'r*, 317 F.3d 357, 362 (4th Cir. 2002) (noting the two appellant physicians "both have admitting privileges or arrangements with physicians who have admitting privileges").

Doc. 5-3, ¶ 24; *see also* Doc. 5-5 (No. 14-597), ¶ 11 (Doe 6 asserting "[i]n my experience" that hospitals "affiliated with the Catholic church … or with the State" will not grant privileges to abortion providers). But plaintiffs acknowledge that Doe 3 "currently" has privileges at Christus Schumpert while, at the same time, they acknowledge he has provided abortions at Hope since 1981. Doc. 5-7, ¶¶ 1, 7. Moreover, federal law prohibits hospitals receiving federal funds or grants from discriminating "in the extension of staff or other privileges" based on whether a physician performs abortions. *Abbott II*, 748 F.3d at 598 n.13 (quoting 42 U.S.C. § 300a-7(c)); *see also Van Hollen*, 738 F.3d at 791-92 (noting that "federal law prohibits hospitals that receive federal funding, including Catholic hospitals, from denying admitting privileges merely because a doctor performs abortions").

iv. In another case, Doe 5 admits he meets the qualifications for privileges at Women's Hospital in Baton Rouge, where he has an application pending, but states he is in the process of locating a "covering physician" in Baton Rouge to satisfy the hospital's residency requirement. Doc. 51, at 2 (application pending until Doe 5 locates covering physician); Doc. 5-4 (No. 14-597), ¶ 12-14 (discussing covering physician issue, but affirming that Women's Hospital "ha[s] indicated that my credentials are not an issue"). In his deposition, Doe 5 confirmed that he meets all qualifications for privileges at Women's, and that his application will remain pending there until he secures a covering physician. Ex. 1, at 9-10; *see note* 4, *supra* (confidential deposition excerpts to be provided separately).

v. Plaintiffs' principal basis for claiming an inability to obtain admitting

privileges rests on the idea that hospitals may require a minimum number of yearly patient admissions. *See, e.g.,* Doc. 5-1, at 8 (stating hospitals "may decide" to limit privileges to "doctors who will admit a minimum number of patients per year"). Yet plaintiffs are careful *not* to state that any of the relevant hospitals inflexibly require minimum admissions before granting privileges. *See, e.g., id.* (stating that plaintiffs cannot obtain privileges, but only "[t]o the extent that local hospitals will impose minimum admission requirements"). Their "vague and imprecise" assertions are based on hearsay and cannot satisfy the heavy burden of preliminary injunctive relief. *See, e.g.,* Doc. 5-3, ¶ 25 (assertion regarding minimum admission requirement based on "my experience and my conversations with hospital credentialing staff"); *see also Abbott II*, 748 F.3d at 597 ("vague and imprecise" findings cannot support undue burden finding)

vi. More importantly, the bylaws plaintiffs attach to their preliminary injunction motion fail to support their assertion that admission requirements will prevent them from gaining privileges. Indeed, the only by-law they actually cite does not mention "minimum admission requirements," but instead contains only a general requirement that the applicant agree "to use the Hospital sufficiently to allow continuing assessment of current competence." Doc. 5-1, at 8 n.6 (citing Willis-Knighton By-Laws, Doc. 5-3, Ex. 1, at 6). Moreover, even that requirement does not appear as one of the "threshold eligibility criteria" for clinical privileges, nor is it on the list of the factors considered in granting privileges. *See* Doc. 5-3, Ex. 1, § 1.A.2, pp. 1-3; *id.* § 4.A.1(d), (f), p. 20. Indeed, where by-laws *do* reference number of

