**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF LOUISIANA**

JUNE MEDICAL SERVICES LLC, *et al.*,

        Plaintiffs,

    v.

KATHY KLIEBERT,

        Defendant.

Civil Action No. 3:14-CV-525- JWD-RLB

**PLAINTIFFS' PROPOSED
FINDINGS OF FACT AND CONCLUSIONS OF LAW**

# TABLE OF CONTENTS

**Page**

I.      INTRODUCTION ................................................................................................. 1

        A.      ACT 620 ................................................................................................... 2

        B.      THE PARTIES ......................................................................................... 4

II.     ABORTION IN LOUISIANA ............................................................................. 5

        A.      CLINICS .................................................................................................. 5

                1.      HOPE MEDICAL GROUP ........................................................... 5

                2.      BOSSIER CLINIC ........................................................................ 6

                3.      CAUSEWAY CLINIC ................................................................... 7

                4.      DELTA CLINIC OF BATON ROUGE ........................................ 7

                5.      WOMEN'S HEALTH CARE CENTER ........................................ 7

        B.      ABORTION PROVIDERS ...................................................................... 8

                1.      DR. JOHN DOE 1 ......................................................................... 8

                2.      DR. JOHN DOE 2 ......................................................................... 9

                3.      DR. JOHN DOE 3 ....................................................................... 11

                4.      DR. JOHN DOE 4 ....................................................................... 12

                5.      DR. JOHN DOE 5 ....................................................................... 13

                6.      DR. JOHN DOE 6 ....................................................................... 14

        C.      EFFECT OF HARRASSMENT EXPERIENCED BY LOUISIANA
                ABORTION PROVIDERS .................................................................... 15

III.    LOUISIANA WOMEN AND ABORTION ...................................................... 19

IV.     LEGAL ABORTION IS A SAFE MEDICAL PROCECURE ........................... 22

        A.      LEGAL ABORTION IS SAFE NATIONALLY AND IN LOUISIANA .......... 22

        B.      LOUISIANA CLINICS HAVE EMERGENCY PROTOCOLS IN PLACE
                TO ADDRESS PATIENT NEEDS ....................................................... 27

V.      ADMITTING PRIVILEGES ............................................................................. 29

        A.      THE ADMITTING PRIVILEGES REQUIREMENT DOES NOT
                CONFORM TO ACCEPTED MEDICAL PRACTICES AND DOES NOT
                PROMOTE CONTINUITY OF CARE FOR PATIENTS ................................. 29

        B.      GENERAL PURPOSE OF ADMITTING PRIVILEGES .................................. 32

        C.      IT IS DIFFICULT FOR ABORTION PROVIDERS TO OBTAIN AND
                MAINTAIN ADMITTING PRIVILEGES ........................................................ 35

VI.     CONTEXT OF PASSAGE OF ACT 620 ........................................................ 38

# TABLE OF CONTENTS
(continued)

Page

A.   LOUISIANA HAS A STATE POLICY OPPOSING LEGALIZED ABORTION AND HAS ENFORCED THIS POLICY BY MAKING IT INCREASINGLY DIFFICULT TO ACCESS ABORTION IN THE STATE .................................................................................................. 38

B.   ACT 620 WAS PASSED FOR THE IMPROPER PURPOSE OF RESTRICTING ACCESS TO ABORTION IN LOUISIANA .......................... 40

C.   DHH'S ENFORCEMENT AND INTERPRETATION OF THE ACT ............. 42

VII.   THE EFFECT OF ACT 620 WOULD BE TO CLOSE ALL BUT ONE OF LOUISIANA'S ABORTION CLINICS ............................................................ 44

A.   IMPACT ON DOCTORS ................................................................... 45

B.   IMPACT ON CLINICS ..................................................................... 46

C.   IMPACT ON WOMEN ..................................................................... 46

VIII.   PLAINTIFFS' EXPERTS ARE CREDIBLE ................................................ 48

IX.   DEFENDANT'S EXPERTS ARE NOT CREDIBLE ...................................... 50

A.   DR. CUDIHY'S TESTMONY IS CONTRADICTED AND UNSUPPORTED BY HIS OWN SOURCES ...................................... 50

B.   DR. CUDIHY'S TESTIMONY WAS COLORED BY HIS LACK OF CANDOR AND HIS BIAS AGAINST ABORTION ......................... 53

C.   DR. MARIER'S TESTIMONY IS LIMITED BY HIS LACK OF RELEVANT EXPERIENCE AND BY HIS ACTIVITIES IN SUPPORT OF ACT 620 ................................................................................. 55

D.   DR. SOLANKY'S ANALYSIS FOCUSED ON SCENARIOS AND ISSUES THAT ARE NOT MATERIAL TO THE BURDENS IMPOSED BY ACT 620 ................................................................................. 56

X.   CONCLUSIONS OF LAW ...................................................................... 57

A.   PRELIMINARY INJUNCTION STANDARD ................................... 57

B.   LIKELIHOOD OF SUCCESS ON THE MERITS ............................. 58

   1.   BROAD LEGAL FRAMEWORK FOR ABORTION REGULATION ..................................................................... 58

   2.   THE APPLICABILITY OF *COLE* IS LIMITED ................... 59

   3.   ACT 620 HAS THE EFFECT OF IMPOSING A SUBSTANTIAL OBSTACLE IN THE PATH OF WOMEN SEEKING AN ABORTION IN LOUISIANA ............................... 63

## TABLE OF CONTENTS
(continued)

Page

4.   ACT 620 WAS ENACTED WITH THE PURPOSE OF IMPOSING A SUBSTANTIAL OBSTACLE IN THE PATH OF WOMEN SEEKING AN ABORTION IN LOUISIANA ...................... 66

5.   ACT 620 IMPOSES SEVERE BURDENS ON PATIENTS AND PHYSICIANS WITHOUT JUSTIFICATION ........................................ 69

6.   CONCLUSION.................................................................... 75

C.   IRREPARABLE HARM ................................................................... 76

D.   THE EQUITIES WEIGH IN FAVOR OF GRANTING A PRELIMINARY INJUNCTION, WHICH IS IN THE PUBLIC INTEREST.......................................................................................... 77

dc-803758

# TABLE OF AUTHORITIES

Page(s)

## CASES

*Alabama Women's Center v. Williamson*,
No. 2:15cv497-MHT, 2015 WL 4873125 (M.D. Ala. August 13, 2015) ......................... 65, 71

*Barnes v. Mississippi*,
992 F.2d 1335 (5th Cir. 1993) ...................................................................... 70, 71

*Bowers v. Firefighters' Ret. Sys.*,
6 So. 3d 173 ............................................................................................... 44

*Burwell v. Hobby Lobby Stores Inc.*,
134 S.Ct. 2751 (2014) .................................................................................. 44

*Charpentier v. Ortco Contractors*,
480 F.3d 710 (5th Cir. 2007) ......................................................................... 61

*Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*,
508 U.S. 520 (1993) .................................................................................. 67, 69

*City of Akron v. Akron Ctr. for Reprod. Health, Inc.*,
462 U.S. 416 (1983) ............................................................................. 69, 70, 75

*Cline v. Oklahoma Coal. for Reprod. Justice*,
313 P.3d 253 (Okla. 2013) ............................................................................ 74

*Comer v. Murphy Oil USA, Inc.*,
718 F.3d 460 (5th Cir. 2013) ......................................................................... 61

*Deerfield Med. Ctr. v. Deerfield Beach*,
661 F.2d 328 (5th Cir. 1981) ..................................................................... 76, 77

*Doe v. Bolton*,
410 U.S. 179 – 95 (1973) .............................................................................. 70

*Edwards v. Aguillard*,
482 U.S. 578 (1987) .................................................................................... 67

*Flagship Marine Servs., Inc. v. Belcher Towing Co.*,
23 F.3d 341 (11th Cir. 1994) ......................................................................... 61

*Gonzales v. Carhart*,
550 U.S. 124 (2007) .................................................................................... 69

-i-

*Harrah's Bossier City Inv. Co., LLC v. Bridges*,
   41 So. 3d 438 (La. 2010) ................................................................44

*Hoover v. Morales*,
   164 F.3d 221 (5th Cir. 1998) ..........................................................57

*Jackson Women's Health Org. v. Currier*,
   760 F.3d 448 (5th Cir. 2014) ................................................... passim

*Jackson Women's Health Org. v. Currier*,
   940 F. Supp. 2d 416 (S.D Miss. 2013), *aff'd in part*, 760 F.3d 448 (5th Cir. 2014) .........76, 77

*June Med. Servs., LLC v. Kliebert*,
   No. 14-525-JWD, 2015 WL 2239877 (M.D. La. May 12, 2015) ...........................................60

*Lawrence v. Texas*,
   539 U.S. 558 (2003)......................................................................58

*Maher v. Roe*,
   432 U.S. 464 (1977)......................................................................72

*Margaret S. v. Edwards*,
   488 F. Supp. 181 (E.D. La. 1980), *aff'd*, 794 F. Supp. 994 (5th Cir. 1986) ..........................68

*Margaret S. v. Treen*,
   597 F. Supp. 636 (E.D. La. 1984) ..................................................68

*Mazurek v. Armstrong*,
   520 U.S. 968 (1997)......................................................................69

*Natural Res. Def. Council, Inc. v. Cnty. of Los Angeles*,
   725 F.3d 1194 (9th Cir. 2013), *cert. denied*, 134 S. Ct. 2135 (2014).....................................61

*Nobby Lobby, Inc. v. Dallas*,
   970 F.2d 82 (5th Cir. 1992) ...........................................................77

*Northshore Dev., Inc. v. Lee*,
   835 F.2d 580 (5th Cir. 1988) .........................................................60

*Okpalobi v. Foster*,
   190 F.3d 337 (5th Cir. 1999), *superseded on reh'g en banc on other grounds*, 244
   F.3d 405 (5th Cir. 2001) ...............................................................66

*Opulent Life Church v. City of Holly Springs, Miss.*,
   697 F.3d 279 (5th Cir. 2012) .........................................................57

*Planned Parenthood Arizona, Inc. v. Humble*,
   753 F.3d 905 (9th Cir.) *cert. denied*, 135 S. Ct. 870 (2014)..............................71, 74

-ii-

*Planned Parenthood Assoc. of Kan. City, Mo., Inc. v. Ashcroft*,
  462 U.S. 476 (1983) .................................................................................................70, 76

*Planned Parenthood of Cent. Mo. v. Danforth*,
  428 U.S. 52 (1976) ..........................................................................................................70

*Planned Parenthood of Greater Texas Surgical Health Servs. v. Abbott*,
  748 F.3d 583 (5th Cir. 2014) ..................................................................................... passim

*Planned Parenthood of the Heartland, Inc. v. Iowa Bd. of Med.*,
  865 N.W.2d 252 (Iowa 2015) .........................................................................................74

*Planned Parenthood Se., Inc. v. Strange*,
  33 F. Supp. 3d 1381 ...................................................................................................53, 71

*Planned Parenthood SE, Inc. v. Strange*,
  9 F. Supp. 3d 1272 ..........................................................................................................74

*Planned Parenthood of Se. Penn. v. Casey*,
  505 U.S. 833 (1992) ................................................................................................... passim

*Planned Parenthood of Wisc., Inc. v. Van Hollen*,
  738 F.3d 786 – 98 (7th Cir. 2013), *cert. denied*, 134 S. Ct. 2841 (2014) .........................71, 74

*Planned Parenthood of Wisconsin, Inc. v. Van Hollen*,
  No. 13-CV-465-WMC, 2015 WL 1285829 (W.D. Wis. Mar. 20, 2015) ...................53, 65, 71

*Productos Carnic S.A. v. Central American Beef and Seafood Trading Co.*,
  621 F.2d 683 (5th Cir. 1980) ...........................................................................................57

*Roe v. Wade*,
  410 U.S. 113 (1973) .....................................................................................................38, 58

*Romer v. Evans*,
  517 U.S. 620 (1996) .....................................................................................................67, 69

*Simopoulos v. Virginia*,
  462 U.S. 506 (1983) ........................................................................................................70

*Sojourner T. v. Edwards*,
  974 F.2d 27 (5th Cir. 1992), *cert. denied*, 507 U.S. 972 (1993) ...........................................68

*Sorrell v. IMS Health Inc.*,
  131 S. Ct. 2653 (2011) .....................................................................................................67

*United States v. Jackson*,
  549 F.3d 963 (5th Cir. 2008), *cert. denied*, 558 U.S. 828 (2009) ...........................................61

-iii-

*United States v. Windsor*,
     133 S. Ct. 2675 (2013)..................................................................................66, 69

*W. Airlines, Inc. v. Int'l Brotherhood of Teamsters*,
     480 U.S. 1301 (1987) (O'Connor, J., in chambers) ................................................61

*Whole Woman's Health v. Cole*,
     135 S. Ct. 2923 (2015)..........................................................................40, 60, 61

*Whole Woman's Health v. Cole*,
     790 F.3d 563 (5th Cir. 2015) (per curiam) *modified*, 790 F.3d 598 (5th Cir. 2015) ....... passim

*Whole Woman's Health v. Cole*,
     No. 14A1288 (June 19, 2015), *available at*
     http://www.reproductiverights.org/sites/crr.civicactions.net/files/documents/2015-06-
     19-Supreme_Court_Motion_to_Stay.pdf..............................................................61

*Whole Woman's Health v. Lakey*,
     769 F.3d 285 (5th Cir.), *vacated in part,* 135 S.Ct. 399 (Oct. 14, 2014)................................60

**STATUTES**

42 U.S.C. § 1395dd (2011) ..............................................................................30

La. Rev. Stat. Ann. § 40:1299.31-33 ..................................................................39

La. Rev. Stat. Ann. §§ 40.1299.31-39(A), 40:1299.41(K) .......................................39, 68

La. Rev. Stat. Ann. §§ 40.1299.30, 14:87..............................................................38

La. Rev. Stat. Ann. §§ 40:1299.35.2(B)-(D), 40:1299.35.6, 40:1299.35.12 ....................39, 68

La. Rev. Stat. § 22:1014..................................................................................40

La. Rev. Stat. § 37:1263 *et seq.* .......................................................................3

La. Rev. Stat. §§ 40.1299.34.5, 40:1299.35.7 .......................................................39

La. Rev. Stat. § 40:1299.35.0 ...........................................................................38

La. Rev. Stat. §§ 40:1299.35.2D(2), 40:1299.35.6, 40:1299.35.19.............................39

La. Rev. Stat. §§ 40:1299.35.6, 40:1299.35.19 .....................................................68

La. Rev. Stat. § 40:1299.35.7...........................................................................68

La. Rev. Stat. § 40:1299:35.2(a)(2)(a) ...............................................................1, 2

La. Rev. Stat. § 40:2175.6...............................................................................4

dc-803758

La. Rev. Stat. § 1299.35.2 .............................................................................................2

**OTHER AUTHORITIES**

*2014 Poverty Guidelines*, U.S. Dep't of Health & Human Servs.,
    http://aspe.hhs.gov/poverty/14poverty.cfm. .........................................................19

Governor Jindal Signs Pro-Life Bills into Law, Press Release (June 12, 2014),
    http://www.gov.state.la.us/index.cfm?md=newsroom&tmp= detail&articleID=4575.) ...........2

La. Executive Order BJ 15-8 (May 19, 2015), "Marriage and Conscience Order," ......................44

## I.    INTRODUCTION

1.      On August 31, 2014, the Court granted Plaintiffs' Application for Temporary Restraining Order ("TRO"), enjoining enforcement of Act 620, 2014 Reg. Sess. (La. 2014), to be codified at La. Rev. Stat. § 40:1299:35.2(a)(2)(a), until a hearing could be held for the purpose of determining whether a preliminary injunction should issue.  (Dkt. 31.)  On November 3, 2014 and January 15, 2015, the Court issued further Orders clarifying the scope of the TRO that remains in effect until further order of the Court following a preliminary injunction hearing. (Dkts. 57, 84.)

2.      The Parties came before this Court for the hearing on the motion for preliminary injunction from June 22, 2015 through June 29, 2015, during which time this Court received evidence in the form of witness testimony, exhibits, stipulations, and designated deposition testimony agreed by the Parties to be received in lieu of live testimony from certain witnesses. Plaintiffs presented live testimony from the following witnesses: Dr. John Doe 1, Dr. John Doe 2, Dr. John Doe 3, Kathaleen Pittman, Secretary Kathy Kliebert, and experts Dr. Christopher Estes, Dr. Sheila Katz, and Dr. Eva Pressman.  Defendant presented live testimony at trial from Cecile Castello and experts Dr. Robert Marier, Dr. Tumulesh K.S. Solanky, and Dr. Damon Cudihy.  A record of the exhibits admitted into evidence was filed and can be found at Dkt 165. A record of the deposition testimony designated by the Parties and offered into evidence can be found at Dkt. 168.

3.      In making the following findings of fact and conclusions of law, the Court has considered the record as a whole.  The Court has observed the demeanor of witnesses and has carefully weighed their testimony and credibility in determining the facts of this case and drawing conclusions from those facts.

4.      All findings of fact contained herein that are more appropriately considered conclusions of law are to be so deemed.  Likewise, any conclusions of law more appropriately considered a finding of fact shall be so deemed.

**A.      ACT 620**

5.      The challenged statute is House Bill No. 388, which was enacted as Act 620, 2014 Reg. Sess. (La. 2014), to be codified at La. Rev. Stat. § 40:1299:35.2(a)(2)(a) (the "Act" or "Act 620").  Act 620 amended R.S. 40:1299.35.2(a), 1299.35.2.1, and 2175.3(2) and (5).  (Joint Exhibit ("JX") 115.)  On June 12, 2014, Governor Bobby Jindal signed Act 620 into law, with an effective date of September 1, 2014.  (JX 115; Governor Jindal Signs Pro-Life Bills into Law, Press Release (June 12, 2014), http://www.gov.state.la.us/index.cfm?md=newsroom&tmp= detail&articleID=4575.)

6.      Act 620 provides that every physician who performs or induces an abortion shall "have active admitting privileges at a hospital that is located not further than thirty miles from the location at which the abortion is performed or induced and that provides obstetrical or gynecological health care services."  (JX 115 § (A)(2)(a) (amending La. Rev. Stat. § 1299.35.2).)  The Act defines "active admitting privileges" to mean that "the physician is a member in good standing of the medical staff of a hospital that is currently licensed by the department, with the ability to admit a patient and to provide diagnostic and surgical services to such patient . . . ." (*Id.*)

7.      Regulations promulgated pursuant to the Act after the commencement of this litigation also enact the same admitting privileges requirement, using the same definitions of "active admitting privileges."  These regulations note that federal litigation is pending on the issue of admitting privileges and that licensing provisions regarding admitting privileges will

only be enforced pursuant to an order, judgment, stipulation, or agreement issued in this case. (JX 137 § 4423(B)(3)(e).)

8.      The Act provides that any outpatient abortion facility that knowingly or negligently provides abortions through a physician who does not satisfy the Act is subject to denial, revocation, or non-renewal of its license by the Louisiana Department of Health and Hospitals ("DHH").  (JX 115 § (A)(1).)  The Act also provides for a fine of not more than four thousand dollars per violation.  (JX 115 § (A)(2)(c).)

9.      The Louisiana State Board of Medical Examiners ("LSBME") has the authority to take disciplinary action against any physician.  La. Rev. Stat. § 37:1263 *et seq.*  The LSBME has the authority to investigate physicians for violations of law, such as Act 620, which are considered acts of unprofessional conduct.  The LSBME has the authority to levy fines and to take other disciplinary actions, including suspending or revoking a physician's medical license. (Dr. Cecilia Mouton Depo. 95:23 – 96:20, 103:9 – 104:11.)  The LSBME also has the ability to suspend or revoke a physician's medical license for a violation of state law, such as Act 620. (Dr. Mouton Dep. 86:24 – 87:13.)

10.     There are currently six doctors who perform abortions in Louisiana.  Due to safety concerns, all of the doctors are identified by pseudonyms in this litigation.  (6/22/2015 Trial Tr. 108:7 – 9 (Dr. John Doe 3); 6/23/2015 Trial Tr. 12:20 – 22 (Dr. John Doe 2); Dkt. 24; 6/24/2015 Trial Tr. 6:13 – 15 (Dr. John Doe 1).)[1]  The Louisiana abortion providers who testified at trial were permitted to do so from behind a screen.

---

[1] On August 13, 2015, the Plaintiffs and Defendant Secretary Kliebert filed a joint motion to redact portions of the trial transcript, which the Court granted, and a redacted copy of the trial transcript was filed by the court reporter on Friday, August 21, 2015.  (Dkts. 190 – 195.)  Because the redacted transcript was not available to Plaintiffs during the drafting of these papers, citations are made to the previously provided, unredacted copy of the trial transcript.