admissions, they suggest that physicians with low admission expectations may qualify as "courtesy" staff that have admitting privileges. For instance, Christus Schumpert's by-laws describe a "Courtesy Category" of doctors who "only occasionally admit patients" (defined as 24 "patient encounters" or fewer). Doc. 5-3, Ex. 2, § 1.7(c), p. 4. That category, however, "shall be eligible to exercise such clinical privileges" granted by the Board, and the limitation on the number of patients "does not imply a limitation on admissions[.]" *Id.*; *cf. id.* § 1.7(d) (explaining that "Affiliate Staff member shall not be permitted to admit … or hold clinical privileges"). Similarly, Minden's by-laws recognize a "Courtesy Medical Staff" category for physicians who care for fewer than 25 inpatients but who nonetheless "shall have all privileges of Active Staff membership except that they may not hold office." Doc. 5-3, Ex. 4, Art. 3, Pt. D, § 3(a), p. 18. University Health's by-laws also establish a "Courtesy Staff" category for physicians who "admit less than 20 patients annually, [or] do not routinely admit patients," due to factors such as "practicing primarily … in an office-based specialty." Doc. 5-3, Ex. 5, § 4.4.1, p. 49. These courtesy staff categories are consistent with Doe 5's courtesy appointment at Touro, which allows him to exercise admitting privileges for a lower number of expected admissions. *See supra* note 3; Doc. 5-4 (No. 14-597), ¶ 19; Doc. 51, at 2.

vii. Finally, as explained *infra*, even assuming that a hospital's minimum admission requirement would pose an obstacle to some physicians obtaining privileges, the Fifth Circuit has made clear that such an obstacle is not attributable to the Act for purposes of the undue burden analysis. *See infra* 2.a.

2.       Plaintiffs have not demonstrated that any difficulty in getting
         admitting privileges is likely attributable to the Act.

As explained above, plaintiffs have not clearly shown they are unlikely to obtain admitting privileges in the first place. However, even assuming they could make such a showing, they must also clearly show that their inability to obtain privileges in any particular case is attributable to the Act itself, and not to factors unrelated to the Act. The record shows plaintiffs have not clearly made this distinct showing, which is an independent basis for denying preliminary injunctive relief.

a. While the State may not place substantial obstacles in the path of a woman's access to abortion, "it need not remove those obstacles … that are 'not of [the government's] own creation.'" *K.P. v. LeBlanc*, 729 F.3d 427, 442 (5th Cir. 2013) (alteration in original) (quoting *Harris v. McRae*, 448 U.S. 297, 316 (1980)). The Fifth Circuit has applied this basic principle to admitting privileges laws, ruling that certain difficulties clinics or physicians may face in complying with those laws are "unrelated to the … requirement" itself, but are instead due to other factors "not of the government's own creation." *See Planned Parenthood of Greater Tex. Surgical Health Servs. v. Abbott*, 734 F.3d 406, 415 & n.45 (5th Cir. 2013) (*Abbott I*); *see also Abbott II*, 748 F.3d at 599. For instance, if a clinic faces difficulties in recruiting new physicians to replace aging or retiring physicians, that difficulty cannot be attributed to the privileges law for purposes of undue burden analysis. *Abbott I*, 734 F.3d at 416. Or if a particular physician cannot be recruited or retained in a particular area because of a feared impact on his current employment, or because of his "fear[s] [of] anti-abortion violence," those also are not obstacles attributable to

13

the law itself. *Abbott II*, 748 F.3d at 599. Or, again, if a particular physician is unable to obtain privileges because of a hospital's alleged "minimum admissions requirement," that is also not attributable to the law. As the Fifth Circuit explained in *Abbott I* and *II*, the difficulty in that situation arises from the fact that "it is the practice of many abortion physicians to instruct their patients to seek care from an emergency room if complications arise." *Abbott II,* 748 F.3d at 599 (quoting *Abbott I*, 734 F.3d at 416). In other words, that medical practice creates the difficulty with meeting any admissions number, not the privileges law itself.

    b. Applying those principles here reveals that the difficulties plaintiffs allege in obtaining privileges, and any corresponding reduction in abortion access, arise from "various reasons unrelated to [Act 620]." *Abbott I*, 734 F.3d at 415.