B.     THE PARTIES

11.     Plaintiff June Medical Services LLC d/b/a Hope Medical Group for Women ("Hope Medical Group" or "Hope Clinic") is a licensed abortion clinic located in Shreveport, Louisiana.  Hope Clinic sues on behalf of its physicians, staff, and patients.  (Dkt. 14 ¶ 11; 6/22/2015 Trial Tr. 14:24 – 25 (Pittman).)

12.     Plaintiff Bossier City Medical Suite ("Bossier Clinic") is a licensed abortion clinic located in Bossier City, Louisiana.  Bossier Clinic sues on behalf of its physicians, staff, and patients.  (Dkt. 14 ¶ 12.)

13.     Plaintiff Choice, Inc. of Texas d/b/a Causeway Medical Clinic ("Causeway Medical Clinic" or "Causeway Clinic") is a licensed abortion clinic located in Metairie, Louisiana.  Causeway Clinic sues on behalf of its physicians, staff, and patients.  (Dkt. 14 ¶ 13.)

14.     Plaintiff Dr. John Doe 1, M.D., is a board-certified physician in Family Medicine and Addiction Medicine who provides abortion services at Hope Clinic.  Dr. John Doe 1 sues on his own behalf and on behalf of his patients.  (Dkt. 14 ¶ 14.)

15.     Plaintiff Dr. John Doe 2, M.D., is a board-certified obstetrician-gynecologist ("OB/GYN") who provides abortion services at Causeway Clinic and Bossier Clinic.  Dr. John Doe 2 sues on his own behalf and on behalf of his patients.  (Dkt. 14 ¶ 15.)

16.     Defendant Kathy Kliebert is the Secretary of DHH.  (Dkt. 14, at 5.)  Secretary Kliebert oversees all of the program policies for Louisiana's health department.  (6/23/2015 Trial Tr. 194:8 – 13 (Kliebert).)  This includes the Health Standards Section, which reviews abortion clinics.  (6/23/2015 Trial Tr. 194:25 – 195:8 (Kliebert).)  DHH has the authority to revoke or deny the clinics' licenses for violation of any law.  La. Rev. Stat. § 40:2175.6.

17.     Mark Henry Dawson, M.D., was also named as a Defendant in this matter in his official capacity as President of the LSBME.  On March 17, 2015, Plaintiffs and Dr. Dawson

filed a joint motion to dismiss Dr. Dawson in his official capacity as President of the LSBME, which was so ordered by this Court on the same day.  (Dkts. 110, 111.)  The LSBME agreed as part of the joint motion to be bound by any injunction issued by this Court regarding the enforceability of Act 620.  (Dkt. 110 ¶ 1(b).)

## II.    ABORTION IN LOUISIANA

18.    Louisiana currently has only five abortion clinics.  (JX 109 ¶ 13.)

19.    The northern part of the state is served by Hope Clinic in Shreveport and by Bossier Clinic in Bossier City.  (6/23/2015 Trial Tr. 17:6 – 8 (Dr. John Doe 2); 6/22/2015 Trial Tr.  110:4 – 11 (Dr. John Doe 3).)  The southern part of the state is served by Causeway Medical Clinic in Metairie, of Baton Rouge, Inc. ("Delta Clinic"), and Women's Health Care Center, Inc. ("Women's Clinic") in New Orleans.  (JX 110 ¶ 1; JX 114 ¶ 1.)

20.    According to DHH, approximately 10,000 women obtain abortions in Louisiana annually.  (DX 148 ¶ 11.)  Women who seek abortions in Louisiana, as elsewhere, do so for a variety of reasons.  These include rape; pregnancies that threaten their lives or health; financial hardship; and the need to control the number and spacing of their children, among other reasons. (6/22/2015 Trial Tr. 20:13 – 17; 94:6 – 15 (Pittman); Dr. John Doe 5 Dep. at 132:11 – 33:16; Dr. John Doe 4 Dep. at 88:9 – 24.)  As many as three-quarters of women who obtain abortions in Louisiana already have children, which is higher than the national average.  (6/22/2015 Trial Tr. 94:7 – 11 (Pittman); 6/23/14 Trial Tr. 152:19 – 153:1 (Katz).)

### A.    CLINICS

#### 1.    HOPE MEDICAL GROUP

21.    Hope Clinic, in Shreveport, has been providing care for women since 1980.  (Dkt. 14 ¶ 11.)

22.     Hope Clinic provides medication abortions through eight weeks and surgical abortions through 16 weeks, six days LMP.[2]  (6/22/2015 Trial Tr. 35:12 – 20 (Pittman), 119:16 – 19, 132:9 – 11 (Dr. John Doe 3).)  Hope Clinic employs two doctors who perform abortions, Dr. John Doe 1 and Dr. John Doe 3.  (6/22/2015 Trial Tr. 21:11 – 13 (Pittman).)  Dr. John Doe 1 performs approximately 70% of the abortions provided by Hope, and Dr. John Doe 3 performs the remaining 30%.  (6/22/2015 Trial Tr. 21:11 – 20 (Pittman); JX 116 ¶ 5.)

23.     Most of Hope Clinic's patients are Louisiana residents, but some travel from outside the state to Hope Clinic as well.[3]  (6/22/2015 Trial Tr. 19:19 – 24, 34:1 – 4 (Pittman).)

## 2.     BOSSIER CLINIC

24.     Bossier Clinic, in Bossier City, Louisiana, has been providing abortion and reproductive health services to women since 1980.  (Dkt. 14 ¶ 12.)  Bossier Clinic provides medication abortions through eight weeks and surgical abortions through the state's legal limit of 21 weeks, six days LMP.  (6/23/2015 Trial Tr. 22:11 – 23:2; 55:1 – 56:2 (Dr. John Doe 2); JX 117 ¶ 4.)

25.     Bossier Clinic employs one doctor, Dr. John Doe 2, who performs first and second trimester surgical procedures as well as medication abortions.  (6/23/2015 Trial Tr. 21:15 – 19 (Dr. John Doe 2); JX 117 ¶ 5.)  Dr. John Doe 2 is the only doctor in Louisiana who performs abortions after 16 weeks, six days LMP.  (JX 187 ¶ 4; 6/23/2015 Trial Tr. 21:23 – 22:3 (Dr. John Doe 2).)

26.     Bossier Clinic's patients are primarily from Louisiana, but also travel to the clinic from surrounding states.  (6/23/2015 Trial Tr. 20:4 – 10 (Dr. John Doe 2).)

---

[2] Throughout this opinion, the Court will define length of pregnancy based on the time elapsed since the first day of a woman's last menstrual period, or LMP.
[3] In 2014, Hope Clinic saw a marked increase in patients, which included a large jump in the number of patients from Texas.  (6/22/2015 Trial Tr. 20:3 – 9 (Pittman).)

### 3.    CAUSEWAY CLINIC

27.    Causeway Clinic in Metairie has been providing abortion and reproductive health services since 1999.  (Dkt. 14 ¶ 13.)  Causeway Clinic offers surgical abortions through 21 weeks, six days LMP.  Causeway does not offer medication abortion.  (JX 117 ¶ 4.)

28.    Causeway employs two doctors who perform abortions, Dr. John Doe 2 and Dr. John Doe 4.  Dr. John Doe 2 performs approximately 25% of the abortions provided by Causeway Medical Clinic, and Dr. John Doe 4 performs the remaining 75%.  (JX 117 ¶ 5.)

29.    Dr. John Doe 2 performs first and second trimester surgical abortions through 21 weeks, six days LMP, and is the only physician in Louisiana to offer abortion after 16 weeks, six days LMP.  (6/23/2015 Trial Tr. 21:23 – 22:3 (Dr. John Doe 2).)

### 4.    DELTA CLINIC OF BATON ROUGE

30.    Delta Clinic, located in Baton Rouge, Louisiana, is a women's reproductive health clinic that has been providing abortion and reproductive health services since at least 1978. (Cochran Dep. at 16:2 – 9; JX110 ¶ 3.)

31.    Delta Clinic employs one doctor who performs abortions, Dr. John Doe 5. (Cochran Dep. at 55:18 – 57:1; JX110 ¶ 3.)

32.    The Delta Clinic provides surgical abortions for women through 16 weeks LMP, and medication abortions through eight weeks.  (Cochran Dep. at 55:18 – 57:1; 82:4 – 83:18.)

### 5.    WOMEN'S HEALTH CARE CENTER

33.    Women's Clinic is a women's reproductive health clinic that has been providing abortion and reproductive health services to the women of Louisiana since at least 2002.  (JX 168 ¶ 1.)  It is located in New Orleans, Louisiana.  (JX 110 ¶ 1.)

34.    Women's Clinic employs two doctors who perform abortions, Dr. John Doe 5 and Dr. John Doe 6.  Dr. John Doe 5 performs approximately 40% of the abortions provided by Women's Clinic, and Dr. John Doe 6 performs the remaining 60%.  (JX 110 ¶ 3; JX 168 ¶ 4.)

35.    Women's Clinic provides surgical abortions for women through 16 weeks and medication abortions through eight weeks.  (Cochran Dep. at 82:4 – 83:18.)  Dr. John Doe 6 provides only medication abortions.  (Cochran Dep. at 55:18 – 57:1.)

**B.    ABORTION PROVIDERS**

**1.    DR. JOHN DOE 1**

36.    Dr. John Doe 1 is a board-certified physician in Family Medicine and Addiction Medicine with over 10 years of experience, seven of those as an abortion provider.  He is one of two physicians providing abortions at Hope Clinic.  (6/22/2015 Trial Tr. 139:17 – 140:6 (Dr. John Doe 3); Dkt. 14 ¶ 14.)  He provides medication abortions through eight weeks and surgical abortions through 13 weeks, six days LMP.  (6/24/2015 Trial Tr. 21:1-7 (Dr. John Doe 1); 6/22/2015 Trial Tr. 132:9-11 (Dr. John Doe 3).)

37.    Dr. John Doe 1 does not currently have admitting privileges at a hospital within 30 miles of Hope Clinic.  (6/22/2015 Trial Tr. 21:21 – 24 (Pittman).)

38.    Dr. John Doe 1 was trained to perform abortion services by Dr. John Doe 3, under a training protocol endorsed in a letter dated July 11, 2008 by the former Executive Director of the LSBME, Dr. Robert Marier, who testified as an expert on Defendant's behalf in this matter.  (6/22/2015 Trial Tr. 140:18 – 141:9 (Dr. John Doe 3); JX 130; JX 135).)

39.    Beginning in June 2014, Dr. John Doe 1 applied for admitting privileges at various hospitals including Minden Medical Center, Christus Schumpert Hospital, and Willis-Knighton Health System, each of which is within 30 miles from Hope Clinic.  Each of these applications has been affirmatively denied or *de facto* denied for reasons unrelated to Dr. John

8

Doe 1's competence as a physician. For example, Dr. John Doe 1's application to Willis-Knighton Health System is effectively denied because the hospital has requested information regarding hospital admissions in the past 12 months, in order to process the application. Dr. John Doe 1 cannot provide any such information because he has not admitted any patients to a hospital in the past 12 months. (JX 186 ¶ 6; JX 50; JX 132; JX 133; JX 134; JX 71; JX 190; JX 53; JX 51; JX 128; JX 189; 6/25/2015 Trial Tr. 78:9 – 11 (Marier); 6/24/2015 Trial Tr. 42:4 – 78:11 (Dr. John Doe 1).)

40.    Dr. John Doe 1 inquired about applying for privileges at University Health, which is also within 30 miles of Hope Clinic. (JX 186 ¶ 7; 6/24/2015 Trial Tr. 47:7 – 12 (Dr. John Doe 1).) The Chairman of the Department of Family Medicine advised Dr. John Doe 1 that the Chairman had met with resistance among the department staff because Dr. John Doe 1 provides abortions. Dr. John Doe 1 has received no further communication from University Health. (JX 186 ¶ 7; 6/24/2015 Trial Tr. 43:10 – 46:4 (Dr. John Doe 1).)

## 2.    DR. JOHN DOE 2

41.    Dr. John Doe 2 is a board-certified OB/GYN who has been performing abortions since 1980. (6/23/2015 Trial Tr. 13:16 – 14:2 (Dr. John Doe 2).) Dr. John Doe 2 performs medication abortions through eight weeks and surgical abortions up through the state's legal limit of 21 weeks, six days LMP.[4] (6/23/2015 Trial Tr. 22:11 – 23:2, 55:1 – 562 (Dr. John Doe 2); JX 187 ¶ 4.) He performs medication and surgical abortions at Bossier Clinic, but only surgical abortions at Causeway Clinic. (6/23/2015 Trial Tr. 21:15 – 23:2 (Dr. John Doe 2).) Last year, Dr. John Doe 2 performed approximately 550 abortions at Bossier and 450 abortions at Causeway Clinic. (6/23/2015 Trial Tr. 17:2 – 18:4 (Dr. John Doe 2); Dkt. 14 ¶ 15.)

---

[4] This is the equivalent of 19 weeks, six days post-fertilization, just under the state's legal limit of 20 weeks post-fertilization.

42.     Dr. John Doe 2 does not currently have active admitting privileges at a hospital within 30 miles of Bossier Clinic or Causeway Clinic.  (6/23/2015 Trial Tr. 19:8 – 10 (Dr. John Doe 2).)  His inability to obtain privileges is not related to his competence as a physician.  (6/23/2015 Trial Tr. 26:22 – 27:9, 26:7 – 21, 26:22 – 27:9, 29:4 – 30:8, 30:17 – 25, 31:22 – 32:22, 100:1 – 9, 104:9 – 17 (Dr. John Doe 2); JX 144; JX 89.)

43.     Dr. John Doe 2 worked at LSU Medical School at various times for approximately 18 years total.  (6/23/2015 Trial Tr. 14:16 – 15:9 (Dr. John Doe 2).)  While he was on staff at LSU Medical Center, and during his years in private practice, Dr. John Doe 2 had admitting privileges at various hospitals.  (6/23/2015 Trial Tr. 24:5 – 21, 95:12 – 14 (Dr. John Doe 2).)  When he left the LSU staff, Dr. John Doe 2 was offered courtesy privileges, which allow him to consult, but do not allow him to admit patients.  (6/23/2015 Trial Tr. 23:3 – 24:4 (Dr. John Doe 2), JX 185 at 1, 4.)

44.     Dr. John Doe 2 attempted to upgrade his courtesy privileges at LSU, but the head of the OB/GYN department met with resistance because Dr. John Doe 2 performs abortions.  (6/23/2015 Trial Tr. 26:7 – 21 (Dr. John Doe 2).)

45.     Dr. John Doe 2 applied for privileges at Willis-Knighton Hospital in Bossier City.  Although Dr. John Doe 2 did not receive a formal denial, Dr. John Doe 2's application to Willis-Knighton has been *de facto* denied because he does not have a hospital-based practice and therefore cannot furnish information requested by Willis-Knighton on specific procedures that he performed in a hospital in the last 12 months.  (6/23/2015 Trial Tr. 79:20 – 25 (Dr. John Doe 2).)

46.     Dr. John Doe 2 applied for privileges at Tulane Medical Center in New Orleans and was granted privileges that allow him to be listed as the admitting physician on the patient record, but require that another physician at Tulane immediately take over the patient's care.  Dr.

John Doe 2 is not permitted to provide surgical or diagnostic services to the patients he admits to Tulane.  (6/23/2015 Trial Tr. 32:23 – 33:3, 33:20 – 34:6, 34:19 – 35:20 (Dr. John Doe 2); JX 183; JX 56; JX 131; JX 181.)

47.    Although Secretary Kliebert has taken the position that Dr. John Doe 2's privileges at Tulane satisfy Act 620, Dr. John Doe 2 has concerns that her position is inconsistent with the plain language of the Act, which requires that "the physician is a member in good standing of the medical staff of a hospital . . . with the ability to admit a patient and to provide diagnostic and surgical services to such patient."  (JX 115)  Dr. John Doe 2 cannot provide diagnostic and surgical services to patients admitted to Tulane as required by the plain language of the statute.  (6/25/2015 Trial Tr. 123:3 – 16 (Dr. Marier); 6/23/2015 Trial Tr. 38:17 – 39:10, 40:11 – 22 (Dr. John Doe 2).)

48.    Dr. John Doe 2 has concerns that the position Secretary Kliebert has taken regarding his privileges at Tulane during the course of this litigation may change at a later date. As a result, he will not risk his medical license by performing abortions in Metairie if Act 620 is allowed to take effect.  (6/23/2015 Trial Tr. 38:17 – 39:10, 40:11 – 22 (Dr. John Doe 2); JX 191.)

### 3.    DR. JOHN DOE 3

49.    Dr. John Doe 3 has been licensed to practice medicine in Louisiana since 1976. (6/22/2015 Trial Tr. 109:17 – 25 (Dr. John Doe 3).)  He is a board-certified OB/GYN and has a general OB/GYN practice, where he delivers babies and routinely performs gynecological surgery including hysterectomies, laparoscopies, and dilation and curettages ("D&Cs"). (6/22/2015 Trial Tr. 110:12 – 25, (Dr. John Doe 3).)

50.    Dr. John Doe 3 is the chief medical officer of Hope Clinic, where he has worked since 1981.  (6/22/2015 Trial Tr. 108:1 – 6, 117:2 – 15 (Dr. John Doe 3), 21:18 – 20 (Pittman).) He provides medication abortions through eight weeks and surgical abortions through 16 weeks,

11

six days LMP.  (6/22/2015 Trial Tr. 119:16-19, 132:9-11 (Dr. John Doe 3); 6/22/2015 Trial Tr.

35:18-22 (Pittman).)

      51.     Dr. John Doe 3 performs abortions at Hope Clinic on Thursday afternoons and all

day on Saturday.  He sees approximately 20 to 30 abortion patients a week.  On occasion, he will

cover for Dr. John Doe 1 and will see more patients in those instances.  (6/22/2015 Trial Tr.

117:16 – 118:8, 153:15 – 17 (Dr. John Doe 3).)

      52.     Dr. John Doe 3 currently has admitting privileges at Willis-Knighton Hospital in

Bossier and at Christus Highland Hospital in Bossier, both of which are within 30 miles of Hope

Clinic.  (6/22/2015 Trial Tr. 21:25 – 22:2 (Pittman), 120:15 – 23, 148:21 – 149:5 (Dr. John Doe

3).)  Dr. John Doe 3's privileges at Christus Highland Hospital require him to admit

approximately 50 patients per year.  (6/22/2015 Trial Tr. 150:24 – 152:4 (Dr. John Doe 3); JX

59).)

      53.     Dr. John Doe 3 has admitting privileges because regularly admits patients to the

hospital as part of his private OB/GYN practice, not because of his work at Hope Clinic.

(6/22/2015 Trial Tr. 124:1 – 13, 147:7 – 20(Dr. John Doe 3).)

#### 4.     DR. JOHN DOE 4

      54.     Dr. John Doe 4 is a board-certified OB/GYN.  He obtained his license to practice

medicine in Maryland in 1959, and in Louisiana in 1965.  (Dr. John Doe 4 Dep. at 16:11 – 13,

17:6 – 20, 18:1 – 8.)

      55.     When Dr. John Doe 4 maintained a full OB/GYN practice, he had admitting

privileges at four hospitals in the Baton Rouge area.  He required admitting privileges to do

OB/GYN surgery and to deliver babies.  (Dr. John Doe 4 Dep. at 18:17 – 20:2.)  These privileges

did not help his pregnancy termination patients because they did not go to the hospital.  (Dr. John

Doe 4 Dep. at 96:11 – 24.)

56.    Dr. John Doe 4 performs abortions at Causeway Clinic in Metairie.  He does not currently have admitting privileges at a hospital within 30 miles of the clinic.  (6/23/2015 Trial Tr. 18:5 – 18 (Dr. John Doe 2).)  His inability to obtain privileges is not related to his competence as a physician.

57.    Dr. John Doe 4 applied for admitting privileges at Ochsner-Kenner Medical Center ("Ochsner") on August 6, 2014.  (JX 57 at 1.)  Dr. John Doe 4 chose to apply to Ochsner because he knew a physician there who agreed to provide coverage for him.  (Dr. John Doe 4 Dep. at 85:2 – 10.)  Ochsner was the only hospital where Dr. John Doe 4 knew a physician who would cover for him and who met the hospital's criteria to be a covering physician.  (Dr. John Doe 4 Dep. at 85:2 – 10; 109:1 – 110:113.)

58.    Ochsner requested additional information, which Dr. John Doe 4 provided, but he has not received a response at this time.  (JX 98; Dkt. 121 at 3 – 4; JX 60 at 2.)