    i. Doe 3—who, as discussed above, currently holds qualifying privileges at Willis-Knighton and Christus Schumpert—states in his affidavit that, if he becomes the only abortion provider with admitting privileges in Louisiana, he will stop providing abortions because he fears for his safety. *See* Doc. 5-7, ¶ 9 ("Out of fear for my personal safety, I have made the decision that I will no longer continue to provide abortions when the Act takes effect on September 1, 2014."); *see also* Doc. 5-1, at 12 (stating Doe 3 will stop providing abortions because he fears "anti-choice groups will drastically escalate their threats to his safety and his career"). No matter how sincere Doe 3's apprehensions are, however, they are not connected to the Act. *See Abbott II*, 748 F.3d at 599 (explaining that, where a doctor could not be recruited because he "feared anti-abortion violence," that obstacle was not

"connected to H.B. 2" for purposes of undue burden analysis); *see also Abbott I*, 734 F.3d at 415 (observing that there are "many factors other than the hospital-admitting-privileges requirement [that] would affect the availability of physicians to perform abortions"). This means that, should Doe 3 stop providing abortions, any resulting reduction in abortion access cannot be attributed to the Act for purposes of the undue burden analysis.[8]

ii. The Fifth Circuit has explained that difficulties in recruiting credentialed physicians are also not attributable to the law itself. *See Abbott II*, 748 F.3d at 599 (explaining that "difficulties in recruiting *new* physicians" were "almost entirely unrelated to H.B. 2"); *Abbott I*, 734 F.3d at 415 (explaining that difficulties in recruiting physicians to a particular area were "unrelated to the [privileges] requirement"). Here, the administrators of Hope, Bossier, and Causeway say nothing about whether they have attempted to recruit new physicians to meet the privileges requirement and, if they have, what those recruiting efforts were. By contrast, the administrator of Delta and Women's Health states that, "[d]ue to threats of violence, intimidation, and harassment, it is very unlikely that Women's Clinic or Delta Clinic would be able to find another physician who is willing to provide abortions[.]" Doc. 5-3 (No. 14-597), ¶ 14; *see also id.* ¶ 38 (stating that, "[d]ue to the hostile environment towards abortion providers, I have had difficulties in the past recruiting physicians"). Again, however, no matter how sincere those

---

[8]   Furthermore, as already discussed, Doe 5 has privileges at Touro. *See supra* I.C.1.b.i. Thus, the record refutes the suggestion that Doe 3 would remain the sole abortion provider in Louisiana with qualifying privileges.

statements are, the difficulty in recruiting credentialed physicians cannot be attributed to the Act itself. *Cf. Abbott II*, 748 F.3d at 599 (discussing testimony related to recruitment efforts). Moreover, the same administrator states that the available pool of recruitable physicians depends on the requests of Ob/Gyn or family medicine residents to receive abortion training. *See* Doc. 5-3 (No. 14-597), ¶ 15 (noting that "[s]uch training must be requested by a resident," who is then "ref[erred] to an abortion clinic for the training"). The number of residents who request such training—and the corresponding number of physicians the clinics can recruit—has nothing to do with the Act, however. *See Abbott I*, 734 F.3d at 415 (noting "many factors other than the [privileges] requirement that would affect the availability of physicians to perform abortions").

iii. Additionally, the record indicates that Doe 5's ability to obtain admitting privileges at Women's Hospital in Baton Rouge may turn, not on his qualifications, but on whether he can obtain a "covering physician." *See* Doc. 5-4 (No. 14-597), ¶ 13 (reporting difficulties in securing a "covering physician" to meet residency requirement); *id.* ¶ 14 (stating that Woman's Hospital has "indicated that my credentials are not an issue"); Doc. 51, at 2 (plaintiffs' chart indicating that, on June 26, 2014, Women's Hospital "inquired as to a covering physician on staff for Dr. Doe 5," but "to date, Dr. Doe 5 has been unable to secure a covering physician"). But just as a clinic's difficulty in recruiting new physicians is not caused by the Act, neither is a qualified physician's ability to obtain a covering physician. *See, e.g., Abbott II*, 748 F.3d at 599 (privileges law was "unrelated" to difficulty in recruiting new