59.    Dr. John Doe 4 did not apply for admitting privileges at Touro Infirmary or LSU New Orleans because both hospitals required Dr. John Doe 4 to find an OB/GYN to cover for him, which Dr. John Doe 4 has been unable to do.  (Dr. John Doe 4 Dep. at 109:1 – 110:113.)

### 5.    DR. JOHN DOE 5

60.    Dr. John Doe 5 is a board-certified OB/GYN and has been licensed to practice medicine in Louisiana since 2005.  (Dr. John Doe 5 Dep. at 15:2 – 13.)  He provides surgical abortions at Delta Clinic and Women's Clinic through 16 weeks LMP.  (Cochran Dep. at 82:4 – 13.)

61.    Dr. John Doe 5 received admitting privileges at Hospital C[5] in New Orleans, which is within 30 miles of Women's Clinic, in July 2014.  (Cochran Dep. at 108:18 – 22; Dr.

---

[5] The name of this hospital is confidential pursuant to the Joint Consent Motion Regarding Confidential Trial Procedures, granted by this Court on June 23, 2015.  (Dkt. 158; Dkt.161.)

John Doe 5 Dep. at 37:22 – 38:4.)  The Parties have stipulated that Dr. John Doe 5's privileges at Hospital C are "active admitting privileges" as defined in Act 620.  (Dkt. 176; Cochran Dep. 109:5 – 9; Dr. John Doe 5 Dep. at 37:22 – 38:4, 44:4 – 45:4.)

62.     Dr. John Doe 5 does not currently have admitting privileges at a hospital within 30 miles of Delta Clinic in Baton Rouge.  He applied for admitting privileges at Woman's Hospital, Lane Regional Medical Center, and Baton Rouge General Medical Center, but has been unable to find a local physician who is willing to provide coverage for him when he is not in Baton Rouge, which all three hospitals require.  (JX 109 ¶ 32; Dkt 51; Dr. John Doe 5 Dep. at 38:2 – 44:3.)

63.     The physicians whom Dr. John Doe 5 has asked to cover for him are fearful that they will be subjected to harassment from anti-abortion activists.  (Dr. John Doe 5 Dep. at 40:16 – 19, 44:19 – 45:10; JX 109 ¶ 32.)

### 6.     DR. JOHN DOE 6

64.     Dr. John Doe 6 has been practicing medicine for 49 years.  He is the medical director of Women's Clinic and Delta Clinic.  Dr. John Doe 6 provides only medication abortion, and only at Women's Clinic.  (JX 109 ¶ 8.)

65.     Dr. John Doe 6 does not currently have admitting privileges at a hospital within 30 miles of Women's Clinic or Delta Clinic.  His inability to obtain privileges is not related to his competence as a physician.

66.     From approximately 1973 to 2005, when he had an OB/GYN practice, Dr. John Doe 6 had admitting privileges at various hospitals in New Orleans.  As his private practice became solely a gynecology practice, and due to the low rate of abortion complications, he was unable to meet the hospitals' requirements to admit a minimum number of patients each year. (JX 168 ¶ 13.)  Dr. John Doe 6 also did not need admitting privileges because he was not

14

admitting patients to the hospital. Consequently, when his admitting privileges expired, he did not apply to renew them. (*Id.*)

67.    On September 17, 2014, Dr. John Doe 6 applied for admitting privileges at East Jefferson Hospital in New Orleans, which is within 30 miles of Women's Clinic. (JX 109 ¶ 31; Dkt. 51 at 2.) That application, pending for almost a year, is considered by the Court to have been *de facto* denied.

68.    Dr. John Doe 6 contacted Tulane University Hospital about the possibility of obtaining admitting privileges and was told not to bother applying because he would not be granted privileges, as he had not had admitting privileges at any hospital since 2005. (JX 168 ¶ 13.)

## C.    EFFECT OF HARRASSMENT EXPERIENCED BY LOUISIANA ABORTION PROVIDERS

69.    Past harassment of abortion providers has a direct impact on the ability of the clinics to recruit physicians who can meet the admitting privileges requirement.

70.    Each of Louisiana's five clinics experiences frequent demonstrations by anti-abortion activists. (6/22/2015 Trial Tr. 23:7 – 11 (Pittman); 6/23/2015 Trial Tr.108:10 – 23 (Dr. John Doe 2); JX 109 ¶ 10; JX 117 ¶ 6; Dr. John Doe 5 Dep. at 129:13 – 130:18.) These demonstrations require some clinics to have additional security on site. (6/22/2015 Trial Tr. 23:18 – 19 (Pittman).)

71.    Hope Clinic has been the subject of three violent attacks: once by a man wielding a sledgehammer, once by an arsonist armed with a Molotov cocktail, and once by having a hole drilled through the wall overnight and butyric acid poured through it. (6/22/2015 Trial Tr. 23:12 – 19 (Pittman).)

72.    Dr. John Doe 1 works at Hope Clinic in fear of violence.  (6/24/2015 Trial Tr. 78:20 – 79:7 (Dr. John Doe 1).)

73.    Dr. John Doe 3 has been threatened as a result of his work at Hope Clinic.  Last year, anti-abortion activists from outside Louisiana left fliers on neighbors' mailboxes calling him an abortionist and saying they wanted to convert him to Jesus.  (6/22/2015 Trial Tr. 108:15 – 109:5 (Dr. John Doe 3).)

74.    These individuals also approached Dr. John Doe 3's regular medical practice patients as they tried to enter his office, requiring the building security officers to escort the activists off the premises.  These individuals told Dr. John Doe 3's patients that he killed babies and that they should not see him.  (6/22/2015 Trial Tr. 109:6 – 16 (Dr. John Doe 3).)

75.    Dr. John Doe 3 fears that, if the other Louisiana abortion providers are not able to obtain admitting privileges, he will become an even greater target for anti-abortion violence.  He testified that "all [these individuals] have to do is eliminate [him] as they have Dr. Tiller and some of the other abortion providers around the country" to eliminate abortion entirely in Northern Louisiana.  (6/22/2015 Trial Tr. 174:13 – 175:25 (Dr. John Doe 3).)

76.    Dr. John Doe 3 is also concerned that such individuals could "cause a lot of other . . . problems that would affect [his] ability to perform the rest of [his] practice."  (6/22/2015 Trial Tr. 174:13 – 175:7 (Dr. John Doe 3).)

77.    Dr. John Doe 3 has difficulty arranging coverage for his OB/GYN practice because other OB/GYN doctors in the Shreveport area refuse to cover his practice as a result of his work at Hope Clinic performing abortions.  (6/22/2015 Trial Tr. 111:5 – 18, 112:21 – 113:24 (Dr. John Doe 3).)

78.     As a result of his fears, and the demands of his private OB/GYN practice, if Dr. John Doe 3 is the last physician performing abortion in either the entire state or in the northern part of the state, he will not continue to perform abortions.  (6/22/2015 Trial Tr. 174:4 – 176:23 (Dr. John Doe 3).)

79.     In the southern part of the state, a physician quit working at Causeway Medical Clinic after receiving harassing telephone calls at his private practice and anti-abortion activists demonstrated outside the hospital where he worked.  (Gross Dep. at 27:5 – 16.)

80.     Dr. John Doe 2 testified behind a screen and under a pseudonym at trial because he feels that it is in his best interests to keep as much anonymity as possible for his own personal safety.  He has received threatening phone calls, has been followed into restaurants and accosted, and has been shouted at with profanity and told that he was going to hell.  (6/23/2015 Trial Tr. 12:23 – 13:15 (Dr. John Doe 2).)

81.     Dr. John Doe 2 was forced to leave a private practice when the practice's malpractice insurer refused to cover him if he continued to perform elective pregnancy terminations.  (6/23/2015 Trial Tr. 16:5 – 17:1 (Dr. John Doe 2).)

82.     Anti-abortion activists have picketed the homes – and neighbors' homes – of Dr. John Doe 5 and Dr. John Doe 6.  (Dr. John Doe 5 Dep. at 125:13 – 127:21, 127; JX 109 ¶ 11.)

83.     Anti-abortion activists picketed the school of the children of a doctor formerly affiliated with Delta Clinic, and a business employing an individual who also worked at Delta Clinic.  (Cochran Dep. at 100:19 – 101:3; JX 109 at 2204.)

84.     Anti-abortion activists have successfully placed pressure on hospitals employing doctors who provide abortions elsewhere to force those physicians to resign from the hospital or cease their abortion practice.  Dr. John Doe 5 received an ultimatum from a hospital where he

17

had privileges and resigned from a hospital rather than cease providing abortions.  Another physician agreed to stop providing abortions at Causeway Medical Clinic after his OB/GYN practice was acquired by a hospital system that subsequently became the target of anti-abortion activists.  (Dr. John Doe 5 Dep. at 124; JX 110 ¶ 21.)

85.    Anti-abortion activists have targeted at least one physician who agreed to provide emergency care for abortion complications, even though he did not provide abortions himself. (Dr. John Doe 5 Dep. at 40:13 – 19, 128:13 – 129:6, JX 110 ¶ 20.)

86.    Anti-abortion activists have targeted hospitals at which Dr. John Doe 5 sought admitting privileges in response to his application.  Fear of intimidation has prevented him from securing a covering physician as required by Baton Rouge hospitals where his applications are pending.  (Dr. John Doe 5 Dep. at 40, 128; JX 110 ¶ 12, 20; JX 109 ¶ 29.)

87.    Clinics in Louisiana routinely make efforts to recruit doctors to work at the clinics, such as placing advertisements throughout the state and working with reproductive health specialists to identify potential candidates.  (6/22/2015 Trial Tr. 22:16 – 19, 24:16 – 25:1, 33:4 – 10, 87:15 – 20 (Pittman); Gross Dep. at 24:24 – 26:16.)  Candidates express concerns about the effect of an abortion practice on the rest of their medical practice.  (6/22/2015 Trial Tr. 24: 7 – 12 (Pittman).)

88.    Recruiting physicians to work in the clinics is very difficult as a result of the atmosphere surrounding abortion in Louisiana.  This includes harassment and violence towards abortion providers both within Louisiana and nationally, including the murders of eight abortion providers across the country.  (6/22/2015 Trial Tr. 22:19 – 23:11, 23:20 – 25, 87:8 – 10 (Pittman).)

89.     Doctors who appear to be good candidates consistently express reluctance to provide abortions as a result of the numerous restrictions placed on Louisiana abortion providers by law and regulation.  (6/22/2015 Trial Tr. 22:21 – 23:11 (Pittman).)  It is "very unlikely" that either Delta Clinic or Women's Clinic could attract a new physician, given that "most doctors are simply too afraid."  (JX 110 ¶¶ 16, 23 n.1; JX 109 ¶ 14.)

90.     Even before Act 620, clinics in Louisiana have had difficulty recruiting physicians to provide abortions due to fear of violence, harassment, and impact on other aspects of a physician's practice.  Act 620 has made recruiting doctors even more difficult.

91.     The Court finds that the clinics will not be able to comply with the Act by recruiting new physicians who have or can obtain admitting privileges.  For example, Hope Clinic recently identified an interested doctor who was ultimately not a viable candidate as a result of Act 620's admitting privileges requirement.  (6/22/2015 Trial Tr. 24:19 – 25:1 (Pittman).)

## III.     LOUISIANA WOMEN AND ABORTION

92.     Louisiana is one of the poorest states in the nation, with the nation's third-highest levels of overall and child poverty.  Twenty-six parishes are classified by the U.S. Department of Agriculture as persistently poor.  Most of the persistently poor parishes are rural, with the exception of one parish in the New Orleans area.  Women in Louisiana are much more likely than men to be poor.  57.4% of people living below the federal poverty line in Louisiana are women.[6]  (6/23/2015 Trial Tr. 128:4 – 7, 130:14 – 131:2, 131:25 – 132:3, 133:8 – 136:2 (Katz); JX 124 ¶¶ 7, 9; PX 166; PX 167; JX 124 ¶ 10.)

---

[6] The United States Department of Health and Human Services defines the federal poverty line as a single person who makes less than $11,670 per year, with an additional $4,060 per year for each additional member of the household.  *2014 Poverty Guidelines*, U.S. Dep't of Health & Human Servs., http://aspe.hhs.gov/poverty/14poverty.cfm.  (JX 124 ¶ 10.)

93.    Approximately 230,000 women of child bearing age live below the federal poverty line in Louisiana.  (6/23/2015 Trial Tr. 135:14 – 16 (Katz).)  These women often do not earn enough to cover their monthly expenses and often do not have enough at the end of each month to buy food and pay their bills.  (6/23/2015 Trial Tr. 141:23 – 142:10 (Katz).)

94.    More than half of Louisiana families with children are at or below 125% of the federal poverty line, and 41.6% of households headed by single mothers with dependent children are at or below the federal poverty line.  (6/23/2015 Trial Tr. 135:21 – 136:2 (Katz); JX 124 ¶ 8.)

95.    Few Louisiana women have medical insurance that covers abortion.  (6/22/2015 Trial Tr. 20:10 – 21:4 (Pittman).)

96.    Women who seek abortion in Louisiana come from all socioeconomic and ethnic backgrounds.  (6/22/2015 Trial Tr. 18:18 – 19 (Pittman); 6/23/2015 Trial Tr. 19:11 – 20:3 (Dr. John Doe 2).)  Women seeking abortion are, however, disproportionately poor.  (6/23/2015 Trial Tr. 191:22 – 192:8 (Katz); JX 124 ¶¶ 8, 13, 14.)  Approximately 42% of women having abortions in the U.S. in 2008 subsisted at or below the federal poverty line, and another 27% had incomes at or below 200% of the poverty line.  Given the high rate of poverty in Louisiana, these figures are likely to be much higher in Louisiana.  Consistent with high poverty levels, half the women seeking abortion in Louisiana have no education beyond high school.  (6/23/2015 Trial Tr. 136:3 – 13 (Katz); JX 192, JX 124 ¶ 14.)

97.    Over 60% of women seeking abortion in Louisiana are African American.  (JX 192 at 3673; 6/23/2015 Trial Tr. 138:16 – 25 (Katz).)

98.    Nearly 75% of women who obtain abortions in Louisiana already have one or more children, which is higher than the national average.  (6/22/2015 Trial Tr. 94:6 – 11 (Pittman); 6/23/14 Trial Tr. 152:19 – 153:1 (Katz); JX 192 at 3673.)

20

99.    In some instances, poor women must choose between paying for an abortion and paying for other basic necessities, such as rent.  (6/22/2015 Trial Tr. 18:16 – 19:13, 34:5 – 22, 89:8 – 13 (Pittman); 6/23/2015 Trial Tr. 135: 4 – 13, 158:9 – 22 (Katz); JX 116 ¶ 14.)

100.    Because there are presently only five clinics, staffed by six physicians, in the entire state of Louisiana that offer abortion care, many women travel considerable distances to obtain abortion services at significant financial and social cost.

101.    Many Louisiana women have difficulty affording or arranging for transportation and childcare on the days of their clinic visits, in addition to the challenge of affording the abortion itself.[7]  (6/22/2015  Trial Tr. 18:16 – 19:13 (Pittman); 6/23/2015 Trial Tr. 142:24 – 143:21, 145:18 – 25 (Katz).)  Increased travel distance to clinics exacerbates the difficulty of securing transportation.  (6/23/2015 Trial Tr. 20:16 – 23 (Katz).)

102.    Intercity travel for low-income women presents a number of significant hurdles, including the logistics and cost of transportation, the costs associated with time off from work, childcare costs, and numerous other socio-psychological hurdles.  (JX 124 ¶¶ 16, 17.)  Low-income women are likely to live in households that have no vehicles.  (6/23/2015 Trial Tr. 142:14 – 23; 146:1 – 9 (Katz).)

103.    Patients frequently call to reschedule appointments due to transportation and childcare issues, thus delaying their access to abortion.  (6/22/2015 Trial Tr. 17:19 – 20:15(Pittman).)

104.    Under Louisiana law, a patient must receive state-mandated counseling and an ultrasound at least 24 hours before an abortion.  (JX 109 ¶ 18; JX 116 ¶ 11; JX 117 ¶ 8.)  Due to the 24-hour notification and waiting period, patients must make two trips to the clinic: the first to

---

[7] In some cases, Hope Clinic has reduced or waived its fee to ensure that women are not forced to delay until a later, more expensive procedure is required.  (6/22/15 Trial Tr. 19:14 – 18 (Pittman).)

receive the ultrasound and state-mandated counseling and the second to obtain an abortion.  (JX 109 ¶ 19.)  This two-trip requirement creates particular hardships for poor women.  (6/23/2015 Trial Tr. 20:16 – 23 (Dr. John Doe 2), 148:13 – 18 (Katz).)

## IV.   LEGAL ABORTION IS A SAFE MEDICAL PROCECURE

### A.   LEGAL ABORTION IS SAFE NATIONALLY AND IN LOUISIANA

105.   Abortion is a common medical procedure in the United States, with nearly one million procedures performed each year.  (6/22/2015 Trial Tr. 197:1 – 6, 232:7 – 13 (Estes); JX 123 ¶ 24.)

106.   Abortion is one of the safest medical procedures in the United States.  (6/22/2015 Trial Tr. 197:1 – 6 (Estes); 6/29/2015 Trial Tr. 32:6 – 9 (Pressman); JX 124 ¶ 24; JX 131 ¶ 54.) Dr. Robert Marier, Defendant's expert witness, has acknowledged "that most first-trimester abortions are performed without serious complications."  (JX 135 at 2804.)

107.   Approximately one in three women in the United States will have an abortion during her lifetime.  (6/22/2015 Trial Tr. 197:1 – 6 (Estes); JX 123 ¶ 24.)

108.   Approximately 90% of abortion procedures occur in the first trimester, almost all of which are performed in an outpatient setting.  (6/22/2015 Trial Tr. 197: 7 – 17 (Estes); JX 123 ¶ 13.; 6/29/2015 Trial Tr. 33:15 – 18 (Pressman).)

109.   There are two types of abortion procedures, surgical abortion and medication abortion.  (JX 123 ¶ 15.)

110.   Surgical abortion is a minimally invasive procedure that involves the use of instruments to evacuate the contents of the uterus, but does not require an incision or the use of general anesthesia.  (6/22/2015 Trial Tr. 138:23 – 139:16 (Dr. John Doe 3); 6/29/2015 Trial Tr. 32:10 – 19, 48:19 – 49:2 (Pressman); JX 123 ¶ 16.)

111.    First trimester surgical abortions are nearly identical to D&Cs to complete a spontaneous miscarriage or for other diagnostic or therapeutic reasons.  (JX 123 ¶19; Dr. John Doe 5 Depo. 123:15 – 17.)

112.    Physicians are not required to have admitting privileges in order to perform D&Cs in Louisiana.  (6/26/2015 Trial Tr. 116:9 – 14 (Cudihy).)

113.    Medication abortion involves the use of a combination of two drugs, usually mifepristone and misoprostol.  (6/22/2015 Trial Tr. 130:8 – 131:1 (Dr. John Doe 3); JX 123 ¶ 22.)  A woman typically takes mifepristone at the clinic and then takes misoprostol at home.  (6/22/2015 Trial Tr. 131:23 – 132:6 (Dr. John Doe 3), 208:23 – 209:15 (Estes); JX 123 ¶ 22.)  Medication abortion is also used as a treatment option in connection with spontaneous abortion, also known as miscarriage.  (6/22/2015 Trial Tr. 210:23 – 211:12 (Estes).)

114.    Virtually all surgical abortions require only mild or moderate sedation and/or local anesthesia.  (6/22/2015 Trial Tr. 138:23 – 139:16 (Dr. John Doe 3).)

115.    Mild or moderate sedation and local anesthesia are much safer than the general anesthesia used in an operating room setting.  (6/22/2015 Trial Tr. 197:24 – 198:12 (Estes); 6/29/2015 Trial Tr. 33:23 – 35:15 (Pressman); JX 123 ¶ 18; PX 185 ¶ 793.)  Medication abortion requires no anesthesia or sedation.  (JX 123 ¶ 23.)

116.    Complications from surgical abortion are rare and include infection, hemorrhage, retained tissue, incomplete abortion, and perforation of the uterus.  (6/22/2015 Trial Tr. 36:20 – 37:24 (Pittman), 198:22 – 5 (Estes).)

117.    Most complications of surgical abortions can be managed in the clinic, including by administering medications that reduce bleeding or cause the uterus to contract, massaging the uterus, applying pressure, using a Foley catheter to apply pressure to the uterus internally,

suturing, or administering oral antibiotics to treat infection.  Surgical intervention is not commonly required.  (6/22/2015 Trial Tr. 25:2 – 5, 89:14 – 25 (Pittman), 135:9 – 137:8 (Dr. John Doe 3), 201:15 – 207:22 (Estes); 6/29/2015 Trial Tr. 38:21 – 39:3 (Pressman).)