16

physicians who "felt deterred by the terms of their existing employment"). Furthermore, the record shows that Delta Clinic already has a transfer agreement with a credentialed physician in Baton Rouge. Doc. 5-3 (No. 14-597), ¶ 21 (stating that "Delta Clinic has a transfer agreement with a trained Ob/Gyn in Baton Rouge who has admitting privileges at an area hospital"). Doe 5 alleges that physician is unwilling to serve as his covering physician because of concerns about "anti-abortion protesters." Doc. 5-4 (No. 14-597), ¶ 13. As already explained, such concerns cannot be attributed to the Act for undue burden purposes. *See Abbott II*, 748 F.3d at 599 (fears of anti-abortion violence not "connected" to a privileges law for undue burden purposes).

iv. Furthermore, a doctor's failure to adequately follow through in the privileges application process obviously cannot be attributed to the Act. In his deposition, Doe 5 admitted that he has not followed up on the progress of his privileges applications at two Baton Rouge area hospitals—Baton Rouge General and Lane Regional (in Zachary)—purely for reasons of personal preference. *See* Ex. 1, at 10-13; *see supra* note 4 (confidential deposition excerpts to be provided separately). It should go without saying that a failure to obtain privileges for reasons of that nature cannot be attributed to the Act for purposes of the undue burden analysis.

v. Finally, the Fifth Circuit has held that any alleged difficulties in meeting hospital admission requirements are not attributable to a privileges law but instead to the medical practices of clinics. *See Abbott II*, 748 F.3d at 599 (district court

finding that admission requirements were an obstacle to gaining privileges "proves little" because "'it is the practice of many abortion physicians to instruct their patients to seek care from an emergency room if complications arise'") (quoting *Abbott I*, 734 F.3d at 416). In this case, plaintiffs point to alleged admission requirements that will pose obstacles to their gaining privileges. *See, e.g.,* Doc. 5-1, at 8 (stating hospitals "may decide" to limit privileges to "doctors who will admit a minimum number of patients per year"). However, just as in *Abbott I* and *II*, patients experiencing post-abortion complications are often advised to seek care in emergency rooms. *See, e.g.,* Doc. 5-1, at 10 ("In the event that a patient does require post-procedure care at a hospital, patients typically are treated by the emergency room doctors on an outpatient basis and released."); Doc. 5-1 (No. 14-597), at 13 (observing that, "if complications arise, they can be and are safely and appropriately treated at a nearby E.R."); Doc. 5-4 (No. 14-597), ¶ 6 (Doe 5 statement that, "[i]n the event that a more serious complication arises after the patient has retuned home, we advise the patient to go to the nearest emergency room"); Doc. 5-5 (No. 14-597), ¶ 7 (Doe 6 statement that, "[i]n the event that a more serious complication arises after the patient has returned home, we advise the patient to go to the nearest emergency room"); Doc. 5-6 (No. 14-597) (letter from emergency physicians to Governor Jindal asserting that a woman experiencing post-abortion complications "can be appropriately treated by an emergency physician"). Consequently, even assuming that alleged minimum admission requirements would prevent plaintiffs from obtaining privileges, that obstacle could not be attributed to the Act itself.