118.    Medication abortion involves the use of a combination of two drugs, usually mifepristone and misoprostol.  (6/22/2015 Trial Tr. 130:8 – 131:1 (Dr. John Doe 3); JX 123 ¶ 22.)  A woman typically takes mifepristone at the clinic and then takes misoprostol at home. (6/22/2015 Trial Tr. 131:23 – 132:6 (Dr. John Doe 3), 208:23 – 209:15 (Estes); JX 123 ¶ 22.) Medication abortion is also used as a treatment option in connection with spontaneous abortion, also known as miscarriage.  (6/22/2015 Trial Tr. 210:23 – 211:12 (Estes).)

119.    The most common complication for medication abortion is incomplete abortion or retained tissue, which is typically remedied by a return visit to the clinic for a suction D&C. (6/22/2015 Trial Tr. 132:9 – 21 (Dr. John Doe 3), 209:16 – 210:16 (Estes); 6/29/2015 Trial Tr. 43:18 – 44:3 (Pressman).)

120.    The prevalence of any complication, including minor complications such as excessive bleeding of first trimester abortion, in the outpatient setting is approximately 0.8%. The prevalence of major complications requiring treatment in a hospital is 0.05%.  The risks of abortion remain low through the second trimester, but the risks do increase with gestational age. The risk of complication requiring hospitalization in the second trimester is approximately 1.0%. (6/22/2015 Trial Tr. 198:13 – 199: 5, 199:11 – 24, 199:25 – 200: 9 (Estes); JX 123 ¶ 25; 6/29/2015 Trial Tr. 42:1 – 44:17, 75:15 – 76:4, 95:2 – 17 (Pressman); PX 195 at 499.)

121.    By comparison, a suction D&C performed after a miscarriage carries greater risk than a suction D&C performed for an abortion because, during a miscarriage, the cervix is already open, allowing the passage of bacteria into the uterine cavity.  (6/29/2015 Trial Tr.

31:19 – 32:2, 35:20 – 36:1 (Pressman).)  There are also far more risks associated with carrying a pregnancy to term and delivering a baby than with abortion.  (6/22/2015 Trial Tr. 129:21 – 130:4 (Dr. John Doe 3), 199:6 – 10 (Estes); JX 123 ¶ 60; 6/29/2015 Trial Tr. 32:3 – 9 (Pressman).)

122.    When a complication requires surgical intervention in the hospital setting, emergency physicians stabilize the patient and facilitate treatment by the appropriate specialist. This is the standard of care.  (6/22/2015 Trial Tr. 213:7 – 17, 249:8 – 250:21 (Estes); 6/29/2015 Trial Tr. 39:4 – 40:2, 55:13 – 56:11; 57:23 – 58:2 (Pressman); 6/24/2015 Trial Tr. 18:12 – 19 (Dr. John Doe 1); 6/25/2015 Trial Tr. 52:20 – 25 (Marier).)

123.    Patients who visit the emergency room after an abortion often are experiencing normal side effects of the procedure and can be observed and released, or treated and released without admission.  (6/22/2015 Trial Tr. 212:1 – 17 (Estes).); 6/29/2015 Trial Tr. 37:19 – 39:3 (Pressman).)  It is more common for women to present at the emergency room with symptoms of spontaneous abortion or miscarriage than with complications following an abortion.  (6/22/2015 Trial Tr. 212:18 – 25 (Estes).)  Emergency room doctors are equipped to stabilize a patient who is experiencing complications from a miscarriage, which are similar to complications following an abortion.  (6/22/2015 Trial Tr. 213:1 – 6, 213:18 – 22 (Estes); 6/29/2015 Trial Tr. 59:4 – 5 (Pressman).)

124.    When women do not have access to safe abortion, because abortion is expensive or difficult to obtain, they may be forced to delay and seek an abortion at a later gestational age, which increases the risks of the procedure.  (6/22/2015 Trial Tr. 200:20 – 201:6, 223:19 – 224:8 (Estes); JX 123 ¶ 60.)  Women may also resort to trying to self-induce abortions, seek unsafe abortions, or obtain medications through the internet, which can carry significant risk of death, complications, or poor health outcomes.  Women without financial resources are at the greatest

risk of these consequences.  (6/22/2015 Trial Tr. 224:9 – 225:3 (Estes); JX 123 ¶¶ 60, 62.)  The evidence in the record is consistent with abortion in Louisiana having the same rates of complication as elsewhere in the United States.

125.    In the last 23 years, Hope Clinic, which serves in excess of 3,000 patients per year, has directly admitted only four patients to the hospital for treatment.  (6/22/2015 Trial Tr. 25:13 – 17, 39:12 (Pittman), 127:7 – 10 (Dr. John Doe 3).)  In each instance, regardless of whether the physician had admitting privileges, the patient received appropriate care and was either observed or treated and discharged from the hospital.  (6/22/2015 Trial Tr. 127:11 – 22, 128:4 – 14, 128:14 – 129:7, 172:13 – 173:5, 129: 8 – 20 (Dr. John Doe 3).)

126.    From 2009 through mid-2014, approximately 4,171 abortions were performed at Bossier Clinic, and only two patients required direct hospital transfer following an abortion.  (JX 117 ¶ 9.)

127.    In the same period, 2009 through mid-2014, approximately 10,836 abortions were performed at Causeway Clinic, and only one patient required direct hospital transfer after an abortion.  (JX 117 ¶ 9.)

128.    Dr. John Doe 2, who has performed 30,000 to 40,000 abortions since 1980, has had no more than 20 patients who required hospitalization.  (6/23/2015 Trial Tr. 46:11 – 20 (Dr. John Doe 2).)

129.    From 2009 through mid-2014, Dr. John Doe 2 directly cared for approximately 6,000 patients who received abortions.  Only two of these patients experienced complications requiring direct hospital transfer.  (JX 187 ¶ 6.)  In both of those situations, he spoke with the hospital doctor who took over care when the patient was admitted to the hospital.  He has never sent a patient to another institution without calling the doctor taking over care for the patient and

26

sending all available written patient medical records to that doctor.  (6/23/2015 Trial Tr. 42:19 –

43:12 (Dr. John Doe 2).)  Both of these patients received appropriate care and were discharged

from the hospital.  (6/23/2015 Trial Tr. 43:13 – 45:9, 45:10 – 46:10 (Dr. John Doe 2).)

130.    Dr. John Doe 5 has performed thousands of abortions at Women's Clinic and

Delta Clinic in the past three years and has never once had to transfer a patient to the hospital.

(JX 110 ¶ 7.)

131.    Dr. John Doe 6, who in the past 10 years performed many thousands of

medication and surgical abortions, has had to make a direct transfer to a hospital on only two

occasions.  Only one of those patients was admitted; the other was treated and released.  (JX 168

¶ 8.).

### B.    LOUISIANA CLINICS HAVE EMERGENCY PROTOCOLS IN PLACE TO ADDRESS PATIENT NEEDS

132.    Patients who receive abortion care in Louisiana's abortion clinics are determined

to be stable by the clinic's medical staff before they are allowed to leave the clinic.  (6/22/2015

Trial Tr. 103:22 – 104:4 (Pittman); JX 117 ¶ 10; JX 158; JX 161; JX 162.)

133.    Louisiana clinics are required by law to provide a patient with the name and

phone number of the hospital nearest to the patient, which is not often within 30 miles of the

clinic because many patients do not live within 30 miles of the clinic.  (6/22/2015 Trial Tr.

26:21 – 27:5, 105:13 – 17 (Pittman); 6/24/2015 Trial Tr. 174:25 – 175:6 (Castello); JX 157; JX

159; JX 161; JX 162; JX 164; JX 165.)

134.    Clinic patients are also provided with a clinic telephone number that is staffed 24

hours a day, seven days a week.  The individual who answers the phone has access to a clinic

doctor at all times, who is available to give instructions regarding the patient's care.  (6/22/2015

Trial Tr. 27:6 – 18, 28:7 – 16 (Pittman), 126:4 – 15 (Dr. John Doe 3); Sylvia Cochran Dep. at

132:5 – 144:11; JX 117 ¶ 11; JX 157; JX 159; JX 161; JX 162; JX 164; JX 165.)

135.    When patients leave Hope Clinic, Bossier Clinic, and Causeway Clinic, aftercare

instructions are reviewed with the patient and the patient is told to call the clinic if she has any

concerns.  Aftercare instructions include what the patient should expect after the procedure and

how to care for herself at home.  Patients are also required to sign the aftercare instructions.

(6/22/2015 Trial Tr. 26:21 – 27:5, 28:19 – 29:9, 40:11 – 41:2 (Pittman); JX 117 ¶ 10; JX 159; JX

162; JX 165.)

136.    If a patient experiencing a complication after she leaves the clinic contacts the

clinic, the clinic will advise her to go to the hospital closest to her, which is not necessarily a

hospital within 30 miles of the clinic.  (6/22/2015 Trial Tr. 90:22 – 91:14 (Pittman), 126:16 –

 127:6 (Dr. John Doe 3); JX 159; JX 162; JX 165.)  This is the standard of care.  (6/22/2015 Trial

Tr. 222:1 – 14 (Estes).)

137.    Patients are scheduled for follow-up visits after their procedures.  In the case of

surgical abortion, these follow-up visits may not be necessary if a patient calls and informs the

clinic that she took a pregnancy test with negative result.  (6/22/2015 Trial Tr. 41:4 – 18

(Pittman); 6/23/2015 Trial Tr. 89:1 – 16 (Dr. John Doe 2); JX 159; JX 162; JX 165.)

138.    Although many women do not return to a clinic for a follow-up visit, they know

that they can contact the clinic if they have any concerns.  (6/22/2015 Trial Tr. 42:11 – 15

(Pittman); JX 117 ¶ 10, 11; JX 157; 159; JX 161; JX 162; JX 163; JX 164; JX 165.)  Women are

likely to contact the clinic in the event of a complication after abortion. because the clinic will

not charge fees for follow up care and because, if the patient contacts another physician, she will

likely be told to follow-up with the provider who performed the abortion. (6/22/2015 Trial Tr. 45:22 – 46:8 (Pittman).)

139.    In the rare event that a patient at the clinic requires emergency care, a clinic physician makes the determination that the patient needs to be transferred to a hospital. (6/22/2015 Trial Tr. 25:18 – 20, 40:2 – 4, 90:1 – 5 (Pittman); JX 117 ¶ 10; JX 158; JX 160; JX 161.)

140.    If a clinic patient requires hospital care, transportation to the hospital is arranged, a copy of the patient's medical records are sent to the hospital with the patient, and the physician will speak with someone at the hospital to provide information regarding the patient's condition. (6/22/2015 Trial Tr. 25:21 – 26:13 (Pittman); JX 117 ¶ 10; JX 158; JX 160.)

## V.    ADMITTING PRIVILEGES

### A.    THE ADMITTING PRIVILEGES REQUIREMENT DOES NOT CONFORM TO ACCEPTED MEDICAL PRACTICES AND DOES NOT PROMOTE CONTINUITY OF CARE FOR PATIENTS

141.    The Act's requirement that abortion providers have active admitting privileges at a hospital within 30 miles of the clinic where they perform abortions does not conform to common medical standards. (6/22/2015 Trial Tr. 214:3 – 13, 225:4 – 6 (Estes).)

142.    Requiring a physician who performs abortions to have admitting privileges provides no benefits to women and does not ensure continuity of care for patients. (6/22/2015 Trial Tr. 222:13 – 16 (Estes); 6/29/2015 Trial Tr. 26:4 – 15, 28:12 – 19 (Pressman); Dr. Cecilia Mouton Dep. at 171:25 – 173:9.)

143.    At trial, Defendants did not introduce any evidence showing that patients have better outcomes when their physicians have admitting privileges.

144.    Admitting privileges requirements such as the Act's are opposed by the medical community. Specifically, the American College of Obstetricians and Gynecologists ("ACOG")

29

and the American Medical Association ("AMA") are opposed to these admitting privileges requirements.  (PX 142; JX 136; 6/22/2015 Trial Tr. 215:4 – 15 (Estes).)

145.    Both ACOG and the AMA have taken the position that "there is simply no medical basis to impose a local admitting privileges requirement on abortion providers," and that such requirements are "out of step with modern medical practice, which contemplates provision of emergency care by specially trained hospital physicians at a hospital near the patient's residence."  (PX 142 at 98, 104.)

146.    The AMA and ACOG also believe that a similar Texas admitting privileges requirement "jeopardizes women's health . . . by imposing a legislative constraint on access to safe and legal abortion."  (PX 142 at 104.)

147.    Whether a patient's treating physician has admitting privileges is not relevant to the patient's care.  If a patient needs to be admitted to the hospital for care, the patient can present to the emergency room and will be admitted to the hospital.  If that patient needs emergency surgery, the patient will be treated by the specialist on call who is best qualified to perform the type of surgery needed.  (6/22/2015 Trial Tr. 220:11 – 25 (Estes); 6/23/2015 Trial Tr. 15:15 – 16:1 (Dr. John Doe 2); 6/29/2015 Trial Tr. 28:20 – 29:16 (Pressman).)

148.    A hospital cannot turn away a patient experiencing an emergency because it is unethical and would be a violation of federal law.  (6/22/2015 Trial Tr. 221:1 – 9 (Estes); 42 U.S.C. § 1395dd (2011).)

149.    Patients who present to the emergency room also do not receive a lesser standard of care because their treating physician did not have admitting privileges.  (6/22/2015 Trial Tr. 221:1 – 14 (Estes).)

150.    It is routine for emergency room doctors to assess patients who present in differing kinds of circumstances, many of whom are experiencing the stress of injury, illness, or trauma.  Patients, even when in significant levels of distress, are able to give emergency room doctors pertinent medical history.  (6/22/2015 Trial Tr. 260:6 – 261:15, 265:2 – 20 (Estes).)

151.    A patient does not have to have the same physician for continuity of care.  In the medical community, patient continuity of care is understood to mean that if a physician is not able to continue providing care to a patient, the physician will make certain that another physician has the information needed to care for the patient.  Continuity of care can be accomplished by communicating with the physician to whom the patient's care is being turned over.  For example, physicians within an OB/GYN practice routinely care for each other's patients, including deliveries.  (6/22/2015 Trial Tr. 124:14 – 125:11 (Dr. John Doe 3); 6/23/2015 Trial Tr. 40:23 – 41:18 (Dr. John Doe 2).)

152.    Many physicians who practice in an office setting are able to ensure continuity of care for their patients without ever having admitting privileges.  (6/22/2015 Trial Tr. 216:8 – 21 (Estes); 6/29/2015 Trial Tr. 28:20 – 30:9 (Pressman).)

153.    The normal practice of medicine involves physicians handing patients off from one shift to the next, from an office-based setting to an emergency room, and from an emergency room to an in-patient ward.  (6/22/2015 Trial Tr. 218:1 – 8 (Estes);  6/29/2015 Trial Tr. 78:25 – 79:5 (Pressman).)   When physicians rely on other physicians to assist in caring for their patients, it is not considered patient abandonment.  (Dr. Mouton Dep. at 82:17 – 22; 83:11 – 15.)

154.    For example, Dr. Cecilia Mouton, the Executive Director of the LSBME, has stated that a physician's transfer agreement with another physician, which all abortion clinics

must maintain, is a mechanism to ensure continuity of care. (Mouton Dep. at 162:6 – 19; Dubea Dep. at 115:4 – 8; Kane Dep. at 71:25 – 72:3.)

155.    Continuity of care for a patient can be maintained even without formal measures, such as a transfer agreement. (6/22/2015 Trial Tr. 241:13 – 23, 242:19 – 243:1 (Estes).)

156.    Moreover, if necessary, the LSBME has the means to investigate and discipline a physician for patient abandonment. (Dr. Mouton Dep. at 85:17 – 86:23.)

### B.    GENERAL PURPOSE OF ADMITTING PRIVILEGES

157.    Hospitals grant admitting privileges to a physician primarily because the physician plans to provide services in the hospital. In general, hospital admitting privileges are not provided to physicians who never intend to provide services in a hospital. (6/29/2015 Trial Tr. 23:16 – 24:6, 25:16 – 26: 3, 27:2 – 11, 74:3 – 75:15 (Pressman).)

158.    Furthermore, surgical privileges are meant for providers who plan to perform surgeries at the hospital. (6/29/2015 Trial Tr. 95:18 – 96:4 (Pressman).)

159.    While hospitals consider a physician's competency in assessing an applicant for admitting privileges, physician competency is but one factor in the equation. (6/29/2015 Trial Tr. 25:16 – 26:3 (Pressman); 6/24/2015 Trial Tr. 50:20 – 51:8 (Pressman); JX 110 ¶ 10; JX 168 ¶ 11 – 13, 17; PX 183.)

160.    Hospitals may deny privileges or decline to consider an application for privileges for myriad reasons unrelated to competency, including the physician's expected usage of the hospital and intent to admit and treat patients there, the number of patients the physician has treated in the hospital in the recent past, the needs of the hospital, the mission of the hospital, or the business model of the hospital, including hospitals that grant privileges only to physicians employed by and on the staff of the hospital and university-affiliated hospitals that grant privileges only to faculty members. (6/29/2015 Trial Tr. 25:16 – 26:3 (Pressman); 6/22/2015

Trial Tr. 169:24 – 170:3 (Dr. John Doe 3); 6/25/2015 Trial Tr. 82:23 – 83:6 (Marier); JX 110 ¶ 10; JX 124 ¶ 50; JX 168 ¶¶ 11 – 13, 17; PX 183.)

161.    If over a period of two to three years, a physician has not admitted any patients to the hospital, a hospital credentialing committee is likely to understand that this physician no longer requires admitting privileges.  (6/29/2015 Trial Tr. 91:7 – 20 (Pressman).)

162.    There are ways other than the hospital credentialing processes to obtain information about a physician's experience, training, and qualifications.  These include state websites such as the LSBME's website, which provides licensing and other provider-specific information.  Physicians also go through a credentialing process as part of the process to obtain malpractice insurance.  (6/29/2015 Trial Tr. 23:16 – 25:15 (Pressman).)

163.    As part of its regulation of physicians' licenses, the LSBME also considers whether physicians are qualified to perform specific procedures.   The LSBME does not allow physicians to do procedures for which they have inadequate training.  (Dr. Mouton Dep. at 48:15 – 49:21.)

164.    The current Executive Director of the LSBME testified that the LSBME's view of a physician's competence to perform specific procedures would effectively "trump" the view of a hospital credentialing committee.  (Dr. Mouton Dep. at 119:8 – 122:23; 189:1 – 7.)

165.    Furthermore, private medical practices do not commonly have credentialing committees.  In this respect, an abortion clinic hiring a doctor to provide services in the clinic is similar to any other private medical practice that hires a doctor to work in that practice. (6/22/2015 Trial Tr. 159:19 – 160:7 (Dr. John Doe 3).)

166.    In Louisiana, there is no uniform set of requirements to obtain an "active" staff appointment at a hospital.  (6/25/2015 Trial Tr. 11:20 – 12:6 (Marier).)  Each hospital defines its

dc-803758

own terminology, requirements, and categories of privileges in its bylaws. (6/25/2015 Trial Tr. 12:11 – 19 (Marier).) There is no standard definition for various levels of privileges accorded to physicians, such as active admitting privileges or courtesy privileges. (6/22/2015 Trial Tr. 167:1 – 15 (Dr. John Doe 3); 6/23/2015 Trial Tr. 104:3 – 8 (Dr. John Doe 2); 6/25/2015 Trial Tr. 11:20 – 12:6 (Marier); 6/29/2015 Trial Tr. 28:4 – 11 (Pressman).)

167.    For example, at some hospitals, an "active" staff appointment does not on its own automatically entitle the physician to admit patients. (JX 46 at 185, JX 141 at 3260.)

168.    Most applications for privileges require references as to medical skill and character from at least two physicians who have observed the applying physician recently. (JX 854, JX 143 at 3357; JX 79 at 1680 – 81, JX 83 at 1873, JX 139 at 3351.) For example, Minden Medical Center prefers that an applicant's peer recommendations come from physicians already on staff at that hospital. (JX 72 at 1300.)

169.    Moreover, several hospitals explicitly acknowledge in their bylaws that they will not award privileges without first ascertaining whether there is the need for another physician in the applicant's specialty. (JX 72 at 1323.)

170.    There is also a subjective component to a hospital making its determination whether to grant privileges to an applicant. (6/29/2015 Trial Tr. 91:21 – 24 (Pressman).)

171.    This subjective component may make it easier for physicians who perform abortions to obtain admitting privileges at hospitals in states where there are fewer legal restrictions on abortion (*e.g.,* allowing abortion through 24 weeks, allowing insurance and Medicaid coverage of abortion). (6/29/2015 Trial Tr. 92:5 – 14 (Pressman).)