> 3. *Even assuming any reduction in abortion availability is attributable to the Act, plaintiffs have not shown that the reduction will likely amount to an undue burden.*

Even if one assumes that (1) the plaintiff physicians currently without qualifying privileges are unlikely to obtain them, and (2) their inability to obtain privileges is likely attributable to the Act and not to other factors, plaintiffs still must clearly show that any resulting decrease in abortion access amounts to an undue burden on Louisiana women. *See, e.g., Abbott II*, 748 F.3d at 597 (even if privileges law has rational basis and valid purpose, plaintiffs could still prevail under *Casey* "if the effect of the law substantially burdened women's access to abortion in Texas").  Plaintiffs are highly unlikely to make this showing.

a. Plaintiffs' undue burden claim depends on their assertion that the operation of Act 620 "will effectively eliminate all access to legal abortion in Louisiana." Doc. 5-1, at 21. As already seen, however, two of the six identified abortion physicians in Louisiana (Does 3 and 5) currently have privileges. *See supra* I.C.1.b.i. Moreover, Doe 3's claim that he may stop providing abortions because of fears for his safety cannot be attributed to the Act for undue burden purposes. *See supra* I.C.2.b.i. Based upon their own evidence and testimony, then, the worst-case scenario for plaintiffs is that operation of the Act would leave credentialed abortion providers in Shreveport and New Orleans.

b. This is the same worst-case scenario—*i.e.*, that the Act would leave credentialed providers only in Shreveport and New Orleans—claimed by the plaintiffs in No. 14-597, before they voluntarily dismissed their claims. *See* Doc. 5-1,

at 1 (claiming that, "if allowed to be enforced, the challenged admitting privileges requirement will leave just two licensed clinics remaining in the entire state"); *id.* at 14 (claiming operation of the Act "will leave only two remaining licensed abortion clinics in all of Louisiana: one in Shreveport and one in New Orleans"); *id.* at 19 (claiming that the Act "would reduce abortion services in Louisiana by three-fifths, leaving only two licensed abortion clinics throughout the entire state"); *id.* at 22-23 (claiming that the Act "would leave only two licensed clinics, one [in] the northwest corner of the State and the other in South Louisiana"); *id.* at 25 (claiming the "practical effect" of the Act is "that three out of the five existing abortion clinics will be forced to close").

c. Assuming this worst-case scenario comes to pass, plaintiffs are unlikely to show it would amount to an undue burden on Louisiana women's access to abortion.

i. Relying on U.S. Census Bureau data showing the distribution of women in Louisiana as of 2013, a University of New Orleans statistician has calculated the average distance Louisiana women would have to drive to obtain an abortion under various hypothetical scenarios. *See* Decl. of Tumulesh K.S. Solanky, Ph.D. (Ex. 3), ¶¶ 6-7. Based on an assumption that the only clinics available to Louisiana women were in Shreveport and New Orleans, Dr. Solanky calculated that "the average distance to be traveled by all women residing in Louisiana is 82.7 miles, and, if we restrict to the women in the age group 15 to 44 years the average distance to be traveled is 82.0 miles." Ex. 3, ¶ 16(iii); *see also id.*, Table 1.[9]

---

[9]   Furthermore, even assuming the only available clinic was in New Orleans, Dr. Solanky calculated "the average distance to be traveled by all women residing in Louisiana is 138.7

ii. *Casey* indicates that an undue burden may not be premised solely on the costs and burdens associated with increased travel distances. In *Casey*, the Supreme Court emphasized that a law with a valid purpose—"one not designed to strike at the right itself"—does not impose an undue burden merely because it "has the incidental effect of making it more difficult or more expensive to procure an abortion." *Casey*, 505 U.S. at 874. More specifically, *Casey* upheld a 24-hour waiting period, *see id.* at 885-87, which required large numbers of women in Pennsylvania to make two trips of "at least one hour, and sometimes longer than three hours, to obtain an abortion from the nearest provider." *Planned Parenthood of Se. Pa. v. Casey*, 744 F.Supp. 1323, 1352 (E.D. Pa. 1990); *see also Abbott I*, 734 F.3d at 415 (observing that *Casey* found waiting period did not impose undue burden "despite the fact that it would require some women to make two trips over long distances"); *Greenville Women's Clinic v. Bryant*, 222 F.3d 157, 170 (4th Cir. 2000) (noting that *Casey* upheld waiting period despite lower court's finding that it "would especially burden women with the fewest financial resources, who had to travel long distances, and who needed to explain their absences to their husbands") (citing *Casey*, 505 U.S. at 886). Consequently, the Fifth Circuit has observed that "*Casey* counsels against striking down a statute solely because women may have to travel long distances to obtain abortions." *Abbott II*, 748 F.3d at 598.