172.    In Louisiana, at least two of the providers have experienced an unwillingness by hospitals to grant them privileges as a result of their abortion practices. *See supra* ¶¶ 40, 44.

34

Rapides Regional Medical Center terminated Dr. John Doe 5's privileges when he refused to stop working at Delta Clinic.  (Dr. John Doe 5 Dep. at 20 – 22, 124 – 25; JX 110 ¶ 10; JX 168 ¶ 11.)  Some hospitals also retain the right, as established in their bylaws, to remove entire practice groups from the hospital.  (JX 78 at 1579 – 80.)

173.    At some hospitals in Louisiana, there are suggested time frames in which hospitals *should* review admitting privileges applications.  However, those guidelines are not requirements, and there is no legal recourse for an applicant if the hospital fails to act on the application within the suggested time period.  (JX 67 at 865.)

174.    A hospital's failure to act on an application by either approving or denying it, may result in the hospital considering the application withdrawn.  In this respect, a hospital's failure to act is, in effect, a *de facto* denial of the application.  (6/29/2015 Trial Tr. 93:10 – 20 (Pressman).)

175.    As one example, Tulane Medical Center, has an expectation, but not a requirement, that applications will be processed within 150 days.  If the Board of Trustees has not taken action on the application within 150 days, the applicant must repeat the verification process to ensure the information is still accurate.  (JX 78 at 1554.)

176.    Here, the evidence shows that the applications of Dr. John Doe 1, Dr. John Doe 2, Dr. John Doe 4, and Dr. John Doe 6 have been pending without action for many months, thus resulting in a *de facto* denial of privileges.  *See supra* ¶¶ 29, 46, 59.

C.    **IT IS DIFFICULT FOR ABORTION PROVIDERS TO OBTAIN AND MAINTAIN ADMITTING PRIVILEGES**

177.    A physician who provides abortion but no other obstetric or gynecological services and therefore only rarely will need to admit a patient (*e.g.,* four times in 20 years), is not likely to obtain admitting privileges.  Not only is there no business incentive for the hospital with

35

so few admissions, but there is no way for the hospital to assess the physician's competence.  As a result, the hospital is not likely to keep the physician on the hospital staff or to grant that physician new privileges.  (6/22/2015 Trial Tr. 168:23 – 169:15, 169:24 – 170:3 (Dr. John Doe 3); 6/24/25015 Trial Tr. 41:14 – 42:3 (Dr. John Doe 1); 6/29/2015 Trial Tr. 23:16 – 24:6, 25:16 – 26: 3, 27:2 – 11, 74:3 – 75:15 (Pressman).)

178.    For example, Dr. John Doe 3 has admitting privileges because of his private OB/GYN practice, not because of his work at Hope Clinic.  If he were to give up or limit his private practice in order to devote more time to performing abortions at Hope Clinic, he would probably lose his admitting privileges because he would be unable to admit the requisite number of patients to maintain his privileges.  (6/22/2015 Trial Tr. 147:10 – 20 (Dr. John Doe 3).)

179.    Similarly, when they had full OB/GYN practices delivering babies and performing gynecological surgery, Dr. John Doe 2, Dr. John Doe 4, and Dr. John Doe 6 maintained admitting privileges at a number of hospitals, but are now unable to secure privileges because their practices are exclusively abortion practices.  (6/23/2015 Trial Tr. 24:5 – 21 (Dr. John Doe 2); Dr. John Doe 4 Dep. at 18:17 – 20:2.)

180.    Some hospitals require the physician seeking privileges to live and/or practice within a certain distance of the hospital.  (JX 83 at 1865; JX 139 at 2925; JX 79 at 1683.)  Dr. John Doe 2 and Dr. John Doe 5 travel significant distances from their respective homes to provide abortion services and would not be able to meet this criteria for hospitals within 30 miles of some or all of the clinics where they provide abortions.  (6/23/2015 Trial Tr. 20:24 – 21:6; Dr. John Doe 5 Dep. at 11:3 – 9, 12:2 – 10, 46:19 – 24.)

181.    At many hospitals, it is impossible for a physician to transition from having provisional privileges to permanent privileges without having demonstrated competency by

36

treating patients in that hospital.  (JX 139 at 2972 – 73.)  At Willis Knighton Bossier, a physician will automatically fail to obtain the requested privileges if he does not does not participate in the "required number of cases" during a provisional period.  (JX 83 at 65.)

182.    There is also no evidence in the record supporting a credible explanation for requiring hospital admitting privileges of physicians who only dispense and prescribe medication for induced abortion.  (6/29/2015 Trial Tr. 21:14 – 17 (Pressman); 6/25/2015 Trial Tr. 87:3 – 7 (Marier); JX 135.)  Dr. Marier, an expert witness for the state, agrees that "[A] physician who performs medical abortions need not possess competence in performing the procedures of surgical abortion."  This would apply to Dr. John Doe 6 who provides medication abortions exclusively.  (JX 135 at 2806.)

183.    Hospital admitting privileges are not required to administer oral medications.  The medications that are used in medication abortions can be prescribed for other purposes by physicians who do not have admitting privileges.  (6/22/2015 Trial Tr. 170:24 – 172:2 (Dr. John Doe 3).)

184.    Many hospitals' admitting privileges applications require the applying physician to identify another physician on staff who will cover his or her patients if the applying physician is unavailable.  (JX 78 at 1539, JX 79 at 1677, JX 138 at 2855, JX 83 at 1866.)

185.    Dr. John Doe 5 was unable to find such a physician in Baton Rouge and was thus unable to successfully complete his application.  (Dr. John Doe 5 Dep. at 39:16 – 40:19.)  Dr. John Doe 3 also has difficulty finding physicians to cover for him due to the animosity towards him as an abortion provider.  (6/22/2015 Trial Tr. 111:1 – 113:20 (Dr. John Doe 3).)

186.    Following passage of the Act, anti-abortion activists attempted to interfere with the doctors' admitting privileges applications.  In the fall of 2014, Woman's Hospital received

37

threatening letters from anti-abortion activists.  (JX 110 ¶ 14.)  Woman's Hospital also had to

remove anti-abortion activists from its medical staff offices due to the activists' disruptive

conduct.  (*Id.*)

## VI.    CONTEXT OF PASSAGE OF ACT 620

### A.    LOUISIANA HAS A STATE POLICY OPPOSING LEGALIZED ABORTION AND HAS ENFORCED THIS POLICY BY MAKING IT INCREASINGLY DIFFICULT TO ACCESS ABORTION IN THE STATE

187.    The Louisiana legislature has codified a statement of opposition to legalized

abortion at La. Rev. Stat. § 40:1299.35.0, which states:

> It is the intention of the Legislature of the State of Louisiana to regulate abortion
> to the extent permitted by the decisions of the United States Supreme Court.  The
> Legislature does solemnly declare and find in reaffirmation of the longstanding
> policy of this State that the unborn child is a human being from the time of
> conception and is, therefore, a legal person for purposes of the unborn child's
> right to life and is entitled to the right to life from conception under the laws and
> Constitution of this State.  Further the Legislature finds and declares that the
> longstanding policy of this State is to protect the right to life of the unborn child
> from conception by prohibiting abortion impermissible only because of the
> decisions of the United States Supreme Court and that, therefore, if those
> decisions of the United States Supreme Court are ever reversed or modified or the
> United States Constitution is amended to allow protection of the unborn then the
> former policy of this State to prohibit abortions shall be enforced.

188.    Consistent with this explicit statement of legislative intent, Louisiana has enacted

a system of laws that creates obstacles for women seeking abortion in the state.

189.    The Louisiana legislature passed a "trigger" ban – banning abortion with only a

limited exception to save a woman's life – to take immediate effect should *Roe v. Wade* be

overturned or a constitutional amendment be adopted to allow states to ban abortion.  La. Rev.

Stat. Ann. §§ 40:1299.30, 14:87.  The trigger ban carries a criminal penalty of 10 years'

imprisonment "at hard labor" for performing an abortion.  (*Id*.)

190.    The Louisiana legislature mandates that every woman undergo an ultrasound

before an abortion, even when not medically necessary, and that she be required to listen to an

oral description of the ultrasound image.  La. Rev. Stat. Ann. §§ 40:1299.35.2(B)-(D), 40:1299.35.6, 40:1299.35.12.

191.    The Louisiana legislature mandates a two-trip, 24-hour waiting period for women, and further mandates that a physician – and not another medical professional – give certain state-mandated information designed to discourage abortion to his patient; violation of this provision carries criminal penalties.  La. Rev. Stat. §§ 40:1299.35.2D(2), 40:1299.35.6, 40:1299.35.19 (JX 109 ¶ 18; JX 116 ¶ 11; JX 117 ¶ 8.)

192.    The Louisiana legislature prohibits public funding of abortion for victims of rape or incest unless the victim reports the act to law enforcement *and* certifies a statement of rape or incest that is witnessed by the physician.  La. Rev. Stat. §§ 40.1299.34.5, 40:1299.35.7.

193.    The Louisiana legislature discriminates against physicians who provide abortions. Physicians who provide abortions are expressly excluded from malpractice reform provisions afforded to all other health care practitioners under the state's medical malpractice protection laws.  Such protection "shall not apply to any health care provider when performing the elective termination of an uncomplicated viable pregnancy."  La. Rev. Stat. Ann. §§ 40.1299.31-39(A), 40:1299.41(K).

194.    The Louisiana legislature permits hospitals to refuse to accommodate the performance of abortions.  La. Rev. Stat. Ann. §40:1299.31-33.  (JX 183.)

195.    Louisiana law allows hospitals to discriminate against physicians who provide abortions – for example, by denying them admitting privileges – but prohibits any discrimination against physicians who refuse to provide them.  La. Rev. Stat. 40:1299.31-33; JX 183.

196.    The effect of Act 620 is thus different from admitting privileges requirements in states where physicians are able to protect themselves from discrimination.  *See, e.g., Whole*

39

*Woman's Health v. Cole*, 790 F.3d 563 (5th Cir. 2015) (per curiam) *modified*, 790 F.3d 598 (5th Cir. 2015), *stayed by* 135 S. Ct. 2923 (2015) ("Texas provides a private cause of action to challenge such discrimination.") (citing Tex. Occ. Code §§ 103.002, 103.003). Act 620 effectively allows hospitals with policies opposed to abortion to prohibit physicians from performing abortions, with no recourse or appeal.

197.    The Louisiana legislature passed laws prohibiting insurance coverage of abortion in state exchanges under the Affordable Care Act. La. Rev. Stat. § 22:1014. Louisiana does not allow women to obtain insurance coverage for abortion even when a woman's life is endangered or when the pregnancy is a result of rape or incest. *Id.*

### B.    ACT 620 WAS PASSED FOR THE IMPROPER PURPOSE OF RESTRICTING ACCESS TO ABORTION IN LOUISIANA

198.    The totality of circumstances surrounding the enactment of Act 620 establishes that the Act was passed for the purpose of restricting access to abortion in Louisiana, not to enhance the safety of abortion services in Louisiana or to further the health of Louisiana women obtaining abortions.

199.    Act 620 was modeled after similar laws that have been successful in closing abortion clinics in other states. On May 5, 2014, the Act's author, Dorinda Bordlee, the Vice President and Executive Counsel of the Bio Ethics Defense Fund, an anti-abortion advocacy group, sent the draft's primary legislative sponsor, Representative Katrina Jackson, an email regarding a similar statute passed in Texas that had "tremendous success in closing abortion clinics and restricting abortion access in Texas." Ms. Bordlee told Representative Jackson that "[Act 620] follows this model." (6/23/2015 Trial Tr. 200:2 – 23 (Kliebert); JX 5 at 2; JX 15 at 1.)

40

200.    Evidence received demonstrates the coordination among advocacy groups,

Representative Katrina Jackson, and DHH employees regarding efforts to restrict abortion.

(6/23/2015 Trial Tr. 199:14 – 200:15, 201:9 – 202:1, 211: 5 – 213:22, 215:19 – 216:7, 220:7 –

221:13 (Kliebert); JX 7; JX 14; JX 20; JX 21; JX 22; JX 37; JX 3; JX 8; JX17; JX6.)

201.    In a March 7, 2014 press release regarding Act 620, Governor Bobby Jindal

declared his position that Act 620 was a reform that would "build upon the work . . . done to

make Louisiana the most pro-life state in the nation."  (PX 174 at 218; 6/23/2015 Trial Tr.

224:2 – 227:7 (Kliebert).)  Governor Jindal stated, "Promoting a culture of life in Louisiana has

been an important priority of mine since taking office, and I am proud to support [Act 620] this

legislation session.  In this state, we uphold a culture of life that values human beings as unique

creatures who were made by our Creator.  [Act 620] will build upon all we have done the past six

years to protect the unborn."  (PX 174 at 218)

202.    Representative Katrina Jackson is also quoted in the March 7, 2014 press release

as saying that Act 620 "will build on our past work to protect life in our state."  (PX 174 at 128.)

203.    Similarly, in her testimony before the Louisiana House Committee in support of

Act 620, Secretary Kliebert testified that Act 620 would strengthen DHH's ability to protect

"unborn children."  (6/23/2015 Trial Tr. 217:17 – 22, 219:13 – 220:6 (Kliebert); JX 40.)

204.    The talking points prepared for Secretary Kliebert by Representative Jackson's

office stated that DHH was "firmly committed to working with Representative Jackson and the

Legislature to continue to work to protect the safety and wellbeing of Louisiana and the most

vulnerable among us, unborn children."  (6/23/2015 Trial Tr. 222:24 – 223:13 (Kliebert); JX 24

at 62.)

dc-803758

### C.    DHH'S ENFORCEMENT AND INTERPRETATION OF THE ACT

205.    The evidence at trial established that DHH has changed its position on the meaning of the Act and it is therefore reasonable for Plaintiffs to be concerned that only admitting privileges that satisfy the plain language of the Act will be sufficient to protect Plaintiffs from future penalties.

206.    As the Secretary of DHH, Defendant Kliebert has ultimate supervisory authority over Louisiana's abortion clinics.  (6/23/2015 Trial Tr. 195:3 – 8 (Kliebert).)

207.    In addition to Secretary Kliebert, Cecile Castello (the Director of the Health Standards Section of DHH responsible for the licensing and regulatory compliance for healthcare facilities, including abortion clinics) and Jennifer Stevens (the Program Manager for outpatient abortion facilities) are DHH personnel with oversight responsibilities with respect to outpatient abortion clinics.  (6/24/2015 Trial Tr. 136:3 – 24, 163:24 – 17 (Castello).)

208.    DHH has primary authority for enforcing Act 620.  This includes the authority to impose fines.  (6/23/2015 Trial Tr. 198:3 – 6, 198:15 – 199:3 (Kliebert).)

209.    Secretary Kliebert was appointed by the current Governor of Louisiana, Bobby Jindal, and she has held this position for just over three years.  In her experience, the head of DHH changes every few years.  (6/23/2015 Trial Tr. 195:13 – 196:3 (Kliebert).)

210.    Secretary Kliebert admitted at trial that she has limited knowledge and understanding of the hospital admitting privileges process, including what type of hospital admitting privileges will meet Act 620's requirements, and of the transfer of emergency patients in the abortion.  (6/23/2015 Trial Tr. 203: 4 – 10, 205:23 – 206: 6, 206:12 – 16, 207:2 – 9 (Kliebert).)

211.    On the Friday before the trial in this matter began, Secretary Kliebert submitted a declaration stating, for the first time, DHH's position that, to comply with Act 620, a physician

42

need only be granted the ability to admit patients to a hospital that can provide diagnostic and surgical care to the patient and that is located within 30 miles of the clinic where the physician performs abortions.  (JX 191 ¶ 6.)  At trial, Secretary Kliebert also articulated that this was DHH's interpretation of Act 620.  (6/23/2015 Trial Tr. 230:19 – 231:13 (Kliebert).)

212.     Secretary Kliebert testified that Act 620 does not require the abortion provider himself to secure privileges that allow him to provide diagnostic and surgical care to an abortion patient admitted to the hospital; all that is required is that the doctor be able to admit the patient to a hospital where such care can be provided.  (6/23/2015 Trial Tr. 203:20 – 205:22 (Kliebert).)

213.     This interpretation is at odds with Secretary Kliebert's trial testimony that she does not know what types of admitting privileges are offered by hospitals and that she is not familiar with the hospital admitting privileges process at all.  (6/23/2015 Trial Tr. 203: 4 – 10, 205:23 – 206:6 (Kliebert).)

214.     This interpretation of the statute is also at odds with the plain language of the statute which requires that the physician have privileges (1) to admit patients and (2) to provide diagnostic and surgical services.  (JX 115.)

215.     Cecile Castello, the head of the Health Standards Section, acknowledged that the plain language of the statute indicated that a physician must have privileges "to admit a patient and provide diagnostic and surgical services."  (6/24/2015 Trial Tr. 201:19 – 202:17 (Castello).)

216.     As discussed above, *see supra* ¶¶ 47, 48, Dr. John Doe 2 is concerned that, notwithstanding Secretary Kliebert's declaration, he does not have privileges that meet the legal requirements of the Act and that Secretary Kliebert's interpretation of his privileges may be reversed at a later time.

217.    As Secretary of DHH, Secretary Kliebert has the authority to make unilateral decisions that are effective immediately.  (6/23/2015 Trial Tr. 267:20 – 268:16 (Kliebert).)

218.    Gov. Jindal also has the authority to issue an executive order directing the head of a state agency to execute in a specific manner laws enacted by the Louisiana legislature consistent with legislative intent and the parameters of the law.  *See* La. Executive Order BJ 15-8 (May 19, 2015), "Marriage and Conscience Order," (directing all state departments to recognize the Supreme Court's interpretation of the term "person" in *Burwell v. Hobby Lobby Stores Inc.*, 134 S.Ct. 2751 (2014), when complying with Louisiana Preservation of Religious Freedom Act.).

219.    Louisiana courts also might not defer to Secretary Kliebert's interpretation of the law.  *See*, *e.g.*, *Harrah's Bossier City Inv. Co., LLC v. Bridges*, 41 So. 3d 438, 449 (La. 2010) ("Although courts may give due consideration to the administrative construction of a law, [they] are certainly not bound by then."); *Bowers v. Firefighters' Ret. Sys.*, 6 So. 3d 173, 176 (La. 2009) (stating that a state agency is not entitled to deference in the interpretation of statute).

## VII.    THE EFFECT OF ACT 620 WOULD BE TO CLOSE ALL BUT ONE OF LOUISIANA'S ABORTION CLINICS

220.    Act 620 requires that physicians who perform abortions in Louisiana have, at a hospital within 30 miles of the site of the procedure, "active admitting privileges" that permit the physician to admit a patient and to "provide diagnostic and surgical services."  This is the plain meaning of the statute.  The clause "and to provide diagnostic and surgical services" modifies the term "physician."  This reading of the statute is the only one consistent with its grammatical construction, its legislative history, and common sense.

221.    Accordingly, the Court finds that Act 620 will cause the following consequences for the physicians, clinics, and women of Louisiana, respectively.

A.    **IMPACT ON DOCTORS**

222.    If Act 620 takes effect, Dr. John Doe 1 will no longer be allowed to provide abortion in Louisiana because he does not have admitting privileges pursuant to the Act within 30 miles of Hope Clinic.

223.    If Act 620 takes effect, Dr. John Doe 2 will no longer be allowed to provide abortions in Louisiana, because he does not have admitting privileges pursuant to the Act within 30 miles of Bossier Clinic or Causeway Clinic.

224.    If Act 620 takes effect, Dr. John Doe 3, who does have admitting privileges pursuant to the Act within 30 miles of Hope Clinic, will no longer provide abortion in Louisiana because of well-founded concern for his personal safety. *See supra* at ¶¶ 73 – 78.

225.    If Act 620 takes effect, Dr. John Doe 4 will no longer be allowed to provide abortions in Louisiana because he does not have admitting privileges pursuant to the Act within 30 miles of Causeway Clinic.

226.    If Act 620 takes effect, Dr. John Doe 6 will no longer be allowed to provide abortions in Louisiana because he does not have admitting privileges pursuant to the Act within 30 miles of Women's Clinic.

227.    If Act 620 takes effect, Dr. John Doe 5 will be allowed to provide abortions at Women's Clinic, in New Orleans, where he has admitting privileges pursuant to the Act.  Dr. John Doe 5 will be the only physician available to provide abortion care in all of Louisiana.

228.    However, Dr. John Doe 5 will not be allowed to provide abortions at Delta Clinic, in Baton Rouge, because he does not have admitting privileges pursuant to the Act within 30 miles of Delta Clinic.

### B.    IMPACT ON CLINICS

229.    If Act 620 takes effect, Hope Clinic will close, Bossier Clinic will close, Causeway Clinic will close, and Delta Clinic will close.