iii. But even if *Casey* leaves open the possibility of plaintiffs' travel-based undue burden claim, binding Fifth Circuit precedent bars it under the particular

_____

miles, and if we restrict to the women in the age group 15 to 44 years the average distance to be traveled is 137.0 miles." Ex. 3, ¶ 16(ii); *see also id.*, Table 1.

circumstances presented here. In both *Abbott I* and *II*, the Fifth Circuit concluded that "an increase of travel of less than 150 miles for some women is not an undue burden under *Casey*." *Abbott II*, 748 F.3d at 598 (citing *Abbott I*, 734 F.3d at 415). *Abbott I* and *II* thus bar any conclusion that the travel distance most likely involved here—an average of 82 miles for Louisiana women aged 15-44—constitutes an undue burden.

d. Plaintiffs assume that the Act will leave Doe 3 the only remaining credentialed provider in Louisiana and, as a result, will leave "women in Louisiana's two largest cities—New Orleans and Baton Rouge" with "no access to an abortion provider within 200 miles." Doc. 5-1, at 23. Plaintiffs are incorrect.

i. Plaintiffs' argument is based on the mistaken premise that other abortion providers in Louisiana currently lack qualifying privileges. As already explained, however, Doe 5 admits he has privileges at Touro in New Orleans. *See supra* I.C.1.b.i. Doe 5 has also clarified that he meets the qualifications for privileges at Women's Hospital in Baton Rouge and that his application there will remain pending until he obtains a covering physician. *See supra* I.C.2.b.iii. Consequently, plaintiffs have not shown that their dire predictions about the Act's impact on abortion access in Louisiana will likely materialize. To the contrary, even the plaintiffs' worst-case scenario would leave providers with privileges in Shreveport and New Orleans hospitals, and likely an eventual provider with privileges in Baton Rouge. And none of this even accounts for the real possibility that other providers will obtain privileges when their applications are acted on, or that new, qualified

22

providers may enter the available market.

ii. Plaintiffs cannot possibly establish—much less *clearly* establish—that an average travel distance of 82 miles likely imposes an undue burden on Louisiana women seeking abortion. As discussed above, *Abbott I* and *II* foreclose the claim outright. Even if those decisions did not, however, plaintiffs would have to show in an as-applied challenge that such a distance is likely an undue burden "in discrete and well-defined instances." *Gonzales*, 550 U.S. at 167. They are highly unlikely to do so, however. Prior to passage of the Act, there were abortion clinics in only five of Louisiana's 64 parishes. *Cf. Abbott II*, 748 F.3d at 597 (observing that, "of the 254 counties in Texas only thirteen had abortion facilities *before* H.B. 2 was to take effect"). Thus, many Louisiana women were *already* traveling to obtain abortion services. Plaintiffs are silent on what percentage of their Louisiana-based patients typically travel and how far—but there seems little question that many do so, given the lack of clinics in large cities like Lake Charles, Lafayette, Alexandria, and Monroe. Plaintiffs do admit, however, that many of their patients are traveling from *outside* Louisiana. The administrator of the Hope clinic states that, in 2013, approximately 25% of Hope's patients traveled from Texas, Mississippi, and Arkansas, and that "[m]any of Hope's patients travel from more than 3-4 hours away to seek abortion services." Doc. 5-3, ¶¶ 9-10, 13. Likewise, the administrator of the Bossier and Causeway clinics states they serve women "who travel … from Texas, Mississippi, and Arkansas." Doc. 5-4, ¶ 7. Given that a significant percentage of patients are already traveling considerable distances from outside Louisiana to

obtain abortions—and given that some significant number of other women are traveling inside Louisiana to do so—it is highly unlikely that a travel distance of 82 miles places a "substantial obstacle" in the path of Louisiana women seeking abortion.