230.    If Act 620 takes effect, only Women's Clinic will remain open, but it will be operating with only one physician, instead of two.

### C.    IMPACT ON WOMEN

231.    The effect of the Act, if enforced, would be severe.  All Louisiana women would be dependent on the provision of abortion care by a single physician in New Orleans.

232.    There would be no physician in Louisiana providing abortions between 17 and 22 weeks gestation.  Women seeking abortion at this state of their pregnancies would be denied all access to abortion in Louisiana.

233.    Given the climate of harassment faced by physicians who provide abortion in Louisiana, as well as the legislative restrictions imposed on them in the state, it is unlikely that new physicians will soon fill the need created by Act 620.

234.    The one remaining physician providing abortion services in Louisiana cannot meet the level of services needed in the state.  The Court finds that this one physician will not be able to perform 10,000 procedures per year.  (Dr. John Doe 5 Dep. at 26:2 – 11; DX 148 ¶ 111.)

235.    As a result of the clinic closures and reduction in available services caused by Act 620, thousands of women seeking an abortion in Louisiana will be unable to obtain one.  Those women who do obtain access to the remaining physician will face unreasonable delays.  Those women who do not obtain access in Louisiana, depending on their financial means, will have to travel to another state or be forced to carry an unwanted pregnancy to term.

236.    The clinic closures that will result from the Act's enforcement will have additional, acute effects for several significant subgroups of women of reproductive age in Louisiana.

237.    First, women seeking abortions after 16 weeks LMP will be unable to exercise their constitutional right to have an abortion in Louisiana.

238.    Second, women living across Northern Louisiana will face substantially increased travel distances to reach an abortion provider in Southern Louisiana.  For example, women in Shreveport or Bossier City who once could access a clinic in their own area will now have to travel approximately 320 miles to New Orleans to reach a clinic.  Additionally they will either have to secure a hotel room in the area or make the trip twice in order to comply with the state's 24-hour waiting period.

239.    Finally, low-income women living outside New Orleans will face increased burdens, costs of travel, and delay in obtaining services.  These increased burdens include greater costs for bus fare or gas, time investment, childcare costs, and lost wages, as well as psychological hurdles.  (6/23/2015 Trial Tr. 145:18 – 146:14, 161:3 – 13, 161:18 – 162:8 (Katz); JX 124 ¶ 15 – 16.)

240.    Women who must travel increased distances to access abortion will in many cases have to take at least two days off from work, which has financial costs if the time off is unpaid, as is often the case in low-wage jobs.  (6/23/2015 Trial Tr. 149:17 – 150:2 (Katz); JX 124 ¶ 30.) These women are also at risk of losing their jobs.  (6/23/2015 Trial Tr. 150:3 – 16 (Katz); JX 124 ¶ 31.)

241.    Women who cannot afford to pay these costs associated with travel, childcare, and time off from work may have to make sacrifices in other areas like food or rent expenses,

rely on predatory lenders, or borrow money from family members or abusive partners or ex-partners, sacrificing their financial and personal security.  (6/23/2015 Trial Tr. 158:9 – 159:19 (Katz); JX 124 ¶¶ 37 – 38.)

242.    Travel to a different city to seek a medical procedure also imposes significant socio-psychological hurdles on low income women.  (6/23/2015 Trial Tr. 160:15 – 161:2 (Katz); JX 124 ¶ 35.)

## VIII.  PLAINTIFFS' EXPERTS ARE CREDIBLE

243.    Plaintiffs called two physicians as expert medical witnesses, Dr. Christopher Estes and Dr. Eva Pressman.  Plaintiffs also called Dr. Sheila Katz as an expert on the sociology of gender and poverty.

244.    Dr. Estes is an OB/GYN, with bachelor's and medical degrees from the University of Miami, and a master's degree in public health from Columbia University.  (6/22/2015 Trial Tr. 186:8 – 189:10 (Estes).)  For seven years, he was a professor on the faculty of the University of Miami's Miller School of Medicine and an OB/GYN surgeon who performed, among other procedures, first and second trimester abortions, with a specialty in high-risk patients.  (6/22/2015 Trial Tr. 186:8 – 191:3 (Estes).)  He was also the Medical Director for Reproductive Health Services and a member of the Quality Review Committee at the University of Miami.  (6/22/2015 Trial Tr. 190:10 – 192:7 (Estes).)  Dr. Estes is presently the Medical Director of Planned Parenthood of South, East, and North Florida, where he provides the full spectrum of family planning services and surgery.  (6/22/2015 Trial Tr. 186:10 – 23, 192:8 – 193:12 (Estes); s*ee generally* PX 92.)  The Court accepted Dr. Estes as an expert in public health, obstetrics, and abortion care.  (6/22/2015 Trial Tr. 194:7 – 196:23 (Estes).)

245.    Dr. Eva Pressman is the Chair of the Department of Obstetrics and Gynecology at the University of Rochester Medical Center, where she is in charge of a department of 50 faculty

members in OB/GYN.  (6/2/2015 Trial Tr. 11:13 – 12:15 (Pressman).)  She graduated from

Brown University and Duke University School of Medicine, and completed her residency in

OB/GYN at Johns Hopkins University.  (6/29/2015 Trial Tr. 12:16 – 13:11 (Pressman).)

Subsequent to her residency, Dr. Pressman served as a professor at Johns Hopkins and as the

Director of Fetal Assessment until she joined the faculty of the University of Rochester Medical

Center.  (6/29/2015 Trial Tr. 13:12 – 14:9 (Pressman); PX 94, 131.)  Dr. Pressman has published

in excess of 70 research articles in peer-reviewed medical journals, received more than 20

research grants, including from the National Institutes of Health and United States Department of

Agriculture, and made over 100 presentations to medical conferences.  (6/29/2015 Trial Tr.

14:10 – 15:4 (Pressman); s*ee generally* PX 94.)  The Court accepted Dr. Pressman as an expert

in public health, obstetrics, and abortion care.  (6/29/2015 Trial Tr. 17:15 – 20:25 (Pressman).)

246.     Dr. Sheila Katz is an Associate Professor of Sociology at the University of

Houston, where she has been on the faculty since 2014.  (6/23/2015 Trial Tr. 110:10 – 114:7

(Katz).)  From 2008 to 2014, she was on the faculty of Sonoma State University as an Assistant

Professor of Sociology.  (6/23/2015 Trial Tr. 110:15 – 23 (Katz).)  She received a Bachelor of

Arts degree in the field of sociology in women and gender studies from the University of

Georgia, and a Master of Arts and a Doctorate degree in sociology from Vanderbilt University.

(6/23/2015 Trial Tr. 107:15 – 110:9 (Katz).)  Dr. Katz's academic work is focused on qualitative

research on low-income women's lived experiences with poverty.  (6/23/2015 Trial Tr. 110:24 –

115:20 (Katz); s*ee generally* JX 91.)  The Court accepted Dr. Katz as an expert in the sociology

of gender and the sociology of poverty.  (6/23/2015 Trial Tr. 123:22 – 126:3 (Katz).)

247.     Dr. Estes, Dr. Pressman, and Dr. Katz testified in accordance with their

experience, research, and review of literature in their respective fields, including, in the case of

49

Dr. Estes and Dr. Pressman, peer-reviewed medical literature.  All three testified candidly on direct and cross-examination, and when asked questions directly by the Court, gave straightforward answers that were responsive to the questions posed.  (6/22/2015 Trial Tr. 197:1 – 268:6 (Estes); 6/23/2015 Trial Tr. 126:6 – 192:9 (Katz); 6/29/2015 Trial Tr. 11:8 – 96:11 (Pressman).)  While these witnesses may have personal opinions about abortion and the Act, their expert testimony was not affected by those opinions, was well supported by reliable facts and data, and was fully credited as reliable and truthful.

## IX.  DEFENDANT'S EXPERTS ARE NOT CREDIBLE

248.    The Defendant called three expert witnesses: Dr. Damon Thomas Cudihy, Dr. Robert Marier, and Dr. Tumulesh Kumar Singh Solanky.

249.    Dr. Cudihy gave testimony that was not credible and was repeatedly impeached by prior inconsistent statements.  His opinions, therefore, are accorded minimal weight.

250.    Dr. Marier's testimony was affected by his limited familiarity and experience with abortion and by his activities in support of the Act.

251.    Dr. Solanky's testimony was based on invalid assumptions and provides little or no relevant information.

### A.  DR. CUDIHY'S TESTMONY IS CONTRADICTED AND UNSUPPORTED BY HIS OWN SOURCES

252.    Dr. Damon Thomas Cudihy is an OB/GYN.  He was accepted as an expert witness in the fields of medical and surgical practice of obstetrics and gynecology, although, as the Court noted, the *Daubert* standard for the admissibility of expert testimony was relaxed in this bench trial.  (6/26/2015 Trial Tr. 23:2 – 24:10, 31:4 – 16 (Cudihy).)  Even though Dr. Cudihy was accepted as an expert, his testimony was not credible, was not based on reliable facts and data, and is given no weight.

50

253. Dr. Cudihy lacks directly applicable experience.  He testified that he has never performed an abortion.  (6/26/2015 Trial Tr. 21:15 – 20 (Cudihy).)  He has not treated a single abortion complication in the two years he has practiced in Louisiana; over his entire career, he has claimed to have treated only 20 such patients.  (6/26/2015 Trial Tr.73:24 – 74:4 (Cudihy).) He has not performed any research regarding the safety of D&Cs or induced abortion. (6/26/2015 Trial Tr.72:5 – 73:1 (Cudihy).)

254. Dr. Cudihy's testimony was not based on reliable facts and data.  Indeed, many of the sources Dr. Cudihy purportedly relied upon directly contradict his testimony.

255. Dr. Cudihy testified at trial, as he stated in his expert report, that the "widely accepted standard of care" for D&C procedures (which are similar to surgical abortions) was that such procedures be performed at a hospital, because of the risks associated with those procedures.  (6/26/2015 Trial Tr. 74:2 – 75:2 (Cudihy).)  His expert report further gave the opinion that he was "unaware of any OB/GYN physicians who perform D&Cs for miscarriage in an office setting."  (6/26/2015 Trial Tr.75:6 – 15 (Cudihy).)

256. As support for these statements, his expert report cited two sources: an ACOG FAQ and a gynecological surgery textbook.  (6/26/2015 Trial Tr.76:4 – 8 (Cudihy).)  However, rather than supporting his opinion that D&Cs must be performed in a hospital, both sources directly and unambiguously contradict Dr. Cudihy.

257. The ACOG FAQ Dr. Cudihy cites actually says that "complications are rare" in these procedures, and as a result that "a D&C can be done in a healthcare provider's office, a surgery center, or a hospital."  (6/26/2015 Trial Tr.76:4 – 81:16 (Cudihy).)

258. Similarly, the textbook Dr. Cudihy credits as "arguably the most authoritative and widely used textbook for gynecologic surgery," Telinde's *Operative Gynecology*, actually says

that "for uncomplicated cases curettage in an operating room adds to the costs and inconvenience yet offers no medical benefit over outpatient curettage."  (6/26/2015 Trial Tr. 88:3 – 15 (Cudihy); PX 184, at 778.)

259.    Dr. Cudihy also misrepresented the standard of care regarding the use of anesthesia during abortions.  He testified that the "overwhelming majority of D&Cs for miscarriage management are performed under general anesthesia."  (6/26/2015 Trial Tr. 84:8 – 18 (Cudihy).)  Yet again, his own cited material directly contradicts that position, saying plainly that "local anesthesia is safer than general anesthesia for both first and second trimester abortions."  (6/26/2015 Trial Tr. 90:3 – 6 (Cudihy); PX 184, at 793.)

260.    Dr. Cudihy testified that a perforated uterus occurs in 0.5% of D&Cs.  (6/26/2015 Trial Tr. 128:23 – 130:5 (Cudihy).)  He had provided no support in his expert report for this statement, but testified during his deposition that this statistic could be found in the *Uptodate* database cited in his report for other reasons.  (6/26/2015 Trial Tr. 128:23 – 130:5 (Cudihy).)  However, this statistic appears nowhere in the current *Uptodate* database, and Dr. Cudihy did not claim that the version of this database on which he purportedly relied – and which he failed to preserve – actually contained this statistic.  (6/26/2015 Trial Tr.130:6 – 135:11 (Cudihy).)

261.    Dr. Cudihy said that 90 percent of doctors would admit an abortion patient with any complications, including any unexpected bleeding or any infection whatsoever, to the hospital.  (6/26/2015 Trial Tr. 100:15 – 106:9 (Cudihy).)  He admitted that there was no citation for this proposition in his expert report and that this statistic is not based on any published data.  (6/26/2015 Trial Tr. 100:15 – 106:9 (Cudihy).)  He similarly opined that the "vast majority" of complications are treated in a hospital, and similarly confirmed that he had no support for that statement.  (6/26/2015 Trial Tr. 111:24 – 112:11 (Cudihy).)

262.     Dr. Cudihy also disputed Dr. Estes' statement, well supported by credible data, that the hospitalization rate for complications resulting from abortions was approximately 0.3%; Dr. Cudihy said that the "actual" rate is "very likely substantially higher."  (6/26/2015 Trial Tr. 137:8 – 14 (Cudihy).)  He confirmed that he had offered no citation in his expert report for this proposition, and that indeed he had no factual, verifiable basis for this opinion.  (6/26/2015 Trial Tr. 137:15 – 25 (Cudihy).)

263.     Some of Dr. Cudihy's opinions about abortion safety were shown to be based on information he received from another defense expert, Dr. John Thorp, who has been a defense expert in cases challenging admitting privileges statutes in other states.  In these cases, Dr. Thorp has been found unbelievable, and his opinion has been given little or no weight.  *Planned Parenthood of Wisconsin, Inc. v. Van Hollen*, No. 13-CV-465-WMC, 2015 WL 1285829, at *15 (W.D. Wis. Mar. 20, 2015) ("In light of the deep flaws in his analysis and his testimony, the court finds little to credit in Dr. Thorp's opinions of the relative risks of abortions to child birth or comparable invasive procedures."); *Planned Parenthood Se., Inc. v. Strange*, 33 F. Supp. 3d 1381, 1394 (M.D. Ala. 2014) ("Thorp displayed a disturbing apathy toward the accuracy of his testimony. . . .  This inconsistency between what he says and what he does led the court to give his opinions extremely limited weight.").

### B.     DR. CUDIHY'S TESTIMONY WAS COLORED BY HIS LACK OF CANDOR AND HIS BIAS AGAINST ABORTION

264.     Dr. Cudihy's testimony makes clear that he is motivated by a strong moral objection to abortion.

265.     He testified that the reason that he has never performed an elective abortion was that, in his opinion, such a procedure would never be in his patient's "best interest."  (6/26/2015 Trial Tr. 21:15 – 20 (Cudihy).)

266.    Dr. Cudihy confirmed that he believed it should be illegal for a physician to perform an elective abortion.  (6/26/2015 Trial Tr. 205:12 – 16 (Cudihy).)  He believes that abortion is "appalling, horrifying, tragic, and unnecessary."  (6/26/2015 Trial Tr.205:17 – 206:2 (Cudihy).)  He believes that Planned Parenthood is "responsible for promoting an intergenerational cycle of poverty among black Americans."  (6/26/2015 Trial Tr.207:6 – 19 (Cudihy).)  He believes that abortion occurs in a "secretive underground."  (6/26/2015 Trial Tr.209:5 – 211:14 (Cudihy).)  He has stated in the past, abortion causes "incredible crushing guilt and depression" and inevitably leads to alcoholism, though at trial he unconvincingly attempted to side step these statements as "a rhetorical statement posed as a question rather than an assertion."  (6/26/2015 Trial Tr.212:4 – 214:6 (Cudihy); PX 193.)

267.    Before being forced to admit his anti-abortion bias, Dr. Cudihy first repeatedly attempted to evade the question entirely by refusing to answer simple, direct questions: "Q:  And you think contraceptives are immoral; is that correct?  A:  I don't believe that these chemical substances are immoral, but I have made a commitment in my professional practice to abide by certain ethical standards in accordance with the ethical and religious directives for Catholic healthcare institutions.  Q:  Sorry.  So you don't believe that taking contraception for contraceptive purposes is immoral?  A:  I didn't say that.  I choose not to make moral judgments on my patients in this matter, so that's something that I would not – I would prefer not to comment on."  (6/26/2015 Trial Tr. 200:6 – 17 (Cudihy).)

268.    Dr. Cudihy's testimony regarding the circumstances leading to his military service in Iraq was also not credible.  Although he testified that he interrupted his residency at Brooke Army Medical Center and volunteered to deploy to Iraq in substitution for a colleague who became distraught when notified that she would deploy, Dr. Cudihy has also stated publicly

that he was sent to Iraq after leaving his residency in the wake of accusations that he removed a patient's IUD without her consent. (6/26/2015 Trial Tr. 188:20 – 23, 189:14 – 192:2 (Cudihy); PX 191, PX 192.)

269.   Dr. Cudihy also repeatedly evaded and refused to answer questions from Plaintiffs' counsel.  This refusal to give candid, honest testimony is yet another reason why his testimony cannot be credited.  (6/26/2015 Trial Tr. 133:24 – 134:3, 134:20 – 135:11, 141:5 – 23, 161:20 – 162:9, 173:6 – 176:4 (Cudihy).)

### C.   DR. MARIER'S TESTIMONY IS LIMITED BY HIS LACK OF RELEVANT EXPERIENCE AND BY HIS ACTIVITIES IN SUPPORT OF ACT 620

270.   Dr. Robert Marier is the Chairman of the Department of Hospital Medicine at Ochsner Medical Center and the former Executive Director of the LSBME.  (6/25/2015 Trial Tr. 4:16 – 9:21 (Marier).)  Dr. Marier was accepted by the Court as an expert in internal medicine, the regulation of physicians and other health care professionals in Louisiana, and hospital administration.  (6/25/2015 Trial Tr.9:23 – 10:22 (Marier).)

271.   Dr. Marier testified regarding the purported benefits of Act 620 to abortion patients.  The weight of Dr. Marier's testimony is diminished because he has never performed an abortion.  His specialty is internal medicine with a special interest in infectious disease. (6/25/2015 Trial Tr. 51:13 – 52:1 (Marier).)  His only experience with any obstetric or gynecological surgeries was performing "some deliveries in medical school" almost 50 years ago.  (*Id.*)

272.   The weight of Dr. Marier's testimony is also limited by his activities in support of the passage of Act 620, which appear consistent with his views that abortion, and even contraception methods such as emergency contraception and intrauterine devices, should be

outlawed in the United States.  (6/25/2015 Trial Tr. 106:10 – 107:18, 27:8 – 17, 89:1 – 13,

93:25 – 94:18, 94:19 – 97:9, 99:12 – 100:16 (Marier).)

273.    The Court finds that Dr. Marier's opinions were colored by his belief that abortion

should, in all circumstances, be illegal.  His testimony was further tainted by his close working

relationship, regarding Act 620, with anti-abortion groups, a relationship he attempted to

minimize.

### D.    DR. SOLANKY'S ANALYSIS FOCUSED ON SCENARIOS AND ISSUES THAT ARE NOT MATERIAL TO THE BURDENS IMPOSED BY ACT 620

274.    Dr. Tumulesh Kumar Singh Solanky is a professor of Mathematics and the

Chairman of the Mathematics Department at the University of New Orleans.  (6/25/2015 Trial

Tr. 128:16 – 24 (Solanky).)  He has Bachelor of Science and Master of Science degrees in

Mathematics, and a Doctorate in Statistics, all from the University of Connecticut.  (6/25/2015

Trial Tr. 128:16 – 24 (Solanky).)   Dr. Solanky was accepted by the Court as an expert in the

fields of mathematics and statistical analysis.  (6/25/2015 Trial Tr. 146:5 – 13 (Solanky).)

275.    Dr. Solanky's testimony did not assist the Court in determining the burdens the

Act would place in the way of women seeking abortions in Louisiana.  As discussed in greater

detail below, Dr. Solanky's statistical calculations are not based on realistic scenarios, and in any

case only purport to analyze the burden the Act would impose on the average woman in

Louisiana, which is not the relevant question.

276.    The testimony of Dr. Solanky does not affect the Court's earlier findings

regarding the increased travel burdens the Act would impose on women in Louisiana who reside

outside the New Orleans area.  *See supra* ¶¶ 238 – 242.  His statistical calculations show the

average distances women would have to travel to an abortion clinic under various scenarios.

(6/25/2015 Trial Tr. 141:8 – 143:14 (Solanky).)  His expert testimony is of very limited

56

evidentiary weight in assessing the burdens the closure or decreased capacity of clinics will place on women in Louisiana for several reasons.

277.    First, most of the scenarios he examined are simply not informative because they are not likely or realistic scenarios, given the evidence regarding the status of doctors' privileges and predicted clinic closures.