iii. Furthermore, even assuming hypothetically that only *one* clinic will remain open—say, in New Orleans via Doe 5's privileges, or in Shreveport via Doe 3's privileges—plaintiffs' undue burden claim would still likely fail. If only a New Orleans clinic were available, the average travel distance would still be 137 miles for women aged 15-44—below the 150-mile holding of *Abbott I* and *II*. If only the Shreveport clinic were available, the average travel distance would be 229.3 miles. *See* Ex. 3, Table 1. While that is somewhat above the *Abbott* line, *Abbott* does not suggest that *any* distance greater than 150 miles is *ipso facto* an undue burden, and plaintiffs would have to clearly show that it is here. Even in that case, however, there would be no obstacle to considering the availability of out-of-state clinics in Texas, Mississippi, and Alabama. The Fifth Circuit's decision in *JWHO*, 760 F.3d at 454, does not forbid consideration of out-of-state clinics under these circumstances. Rather, *JHWO* carefully limited its holding to the specific "factual context" where an admitting privileges law has the effect of "effectively closing the one abortion clinic in the state." *Id.* at 458. Thus, considering out-of-state clinics *in addition to* a remaining clinic in Louisiana would logically reduce any travel burdens even further. *See, e.g., Van Hollen*, 738 F.3d at 805 (Manion, J., concurring) (explaining that, "to the extent the remaining [Wisconsin] clinics are unable to quickly adjust

for the decreased supply of legally qualified abortion doctors, most Wisconsin women seeking abortions can travel to clinics in Illinois," and "women living in the northern part of Wisconsin can seek abortions in Minnesota").

iv. Plaintiffs also suggest that the relative poverty of women in Louisiana should be taken into account in assessing the Act's impact on abortion access. *See, e.g.,* Doc. 5-1, at 13 (claiming the Act's impact is "particularly significant obstacles for low-income women"). They are mistaken. The Supreme Court has already held that indigency is not a factor attributable to the government in the undue burden analysis. *See K.P.*, 729 F.3d at 442 (explaining that "indigency" was "described in *Harris v. McRae* as an obstacle for which the government is not responsible") (citing *Harris*, 448 U.S. at 316). *Casey* itself upheld a 24-hour waiting period, despite the district court's explicit finding that the law would be "particularly burdensome to those women who have the least financial resources." *Casey*, 744 F.Supp. at 1352 (finding #199). Finally, *Abbott I* held that visa checkpoints preventing non-citizen women from traveling to a clinic were an "obstacle … unrelated to the hospital-admitting-privileges requirement." 734 F.3d at 415 (citing *K.P.*, 729 F.3d at 442)). In light of that, travel burdens caused by a woman's particular financial or personal situation also cannot be attributed to the Act for undue burden purposes.

v. Finally, plaintiffs emphasize that, in *Abbott II*, the Fifth Circuit pointed out that "all of the major Texas cities" continue to have clinics where physicians "will have or obtain hospital admitting privileges." *Abbott II*, 748 F.3d at 598; *see* Doc. 5-1, at 20-21, 22. That is of little significance here. As already explained,

plaintiffs are mistaken about the likely impact of Act 620 in Louisiana: even the worst-case scenario for plaintiffs will leave providers in Shreveport and New Orleans, and likely also in Baton Rouge. More to the point, Louisiana is not Texas. Louisiana has an estimated population of 4.6 million and a land mass of about 52,000 square miles. By contrast, Texas has an estimated population of 26.9 million and a land mass of about 269,000 square miles.[10] Plaintiffs' comparison thus proves nothing other than that Texas is a vast state with over five times the population and land mass of Louisiana.