278.    Second, average distance calculations do not provide any useful information about the true travel distances faced by women most affected by the Act, namely women in the northern portion of the state and the Baton Rouge area.  Averages, by their nature, attempt to capture the experience of all Louisiana women in one figure, and therefore obscure the distances that must be traveled by women most affected by clinic closures.

279.    Finally, Dr. Katz's analysis of the costs and time required for various intercity trips in Louisiana demonstrates the limited information regarding burdens that can be gleaned from a figure representing only one-way distances in miles.

## X.    CONCLUSIONS OF LAW

### A.    PRELIMINARY INJUNCTION STANDARD

280.    Entry of a preliminary injunction is warranted when the moving party demonstrates: (1) a substantial likelihood of success on the merits; (2) a substantial threat that failure to grant the injunction will result in irreparable injury to the moving party; (3) that the threatened injury outweighs any damages the injunction may cause defendant; and (4) that the injunction will not disserve the public interest.  *Hoover v. Morales*, 164 F.3d 221, 224 (5th Cir. 1998); *Opulent Life Church v. City of Holly Springs, Miss.*, 697 F.3d 279, 288 (5th Cir. 2012); *Productos Carnic S.A. v. Central American Beef and Seafood Trading Co.*, 621 F.2d 683, 685 (5th Cir. 1980).  "Where the other factors are strong, a showing of some likelihood of success on the merits will justify temporary injunctive relief."  *Id.* at 686.

**B.    LIKELIHOOD OF SUCCESS ON THE MERITS**

**1.    BROAD LEGAL FRAMEWORK FOR ABORTION REGULATION**

281.    Women in the United States have a fundamental constitutional right, rooted in the substantive component of the Due Process clause, to choose to have an abortion.  *Roe v. Wade*, 410 U.S. 113, 153 (1973); *Jackson Women's Health Org. v. Currier*, 760 F.3d 448, 453 (5th Cir. 2014) ("for more than forty years, it has been settled constitutional law that the Fourteenth Amendment protects a woman's basic right to choose an abortion."); *Planned Parenthood of Greater Texas Surgical Health Servs. v. Abbott*, 748 F.3d 583, 590 (5th Cir. 2014) ("the Fourteenth Amendment's concept of personal liberty encompasses a woman's right to end a pregnancy by abortion").  "*Roe* recognized the right of a woman to make certain fundamental decisions affecting her destiny and confirmed once more that the protection of liberty under the Due Process Clause has a substantive dimension of fundamental significance in defining the rights of the person." *Lawrence v. Texas*, 539 U.S. 558, 565 (2003).  For nearly half a century, the right to access legal abortion services has facilitated "[t]he ability of women to participate equally in the economic and social life of the Nation." *Planned Parenthood of Se. Penn. v. Casey*, 505 U.S. 833, 856 (1992).

282.    The fundamental right to choose abortion, as with any constitutional right, has limits.  A state may enact regulations "to foster the health of a woman seeking abortion" or "to further the State's interest in fetal life," provided that these regulations do not impose an "undue burden" on the woman's decision.  *Id.* at 877 – 78 (plurality opinion).  "A finding of an undue burden is shorthand for the conclusion that a state regulation has the purpose or effect of placing a substantial obstacle in the path of a woman seeking an abortion of a nonviable fetus." *Id.* at 877.  "[A] statute which, while furthering [a] valid state interest, has the effect of placing a

58

substantial obstacle in the path of a woman's choice cannot be considered a permissible means of serving its legitimate ends." *Id*.

283.    The particular application at issue here is whether "[u]nnecessary health regulations that have the purpose or effect of presenting a substantial obstacle to a woman seeking an abortion impose an undue burden on the right." *Id*. at 878. *See also id.* ("Regulations designed to foster the health of a woman seeking an abortion are valid if they do not constitute an undue burden."); *Currier*, 760 F.3d at 453; *Abbott*, 748 F.3d at 590.

284.    The Fifth Circuit has clarified that, with respect to the substantial obstacle element of the test, "the proper formulation of the undue burden analysis focuses solely on the effects within the regulating state." *Currier*, 760 F.3d at 457.

285.    In addition to not imposing an undue burden, in this Circuit, "abortion restrictions must also pass rational basis review." *Abbott*, 748 F.3d at 590 (citing *Gonzales v. Carhart*, 550 U.S. 124, 158 (2007).)  A law satisfies this inquiry if it is supported by "rational speculation" that it would achieve its objective, in other words, if "any conceivable rationale exists for [its] enactment." *Abbott*, 748 F.3d at 594; *accord Currier*, 760 F.3d at 454.

286.    Thus, to satisfy these controlling standards, a law regulating abortion must (1) have a valid purpose; (2) further a valid state interest; and (3) avoid imposing substantial obstacles in the path of women seeking pre-viability abortion services.

## 2.    THE APPLICABILITY OF *COLE* IS LIMITED

287.    Last year, the Fifth Circuit held that a Texas law requiring physicians who provide abortions to have admitting privileges at a hospital within 30 miles satisfies the rational basis test. *Abbott*, 748 F.3d at 595.  The Court of Appeals subsequently held that this was "binding precedent" when reviewing an admitting privileges requirement for abortion providers in Mississippi. *Currier*, 760 F.3d at 454.  This Court has already reviewed those opinions at

59

length and ruled that, given the substantial similarity between Act 620 and the laws reviewed in these earlier cases, this Court is bound by them to hold that the admitting privileges regulation here passes rational basis review. *June Med. Servs., LLC v. Kliebert*, No. 14-525-JWD, 2015 WL 2239877, at *10 (M.D. La. May 12, 2015).

288. On the eve of trial, the Fifth Circuit issued a further opinion on the constitutionality of Texas's law, to which the plaintiffs had raised a challenge based on facts that arose after the law had taken full effect. *Whole Woman's Health v. Cole*, 790 F.3d 563 (5th Cir. 2015) (per curiam) *modified*, 790 F.3d 598 (5th Cir. 2015), *stayed by* 135 S. Ct. 2923 (2015).[8] The *Cole* plaintiffs had argued that the law's effect – closing the majority of Texas's abortion facilities – and the dearth of credible evidence showing the law would actually improve women's health, were together dispositive of their claim that the law was enacted with the purpose of imposing an undue burden on abortion. *Id*. at 585.

289. The *Cole* Court rejected that argument, holding that more evidence was required to show that the Texas legislature had acted with an improper purpose. *Id*. at 858 – 86.

290. *Cole* also held that where an admitting privileges requirement imposes a substantial obstacle on a large fraction of women of reproductive age in a state – such as by reducing abortion clinic capacity to the point where a large fraction of the state's population will be unable to obtain abortion, or will be forced to travel long distances to obtain one – the law is unconstitutional under *Casey*. *Cole*, 790 F.3d at 589.[9]

---

[8] The *Cole* decision was preceded by a review of the same trial court decision by a motions panel of the Fifth Circuit. *Whole Woman's Health v. Lakey*, 769 F.3d 285 (5th Cir. 2014). The Supreme Court vacated much of that opinion. 135 S.Ct. 399 (Oct. 14, 2014). *Lakey* was later superseded by the Fifth Circuit's opinion in *Cole*. 790 F.3d at 580 ("we are not bound by the determinations of the motions panel"). *See also generally Northshore Dev., Inc. v. Lee*, 835 F.2d 580, 583 (5th Cir. 1988) ("a motions panel decision is not binding precedent") (reviewing cases).

[9] The test in *Casey* is not whether a large fraction of the population will be prevented from exercising constitutional rights, as *Cole* might suggest. "The proper focus of constitutional inquiry is the group for whom the law is a restriction, not the group for whom the law is irrelevant." *Casey*, 505 U.S. at 894. In *Casey*, a spousal notification

291.    *Cole* is not final because the United States Supreme Court has stayed the issuance

of the Fifth Circuit's mandate in that case, pending filing and disposition of a petition for

*certiorari*.  *Whole Woman's Health v. Cole*, 135 S. Ct. 2923 (2015).[10]  The Fifth Circuit has

repeatedly stated that its opinions are "not final until [it] issues a mandate."  *Charpentier v.*

*Ortco Contractors*, 480 F.3d 710, 713 & n.10 (5th Cir. 2007) (reviewing cases); *accord Comer v.*

*Murphy Oil USA, Inc.*, 718 F.3d 460, 468 (5th Cir. 2013) ("absent the issuance of a mandate, the

original district court judgment remains in effect") (citation and internal punctuation omitted);

*United States v. Jackson*, 549 F.3d 963, 980 (5th Cir. 2008), *cert. denied*, 558 U.S. 828 (2009).

Until the mandate issues, an opinion is not "settled" law, "and reliance on the opinion is a

gamble."  *Natural Res. Def. Council, Inc. v. Cnty. of Los Angeles*, 725 F.3d 1194, 1203 (9th Cir.

2013), *cert. denied*, 134 S. Ct. 2135 (2014) (quoting *Carver v. Lehman*, 558 F.3d 869, 878 n. 16

(9th Cir. 2009)); *see also Flagship Marine Servs., Inc. v. Belcher Towing Co.*, 23 F.3d 341, 342

(11th Cir. 1994) ("Until the mandate issues, an appellate judgment is not final; the decision

reached in the opinion may be revised by the panel . . . or *certiorari* may be granted by the

Supreme Court."); 1998 Adv. Comm. Note ("A court of appeals' judgment or order is not final

until issuance of the mandate.").

292.    Additionally, the Supreme Court's issuance of a stay in *Cole* indicates that the

granting justices are of the opinion that "at least four Justices would vote to grant certiorari and

that the applicants are likely to prevail on the merits."  *W. Airlines, Inc. v. Int'l Brotherhood of*

*Teamsters*, 480 U.S. 1301, 1310 (1987) (O'Connor, J., in chambers).

---

statute was struck down because of its impact on a large fraction of the women it affected, even though the latter
group compromised only 1% of all women seeking abortions.  *Id.*
[10] The *Cole* Plaintiffs have indicated they will file a petition for *certiorari*.  Application to Stay Pending Filing and
Disposition of Petition for Writ of Certiorari at 12, *Whole Woman's Health v. Cole*, No. 14A1288 (June 19, 2015),
*available at* http://www.reproductiverights.org/sites/crr.civicactions.net/files/documents/2015-06-19-
Supreme_Court_Motion_to_Stay.pdf.

293.    Because the *Cole* decision is not final and is likely to be modified on review by the Supreme Court, in deciding this case, this Court relies on Supreme Court opinions and on settled Circuit law applying them, including *Currier* and *Abbott*, but proceeds cautiously with *Cole*.[11]

294.    Even if *Cole* were a settled decision, it is distinguishable from the present case. The record in this case is different from that in *Cole*.  If enforced, Act 620 would shutter four out of the state's five abortion clinics, clinics that presently serve 10,000 women every year.  Instead of six physicians serving women in Louisiana, the entire state would be left with a single physician providing abortions.

295.    One physician cannot possibly serve the 10,000 women who seek an abortion annually in the state; those he can serve will be subjected to substantial delays with serious consequences.  The Act's effect, therefore, is to impose a substantial obstacle in the path of every woman seeking an abortion in Louisiana.  Alternatively, the Act imposes a substantial obstacle on all women for whom it is a relevant restriction, including women who are poor, women in Northern Louisiana, and women seeking abortion after 16 weeks LMP.  This permits the Court to find that Act 620 imposes an undue burden, even in light of *Cole*.

296.    Further, as discussed in more detail below, *see infra* ¶¶ 314 – 321, 330 – 334, on the present record, including the lack of medical justification for the Act, the legal context in which it operates, and the anti-abortion motivations of the individuals who drafted, enacted, and are enforcing the Act, the true purpose of Act 620 is to restrict women's access to abortion, which is prohibited under *Casey*.

---

[11] For these reasons, Defendants' Motion to Reconsider Rulings on Summary Judgment and Motion in Limine (Dkt. 144), which is based entirely on *Cole*, is **DENIED**.

### 3.   ACT 620 HAS THE EFFECT OF IMPOSING A SUBSTANTIAL OBSTACLE IN THE PATH OF WOMEN SEEKING AN ABORTION IN LOUISIANA

297.   The Court finds that the drastic reduction in the number and geographic distribution of abortion providers that Act 620 would cause, would have the *effect* of imposing a substantial obstacle in the path of women seeking pre-viability abortions.  Accordingly, Act 620 is unconstitutional because it imposes an undue burden on the rights of women in Louisiana. *Casey*, 505 U.S. at 877.

298.   If allowed to take effect, Act 620 would cripple women's ability to choose to have an abortion in Louisiana.  Currently, about 10,000 women per year seek abortions in the state. The Plaintiffs have shown that, should the Act take effect, there will be one physician left, Dr. John Doe 5, providing abortions in the state.  Working four to five days per week, he is able to provide fewer than 3,000 abortions per year.  Even working an implausible seven-day week, it would be impossible for him to expand his practice to meet even half the state's need for abortion services.  Moreover, he does not have admitting privileges outside of New Orleans. Women from elsewhere would have to travel up to several hundred miles to see him, if they could obtain an appointment at all.  The result is that women seeking a safe, legal abortion in Louisiana will be unable to obtain one.

299.   Moreover, those women who do obtain an appointment with the remaining physician (indeed, two appointments, with the 24-hour two-trip requirement), will face lengthy delays, pushing them to later gestational ages with associated increased risks.  Those who would be candidates for medication abortion would have difficulty obtaining an appointment before that method becomes unavailable because of later gestational age; many women toward the end of the first trimester would have difficulty obtaining an appointment before they reach 16 weeks, the latest gestational age at which Dr. John Doe 5 provides abortions.

300.    Finally, the Act would result in a complete ban on abortions after 16 weeks in Louisiana because the only physician who provides abortions through 21 weeks 6 days, Dr. John Doe 2, would no longer be able to practice.[12]  The Act's incapacitation of Louisiana's only physician with expertise in such procedures (Dr. John Doe 2) would deprive those women of their constitutionally protected right to choose a pre-viability abortion.

301.    Nor does the Court find it likely that other physicians will readily step into the breach.  The legislative scheme regulating abortion and providers of abortion ensures that.  By design, Louisiana law places barriers to entry for physicians who would provide this aspect of women's health care.  *See infra* ¶¶ 187 – 197, 314 – 321.

302.    These findings lead inexorably to this Court's determination that the undue burdens imposed by Act 620 will fall on a large fraction of women seeking an abortion in Louisiana and that therefore the Act must be struck down on its face.[13]

303.    Additionally, the Act will impose substantial obstacles on three particular groups of women who, together, represent a large fraction of all women seeking abortion in Louisiana. First, low-income women outside the New Orleans metropolitan area will face severe obstacles in accessing abortion.  They would need to endure the costs associated with transportation, childcare, lost wages, and overnight accommodations, as well as the psychological hurdles of intercity travel, to access abortion.  Many will not overcome these obstacles.  The evidence shows that most women seeking abortions in Louisiana are poor.  These women will "likely [] be deterred from procuring an abortion as surely as if the Commonwealth had outlawed abortion in all cases."  *Casey*, 505 U.S. at 894.

---

[12] As previously noted, *see supra* ¶¶73 – 78, Dr. John Doe 3, who provides abortions through 16 weeks, six days, would stop providing abortions as well if the Act goes into effect.

[13] This is the test for facial relief in *Abbott*, which is difficult to reconcile with the "large fraction" analysis in *Casey*. Acknowledging the unsettled law of "undue burden" at the time of this Order, the Court holds that Act 620 will impose undue burdens on a large fraction of women under both the *Casey* and the *Abbott* iterations of the test.

304.    Second, women living in Northern Louisiana will have no access to abortion services in their region of the state.  They would have to travel hundreds of miles in each direction to obtain an abortion in Louisiana at the sole remaining clinic in New Orleans.[14]  Under *Abbott*, increased travel distances of well over 150 miles constitute a substantial obstacle to abortion access.  *Abbott*, 748 F.3d at 597 – 98.

305.    Third, there will be no access whatsoever to abortions past 16 weeks LMP up to the state's legal limit –  20 weeks "post-fertilization" or 22 weeks LMP – thereby imposing an insurmountable obstacle to all Louisiana women seeking such an abortion.

306.    The costs and burdens imposed by the Act will place substantial obstacles in the path of these three groups of women seeking a safe and legal abortion, causing some to resort to unsafe options (self-induced abortions or back-alley abortions) and forcing others to carry unwanted pregnancies to term.  *Alabama Women's Center v. Williamson*, No. 2:15cv497-MHT, 2015 WL 4873125 *11-12, 16 (M.D. Ala. August 13, 2015) ("travel-related obstacles and a statewide capacity constraint . . . appear to have made it more difficult to obtain an abortion . . .there is now likely to be a greater risk that women . . . will attempt to obtain an abortion without medical supervision with corresponding dangers to life and health" while the "admitting privileges requirement seems to provide little to no realistic benefit"); *see also Planned Parenthood of Wisconsin, Inc. v. Van Hollen*, 2015 WL 1285829, at *42 n. 31 (W.D.Wis.2015) (Conley, J.) (crediting evidence that "epidemiologic data indicate an inverse relationship between the availability of legal abortion and resorting to illegal abortion associated with remarkable increased risks of death or morbidity").

---

[14] The testimony and charts presented by Defendant's own expert, Dr. Solanky, illustrate the large swath of northern Louisiana that is outside a 150-mile radius of the New Orleans area (*see* Exhibit DX 155), and the large population of women of reproductive age residing in the Northern part of the state.  (*See* Exhibit DX 151.)

307.     For all these reasons, the Court concludes that Plaintiffs are likely to succeed on their claim that Act 620 is facially unconstitutional.

### 4.     ACT 620 WAS ENACTED WITH THE PURPOSE OF IMPOSING A SUBSTANTIAL OBSTACLE IN THE PATH OF WOMEN SEEKING AN ABORTION IN LOUISIANA

#### a)     The Legal Standard

308.     A challenged law that regulates abortion is unconstitutional if that law was passed for the *purpose* of placing a substantial obstacle in the path of a woman seeking an abortion. *Casey*, 505 U.S. at 877.

309.     Improper purpose is an independently sufficient basis for finding a law regulating abortion unconstitutional. *Abbott*, 748 F.3d at 597 ("*Casey* holds that the legislature may not enact an abortion regulation whose purpose is to create a substantial obstacle to a woman seeking an abortion."); *Okpalobi v. Foster*, 190 F.3d 337, 354 (5th Cir. 1999), *superseded on reh'g en banc on other grounds*, 244 F.3d 405 (5th Cir. 2001) ("Thus, under *Casey* . . . we are directed to examine (1) the purpose and (2) the effect of Act 825.  As the . . . *Casey* test for undue burden is disjunctive, a determination that either the purpose or the effect of the Act creates such an obstacle is fatal.").

310.     In analyzing *Casey*'s purpose prong, the Fifth Circuit "has looked to various types of evidence, including the language of the challenged act, its legislative history, the social and historical context of the legislation, and other legislation concerning the same subject matter as the challenged measure." *Okpalobi*, 190 F.3d at 354.

311.     Whether the law has a good "fit" between its means and stated ends may be an important factor in the evaluation of whether the restriction has a valid purpose.  The Supreme Court considers a law's failure to serve its stated goals as evidence of an improper purpose.  *See, e.g.*, *United States v. Windsor*, 133 S. Ct. 2675, 2694 (2013) (a statute's "operation in practice

confirms [its] purpose"); *Sorrell v. IMS Health Inc*., 131 S. Ct. 2653, 2669 (2011) ("[The challenged statute] does not advance the State's asserted interest in physician confidentiality. The limited range of available privacy options instead reflects the State's impermissible purpose to burden disfavored speech."); *Romer v. Evans*, 517 U.S. 620, 632 (1996) ("[The law's] sheer breadth is so discontinuous with the reasons offered for it that [it] seems inexplicable by anything but animus toward the class it affects."); *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 535 (1993) ("the effect of a law in its real operation is strong evidence of its object").

312.    Courts do not owe blind deference to a legislature's stated purpose.  To the contrary, they must scrutinize it to ensure that it is "sincere and not a sham."  *Edwards v. Aguillard*, 482 U.S. 578, 587 (1987).

313.    Whether a state law was motivated by an impermissible purpose is a fact-specific inquiry; the Court thus considers the Louisiana legislature's purpose based on the evidence at trial and the legislative context of Act 620.  That the Fifth Circuit has found that other plaintiffs in another case did not prove that a different state's legislature had an improper purpose in passing a similar abortion restriction has no precedential force.  *See Cole*, 790 U.S. 563.

### b)        Act 620 Was Enacted for an Impermissible Purpose

314.    This Court holds that Act 620 was passed for the purpose of eliminating or severely curtailing access to abortion in Louisiana.  The impermissible purpose behind the law is an independent basis for this Court's holding that Act 620 is unconstitutional and should be struck in its entirety.