### D.   The remaining equitable factors do not favor a preliminary injunction.

1. Plaintiffs claim that they and their patients will be irreparably harmed by enforcement of the Act because it will result in the "elimination of abortion" in Louisiana. Doc. 5-1, at 24. Plaintiffs are mistaken: even assuming *none* of the pending physician applications are accepted, that would still leave abortion providers with admitting privileges at Shreveport and Baton Rouge hospitals. Because the Act therefore imposes no unconstitutional burden on abortion access in Louisiana, plaintiffs' claims of irreparable harm cannot tip the scales in favor of a preliminary injunction. *See, e.g., Abbott I*, 734 F.3d at 419 (the "State's likely success on the merits" outweighed even plaintiffs' "strong showing" of harm in staying enforcement of privileges law).

---

[10]   *See* U.S. Dep't of Commerce, U.S. Census Bureau Factfinder, *available at:* http://factfinder.census.gov/faces/tableservices/jsf/pages/productview.xhtml?src=bkmk (last visited Feb. 13, 2015); U.S. Dep't of Commerce, United States Summary 2010, Population and Housing Counts, at 41, *available at:* http://www.census.gov/prod/cen2010/cph-2-1.pdf. (last visited Feb. 16, 2015).

2.   Indeed, it is the State that would be irreparably harmed by a preliminary injunction against the Act. *See, e.g., Maryland v. King*, 137 S.Ct 1, 3 (2012) (Roberts, C.J., in chambers) (explaining that "[a]ny time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable harm") (internal quotations omitted). The harm would be especially grievous here, given that (1) the Fifth Circuit has already facially upheld an identical privileges law against identical constitutional challenges, and (2) plaintiffs have failed to show that the operation of the Act in Louisiana would unduly burden women's access to abortion.

3. Finally, the public interest favors allowing the Act to be enforced. "When a statute is enjoined, the State necessarily suffers the irreparable harm of denying the public interest in the enforcement of its laws." *Abbott I*, 734 F.3d at 419 (citations omitted). As the Fifth Circuit has explained, a privileges law like Louisiana's furthers "the desirable protection of abortion patients' health," validly "regulate[s] the medical profession by heeding … patient-centered concerns," and legitimately "'assist[s] in preventing patient abandonment.'" *Abbott II*, 748 F.3d at 594-95; *JHWO*, 760 F.3d at 454 (quoting *Abbott II*, 748 F.3d at 594-95). To enjoin the Act would thwart those benefits without gaining anything in return.

## CONCLUSION

For the foregoing reasons, Defendants Kathy Kliebert and Mark Dawson ask the Court to deny plaintiffs' motion for declaratory and preliminary injunctive relief.

Respectfully submitted,

/s *Don S. McKinney*

Don S. McKinney (La. Bar No. 26685)
Philip O. Bergeron (La. Bar. No. 2988)
ADAMS AND REESE LLP
4500 One Shell Square
New Orleans, LA  70139
Main: 504.581.3234
Direct:  504.585.0134
Cell:  504.813.9662
Fax:  504.566.0210
Email:  don.mckinney@arlaw.com

*Counsel for Defendant Dr. Mark Henry Dawson, in his official capacity as President of the Louisiana Board of Medical Examiners*

/s *S. Kyle Duncan*

S. Kyle Duncan (La. Bar No. 25038)
DUNCAN PLLC
1629 K Street NW, Suite 300
Washington, DC 20006
Phone: 202.714.9492
Fax: 571.730.4429
Email: kduncan@duncanpllc.com

J. Michael Johnson
KITCHENS LAW FIRM, APLC
2250 Hospital Drive
Beene Office Park, Suite 248
Bossier City, LA 71111
Phone: 318.658.9456
Email: mjohnsonlegal@gmail.com

*Counsel for Defendant Kathy Kliebert, in her official capacity as Secretary of the Louisiana Department of Health and Hospitals*

### CERTIFICATE OF SERVICE

I hereby certify that on February 16, 2014, I electronically filed the foregoing with the Clerk of Court by using the CM/ECF system which will send a notice of electronic filing to all counsel of record.


/s *S. Kyle Duncan*
S. Kyle Duncan