315.    The Louisiana legislature has codified its opposition to legal abortion stating that "the longstanding policy of this State is to protect the right to life of the unborn child from

conception by prohibiting abortion" and punishing physicians who provide abortions with imprisonment "at hard labor."

316.    Further, no other comparable medical procedure has been singled out for the same level of restriction in Louisiana as abortion.  The Louisiana legislature has passed an array of laws, from mandating unnecessary ultrasounds (La. Rev. Stat. Ann. §§ 40:1299.35.2(B)-(D), 40:1299.35.6, 40:1299.35.12) to requiring physician-only state-scripted biased counseling to two-trip, 24-hour waiting periods.  La. Rev. Stat. §§ 40:1299.35.6, 40:1299.35.19.  The legislature has placed burdens on rape and incest victims seeking an abortion.  La. Rev. Stat. § 40:1299.35.7.  It has singled out physicians who perform abortions from all other physicians for heightened liability exposure.  La. Rev. Stat. Ann. §§ 40.1299.31-39(A), 40:1299.41(K).  Several of the abortion restrictions passed by the Louisiana legislature have been struck down in court. *See, e.g.*, abortion ban (*Sojourner T. v. Edwards*, 974 F.2d 27 (5th Cir. 1992), *cert. denied*, 507 U.S. 972 (1993)); second trimester hospitalization requirement (*Margaret S. v. Treen*, 597 F. Supp. 636 (E.D. La. 1984)); requirement in post-viability abortions to use method most likely to save fetus regardless of danger to maternal health (*Margaret S. v. Edwards*, 488 F. Supp. 181 (E.D. La. 1980), *aff'd*, 794 F. Supp. 994 (5th Cir. 1986)).

317.    Defendant has asserted in this litigation that the reason the legislature passed Act 620 was to promote women's health.  But Louisiana does not require physicians to have admitting privileges at a local hospital as a condition of performing any other outpatient procedure – including those of similar or greater risk than abortion.  The Supreme Court has long recognized that laws that target a particular group for disfavored treatment are more likely to have an improper purpose than those that are neutral and generally applicable.  *See, e.g.*,

*Windsor*, 133 S. Ct. at 2693 – 94; *Church of the Lukumi*, 508 U.S. at 524; *Romer*, 517 U.S. at 633.

318.    The totality of circumstances establishes that "promoting women's health" is a pretext intended to mask the true intent of the law, which was to place a substantial obstacle in the path of women seeking abortion in Louisiana.

319.    The law was drafted by an anti-abortion organization building on perceived success at using an admitting privileges requirement to close abortion clinics in Texas.

320.    Not all proponents of this law were disingenuous about their motives.  Secretary Kliebert and elected officials up to and including the governor stated the law was intended to prevent abortions.

321.    The fact that Act 620's purported purpose – to promote women's health – is subverted rather than advanced by its predictable effects is no coincidence.  Act 620's purpose was plainly to prevent abortions at the expense of women and their constitutionally protected rights.

## 5.    ACT 620 IMPOSES SEVERE BURDENS ON PATIENTS AND PHYSICIANS WITHOUT JUSTIFICATION

322.    The Supreme Court has never upheld a law that limits the availability of abortion services without first confirming that the law furthers a valid state interest.[15]  *See, e.g.*, *Gonzales v. Carhart*, 550 U.S. 124, 158 (2007); *Casey*, 505 U.S. at 882, 885.  Indeed, with respect to laws aimed at promoting health, the Supreme Court has explained that:  "The existence of a compelling state interest in health…is only the beginning of the inquiry.  The State's regulation may be upheld only if it is reasonably designed to further that state interest."  *City of Akron v.*

---

[15] The Court's decision in *Mazurek v. Armstrong* is no exception to this rule.  520 U.S. 968 (1997).  There, the Court upheld Montana's physician-only law only after concluding that it did not limit the availability of abortion services in Montana.  *Id.* at 973-74.

*Akron Ctr. for Reprod. Health, Inc.*, 462 U.S. 416, 434 (1983) (overruled in part on other grounds); *accord Planned Parenthood of Cent. Mo. v. Danforth*, 428 U.S. 52, 65 – 67, 75 – 79, 80 – 81 (1976) (invalidating a ban on the use of a common second trimester abortion method but upholding certain informed consent and recordkeeping requirements); *Doe v. Bolton*, 410 U.S. 179, 194 – 95 (1973) (invalidating a Georgia law requiring that all abortions be performed in an accredited hospital).[16]

323.    The Court in *Casey* upheld challenged recordkeeping and reporting requirements only after concluding that they are "reasonably directed to the preservation of maternal health." 505 U.S. at 900 – 01.  Applying a similar analysis, the Court had previously invalidated laws enacted by the City of Akron, Ohio, and the State of Missouri requiring that second trimester abortions be performed in accredited hospitals.  *City of Akron*, 462 U.S. at 431 – 39; *Planned Parenthood Assoc. of Kan. City, Mo., Inc. v. Ashcroft*, 462 U.S. 476, 481 – 82 (1983).  Based on the medical evidence presented in the respective cases, the Court concluded that the Akron and Missouri requirements "imposed a heavy and unnecessary burden on women's access to a relatively inexpensive, otherwise accessible, and safe abortion procedure."  *City of Akron* 462 U.S. at 438; *accord Ashcroft*, 462 U.S. at 481 – 82.  In contrast, the Court upheld "Virginia regulations [that] appear[ed] to be generally compatible with accepted medical standards governing outpatient second-trimester abortions," and that the appellant did not "attack[]…as being insufficiently related to the State's interest in protecting health."  *Simopoulos v. Virginia*, 462 U.S. 506, 517 (1983) (footnote omitted).

324.    The Fifth Circuit, consistent with these precedents, has held that "the constitutionality of an abortion regulation…turns on an examination of [both] the importance of

---

[16] The Court of Appeals for the Fifth Circuit has long held that, "based on the rationale for *stare decisis* articulated by the *Casey* plurality, …the 'central holdings' of pre-*Casey* decisions remain intact" to the extent not inconsistent with *Casey*.  *Barnes v. Mississippi*, 992 F.2d 1335, 1337 (5th Cir. 1993).

the state's interest in the regulation and the severity of the burden that regulation imposes on the woman's right to seek an abortion." *Barnes*, 992 F.2d at 1339.  In *Currier*, it affirmed the entry of a preliminary injunction against a Mississippi admitting-privileges requirement based in part on evidence showing that, as applied to the plaintiffs, the requirement would not further a valid state interest.[17]  *Currier*, 760 F.3d at 458 ("In reaching this determination, we look to the entire record and factual context in which the law operates, including…the reasons cited by the hospitals for denying admitting privileges to [abortion providers] and the nature and process of the admitting privileges determination."); *accord Planned Parenthood of Wisc., Inc. v. Van Hollen*, 738 F.3d 786, 795 – 98 (7th Cir. 2013) (affirming entry of preliminary injunction against admitting privileges requirement finding "state has not presented evidence of a health benefit" nor rebutted plaintiffs' evidence that the requirement will harm women), *cert. denied*, 134 S. Ct. 2841 (2014); *Planned Parenthood of Wisc., Inc. v. Van Hollen*, 2015 WL 1285829 *1  (W.D. Wisc. March 20, 2015) ("the State has failed to meet its burden of demonstrating through credible evidence a link between the admitting privileges requirement and a legitimate health interest"); *Strange*, 33 F. Supp. 3d at 1380 ("if this [admitting privileges] requirement would not, in the face of all the evidence in the record, constitute an impermissible undue burden, then almost no regulation, short of those imposing an outright prohibition on abortion, would.");  *Williamson*, 2015 WL 4873125 at*10 ("regulations such as the one at issue here [admitting privileges], which purportedly enhance women's health, cause delays which increase the risk of complications if the woman is able to eventually obtain the procedure").

---

[17] Defendants and some courts, *see Planned Parenthood Arizona, Inc. v. Humble*, 753 F.3d 905, 914 (9th Cir.) *cert. denied*, 135 S. Ct. 870 (2014); *Strange*, 33 F. Supp. 3d at 1338, interpret *Abbott* as stating a contrary rule.  But *Abbott* need not be read in this way.  There, the Court held only that abortion regulations that purport to serve the State's interest in health are subject to "*Casey*'s undue burden balancing test" rather than "strict scrutiny," and that they are independently subject to rational basis review.  748 F.3d at 590.  It did not hold that *Casey*'s balancing test excludes consideration of the extent to which an abortion regulation furthers a valid state interest.

325.   In *Cole*, the Fifth Circuit acknowledged *Casey*'s holding "that a law regulating pre-viability abortion" must be "reasonably related to (or designed to further) a legitimate state interest," *Cole*, 790 F.3d at 572, but later said that its own decision in *Abbott* "disavowed" this inquiry and instead required the district court to sustain the challenged requirements if "any conceivable rationale exists" for their enactment.   *Id.* at 587 (quoting *Abbott*, 748 F.3d at 594).

326.   *Cole*'s "any conceivable rationale" test is at odds with *Casey* and, as discussed above, *see supra* ¶ 291 and note 10, is likely to be reviewed by the Supreme Court.   The Supreme Court on June 29, 2015 took the extraordinary measure of staying the mandate in the *Cole* case, pending action on an anticipated petition for *certiorari*.

327.   This Court has already held Act 620 likely unconstitutional on two independent grounds:  that it unduly burdens a woman's constitutional right to choose abortion because it has the *effect* on placing a substantial obstacles in her path, and because in enacting Act 620, the legislature had the impermissible *purpose* to do just that.

328.   As the law in this Circuit is presently unsettled, the Court undertakes a third alternative holding.

329.   In undertaking this analysis, the Court returns to the principle that the constitutional "right [to abortion] protects the woman from unduly burdensome interference with her freedom to decide whether to terminate her pregnancy."  *Maher v. Roe*, 432 U.S. 464, 473 – 74 (1977) (cited with approval by *Casey*, 505 U.S. at 874).  Consistent with that right, "[a]s with any medical procedure, the State may enact regulations to further the health or safety of a woman seeking an abortion."  *Casey*, 505 U.S. at 878.  The threshold inquiry is therefore whether the admitting privileges provision of Act 620 is, in fact, a "regulation[] to further the health or safety of a woman seeking an abortion."  *Casey*, 505 U.S. at 877.

330.    Here the state asserts that Act 620 is a proper health regulation to further women's health and safety.  However, the record contradicts that assertion.  If anything, the evidence shows the law harms women, for all the reasons catalogued at Section VII.  *See supra* ¶¶ 220 – 242.  Hospitals are not in the credentialing business; they grant privileges to physicians to promote the smooth functioning of the hospital, while the LSBME ensures physician competency.  Complications from abortion are rare; when they occur, the vast majority can be successfully managed in the office setting.  In the unusual circumstance where a patient at the clinic requires immediate hospital care, transfer agreements are perfectly suited to ensure continuity of care.  Some complications of surgical abortion and all complications of medication abortion occur long after the patient has returned home; the fact that a patient's physician has admitting privileges near the clinic is of no moment to her.  She is best served by going to the nearest hospital with an emergency room where physicians are well equipped to stabilize patients and, if necessary, summon the appropriate specialist.

331.    The health and safety of women in Louisiana are best served by the medical professionals who dedicate themselves to caring for women and their comprehensive reproductive health.  The Court was impressed by the physicians who are presently providing abortion in the state – the quality of their care, their expertise, their compassion, their trust in women, and their bravery.  It would promote women's health in Louisiana to have more, not fewer, such exemplary physicians serving throughout the state.

332.    The Court therefore makes its third alternative holding on the record before it that Act 620 fails to meet even the threshold test of *Casey* because Act 620 is not a valid health regulation that furthers women's health and safety.  Accordingly, Act 620 is unconstitutional.

333.     Moreover, even if Act 620 could be said to further women's health to some marginal degree, the burdens it imposes far outweigh any such benefit and thus the Act imposes an unconstitutional undue burden.  *See Planned Parenthood Arizona, Inc. v. Humble*, 753 F.3d 905, 913 (9th Cir.) *cert. denied*, 135 S. Ct. 870 (2014) ("we must weigh the burdens against the state's justification, asking whether and to what extent the challenged regulation actually advances the state's interests. If a burden significantly exceeds what is necessary to advance the state's interests, it is 'undue.'"); *Planned Parenthood of Wis., Inc. v. Van Hollen*, 738 F.3d 786, 798 (7th Cir. 2013) *cert. denied*, 134 S. Ct. 2841 (2014) ("The feebler the medical grounds, the likelier the burden, even if slight, to be 'undue' in the sense of disproportionate or gratuitous."). *See also Planned Parenthood SE, Inc. v. Strange*, 9 F. Supp. 3d 1272, 1287 (M.D. Ala. 2014) ("the court must also consider the strength of the justifications that support a regulation."); *Planned Parenthood of the Heartland, Inc. v. Iowa Bd. of Med.*, 865 N.W.2d 252, 264, (Iowa 2015) ("the 'unnecessary health regulations' language used in *Casey* requires us to weigh the strength of the state's justification for a statute against the burden placed on a woman seeking to terminate her pregnancy when the stated purpose of a statute limiting a woman's right to terminate a pregnancy is to promote the health of the woman."); *Cline v. Oklahoma Coal. for Reprod. Justice*, 313 P.3d 253, 255, 262 (Okla. 2013) (affirming *Casey* requires an abortion restriction be reviewed for consistency with "the standard that governs the practice of medicine").

334.     Where, as here, the record is devoid of any evidence that the Act will have a measurable benefit to women's health, but it is clear that the Act will drastically burden women's right to choose abortion, the burden is patently undue.  *See Casey*, 505 U.S. at 878.

74

### 6.     CONCLUSION

335.     The Court has set forth its alternative conclusions of law, all of which lead to invalidation of Act 620.

336.     To summarize, as set forth in Section VII *supra*, evidence of the deleterious effects of Act 620 was stark.  The operation of the admitting privileges requirement would immediately result in a drastic reduction in the number and geographic distribution of abortion providers:  from five clinics to one; from six physicians to one.  The result is that most Louisiana women will lose their constitutional right to choose abortion.  Nor is it foreseeable that other physicians would rush in to fill the void:  the labyrinth of legal restrictions in Louisiana that specifically target physicians who provide abortion care ensures that would-be abortion providers are deterred.

337.     Likewise, as set forth in Section VI *supra*, evidence of the legislature's improper purpose in passing Act 620 in order to restrict abortion in Louisiana is overwhelming.  That purpose – to place a substantial obstacle in the path of women seeking abortion – was manifested by the stated intent of the legislature to restrict abortion to the greatest extent possible; by the lack of medical evidence supporting the basic premises of the admitting privileges law; by the law's disparate treatment of abortion providers as contrasted with other medical professionals; by the drafting of the statute by individuals and organizations dedicated to criminalizing abortion; and by testimony presented to the legislature that the law was meant to "protect the unborn." Lest any legislator fail to get the message, Governor Jindal's unabashed press statements left no doubt that Act 620 was designed to restrict abortion access.

338.     Additionally, the evidence overwhelmingly demonstrated that the admitting privileges requirement was not reasonably designed to further the state's interest in women's health.  *See supra* ¶¶ 141 – 156, 204 – 210.  Like the regulations struck down in *City of Akron*,

75

*Ashcroft*, and *Currier*, the requirement challenged here imposes a heavy burden on women's access to abortion services while providing no discernable health benefits.  This alone would provide an adequate basis for holding them unconstitutional.

339.    The Court concludes that Act 620 is anathema to *Casey*'s recognition that the ability to terminate a pregnancy is a choice "central to personal dignity and autonomy . . . [and] the liberty protected by the Fourteenth Amendment," *Casey*, 505 U.S. at 851, and its admonition that "[u]nnecessary health regulations that have the purpose or effect of presenting a substantial obstacle to a woman seeking an abortion impose an undue burden on the right." *Id.* at 878.

340.    The Court therefore finds that Plaintiffs have shown a likelihood of success on the merits of their claim that Act 620 is unconstitutional.

### C.    IRREPARABLE HARM

341.    There is a substantial threat that, were Act 620 to be enforced, irreparable injury would result to the Plaintiffs and their patients.

342.    As explained in detail above, *see supra* ¶¶ 297 – 334, the Act will violate women's constitutional right to abortion.  This is, by definition, irreparable harm. *Deerfield Med. Ctr. v. Deerfield Beach*, 661 F.2d 328, 338 (5th Cir. 1981) (finding that the conclusion that the right to abortion is "'either threatened or in fact being impaired' . . . mandates a finding of irreparable injury.") (quoting *Elrod v. Burns*, 427 U.S.347, 373 (1976)).  Likewise, the total inability to access abortion care, and unreasonable and dangerous delays in the ability to schedule an abortion procedure with the single remaining provider, will constitute irreparable harm for the majority of Louisiana women seeking abortions.  *See Jackson Women's Health Org. v. Currier*, 940 F. Supp. 2d 416, 424 (S.D Miss. 2013), *aff'd in part*, 760 F.3d 448 (5th Cir. 2014) (finding that clinic closure is irreparable harm).  Many women will also face irreparable harms from the burdens associated with increased travel distances and costs in reaching an

76

abortion clinic. *Cf. Deerfield Med. Ctr.*, 661 F.2d at 338 ("The district court misapplied the controlling law to the facts before it, and thereby abused its discretion, when finding no irreparable injury to pregnant women's rights of privacy because 'other abortion facilities nearby (could) provide services to those women.'").

343.    The Court therefore finds that Plaintiffs have shown a substantial threat that failure to grant the injunction will result in irreparable injury.

### D.    THE EQUITIES WEIGH IN FAVOR OF GRANTING A PRELIMINARY INJUNCTION, WHICH IS IN THE PUBLIC INTEREST

344.    Plaintiffs have shown that the injury threatened by enforcement of Act 620 outweighs any damage the injunction may cause Defendant.  By contrast, Defendant has not shown that any damage would result from the issuance of a preliminary injunction.  A preliminary injunction will preserve the *status quo*, and permit the clinics and physicians to continue to provide safe, needed abortion care to their patients.  The substantial injury threatened by enforcement of the Act – namely irreparable harm to women and the violation of their constitutional rights – clearly outweighs the impact of an injunction on Defendant.  *See Currier*, 940 F. Supp. 2d at 424.

345.    A preliminary injunction is also in the public interest.  The public interest is not served by allowing an unconstitutional law to take effect.  *Currier*, 940 F. Supp. 2d at 424 ("[T]he grant of an injunction will not disserve the public interest, an element that is generally met when an injunction is designed to avoid constitutional deprivations."); *see also Nobby Lobby, Inc. v. Dallas*, 970 F.2d 82, 93 (5th Cir. 1992) ("the public interest always is served when public officials act within the bounds of the law and respect the rights of the citizens they serve") (citation omitted).

346.    Without an injunction, Louisiana women will suffer significantly reduced access to constitutionally protected abortion services, which will have serious health consequences.

347.    The Court concludes that Plaintiffs have demonstrated that the threatened injury of Act 620 outweighs any damages the injunction may cause Defendant, and that the injunction will not disserve the public interest.


In light of the foregoing findings of fact and conclusions of law, which establish that Plaintiffs have met each of the four factors necessary for entry of a preliminary injunction, it is HEREBY ORDERED that Act 620 be preliminarily enjoined in its entirety.


August 24, 2015

                                        /s/ William E. Rittenberg
                                        William E. Rittenberg
                                        Louisiana State Bar No. 11287
                                        RITTENBERG, SAMUEL AND PHILLIPS, LLC
                                        715 Girod St.
                                        New Orleans, LA 70130-3505
                                        (504) 524-5555
                                        rittenberg@rittenbergsamuel.com

                                        Dimitra Doufekias
                                        David Scannell
                                        MORRISON & FOERSTER LLP
                                        2000 Pennsylvania Avenue, NW
                                        Suite 6000
                                        Washington, DC 20006-1888
                                        (202) 887-1500
                                        ddoufekias@mofo.com


                                        Ilene Jaroslaw
                                        David Brown
                                        Zoe Levine
                                        CENTER FOR REPRODUCTIVE RIGHTS
                                        199 Water Street, 22nd Floor
                                        New York, NY 10038

(917) 637-3697
ijaroslaw@reprorights.org


*Attorneys for Plaintiffs*
*June Medical Services LLC d/b/a Hope Medical*
*Group for Women, Bossier City Medical Suite,*
*Choice Inc., of Texas d/b/a Causeway Medical*
*Clinic,  John Doe 1, M.D., and John Doe 2, M.D.*

79

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 24th day of August, 2015, a copy of the foregoing has been served upon counsel of record by email.


/s/      *Kerry C. Jones*
Kerry C. Jones