# UNITED STATES DISTRICT COURT

# MIDDLE DISTRICT OF LOUISIANA

JUNE MEDICAL SERVICES LLC d/b/a HOPE
MEDICAL GROUP FOR WOMEN, on behalf of
its patients, physicians, and staff; BOSSIER
CITY MEDICAL SUITE, on behalf of its
patients, physicians, and staff; CHOICE, INC.,
OF TEXAS, d/b/a CAUSEWAY MEDICAL
CLINIC, on behalf of its patients, physicians,
and staff, JOHN DOE 1, M.D., AND
JOHN DOE 2, M.D.

                                      **CIVIL ACTION**

**VERSUS**

                                      **NO. 14-CV-00525-JWD-RLB**

KATHY KLIEBERT, in her official capacity as
Secretary of the Louisiana Department of Health
and Hospitals and MARK HENRY DAWSON,
M.D., in his official capacity as President of the
Louisiana State Board of Medical Examiners

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

# TABLE OF CONTENTS

**OVERVIEW**

**I.**      **Introduction**


**FINDINGS OF FACT**

**II.**      **Background and Procedural History**

**III.**      **Contentions of the Parties**

**IV.**      **The Factual Issues**

**V.**      **Abortion in Louisiana**

     **A.**      **Generally**

     **B.**      **The Clinics**

         *(1)*      *Hope*

         *(2)*      *Bossier*

         *(3)*      *Causeway*

         *(4)*      *Women's Health*

         *(5)*      *Delta*

     **C.**      **The Doctors**

         *(1)*      *Doe 1*

         *(2)*      *Doe 2*

         *(3)*      *Doe 3*

         *(4)*      *Doe 4*

         *(5)*      *Doe 5*

       *(6)*    *Doe 6*

  **D.**    **Admitting Privileges**

  **E.**    **The Climate**

**VI.**    **Act 620**

  **A.**    **Text of Act 620 and Related Provisions**

  **B.**    **Louisiana's Policy and Past Legislation Regarding Abortion**

  **C.**    **Drafting of Act 620**

  **D.**    **Official Legislative History of Act 620**

**VII.**    **The Purpose and Medical Reasonableness of Act 620**

**VIII.**    **Efforts of Doctors to Comply With Act 620 and the Results of Those Efforts**

  **A.**    **Doe 1**

  **B.**    **Doe 2**

  **C.**    **Doe 3**

  **D.**    **Doe 4**

  **E.**    **Doe 5**

  **F.**    **Doe 6**

  **G.**    **Post-Trial Updates**

**IX.**    **Effects of Act 620**

  **A.**    **The Effect of Act 620 on Doe 1–6**

  **B.**    **The Effect of Act 620 on the Clinics and Women of Louisiana**

**CONCLUSIONS OF LAW**

**X.**    **Summary of Legal Arguments**

**XI.**    **Test for Determining the Constitutionality of Act 620**

    **A.**    **Rational Basis**

    **B.**    **Undue Burden Test - Generally**

    **C.**    **Undue Burden - Purpose Prong**

    **D.**    **Undue Burden - Effect Prong**

**XII.**    **Analysis: Application of Tests**

    **A.**    **Rational Basis**

    **B.**    **Undue Burden - Purpose of Act 620**

    **C.**    **Undue Burden - Effect of Act 620**

**XIII**.  **Conclusion**

    **A.**    **Motion to Reconsider Rulings on Summary Judgment and Motion in Limine**

    **B.**    **Preliminary Injunction**

        *(1)*    *Preliminary Injunction Standard*

        *(2)*    *Application of the Preliminary Injunction Standard*

    **C.**    **Judgment**

**OVERVIEW**

**I.    Introduction**

Before the Court is Plaintiffs' Application for Temporary Restraining Order and Motion for Preliminary Injunction ("Application"), filed by five persons: June Medical Services LLC, d/b/a Hope Medical Group for Women ("Hope" or "Hope Clinic"); Bossier City Medical Suite ("Bossier" or "Bossier Clinic"); Choice Inc., of Texas, d/b/a Causeway Medical Clinic ("Choice" or "Causeway") (collectively, "Plaintiff Clinics"); including two natural persons, Doctor Doe 1 ("Doe 1")[1] and Doctor Doe 2 ("Doe 2") (collectively, "Plaintiff Doctors") (collectively, "Plaintiffs"). (Doc. 5.) The Application sought to bar enforcement of Section A(2)(a) of Act Number 620 ("Act" or "Act 620"),[2] amending Louisiana Revised Statutes § 40:1299.35.2.[3] Although Plaintiffs sought a temporary restraining order and a preliminary injunction in this single document, this Court issued the requested temporary order on August 31, 2014, and deferred ruling on their conjoined motion for a preliminary injunction ("TRO"), (Doc. 31 at 1–2), a distinction subsequently clarified by this Court's later order, (Docs. 57, 84). This Ruling and

---

[1] The identities of the Plaintiff Doctors as well as the other Louisiana abortion physicians who are not parties–Doctors Doe 3, 4, 5, and 6 (individually, "Doe 3," "Doe 4," "Doe 5," "Doe 6")–are protected by virtue of two protective orders. (Docs. 24, 55.) Rather than repeating the formulation "Dr. Doe []," this Court opts for the simpler "Doe []" and, only occasionally, "Dr. Doe []."

[2] A copy of the final bill appears as a joint exhibit, (JX 115), and in other filings, (*See, e.g.*, Doc. 168-10 at 39–43). As the statute was subsequently codified, and as a statute's language need not be evidenced to be known, this Court will cite to Act 620 as codified. *See infra* note 3. The Court does so throughout this opinion unless it is recounting, as it later does, *see infra* Part VI, Act 620's pre-enactment's history.

[3] In this Ruling, any and all references to "Section []" or "§ []" are to Act 620 as codified in Louisiana Revised Statutes. Act 620 also amended Sections 1299.35.2.1 and 2175.3(2) and (5). *See infra* Part VI.

Order ("Ruling") now addresses this latter request ("Motion for Preliminary Injunction"). Also before the Court is Defendant's Motion to Reconsider Rulings on Summary Judgment and Motion *in Limine* ("Motion for Reconsideration"), (Doc. 144), filed by Ms. Kathy Kliebert ("Defendant," "Kliebert," "Secretary," or "Secretary Kliebert"), who is being sued by Plaintiffs in her official capacity as then Secretary of Department of Health and Hospitals of the State of Louisiana ("DHH").[4]

The hearing on the Motion for Preliminary Injunction was held from June 22, 2015, through June 29, 2015. (Docs. 163–64, 166, 169, 174.) At the hearing, the Court received evidence in the form of live witness testimony, exhibits, stipulations, and designated deposition testimony agreed by Plaintiffs and Defendant (collectively, "Parties") to be received in lieu of certain witness' live testimony.  Plaintiffs presented live testimony from the following witnesses:

- Doe 1;

- Doe 2;

- Doe 3;

- Ms. Kathaleen Pittman ("Pittman"), June's administrator; and

- Kliebert; and

- Three experts, specifically:

    - Doctor Christopher M. Estes ("Estes"), Chief Medical Officer of Planned Parenthood of South Florida and the Treasure Coast, (PX 92);

_____

[4] As permitted by precedent, *Ex parte Young*, 209 U.S. 123, 152, 28 S. Ct. 441, 451, 52 L. Ed. 714 (1908); *accord Guillemard-Ginorio v. Contreras-Gomez*, 585 F.3d 508, 530 n.24 (1st Cir. 2009), Plaintiffs sue for injunctive relief against Kliebert in her official capacity, (Doc. 1 at 5). To wit, the true defendant here is Louisiana, not Kliebert or even DHH. *See Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71, 109 S. Ct. 2304, 2312, 105 L. Ed. 2d 45 (1989).

- Doctor Sheila Katz ("Katz"), an assistant professor at the University of Houston, (JX 91); and

- Doctor Eva Karen Pressman ("Pressman"), the Henry A. Thiede Professor and Chair of The Department of Obstetrics and Gynecology at The University of Rochester, (PX 94).

Defendant presented live testimony at trial from the following witnesses:

- Ms. Cecile Castello ("Castello"), Director of Health Standards Section ("HSS") for DHH; and

- Three other experts, specifically:

  - Doctor Robert Marier ("Marier"), Chairman of the Department of Hospital Medicine at Ochsner Medical Center in New Orleans, (DX 146);

  - Doctor Tumulesh Kumar Singh Solanky ("Solanky"), a professor and the chair of the Mathematics Department at the University of New Orleans, (DX 148); and

  - Doctor Damon Thomas Cudihy ("Cudihy"), an obstetrician-gynaecologist ("OB/GYN," "Ob/Gyn," "OBG," or "O&G") currently licensed to practice medicine in Louisiana and Texas, (DX 147).

A record of the exhibits admitted into evidence was filed. (Doc. 165.) A record of the deposition testimony designated by the Parties and offered into evidence was also docketed. (Doc. 168.[5]) In

---

[5] Cochran's deposition appears in Document 168-4, Doe 4's in Document 168-5, Doe 5's in Document 168-6, Ms. Hedra Dubea's in Document 168-7, Mr. Robert Gross' in Document 168-8, Ms. Dora Kane's in Document 168-9, Doctor Cecilia Mouton's in Document 168-10, and Ms. Jennifer Christine Stevens in Document 168-11.

addition, the Parties submitted proposed findings of fact and conclusions of law, (Docs. 196, 200), and responses to each other's proposed findings and conclusions, (Docs. 201, 202).

In making the following findings of fact and conclusions of law, the Court has considered the record as a whole. The Court has observed the demeanor of witnesses and has carefully weighed their testimony and credibility in determining the facts of this case and drawing conclusions from those facts. All findings of fact contained herein that are more appropriately considered conclusions of law are to be so deemed.[6] Likewise, any conclusions of law more appropriately considered a finding of fact shall be so classified.[7]

After having considered the evidence, briefing, and record as a whole, for the reasons which follow, Defendant's Motion for Reconsideration, (Doc. 144), is DENIED. The active admitting privileges requirement of Section A(2)(a) of Act 620 is found to be a violation of the substantive due process right of Louisiana women to obtain an abortion, a right guaranteed by the Fourteenth Amendment of the United States Constitution as established in *Roe v. Wade*, 410 U.S. 113, 93 S. Ct. 705, 35 L. Ed. 2d 147 (1973) ("*Roe*"), and pursuant to the test first set forth in *Planned Parenthood of Se. Pa. v. Casey*, 505 U.S. 833, 112 S. Ct. 2791, 120 L. Ed. 2d 674 (1992) ("*Casey*"), and subsequently refined by the Fifth Circuit, *see infra* Part XI. Act 620 is therefore declared unconstitutional, its enforcement constitutionally barred. As such, the Motion for Preliminary Injunction is GRANTED IN PART, and any enforcement of § 40:1299.35.2 is enjoined as to Does 1 and 2, Hope, Bossier, and Causeway.

_____

[6] For an example of such an approach, see Doc. 14021, No. 2:10-md-02179-CJB-SS (E.D. La. Jan. 15, 2015).

[7] *Id.*

Furthermore, because applications for "active admitting privileges"[8] by several doctors technically remain "pending," the Court orders Plaintiffs to provide to the Court and Defendant with a written notification of any changes in the status of these applications on a monthly basis, beginning on March 1, 2016. Should the status of any application change, the Parties are free to request any other relief that they may deem appropriate. Finally, so as to discuss any outstanding issues and schedule this case's course, the Court will hold a telephonic status conference with counsel for all Parties on January 29, 2016, at 11:30 a.m.

## FINDINGS OF FACT

**II.      Background and Procedural History**

    1.  Plaintiffs are:

-     Hope, a licensed abortion clinic located in Shreveport, Louisiana, suing on behalf of its physicians, staff and patients;

-     Bossier, a licensed abortion clinic located in Bossier City, Louisiana, suing on behalf of its physicians, staff, and patients;

-     Choice, a licensed abortion clinic suing on behalf of its physicians, staff, and patients;

-     Doe 1, a physician licensed to practice medicine in the State of Louisiana and board-certified in Family Medicine and Addiction Medicine, suing on his own behalf and that of his patients; and

-     Doe 2, a physician licensed to practice medicine in the State of Louisiana and

---

[8] For a definition of this term, see *infra* Part V.D.

board-certified in OB/GYN, suing on his own behalf and that of his patients.

2. Kliebert, the Secretary of DHH.[9] Pursuant to § 40:2175.6, Kliebert "has the authority to revoke or deny clinics' licenses for violation of this or any other law."(Doc. 109 at 5 (citing LA. R.S. § 40:2175.6).)[10]

3. On August 22, 2014, Plaintiffs filed the Complaint for Declaratory and Injunctive Relief, (Doc. 1), and the Application, (Doc. 5), seeking to enjoin various defendants from enforcing Act 620's Section (A)(2)(a). (Doc. 5-2 at 2–5.)

4. Act 620 has been codified at an amended Section 40:1299.35.2. LA. R.S. § 40:1299.35.2. Section A(2)(a) requires every doctor who performs abortions in Louisiana to have "active admitting privileges" at a hospital within 30 miles of the facility where abortions are performed. *Id.* § 40:1299.35.2A(2)(a). While the Act contains other requirements, this provision is the only one being challenged. (Doc 5-1 at 8 n.1.) Act 620 was signed into law by the Governor

---

[9]  In the original Complaint, Plaintiffs sued Mr. James David Caldwell ("Caldwell") in his official capacity as Louisiana's Attorney General and Doctor Jimmy Guidry ("Guidry") in his official capacity as the State Health Officer of Louisiana and Medical Director of DHH. (Doc. 1 at 1.) The Court dismissed both Caldwell and Guidry. (Doc. 31.) Kliebert was added as a defendant in an Amended Complaint for Declaratory and Injunctive Relief. (Doc. 14.)  Doctor Mark Henry Dawson, President of the Louisiana State Board of Medical Examiners ("Board"), was sued because Act 620 purports to make the Board an enforcement arm of the Act. LA. R.S. § 40:1299.35.2.1(E). In addition, the Board has the authority to take disciplinary action against any physician, LA. R.S. § 37:1263 *et seq.* (Doc. 109 at 6.)  However, Dawson was subsequently dismissed at the Parties' joint request. (Docs. 110, 111.) As a part of the joint motion, the Board agreed to be bound by any injunction issued by the Court regarding Act 620. (Doc. 110 ¶ 1(b) at 1.)

[10] In accordance with *The Bluebook: A Uniform System of Citation*, the documents filed in this case's docket, but not later submitted as exhibits at the June hearing, will be cited by document number alone, e.g. Doc. 109. Conversely, the evidence introduced by the Parties, either individually or jointly, as exhibits will be identified by their precise exhibit number even if later filed as a document on this case's docket, *see* Doc. 196. For example, joint exhibit 10 will be cited as "JX 10," Defendant's exhibit five as "DX 5," and Plaintiffs' exhibit six as "PX 6."

of Louisiana, the Honorable Piyush "Bobby" Jindal ("Jindal" or "Governor"), on June 12, 2014. (Doc. 138 at 2; *see also, e.g.*, H.B. 388, 2014 Leg., Reg. Sess. (La. 2014) (signed by Governor, June 12, 2014).) Its effective date was set as September 1, 2014. (*See, e.g.*, Doc. 5-1 at 8; Doc. 5-2 at 6.)

5. Hope, Bossier, and Choice are three of five licensed abortion clinics in Louisiana. (*See, e.g.*, Doc. 109 at 4–5; Doc. 14 ¶ 10 at 3.) They are located in Shreveport, Bossier City, and Metairie, respectively.  (Doc. 109 at 4–5; *see also, e.g.*, Doc. 14 ¶¶ 11–13 at 3–4.) Does 1 and 2 are two of six physicians performing abortions in Louisiana. (Doc. 109 at 5; *see also, e.g.*, Doc. 14 ¶¶ 14–15 at 4.) Doe 1 performs abortions at Hope; Doe 2 performs abortions at Bossier and Choice. (Doc. 109 at 5; *see also, e.g.*, Doc. 14 ¶¶ 14–15 at 4.)

6. The Court issued the TRO on August 31, 2014, enjoining enforcement of Act 620 "until a hearing is held for the purpose of determining whether a preliminary injunction should issue." (Doc. 31 at 18.) Per this order, Plaintiffs were expected to continue seeking admitting privileges at the relevant hospitals. (*Id.* at 1–2.) Thus, the Act would be allowed to take effect, but the Plaintiffs would not be subject to its  penalties and sanctions for practicing without the relevant admitting privileges during the application process. (*Id.* at 2, 18.) The Plaintiff Clinics were allowed to operate lawfully while the Plaintiff Doctors continued their efforts to obtain privileges. (*Id.*)

7. On September 19, 2014, three other plaintiffs–Women's Health Care Center, Inc. ("Women's Health" or "Women's Clinic"); Delta Clinic of Baton Rouge, Inc. ("Delta"); Doctor John Doe 5 ("Doe 5"); and Doctor John Doe 6 ("Doe 6") (collectively, "Women's Health Plaintiffs")–filed the Complaint for Declaratory and Injunctive Relief, thereby initiating a

separate case, and a Motion for Preliminary Injunction. (Docs. 1, 5, No. 3:14-cv-00597-JWD-RLB.) On that same day, these parties tendered a motion to consolidate their case with this earlier proceeding. (Doc. 2, No. 3:14-cv-00597-JWD-RLB.) By this Court's order, these two cases were consolidated on September 24, 2014. (Doc. 8, No. 3:14-cv-00597-JWD-RLB.)

8. All the Parties agreed in briefs and orally at a status conference held on September 30, 2014, that significant discovery would need to be done to prepare for the hearing; therefore, the Court set the preliminary injunction hearing for March 30, 2015. (Doc. 45.) A Joint Proposed Scheduling Order was submitted by the Parties on October 8, 2014, (Doc. 49), and adopted as this Court's order on October 21, 2014, (Doc. 56).

9. On November 3, 2014, following the addition of the Women's Health Plaintiffs, this Court issued the Order Clarifying Temporary Restraining Order of August 31, 2014. (Doc. 57.) For the reasons given therein, the Court ruled: "It was and is the intention of this Court that the TRO remain in effect as to all parties before it until the end of the Preliminary Injunction Hearing." (*Id.* at 6.)

10. On December 5, 2014, the Women's Health Plaintiffs filed the Motion for Voluntary Dismissal. (Doc. 70.) With the consent of the Parties, the Court dismissed this suit without prejudice on December 14, 2014. (Doc. 77.) In light of that dismissal, the Court on January 15, 2015, issued the Second Order Clarifying Temporary Restraining Order of August 31, 2014. (Doc. 84.) In this order, for reasons explained therein, this Court ruled that "the TRO of August 31, 2014 (Doc. 31) remains in force until the Preliminary Injunction hearing on March 30, 2015 or as otherwise modified by this Court." (*Id.* at 4.)

11. On February 16, 2015, Defendants filed the Motion for Partial Summary

Judgment ("Partial MSJ"), (Doc. 87), which was opposed, (Doc. 104). On February 24, 2015, Defendants filed an Unopposed Motion to Set Oral Argument on Motion for Partial Summary Judgment (Doc. 90.) On March 3, 2015, the Court granted that motion, (Doc. 92), and oral argument was set and heard on March 19, 2015, (Docs. 128, 137).

12. On May 12, 2015, the Partial MSJ was granted in part, finding that under binding Fifth Circuit jurisprudence, the admitting privileges requirement of Act 620 is rationally related to a legitimate State interest. (Doc. 138 at 125.) In all other respects, the motion was denied. (*Id.*)

13. Based on a stipulation reached among the Parties, the Joint Motion to Dismiss Defendant Mark Dawson was filed on March 17, 2015, (Doc. 110), and granted the same day, (Doc. 111). On March 20, 2015, the Parties conferred with the Court and agreed to a continuance of the hearing on the preliminary injunction until the week of June 22, 2015. (Doc. 129.) The Parties agreed that the TRO would remain in effect until the completion of the trial and ruling on the merits of the preliminary injunction. (*Id.*)

14. On April 1, 2015, oral argument was heard on motions in limine filed by the Parties. (Docs. 136, 151.) In the ruling issued that same day, the Court denied Plaintiffs' Motion in Limine to Preclude Expert Testimony of Dr. Tumulesh Solanky, (Doc. 96), and Defendant's Motion to Exclude Expert Testimony of Sheila Katz, Ph.D., (Doc. 99). (Doc. 136.) Plaintiffs' Motion in Limine to Preclude Expert Testimony of Dr. McMillan, (Doc. 97), was denied as moot. (Doc. 136.) Because of their connection to the Partial MSJ, Defendant's Motion in Limine to Exclude Irrelevant Evidence ("Defendant's Motion in Limine"), (Doc. 95), and Plaintiffs' Motion in Limine to Preclude Evidence of DHH Deficiency Reports and Related Evidence, (Doc. 98), were taken under advisement. (Doc. 136.) These two motions were ultimately denied. (Docs. 139,

140.)

15. On June 11, 2015, Defendant filed the Motion to Reconsider Rulings on Summary Judgment and Motion in Limine. (Doc. 144.) Plaintiffs submitted their response in opposition on June 16, 2015. (Doc. 150.) Because this was submitted for consideration only six days before trial, the motion was taken under advisement and deferred to trial.

16. Trial on the Motion for Preliminary Injunction began on June 22, 2015, and ended on June 29, 2015. (Docs. 163, 164, 166–69, 174). The Redacted Transcript[11] of the trial was later docketed.[12] (Docs. 190–95.)

III.   **Contentions of the Parties**

17. In broad terms,[13] Plaintiffs contend that Act 620 is facially[14] unconstitutional first, because the Act places an undue burden on the right of Louisiana women seeking an abortion by

---

[11] The unredacted transcript was sealed on the joint motion of the Parties. (Doc. 183.)

[12] Each of the six volumes of testimony corresponds to the trial day in which the evidence was received: Document 190 is Volume I, June 22; Document 191 is Volume II, June 23; Document 192 is Volume III, June 24; Document 193 is Volume IV, June 25; Document 194 is Volume V, June 26; and Document 195 are Volume VI, June 29. Document 190 (or Volume I) contains the testimony of Pittman, Doe 3, and Estes; Document 191 (or Volume II), that of Doe 2, Katz, and Kliebert; Document 192 (or Volume III), that of Doe 1 and Castello; Document 193 (or Volume IV), that of Marier and Solanky; Document 194 (or Volume V), that of Cudihy; Document 195 (or volume VI), that of Pressman.

[13] The Parties' specific contentions underlying these broad positions are discussed in connection with the individual issues to which they are relevant.

[14] Plaintiffs state emphatically that they are not making an "as-applied" challenge and that their only challenge is facial. (Doc. 202 at 53.)

placing substantial obstacles in their path, (*See, e.g.*, Doc. 202 at 46–53);[15] second, because the

purpose of the Act is to create those obstacles, (*See, e.g.*, *id.* at 53–58) and third, because Act 620

does not further a valid state interest, (*See, e.g.*, *id.* at 58–65).

18. Plaintiffs argue that a preliminary injunction should issue enjoining the enforcement of

Act 620 because Plaintiffs are likely to succeed at trial, (Doc. 196 at 67–85); absent an injunction,

irreparable harm will occur, (*Id.* at 85–86); the balance of hardships weighs in Plaintiffs' favor,

(*Id.* at 86–87); and finally, granting the preliminary injunction will not adversely affect the public

interest, (*Id.*).

19. Defendant counters broadly that Act 620 places no substantial burden on a woman's

right to seek an abortion in Louisiana, (*See, e.g.*, Doc. 200 at 59–66), and that the Act serves a

valid purpose, (*See, e.g.*, *id.* at 66–74). Further, Defendant argues that this Court has already ruled

that Act 620 serves a valid state interest and has a rational basis. (*See, e.g., id.* at 6–7.)

20. Defendant argues that Plaintiffs have failed to carry their burden that they are likely to

succeed at trial and further, urge that no irreparable harm will occur by allowing the enforcement

of Act 620. (*See, e.g.*, *id.* at 88–90.)

21. Finally, Defendant contends that the balance of hardships weighs in her favor and that

the enforcement of Act 620 will not adversely affect the public interest. (*Id.*)

---

[15] Page references to the Parties' briefs and other docketed documents are to the docketed
document's page number and not its internal pagination. In contrast, for exhibits, this Court will
employ their internal page number so as to permit a reader to more easily and quickly locate the
relevant data.

## IV.     The Factual Issues

22. Four main issues of fact were tried at the June hearing:

(A)      What is the purpose of Act 620?

(B)      Is Act 620 medically necessary and reasonable?

(C)      How, if at all, will the implementation of Act 620 affect the physicians and clinics who perform abortions in the state of Louisiana?

(D)      How, if at all, will the implementation of Act 620 affect the ability of Louisiana women to obtain an abortion?

23. Whether these factual issues and their resolution are relevant under the applicable legal standard, and whether they play a role in this Court's ruling, is discussed in the Conclusions of Law section. *See infra* Parts XI–XII.

## V.     Abortion in Louisiana

### A.     Generally

24. According to DHH, approximately 10,000 women obtain abortions in Louisiana annually. (DX 148 ¶ 11.)

25. Nationally, approximately 42% of women who have abortions fall below the federal poverty level, and another 27% fall below 200% of that level. (JX 124 at 480; Doc. 191 at 190–91.)[16] That number is likely significantly higher for Louisiana women seeking abortions. (*Id.*) The expert and lay testimony on this issue are consistent. (*See, e.g.,* Doc. 190 at 34

---

[16] The Court accepted Katz as an expert in the sociology of gender and the sociology of poverty. (Doc. 191 at 123–26.) The Court found Katz well qualified and credible.

(Testimony of Pittman) (testifying that 70% to 90% of patients at Hope are below the federal poverty level).)

26. Under Louisiana law, a patient must receive state-mandated counseling and an ultrasound at least 24 hours before an abortion. (JX 109 ¶ 18; JX 116 ¶ 11; JX 117 ¶ 8.)

27. Due to this notification and waiting period, patients who wish to obtain an abortion must make two trips to the clinic: the first to receive the ultrasound and state-mandated counseling, and the second to obtain the sought abortion. (JX 109 ¶ 19.)

## B.    The Clinics

28. There are currently five women's reproductive health clinics in Louisiana that provide abortion services. (*E.g.*, Doc. 109 at 4; JX 109 ¶ 13.)

### *(1)    Hope*

29. Hope is a women's reproductive health clinic located in Shreveport, Louisiana, that has been operating since 1980 and offers abortion services. (Doc. 109 at 4; *see also*  Doc. 14 ¶ 11 at 5.) Hope is a licensed abortion clinic suing on its own behalf and on behalf of its physicians, staff and patients. (Doc. 14 ¶ 11 at 5; Doc. 190 at 14.)

30. Hope provides medication abortions through eight weeks and surgical abortions through 16 weeks, six days LMP.[17] (Doc. 190 at 35, 119, 132.) Hope employs two doctors who perform abortions, Does 1 and 3. (*Id.* at 21.) Doe 1 performs approximately 71% of the abortions

---

[17] Throughout this opinion, the Court will define the length of pregnancy based on the time elapsed since the first day of a woman's last menstrual period, or LMP.

provided by Hope, and Doe 3 performs the remaining 29%. (Doc. 190 at 21; JX 116 ¶ 5.)

31. 69% of Hope's patients are Louisiana residents, but the remainder travel from outside the state to Hope. (JX, 116 ¶ 10; Doc. 190 at 19, 34.)

*(2)*     ***Bossier***

32. Bossier is a women's reproductive health clinic that has been operating in Bossier City since 1980 and provides first and second trimester abortions. (Doc. 109 at 4; Doc. 14 ¶ 12.) Bossier is a licensed abortion clinic and a plaintiff suing on its own behalf and on behalf of its physicians, staff, and patients. (Doc. 14 ¶ 12.)

33. Bossier provides medication abortions through eight weeks and surgical abortions through the state's legal limit of 21 weeks, six days LMP. (Doc. 191 at 22–23, 55–56; JX 117 ¶ 4.)

34. Bossier employs one doctor, Doe 2, who performs first and second trimester surgical procedures as well as medication abortions. (Doc. 191 at 21; JX 117 ¶ 5.) Doe 2 is the only doctor in Louisiana who performs abortions after 16 weeks, six days LMP. (JX 187 ¶ 4; Doc. 191 at 21–22.)[18]

35. Bossier's patients are primarily from Louisiana, but also travel to the clinic from surrounding states. (Doc. 191 at 20.)

---

[18] There is testimony that Doe 5 has also performed abortions up to 18 weeks although it is unclear whether he is referring to the present or what he has done in the past. (Doc. 168-6 at 7–8.) The resolution of this issue is not critical to the Court's ruling.

*(3)*    ***Causeway***

36. Causeway is a women's reproductive health clinic located in Metairie, Louisiana, and has provided abortion and reproductive health services since 1999. (Doc. 109 at 2–5; Doc. 14 ¶ 13.) Causeway is a licensed abortion clinic suing on its own behalf and that of its physicians, staff, and patients. (Doc. 14 ¶ 14.)

37. Causeway offers surgical abortions through 21 weeks, six days LMP, and does not offer medication abortions. (JX 117 ¶ 4.)

38. Causeway employs two doctors who perform abortions, Does 2 and 4. (*See, e.g.*, Doc. 168-5 at 8.) Doe 2 performs approximately 25% of the abortions provided at Causeway, and Doe 4 performs the remaining 75%. (JX 117 ¶ 5.)

*(4)*    ***Women's Health***

39. Women's Health is a women's reproductive health care clinic located in New Orleans, Louisiana, and has provided abortion and women's reproductive health services since 2001. (Doc. 109 at 5; JX 168 ¶ 1; JX 110 ¶ 1.)

40. Women's Health employs two doctors who perform abortions, Does 5 and 6. (JX 110 ¶ 3; JX 168 ¶ 4.) Doe 5 performs approximately 40% of the abortions provided at Women's Clinic, and Doe 6 performs the remaining 60%. (JX 110 ¶ 3; JX 168 ¶ 4.)

41. Women's Health provides surgical abortions for women through 16 weeks and medication abortions through eight weeks. (Doc. 168-4 at 19.[19]) Doe 6 provides only medication

---

[19] The designated deposition testimony appears within the larger docketed document. (Doc. 168.) For the sake of consistency and ease, the Court continues to use the page numbers of the uploaded document and not of the deposition transcript itself.

abortions. (*Id.* at 55.)[20]

### (5)    *Delta*

42. Delta is a women's reproductive health care clinic located in Baton Rouge, and has provided abortion and women's reproductive health services since 2001. (Doc. 109 at 5.)

43. Delta employs one doctor who performs abortions, Doe 5. ( JX 110 ¶ 35.)

44. Delta provides surgical abortions for women through 16 weeks LMP, and medication abortions through eight weeks. (Doc. 168-4 at 13–14, 19.)[21]

45. The northern part of Louisiana is served by Hope in Shreveport and by Bossier Clinic in Bossier City. (Doc. 191 at 17; Doc. 190 at 110.) The southern part of this state is served by Causeway in Metairie, Delta in Baton Rouge,  and Women's Health in New Orleans. (JX 110 ¶ 1; JX 114 ¶ 1; JX 109 ¶ 13.)

### C.    **The Doctors**

46. There are currently six doctors who perform all abortions in Louisiana. (Doc. 109 at 4; *see also, e.g.*, JX 109 ¶ 14.)

### (1)    *Doe 1*

47.  Doe 1 is a board-certified physician in Family Medicine and Addiction Medicine and is one of two clinic physicians at Hope. (Doc. 109 at 5).

---

[20] *See* supra note 18.

[21] *Id.*

48. Doe 1 has over 10 years of experience, seven of those as an abortion provider. (Doc. 190 at 139–40; Doc. 14 ¶ 14.) He provides medication abortions through eight weeks and surgical abortions through 13 weeks, six days LMP. (Doc. 192 at 21; Doc. 190 at 132.)

49. Doe 1 was trained to provide abortion services by Doe 3, the medical director of the Hope Clinic, where they both work. (Doc. 192 at 140–41.)

50. Despite beginning his efforts to get admitting privileges at a nearby hospital in July 2014, (*Id.* at 52),  Doe 1 still does not have active admitting privileges at a hospital within 30 miles of Hope Clinic. (Doc. 190 at 21.) The efforts of all six doctors to gain active admitting privileges and the results of those efforts are reviewed in more detail in another section of this Ruling. *See infra* Part VIII.


*(2)*     ***Doe 2***

51. Doe 2 is a board-certified obstetrician-gynecologist and is one of two clinic physicians at Causeway and the only clinic physician at Bossier who provides abortion services. (Doc. 109 at 5.) He is the medical director of Causeway and Bossier. (*Id.*)

52. Doe 2 has been performing abortions since 1980. (Doc. 191 at 13-14.) Doe 2 performs medication abortions through eight weeks and surgical abortions up through the state's legal limit of 21 weeks, six days LMP. (Doc. 191 at 22–23, 55–56; JX 187 ¶ 4.) He performs medication and surgical abortions at Bossier Clinic, but only surgical abortions at Causeway Clinic. (*Id.* at 21–23.) Last year, Doe 2 performed approximately 550 abortions at Bossier and 450 abortions at Causeway Clinic. (*Id.* at 17–18.)

53. Doe 2 performs first and second trimester surgical abortions through 21 weeks, six

days LMP, and is the only one of two physicians in Louisiana to offer abortion after 16 weeks, six

days LMP. (*Id.* at 21–22.)[22]

54. Doe 2 has been unsuccessful in getting active admitting privileges within 30 miles of

Bossier and has been able to obtain only limited privileges, which do not meet the requirements

of Act 620, within 30 miles of Causeway. (*See, e.g., id.*)


*(3)*   ***Doe 3***

55. Doe 3 is a board-certified obstetrician-gynecologist and one of two clinic physicians at

Hope. (Doc. 109 at 5.) He is also the medical director at Hope. (*Id.*)

56. Doe 3 has been licensed to practice medicine in Louisiana since 1976. (Doc. 190 at

109.) In addition to his abortion practice, he has an active general OB/GYN practice, where he

delivers babies and routinely performs gynecological surgery including hysterectomies,

laparoscopies, and dilation and curettages ("D&Cs"). (*Id.* at 110.)

57. Doe 3 is the chief medical officer of Hope Clinic, where he has worked since 1981.

(Doc. 190 at 108, 117, 21.) He provides medication abortions through eight weeks and surgical

abortions through 16 weeks, six days LMP. (*Id.* at 35, 119, 132.)

58. Doe 3 performs abortions at Hope Clinic on Thursday afternoons and all day on

Saturday. He sees approximately 20 to 30 abortion patients a week. (*Id.* at 117–18, 153.) On

occasion, he will cover for Doe 1 and will see more patients in those instances. (*Id.*)

59. Doe 3 currently has admitting privileges at Willis-Knighton Hospital in Bossier

("WKB") and at Christus Highland Medical Center in Bossier ("Christus"), both of which are

---

[22] *Id.*

within 30 miles of Hope Clinic. (*Id.* at 21–22, 120, 148–49.) Doe 3's current privileges at

Christus require him to admit approximately 50 patients per year. (*Id.* at 150–52; JX 59.)

60. Doe 3 has his current admitting privileges because he regularly admits patients to the

hospital as part of his private OB/GYN practice, not because of his work at Hope Clinic. (*Id.* at

124, 147.)

*(4)     Doe 4*

61. Doe 4 is a board-certified obstetrician-gynecologist and one of two clinic physicians at

Causeway. (Doc. 109 at 5.)

62. Doe 4 obtained his license to practice medicine in Maryland in 1959 and has been

practicing medicine for 56 years and in Louisiana since 1965. (Doc. 168-5 at 5–6.) He served as

an assistant professor or assistant instructor in obstetrics and gynecology for seventeen years at

Earl K. Long Hospital. (*Id.* at 12.)

63. When Doe 4 maintained a full OB/GYN practice, he had admitting privileges at four

hospitals in the Baton Rouge area. (*Id.* at 6.) He was required to have admitting privileges to do

OB/GYN surgery and, in his words, "to deliver babies." (*Id.*) The existence of these privileges did

not benefit his pregnancy termination patients because, to his knowledge, none of his abortion

patients experienced any problem and required hospital admission. (*Id.* at 19–20.)

64. Doe 4 performs abortions at Causeway in Metairie. (Doc. 109 at 5; *see also, e.g.*, Doc.

168-5 at 8.) He does not currently have and has been unable to get admitting privileges at a

hospital within 30 miles of Causeway. (Doc. 191 at 18; *see also, e.g.*, Doc. 168-5 at 16.)

*(5)* **Doe 5**

65. Doe 5 is a board certified obstetrician-gynecologist. (Doc. 109 at 5; *see also* Doc. 168-6 at 4–5.) He is one of two clinic physicians at Women's Clinic and the only clinic physician at Delta Clinic. (Doc. 109 at 5; *see also* Doc. 168-6 at 4, 13–14, 22.)

66. Doe 5 has been licensed to practice medicine in Louisiana since 2005. (Doc. 168-6 at 5.) He provides surgical abortions at Delta Clinic and Women's Health through 16 weeks LMP. (*Id.* at 20; *see also* JX 110 ¶ 1.)[23]

67. Doe 5 has been successful in getting active admitting privileges within 30 miles of Women's Health in New Orleans but has been unsuccessful in his efforts to get active admitting privileges within 30 miles of Delta in Baton Rouge. (Doc. 168-6 at 11–13; *see also, e.g.*,  JX 109 ¶¶ 33–34; JX 110 ¶¶ 15–19.)

*(6)* **Doe 6**

68. Doe 6 is a board certified obstetrician-gynecologist and one of two clinic physicians at Women's Health. (Doc. 109 at 5; *see also* Doc. 168-4 at 13.)

69. Doe 6 has been practicing medicine for 48 years. (JX 109 ¶ 8.) He is currently the medical director of Women's Clinic and Delta Clinic. (*Id.*) Dr. John Doe 6 provides only medication abortions and does so only at Women's Clinic. (*Id.* ¶¶ 8–9.)

70. Doe 6 has been unsuccessful in his efforts to get active admitting privileges within 30 miles of Women's. (*Id.* ¶¶ 23–26.)

---

[23] *Id.*

**D.      Admitting Privileges in Louisiana**

71. In order to perform abortions legally in Louisiana, Act 620 requires an abortion doctor to have "active admitting privileges" at a hospital within 30 miles of the facility where he or she performs abortions. LA. R.S. § 40:1299.35.2A(2)(A). To have "active admitting privileges" the physician must be a "member in good standing of the medical staff" of a hospital "with the ability to admit a patient and to provide diagnostic and surgical services to such patient . . . ." *Id.* The phrase "member in good standing of the medical staff" is not separately defined. (*Cf.* Doc. 193 at 12.)

72. Thus, how a physician may obtain "medical staff" and "active admitting" privileges from a Louisiana hospital is critical in determining the effect, if any, that Act 620 has on abortion providers and, in turn, the women that they serve.

73. The expert testimony regarding hospital admitting privileges came primarily from two experts–Pressman, Plaintiffs' expert, (Doc. 195 at 11–96), and Marier, Defendant's (Doc. 193 at 4–124)–and, to a lesser extent, from the other physicians, including Does 1, 2, 3, 4, 5, and 6, who testified. *See supra* Part I. On the issue of admitting privileges and hospital credentialing, the Court found both Pressman and Marier to be generally well qualified.

74. Additional information about the credentialing process and the specific requirements of various hospitals came from certain hospital by-laws introduced into evidence. (*See, e.g.*, JX 46, 48, 67, 72, 76, 78–79, 81, 138, 140–43.)

75. Credentialing is a process that hospitals employ to determine what doctors will be allowed to perform what tasks within that hospital. (Doc. 193 at 11; *see also, e.g.*, Doc. 195 at 23–27; Doc. 168-5 at 24.)

76. Part of this process involves the hospital's granting or denying "admitting privileges." (*See, e.g.*, Doc. 193 at 20; Doc. 195 at 17, 23–25.)  These privileges govern whether or not a physician is authorized to admit and treat a patient at that hospital and what care, services and treatment the physician is authorized to provide. (*See, e.g.*, Doc. 193 at 20–21; Doc. 195 at 23, 25–26.)

77. Admitting privileges are related to but not the same as being on the "medical staff" of a hospital. (Doc. 193 at 11; Doc. 195 at 25–26.)

78. There is no requirement that a physician have admitting privileges or be on the medical staff at a hospital in order to practice medicine. (*See, e.g.*, Doc. 195 at 26.) Many physicians who do not have a hospital based practice, i.e. do not intend to admit and treat their patients in a hospital setting, have neither as there is no need for staff or admitting privileges under those circumstances. (*See, e.g.*, Doc. 175 at 75; Doc. 192 at 41–42; Doc. 195 at 75.)

79. There is no state or federal statute which governs the rules for the granting or denial of hospital admitting privileges in Louisiana.[24] *Cf. Planned Parenthood of Wis., Inc. v. Van Hollen*, 738 F.3d 786, 792 (7th Cir. 2013) ("The criteria for granting admitting privileges are multiple, various, and unweighted."). Rather, partly as a consequence of this absence, these rules vary from hospital to hospital and are governed by each one's distinct by-laws.[25] (*See, e.g.*, Doc. 193 at 12,

---

[24] While one statute, commonly known as the Church Amendment, does impose a type of germane privileges requirement on hospitals accepting federal funds, 42 U.S.C. § 300a-7(c)(1)(B), this statute was not shown to apply to the hospitals involved in this case, *see infra* note 32.

[25] *Cf.* AM. MED. ASS'N, OPINION 4:07 - STAFF PRIVILEGES (June 1994) ("Privileges should not be based on numbers of patients admitted to the facility or the economic or insurance status of the patient. . . . Physicians who are involved in the granting, denying, or termination of hospital privileges have an ethical responsibility to be guided primarily by concern for the

15; Doc. 195 at 28.)

80. Specifically, there is no state or federal statute which defines or sets uniform standards for the categories of admitting privileges a hospital may grant. (Doc. 193 at 11–12.) Like other rules, these are therefore set by each hospital's by-laws. (*Id.*; *see also, e.g.*, Doc. 195 at 28; JX 81 at 1798.) To make matters more confusing, the terms used to describe those categories (e.g. "active admitting privileges", "courtesy admitting privileges", "clinical admitting privileges") vary from hospital to hospital. (*See, e.g.*, Doc. 190 at 167; Doc. 191 at 104; Doc. 193 at 11–12; Doc. 195 at 28.)

81. Similarly, terms like "medical staff", "active staff", "courtesy staff", "clinical staff" vary among hospitals. (Doc. 191 at 35; Doc. 193 at 12; Doc. 195 at 28; *cf.* JX 79 at 1707–12.)

82. For example, at some hospitals, an "active" staff appointment does not, alone, automatically entitle the physician to admit patients. (*See, e.g.*, JX 46 at 185; JX 79 at 1673; JX 141 at 3259–60.)

83. Because of the varying definitions given to the categories of admitting privileges and the varying requirements for the attainment of same, whether a physician has been given "active admitting privileges" or is a "member in good standing on the medical staff" within the meaning of Act 620 entirely depends upon the specific definition, requirements and restrictions imposed by a given hospital in a given circumstance. (*See, e.g.*, Doc. 193 at 12.)

---

welfare and best interests of patients in discharging this responsibility."). The evidence presented in this case shows that these aspirational goals are not reflected in the by-laws of the Louisiana hospitals whose rules and practices are before the Court.

84. Unlike some states,[26] there is also no statute or rule in Louisiana which sets a maximum time period within which a physician's application for admitting privileges must be acted upon. Thus, unless there is such a time limit in the hospital's by-laws, a hospital can effectively deny a doctor's application of privileges by never acting on it, a decision on any one doctor's application permanently delayed without a consequence being effected or a reason being given. A definite decision stays unreached–but, with his or her request suspended, the relevant doctor's privileges remain, as a matter of fact and law, nonexistent. In this Ruling, the Court uses the term "de facto denial" of privileges to describe this circumstance.[27]

85. At some hospitals in Louisiana, there are suggested time frames in which hospitals should review admitting privileges applications. (JX 72 at 1320–23; *see also, e.g.*, JX 67 at 857–58; JX 76 at 1444–47.) However, those guidelines are not requirements, and there is no legal

---

[26] Texas sets a 170 day time limit within which a hospital's credentialing committee must take final action on a completed application for medical staff membership or privileges. TEX. HEALTH & SAFETY CODE § 241.101; *Planned Parenthood of Greater Tex. Surgical Health Servs. v. Abbott*, 748 F.3d 583, 600 (5th Cir. 2014)("*Abbot II*") (making this point).

[27] In other contexts, this notion has appeared. *See, e.g.*, *Khorrami v. Rolince*, 539 F.3d 782, 786 (7th Cir. 2008) (observing that a judicial ruling's delay can sometimes be "so long . . . that the delay becomes a *de facto* denial"); *Morgan v. Gandalf, Ltd.*, 165 F. App'x 425, 431 (6th Cir. 2006) (construing a court's failure to explain its reason as a "*de facto* denial" and reviewing such a denial for abuse of discretion); *Omnipoint Communc'ns Enters., L.P. v. Zoning Hearing Bd. of Easttown Twp.*, 331 F.3d 386, 393 (3d Cir. 2003) (observing that under Pennsylvania law, a de facto exclusion exists "where an ordinance permits a use on its face, but when applied acts to prohibit the use throughout the municipality" (internal quotation marks omitted)); *Alexander v. Local 496, Laborers' Int'l Union*, 177 F.3d 394, 408–09 (6th Cir. 1999) (finding that a "longstanding and demonstrable policy" where the union's "working-in-the-calling" rule, which was memorialized in its constitution and bylaws, resulted in the "de facto exclusion" of African Americans from union membership). Seemingly, though also in other contexts, the Fifth Circuit has recognized such a possibility. *See Chevron USA, Inc. v. Sch. Bd. of Vermilion Parish*, 294 F.3d 716, 720 (5th Cir. 2002) ("Arguably, the district court's order was a de facto denial of class certification (although the parties have not treated it as such, and no motion for class certification was ever filed).").

recourse for an applicant if the hospital fails to act on the application within the suggested time period. (*See, e.g.*, JX 67 at 858–59; JX 72 at 1320–24; JX 109 ¶ 27.) For example, Tulane University Medical Center ("Tulane") has an expectation, but has adopted no requirement, that applications will be processed within 150 days. (JX 78 at 1554.) If the Board of Trustees has not taken action on the application within 150 days, the applicant must repeat the verification process to ensure the information contained therein is still accurate. (*Id.*)

86. A hospital's failure to act on an application by either approving or denying it may result in the hospital considering the application withdrawn. (*See, e.g.*, Doc. 195 at 93; JX 71 at 1279.) In this additional respect, a hospital's failure to act is, in effect, a de facto denial of the application.

87. While a physician's competency is a factor in assessing an applicant for admitting privileges, it is only one factor that hospitals consider in whether to grant privileges. (*See, e.g.*, Doc. 190 at 158–59; Doc. 195 at 25–26; Doc. 192 at 50–51; Doc. 168-5 at 17; Doc. 168-6 at 12; JX 110 ¶ 10; JX 168 ¶¶ 11–13, 17; PX 183.)

88. Defendant argues: "When Louisiana hospitals decide whether to grant a physician staff membership, privileges to admit patients, or privileges to perform particular procedures, hospital by-laws indicate that they may make such determinations based on the physician's prior and current practice, and indicia of the physician's clinical competence."[28] (Doc. 200 ¶ 114 at 38 (citing to JX 2873; JX 1838; JX 1542–43; JX 852–53).)

89. The Court finds that this is only partly true because both by virtue of by-laws and how

---

[28] The Defendant's briefing cites exhibits by Bates page numbers rather than exhibit numbers.

privileges applications are handled in actual practice, hospitals may deny privileges or decline to consider an application for privileges for myriad reasons unrelated to competency. Examples include the physician's expected usage of the hospital and intent to admit and treat patients there, the number of patients the physician has treated in the hospital in the recent past, the needs of the hospital, the mission of the hospital, or the business model of the hospital. Furthermore, hospitals may grant privileges only to physicians employed by and on the staff of the hospital. And university-affiliated hospitals may grant privileges only to faculty members. These possible variances in causes and justification for any particular denial are attested to by this case's evidentiary submissions and testimony. (*See, e.g.*, Doc. 195 at 25–26; Doc. 190 at 123, 168–70; Doc. 193 at 82–83; JX 109 ¶¶ 27–28; JX 110 ¶ 10; JX 168 ¶¶ 11–13, 17; Doc. 168-5 at 6, 23.)

90. An apparently benign example of such a non-competency based, business driven reason for denying privileges is the denial of Doe 1's application to the Minden Medical Center ("Minden"). (JX 50 at 318; Doc. 192 at 50–51.) In declining his application for staff membership and clinical privileges, Minden's Medical Staff Coordinator wrote to Doe 1: "Since we do not have a need for a satellite primary care physician at this time, I am returning your application and check." (JX 50 at 318; *see also* JX 72 at 1323.)

91. When they had full OB/GYN practices delivering babies and performing gynecological surgery, Does 2, 4, and 6 had no problem obtaining and maintaining admitting privileges at a number of hospitals. (*See, e.g.*, Doc. 168-5 at 6–8; JX 109 ¶ 30.) However, under Act 620, for reasons unrelated to competency, they are now unable to secure active admitting privileges. (*See, e.g.*, Doc. 191 at 24–26; Doc. 168-5 at 16–17; JX 109 ¶¶ 23, 30, 31–34.)

92. Another example of a non-competency based application criteria is that some hospitals

require the physician seeking privileges to live and/or practice within a certain distance of the hospital. (JX 83 at 1865; JX 139-a at 2925; JX 79 at 1679–83.) Does 2 and 5 travel significant distances from their respective homes to provide abortion services and would not be able to meet this criteria for hospitals within 30 miles of some or all of the clinics where they provide abortions. (Doc. 191 at 20–21; Doc. 168-6 at 4, 11–13; JX 109 ¶¶ 31–36.)

93. Defendant argues that "[t]here is no evidence suggesting that, in making the determinations about staff membership or privileges, Louisiana hospitals discriminate against physicians based on whether they provide elective abortions." (Doc. 200 ¶ 115 at 38 (citing Marier's testimony, as it appears on Doc. 193 at 83–86).) In his testimony, however, Marier only acknowledged that he personally knew of no hospitals which refused to extend privileges to a doctor "simply because he or she performs an abortion." (Doc. 193 at 83–85.) Regardless, to the extent Marier's testimony can be so construed, the Court finds his testimony on this point to be not credible and contradicted by an abundance of evidence introduced at the hearing demonstrating that hospitals can and do deny privileges for reasons directly related to a physician's status as an abortion provider. (*See, e.g.*, Doc. 168-6 at 12; Doc. 190 at 53; JX 109 ¶¶ 28, 30, 39.)

94. For instance, Doe 1 contacted the director of the Family Medicine Department at University Health Hospital in Shreveport ("University" or "University Health")[29] where he had done his residency in family medicine. Dr. Doe 1 was initially told that he would be offered a job as a faculty member teaching sports medicine which would "take care of the admitting privileges

---

[29] This hospital is a teaching hospital associated with LSU Medical School and is sometimes referred to as LSU Shreveport Hospital. (*See, e.g.*, JX 79; Doc. 192 at 19, 47.)

thing." (Doc. 192 at 45.) Doe 1 was told that the application forms for admitting privileges would be forwarded to him. (*Id.*)

95. When Doe 1 did not get the application forms and inquired, he was told by the director of the department that he would not be offered a position because "there was some objection from certain staff about [Doe 1] coming to work there because of where [he] work[ed], at Hope Medical." (*Id.* at 45–46.)[30]

96. This same essential response was also given to Doe 2 when he attempted to upgrade his courtesy privileges at University Health. (Doc. 191 at 24–26.)

97. There is no Louisiana statute which prohibits a Louisiana hospital or those individuals charged with credentialing responsibilities from declining an application for admitting privileges based on the applicant's status as an abortion provider.[31]

98. Section 40:1299.32 provides: "No hospital, clinic or other facility or institution of any kind shall be held civilly or criminally liable, discriminated against, or in any way prejudiced or

---

[30] This testimony was objected to as hearsay, which objection was overruled. (Doc. 192 at 46.) It was overruled for two reasons. First, the ordinary rules of admissibility are relaxed in a preliminary injunction hearing and hearsay may be admitted. *E.g.*, *Fed. Savings & Loan Ins. Corp. v. Dixon*, 835 F.2d 554, 558 (5th Cir. 1987); *Sierra Club, Loan Star Chapter v. F.D.I.C.*, 992 F.2d 545, 551 (5th Cir. 1993); *see also* 11A CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 2949 (3d. 2015). Second, as this testimony was presented so as to explain Doe's failure to make formal application for privileges at University, the testimony was not offered to prove its truth and was thus, for this limited purpose, not hearsay. FED. R. CIV. P. 801(c)(2).

[31] Texas law, in contrast, "specifically prohibits discrimination by hospitals or health care facilities against physicians who perform abortions." TEX. OCC. CODE § 103.002(b). Texas law further provides a private cause of action for an individual to enforce this non-discrimination clause. *Id.* § 103.003, *cited in Abbott II*, 748 F.3d at 598 & n.13; *accord Whole Woman's Health v. Cole*, 790 F.3d 563, 596 n.44 (5th Cir. 2015) (per curiam), *modified by* 790 F.3d 598 (5th Cir. 2015), *stayed by* 135 S. Ct. 2923, 192 L. Ed. 2d 920 (2015), *cert. granted*, 136 S. Ct. 499, 193 L. Ed. 2d 364 (2015).

damaged because of any refusal to permit or accommodate the performance of any abortion in said facility or under its auspices." LA. R.S. § 40:1299.32.[32]

99. The Court was surprised that Defendant's credentialing expert, Marier, was unaware of this provision, but Marier agreed that, by virtue of this provision, "a hospital, if it chooses to, may discriminate against any abortion provider with no consequence under Louisiana law." (Doc. 193 at 84.)

100. Section 40:1299.33(C) states: "No hospital, clinic, or other medical or health facility, whether public or private, shall ever be denied government assistance or be otherwise discriminated against or otherwise be pressured in any way for refusing to permit facilities, staff or employees to be used in any way for the purpose of performing any abortion." LA. R.S. § 40:1299.33(C).[33]

101. While Doe 2 ultimately received limited privileges at Tulane, the negotiations that led to these privileges being granted clearly demonstrate that Doe 2's status as an abortion provider was a central issue in the decision making process over whether to grant him privileges and the limitations those privileges would have. (*See* JX 161–81; *see infra* Part VIII.)

102. There are ways in which the hospital staff's and/or the general public's hostility to abortion and abortion providers can be injected into the credentialing process. For instance, many

---

[32] The statute was introduced as an exhibit. (PX 183.) Not before the Court is the efficacy of this state statute in the face of the Church Amendment, which prohibits a hospital which receives funding under the Public Health Service Act, 42 U.S.C. § 201 *et seq.*, from discriminating in employment against those who perform abortions.  42 U.S.C. § 300a-7. Furthermore, no evidence was introduced as to whether any of the hospitals where credentials were sought in this case, or in Louisiana generally, receive such funds. The text of the Church Amendment was submitted as an exhibit. (DX 162.)

[33] This subsection was introduced as an exhibit. (PX 182.)

applications for privileges require references from at least two physicians who recently have observed the applying physician as to applicant's medical skill and "character." (JX 143 at 3357; JX 79 at 1680–81; JX 83 at 1873; JX 143 at 3351.) For example, Minden prefers that an applicant's peer recommendations come from physicians already on staff at that hospital. (JX 72 at 1300.) Although competent, an abortion provider can face difficulty in getting the required staff references because of staff opposition to abortion. (*See, e.g.*, Doc. 168-6 at 12; Doc. 190 at 53; JX 109 ¶¶ 28, 30, 39.)

103. Other hospitals' admitting privileges applications require the applying physician to identify another physician on staff who will "cover" his or her patients if the applying physician is unavailable, frequently called a "covering physician." (JX 78 at 1539; JX 79 at 1677; JX 138 at 2855; JX 83 at 1866.) As summarized below, the evidence shows that opposition to abortion can present a major, if not insurmountable hurdle, for an applicant getting the required covering physician.

104. For example, Doe 5 has applied for admitting privileges at three hospitals in the Baton Rouge area: Woman's Hospital in April or May of 2014 and Lane Regional Medical Center and Baton Rouge General Medical Center in July of 2014. (Doc. 168-6 at 11.) Doe 5 has been unable to find a local physician who is willing to provide coverage for him when he is not in Baton Rouge, which all three hospitals require. (JX 109 ¶¶ 32–33; JX 110; Doc. 51; Doc. 168-6 at 11–12.)[34] Doe 3 also has had difficulty finding physicians to cover for him due to the animosity

---

[34] This continues to be an obstacle to Doe 5 getting privileges in Baton Rouge. (JX 193.) While Dr. Doe 2 was ultimately able to get limited privileges, it appears that this difficulty may have played a role in the limitations imposed on his privileges.

towards him as an abortion provider. (Doc. 190 at 11–13.) While Doe 2 ultimately got limited privileges at Tulane, (JX 183), the evidence therefore demonstrates that staff physicians who oppose abortion present a real obstacle, *see infra* Part VIII.B.

105. Some other non-competency based admitting privileges requirements create a particular obstacle for abortion providers whose practice is not hospital based, who do not admit patients to a hospital as a part of their practice, and who do not perform surgeries at a hospital.

106. As one example, hospitals often grant admitting privileges to a physician because the physician plans to provide services in the hospital. (*See, e.g.*, Doc. 195 at 24–25; Doc. 193 at 66.) In general, hospital admitting privileges are not provided to physicians who never intend to provide services in a hospital. (Doc. 195 at 23–25, 27, 74–75; Doc. 193 at 66–67.)

107. Thus, in connection with the applications of Does 1 and 2 at Willis-Knighton Medical Center ("WKMC"), Willis-Knighton South ("WKS"), and Willis-Knighton Pierremont Health Center ("WKP") in Shreveport, (JX 53, 144), the Willis-Knighton Health System ("Willis-Knighton"), which runs these three (as well as other) entities, has required these doctors to submit data on hospital admissions, patient management and consultations of patients in the past 12 months in a hospital. (Doc. 192 at 75–76; JX 128; JX 89 at 1950.)

108. Because their abortion practice is not hospital based, neither doctor can possibly comply with that requirement. In the case of Doe 1, since he formally responded to a hospital's request for more information regarding his history of admitting patients during the preceding twelve months, saying he had no such information, he has never again heard from the hospital - there being neither a denial nor an approval of his application. (Doc. 192 at 75–78.) Similarly, when Doe 2 gave the hospital the only information in his possession, he received formal notice

that this was insufficient and "[w]ithout that [additional] information, your application remains incomplete and cannot be processed." (JX 89 at 1950.) Doe 2 could do nothing else, explaining, "I'm in a Catch-22 basically. I can't provide information I don't have." (Doc. 191 at 79–80.)

109. Even if these Does and similar practitioners somehow got admitting privileges, it is unlikely they would be able to keep them. If over a period of two to three years, a physician has not admitted any patients to the hospital, a hospital credentialing committee is likely to understand that this physician no longer requires admitting privileges. (*See, e.g.*, Doc. 195 at 91.) Because, by all accounts, abortion complications are rare, (*See, e.g.*, Doc. 168-5 at 14, 16, 20–21; Doc. 193 at 81–82; Doc. 195 at 38–39), an abortion provider is unlikely to have a consistent need to admit patients.

110. Furthermore, surgical privileges are meant for providers who plan to perform surgeries at the hospital. (Doc. 195 at 95–96.)

111. For the reasons outlined above, the Court finds that the Louisiana practice of credentialing, i.e. a hospital's consideration of and acting (or not acting) upon applications for admitting privileges, creates particular hardships and obstacles for abortion providers.

112. The efforts made by Does 1–6 to comply with the admitting privileges requirement of Act 620, and the result of those efforts, is reviewed in another section of this Ruling. *See infra* Part VIII.

## E.       The Climate

113. The evidence is overwhelming that in Louisiana, abortion providers, the clinics where they work and the staff of these clinics, are subjected to violence, threats of violence,

harassment and danger.

114. Defendant offered no evidence to counter Plaintiffs' evidence on this point. Rather, Defendant makes two arguments: first, some of the Plaintiffs' evidence on this point is hearsay, and second, the violence is "legally irrelevant" to the undue burden analysis. (Doc. 201 at 14–15.) The issue of legal relevance is addressed in the Conclusions of Law section of this Ruling. *See infra* Parts XI–XII.

115. Defendant objects to the testimony and exhibits cited in Plaintiffs' proposed findings and conclusions (Doc. 196 ¶¶ 79, 84, 87, 89), as hearsay. However, almost all of this testimony was not objected to by Defendant at the time it was introduced. Moreover, in some instances, this testimony came in by way of exhibits offered jointly by the Parties or in questions asked by counsel for the Defendant.

116. But even if the objected-to evidence were excluded, there is a mountain of uncontradicted and un-objected to evidence supporting this conclusion, some of which is summarized below.

117. In addition to the harassment and violence, as was discussed briefly in the previous section and will be discussed in more detail in the section reviewing the doctors' efforts to gain admitting privileges, the personal and/or religious feelings against abortion by the public, some members of the medical profession and hospital administrators has had a negative effect on the doctors' efforts to gain admitting privileges. (*See, e.g.*, Doc. 168-6 at 12; Doc. 190 at 53; Doc. 191 at 24–26; Doc. 192 at 45–46; JX 109 ¶¶ 28, 30, 39.)

118. Indeed, after reviewing Plaintiffs' motion to allow the Plaintiff doctors to use pseudonyms as well as their supporting affidavits, the United States Magistrate Judge concluded:

"The Court is satisfied that the potential for harassment, intimidation and violence in this case, particularly recent instances of such conduct, both nationwide and in Louisiana, justifies the unusual and rare remedy of allowing the individual Plaintiffs to proceed anonymously." (Doc. 24 at 3; *see also* Doc 190 at 108; Doc. 191 at 12; Doc. 192 at 6.) A similar order was signed when Does 3–6 were added as parties. (Doc. 55.)

119. Also recognizing these legitimate safety concerns, Defendant joined with Plaintiffs in a Joint Consent Motion Regarding Confidential Trial Procedures, (Doc. 158), granted on June 23, 2015, (Doc. 161). These procedures included allowing Does 1–3 to testify from behind a screen.[35] (Doc. 158 at 1.)

120. The security concerns even went beyond the Parties, however. A request for anonymity was made on behalf of a hospital which had granted privileges to Doe 5 and the non-party doctors who assisted in the privileges request. No objection was made by any party and the Court ordered this hospital to be called "Hospital C" and the doctor involved for that hospital," Dr. C." (*Id.*) Other doctors involved in granting the limited privileges to Doe 2 were ordered to be called "Dr. A" and "Dr. B." (*Id.*)

121. In order to insure the use of the pseudonyms and protect the identities of Plaintiff doctors as well as certain non-party doctors and hospitals, the Plaintiffs and Defendant filed a joint motion to redact portions of the trial transcript, which the Court granted. (Doc. 180.) By their filings in this case, therefore, Defendant and Plaintiffs have implicitly acknowledged the charged emotions generated by this particular issue within and outside this state.

---

[35] The screen was positioned so as to protect the identity of the witness from the public but allowed the Court to see and judge the demeanor of the witnesses.

122. The evidence, in turn, leaves no question about the dangers and hostility regularly endured by Plaintiffs.

123. Each of Louisiana's five clinics experiences frequent demonstrations by anti-abortion activists. (Doc. 190 at 24, 108; Doc. 191 at 13; JX 109 ¶¶ 10–12; JX 117 ¶ 6; JX 112 ¶ 2;  JX 113 ¶ 2; Doc. 168-6 at 25.) These demonstrations require some clinics to have additional security on site. (Doc. 190 at 23.)

124. Hope Clinic in Shreveport has been the subject of three violent attacks: once by a man wielding a sledgehammer, once by an arsonist who threw a Molotov cocktail at the clinic, and once by having a hole drilled through the wall and butyric acid poured through it. (Doc. 190 at 23; JX 116 ¶ 8.)

125. In the fall of 2014, following passage of the Act, anti-abortion activists attempted to interfere with Doe 5's admitting privileges application at Woman's Hospital in Baton Rouge by sending threatening letters to the hospital. (JX 110 ¶ 14; JX 109 ¶ 29.) Woman's Hospital also had to remove anti-abortion activists from its medical staff offices due to the activists' disruptive conduct. (JX 110 ¶ 14.)

126. When Doe 5 worked as a hospital employed physician, protests outside the hospital caused the hospital administration to give him an ultimatum: quit performing abortions or resign from the hospital staff. (JX 110 ¶ 21; *see also* Doc. 168-6 at 23–24.) In his words, he "was therefore forced to stop working at the hospital so that . . . [he] could continue providing services at Women's Clinic and Delta Clinic." (JX 110 ¶ 21; *see also* JX 109 ¶ 30.)

127. After Doe 5 recently acquired privileges at a local hospital (Hospital C), anti-abortion activists began sending threatening letters to that hospital causing him to fear that he might lose

the privileges that he acquired. (JX 110 ¶ 20; *see also* JX 109 ¶ 39.)

128. Anti-abortion activists picketed the school of the children of a doctor formerly affiliated with Delta, after which that doctor quit. (Doc. 168-4 at 23–24.)

129. A physician quit working at Causeway after receiving harassing telephone calls at his private practice and anti-abortion activists demonstrated outside the hospital where he worked. (Doc. 168-8 at 8.)

130. Doe 1 works at Hope–but he does so in fear of violence. (Doc. 192 at 78–79.)

131. Doe 2 has received threatening phone calls, has been followed into restaurants and accosted, and has been shouted at with profanity and told that he was going to hell. (Doc. 191 at 12–13.)

132. Doe 2 was forced to leave a private practice when the practice's malpractice insurer refused to cover him if he continued to perform elective pregnancy terminations. (*Id.* at 16–17.)

133. Doe 3 has been threatened as a result of his work at Hope Clinic. (JX 113 ¶ 3.) Last year, anti-abortion activists from outside Louisiana left fliers on neighbors' mailboxes calling him an abortionist and saying they wanted to convert him to Jesus. (Doc 190 at 108–09.) Local police have had to patrol his neighborhood and search his house before he entered. (JX 113 ¶ 4.)

134. These individuals also approached Doe 3's regular medical practice patients as they tried to enter his office, requiring the building security officers to escort the activists off the premises. (*Id.* ¶ 3.)  These individuals told Doe 3's patients that he killed babies and that they should not see him. (Doc. 190 at 109.)

135. Doe 3 fears that, if the other Louisiana abortion providers are not able to obtain admitting privileges, he will become an even greater target for anti-abortion violence. (JX 113 ¶¶

6–7.)  He specifically testified that "all [these individuals] have to do is eliminate [him] as they have Dr. Tiller and some of the other abortion providers around the country" to eliminate abortion entirely in northern Louisiana. (Doc. 190 at 174.)

136. Doe 3 also explicitly emphasized that he is concerned that such individuals could "cause a lot of other . . . problems that would affect [his] ability to perform the rest of [his] practice." (*Id.* at 174–75; *cf.* JX 113 ¶¶ 6–7.)

137. Doe 3 has difficulty arranging coverage for his OB/GYN practice because other OB/GYN doctors in the Shreveport area refuse to cover his practice as a result of his work at Hope. (Doc. 190 at 111–13.)

138. As a result of his fears, and the demands of his private OB/GYN practice, Doe 3 has testified that if he is the last physician performing abortion in either the entire state or in the northern part of the state, he will not continue to perform abortions. (*Id.* at 174–76.)

139. Anti-abortion activists have picketed the homes – and neighbors' homes – of Does 5 and 6, also distributing threatening flyers. (Doc. 168-6 at 24; JX 109 ¶ 11.)

140. Anti-abortion activists have targeted at least one physician who agreed to provide emergency care for abortion complications, even though he did not provide abortions himself. (Doc. 168-6 at 11, 24–25; JX 110 ¶ 20.)


**VI.**    **Act 620**

**A.**    **Text of Act 620 and Related Provisions**

141. The challenged statute is Act 620. LA. R.S. § 40:1299.35.2.

142. Act 620 amended Louisiana Revised Statutes § 40:1299.35.2(a), 1299.35.2.1, and

2175.3(2) and (5). (*Id.*)

143. On June 12, 2014, Governor Bobby Jindal signed Act 620 into law, with an effective date of September 1, 2014. (*See, e.g.*, Doc. 109 at 4.)

144. Act 620 provides that every physician who performs or induces an abortion shall "have active admitting privileges at a hospital that is located not further than thirty miles from the location at which the abortion is performed or induced and that provides obstetrical or gynecological health care services." LA. R.S. § 40:1299.35.2A(1).

145. The Act defines "active admitting privileges" to mean that "the physician is a member in good standing of the medical staff of a hospital that is currently licensed by the department, with the ability to admit a patient and to provide diagnostic and surgical services to such patient . . . ." *Id.* § 40:1299.35.2A(2)(a).

146. Regulations connected to the Act and promulgated after the commencement of this litigation by DHH use the same definition of "active admitting privileges." LA. ADMIN CODE tit. 46, § 4401.[36] These regulations note that federal litigation is pending on the issue of admitting privileges and that licensing provisions regarding admitting privileges will only be enforced pursuant to an order, judgment, stipulation, or agreement issued in this case. *Id.* § 4423.

147. The Act provides that any outpatient abortion facility that knowingly or negligently provides abortions through a physician who does not satisfy the Act is subject to denial, revocation, or non-renewal of its license by DHH. LA. R.S. § 40:1299.35.2A(1).

148. The Act provides that a physician who fails to comply with the admitting privileges requirement can be fined $4,000 per violation. *Id.* § 40:1299.35.2A(2)(c).

---

[36] A copy of this regulation was submitted as a joint exhibit. (JX 137.)

149.  In addition, discipline by the Board is made an enforcement provision in Act 620. *Id.* § 40:1299.35.2.1E. The Board has the authority to take disciplinary action against any physician. *Id.* § 37:1261 *et seq.* The Board has the authority to investigate physicians for violations of law, such as Act 620. *Id.* § 40:1299.35.2E. By violating this law, physicians could be subjected to fines or other sanctions, including the suspension or revocation of the physician's license to practice medicine. (Doc. 168-10 at 12, 14–15; *see also* Doc. 31 at 4 n.4.)

**B.     Louisiana's Policy and Other Legislation Regarding Abortion**

150. The Louisiana legislature has codified a statement of opposition to legalized abortion, stating:

> It is the intention of the Legislature of the State of Louisiana to regulate abortion to the extent permitted by the decisions of the United States Supreme Court. The Legislature does solemnly declare and find in reaffirmation of the longstanding policy of this State that the unborn child is a human being from the time of conception and is, therefore, a legal person for purposes of the unborn child's right to life and is entitled to the right to life from conception under the laws and Constitution of this State. Further the Legislature finds and declares that the longstanding policy of this State is to protect the right to life of the unborn child from conception by prohibiting abortion impermissible only because of the decisions of the United States Supreme Court and that, therefore, if those decisions of the United States Supreme Court are ever reversed or modified or the United States Constitution is amended to allow protection of the unborn then the former policy of this State to prohibit abortions shall be enforced.

LA. R.S. § 40:1299.35.0; *see also State v. Aguillard*, 567 So. 2d 674, 676 (La. Ct. App. 1990) (observing that "the Louisiana legislature has expressed its disfavor for abortion" with this provision).

151. Consistent with this explicit statement of legislative intent, as shown below, Louisiana has enacted other laws that place restrictions on women seeking abortion in the state,

and doctors and clinics who perform abortions.

152. In 2006, the Louisiana legislature passed a "trigger" ban – banning abortion with only a limited exception to save a woman's life – to take immediate effect should *Roe v. Wade* be overturned or a constitutional amendment be adopted to allow states to ban abortion. S.B. 33, 2006 Leg., Reg. Sess. (La. 2006) (codified as LA. R.S. §§  40:1299.30, 14.87). The trigger ban carries a criminal penalty of up to 10 years' imprisonment "at hard labor" for a physician performing an abortion. LA. R.S. §§ 40:1299.30D, 14:87D(1).

153. Another law mandates that every woman undergo an ultrasound before an abortion, even when not medically necessary, and that she be required to listen to an oral description of the ultrasound image. *Id.* §§ 40:1299.35.2B–D, 40:1299.35.6, 40:1299.35.12.

154. Louisiana requires a two-trip, 24-hour waiting period for women, and further mandates that a physician – and not another medical professional – give certain state-mandated information designed to discourage abortion to his patient; violation of this provision carries criminal penalties. *Id.* §§ 40:1299.35.2D(2), 40:1299.35.6, 40:1299.35.19.

155. The Louisiana legislature prohibits public funding of abortion for victims of rape or incest unless the victim reports the act to law enforcement and certifies a statement of rape or incest that is witnessed by the physician. *Id.* §§ 40.1299.34.5, 40:1299.35.7.

156. Physicians who provide for the "elective termination of an uncomplicated viable pregnancy" are expressly excluded from malpractice reform provisions afforded to all other health care practitioners under the state's medical malpractice protection laws. *Id.* §§ 40.1299.31–39A, 40:1299.41(K).

157. The legislature has passed laws prohibiting insurance coverage of abortion in state

exchanges under the Affordable Care Act. *Id.* § 22:1014. Louisiana does not allow women to obtain insurance coverage for abortion even when a woman's life is endangered or when the pregnancy is a result of rape or incest. *Id.*

158. The Louisiana legislature permits hospitals to refuse to accommodate the performance of abortions. *Id.* § 40:1299.31–33.

159. Louisiana has no law which prohibits a hospital from discriminating against a physician applying for privileges there based on that physician's status as an abortion provider. *Compare* TEX. OCC. CODE § 103.002(b).

160. The effect of Act 620 is thus significantly different from admitting privileges requirements in states where physicians are protected from discrimination. *See, e.g.*, *Cole*, 790 F.3d at 563; *see also Abbott II*, 748 F.3d at 598 n.13.


**C.     Drafting of Act 620**

161. Act 620 was modeled after similar laws which have had the result of closing abortion clinics in other states. On May 5, 2014, Ms. Dorinda Bordlee ("Bordlee"), the Vice President and Executive Counsel of the Bio Ethics Defense Fund, an anti-abortion advocacy group, sent the draft's primary legislative sponsor, Representative Katrina Jackson ("Jackson"), an email regarding a similar statute passed in Texas that had "tremendous success in closing abortion clinics and restricting abortion access in Texas." (Doc. 191 at 200; Doc. 196-5 at 2; Doc. 196-10 at 1.)[37] Bordlee told Jackson that "[Act 620] follows this model." (Doc. 191 at 200; Doc. 196-5 at

---

[37] Many of the Joint Exhibits mentioned in this section, including email exchanges to and from pro-life advocacy groups and others participating in the drafting of what came to be Act 620, were the subject of Defendant's Motion in Limine, (Doc. 95). Defendant argues that this

2; Doc. 196-10 at 1.)

162. Evidence received demonstrates the coordination among advocacy groups, Jackson, and DHH employees regarding efforts to restrict abortion. (*See, e.g.*, Doc. 191 at 199–202, 211–13, 215–16, 220–21; JX 3, 6–16.)

163. In a press release regarding Act 620 released on March 7, 2014, Jindal declared his position that Act 620 was a reform that would "build upon the work . . . done to make Louisiana the most pro-life state in the nation." (PX 174 at 1; Doc. 191 at 224–27.) Jindal stated:

> Promoting a culture of life in Louisiana has been an important priority of mine since taking office, and I am proud to support [Act 620] this legislative session. In this state, we uphold a culture of life that values human beings as unique creatures who were made by our Creator. [Act 620] will build upon all we have done the past six years to protect the unborn.

(PX 174 at 1.)

164. Indirectly referencing the legislation just summarized, Jackson is quoted in this press release as saying that Act 620 "will build on our past work to protect life in our state." (*Id.* at 2.)

165. Similarly, in her testimony before the Louisiana House Committee in support of Act 620, Kliebert testified that Act 620 would strengthen DHH's ability to protect "unborn children." (Doc. 191; JX 140 at 1.)

166. The talking points prepared for Secretary Kliebert by Representative Jackson's office stated that DHH was "firmly committed to working with Representative Jackson and the

---

evidence is legally irrelevant to the purpose of Act 620. For reasons stated in its ruling, (Doc. 138), and reiterated in this Ruling's Conclusions of Law, *see infra* Parts XI–XII, the Court denied the motion. The Court finds that while this evidence is insufficient under Fifth Circuit jurisprudence for Plaintiffs to meet their burden under the purpose prong of the undue burden test, it is nonetheless relevant and admissible.

Legislature to continue to work to protect the safety and well-being of Louisiana [women] and the most vulnerable among us, unborn children." (Doc. 191 at 222–23; *see also* JX 24 at 2–4.)

### D.   Official Legislative History of Act 620[38]

167.   Act 620 (at the time known as HB 388) was considered by the House Health and Welfare Committee on March 9, 2014, and the Senate Health and Welfare Committee on May 7, 2014. The House and Senate Committees heard extensive testimony regarding the purposes of proposed statute. (DX 119 at 1–30, 39–67.)

168.   More specifically, the House and Senate Committees heard testimony that the proposed statute was intended to safeguard the health and safety of women undergoing abortions in outpatient clinics in Louisiana. (*Id.*)

169.   For example, the House and Senate Committees heard testimony that:

-   Abortion carries the risk of serious complications that could require immediate hospitalization. (*Id.* at 3, 5.)

-   Women who experience abortion complications frequently rely on the care of emergency room physicians, who often must call on the assistance of a specialist in obstetrics or gynecology. (*See id.* at 4, 5, 8.)

-   "[M]ost emergency departments lack adequate on-call coverage for medical and

---

[38] The official legislative history, submitted as one document, (DX 119), contains the reports of the House and Senate as well as a transcript of various senators' comments, each of which commence with their own page number. Thus, for the sake of easy location, this Court cites to the page number of the pdf document itself. Within Document Number 119, the House report appears on pages 2 through 30, the Senate report on pages 33 through 67, and the transcript of the Senate floor debate on pages 69 through 73.

surgical specialists, including obstetricians and gynecologists." (*Id.* at 48.)

- The history of health and safety violations by Louisiana abortion clinics raises concerns about the potential for serious abortion-related complications. (*Id.* 119 at 10.)

- Requiring outpatient abortion providers to have admitting privileges benefits the safety of women seeking abortion and also enhances regulation of the medical profession. (*Id.* at 3, 48.)

- For instance, the admitting privileges requirement improves the "credentialing process" for physicians by "provid[ing] a more thorough evaluation mechanism of physician competency than would occur otherwise." (*Id.* at 48.)

- The requirement also "acknowledges and enables the importance of continuity of care" for an abortion patient. (*Id.*)

- Additionally, the requirement "enhances inter-physician communication and optimizes patient information transfer and complication management." (*Id.*)

- Finally, the requirement "supports the ethical duty of care of the operating physician to prevent patient abandonment." (*Id.* at 3, 48.)

- A virtually identical admitting privileges requirement in Texas had recently been upheld by the U.S. Fifth Circuit as a reasonable measure for achieving these health and safety goals. (*Id.* at 48.)

- There was no obstacle preventing abortion providers from obtaining admitting privileges at Louisiana hospitals. (*Id.* at 9 (testimony that one Louisiana abortion provider already had admitting privileges).)

- Louisiana hospitals grant or deny admitting privileges "based entirely on [the applicant's] medical training and experience." (*Id.* at 50.)

- Louisiana hospitals have recognized categories of staff membership to accommodate physicians who are expected to admit low numbers of patients for a variety of reasons. (Id. at 50.)

170. Additionally, the House and Senate Committees also heard testimony that, unlike physicians performing surgical procedures in ambulatory surgical centers in Louisiana, physicians performing abortions in outpatient clinics had not previously been required to have any kind of hospital privileges. The committees heard testimony explaining that the proposed statute was designed to close that loophole and thus achieve greater consistency in the overall regulation of outpatient surgical procedures in Louisiana. (*See id.* at 2–4 (House committee testimony regarding goal of achieving greater consistency with ASC regulations), 41–43 (Senate committee testimony regarding same subject).)

171. For example, the House and Senate Committees heard testimony that:

- The Act was intended to bring outpatient abortion facilities in line with "the standard that is currently in place for [ASCs] as set forth in Louisiana Administrative Code, Chapter 45 … Section 4535." (*Id.* at 4.)

- The Act intended to "close a loophole" in Louisiana regulation by requiring outpatient abortion providers to have privileges comparable to those required for physicians performing outpatient surgery in ASCs. (*Id.* at 41–42.)

- The Act's requirement of admitting privileges is consistent with requiring surgical privileges for ASC physicians. (*Id.* at 49 (explaining that "the effect is the same

both in terms of … the credentialing process itself and in the application of the

standards by the state").)

- In both cases, the privileges requirement is based on the "well-established

principle … that a provider should not undertake a procedure unless he is qualified

and able to take care of whatever complications there might be." (*Id.* at 49.)

172. The full House and Senate heard statements in support of HB 388 explaining that it

was intended to protect "the safety of women" and ensure that "every physician performing any

surgery, including abortions, does so in a prudent manner and with the best interest of each

woman's health in mind," (*Id.* at 34–35), and also that it was intended to safeguard "the lives and

safety of pregnant women who may experience short-term risk[s] of abortion, which can include

hemorrhaging, uterine perforation, or infection," (*Id.* at 48).

173. The full House was informed that the proposed law tracked the Texas

admitting-privileges law, HB 2, which had been upheld as constitutional by the U.S. Fifth Circuit

Court of Appeals a week earlier. (*Id.* at 34–35 (referring to *Abbott II*).)

174. The Senate approved one amendment to the proposed statute, concerning

the definition of admitting privileges, and rejected another amendment that would

have eliminated the 30-mile radius requirement. (*Id.* at 69–70.)

175. The proposed statute passed both chambers, with 85 House members and 34 Senators

voting in favor, and 88 House members concurring in the Senate amendment. See

https://www.legis.la.gov/legis/ViewDocument.aspx?d=887948 (House final passage);

https://www.legis.la.gov/legis/ViewDocument.aspx?d=903997 (Senate final passage);

https://www.legis.la.gov/legis/ViewDocument.aspx?d=903981 (Senate amendment);

https://www.legis.la.gov/legis/ViewDocument.aspx?d=906861 (House concurrence) (all

legislative websites last visited Aug. 24, 2015).


**VII.    The Purpose and Medical Need for and Reasonableness of Act 620**

176. The evidence introduced to show the purpose of Act 620 came in several forms. The

Plaintiffs offered: (1) press releases, public statement, emails, and similar evidence produced by

public officials, lobbyists, advocacy groups and others involved or interested in the drafting and

passage of Act 620; (2) the testimony of some of those involved in these communications; (3)

Louisiana's legislatively stated "longstanding policy . . . to protect the right to life of the unborn

child from conception by prohibiting abortion impermissible only because of the decisions of the

United States Supreme Court . . . .," La. R.S. § 40:1299.35.0; and (4) expert testimony  purporting

to show two things: first, there is no medical need for Act 620 because legal abortion is safe, and

second, that Act 620 is medically unreasonable in that Act 620 does not advance the health and

safety of women undergoing abortions.

177. In support of her position, Defendant offered: (1) the text and legislative history of

the Act, including testimony considered during the legislature's deliberations, and (2) expert

testimony at trial purporting to show that the  admitting privileges requirement is needed because

of potential complications from abortions and that the Act is medically necessary and beneficial

for the health and safety of a woman undergoing an abortion.

178. The Court carefully considered all the evidence introduced on this issue and makes

the following findings of fact:

(A)      A purpose of the bill is to improve the health and safety of women undergoing an

abortion.[39]

(B)     Another purpose of the bill is to make it more difficult for abortion providers to

        legally provide abortions and therefore restrict a woman's right to an abortion.[40]

(C)     There is a dispute medically and scientifically as to whether Act 620 serves a

        legitimate medical need and is medically reasonable.[41]

(D)     Legal abortions in Louisiana are very safe procedures with very few

        complications.[42]

(E)     The vast majority of women who undergo abortions in Louisiana are poor. (*See,*

        *e.g.*, JX 124 at 2480; Doc. 191 at 190–91; Doc. 190 at 34.) As a result of that

        poverty, the burden of traveling farther to obtain an abortion would be significant,

---

[39] The Court relies primarily on the legislative history of the statute, (DX 119 at 1–30, 39–67), for this finding. While the Court had serious concerns about the credibility and bias of defense expert Dr. Damon Cudihy and Marier's expertise  as it pertained to the subject of abortion practice, the Court forgoes a detailed analysis of this testimony for one simple reason. Pursuant to binding jurisprudence, the Court must find that Act 620 meets the purpose prong of the undue burden analysis based on the Court's finding that there is medical uncertainty as to the health benefits of the legislation. *See infra* Parts XI–XII.

[40] The Court forgoes a detailed discussion of this evidence since, under Fifth Circuit law, Act 620 would fail the purpose prong of the undue burden test only if Act 620 "serve[s] *no* purpose *other than* to make abortions more difficult." *Cole*, 790 F.3d at 586 (emphasis added) (quoting *Casey*, 505 U.S. at 900–01). Since the Court has found that one purpose of the Act is to promote the health and safety of women seeking an abortion, it need go no further.

[41] Plaintiffs and Defendant presented conflicting expert testimony on this issue. It is unnecessary to resolve this conflicting testimony since, under Fifth Circuit jurisprudence, the Court must find that Act 620 meets the purpose prong of the undue burden analysis given the evidence showing medical uncertainty on the merits of the legislation. *See infra* Parts XI–XII.

[42] The Court was impressed with the expertise and credibility of Plaintiffs' experts, Estes and Pressman, most especially Pressman. However, the Court foregoes a detailed discussion of the testimony since,  under Fifth Circuit jurisprudence, the Court must find that Act 620 meets the purpose prong of the undue burden analysis given the evidence showing medical uncertainty on the merits of the legislation. *See infra* Parts XI–XII.

fall harder on these women than those who are not poor and cause a large number

of these women to either not get an abortion, perform the abortions themselves, or

have someone who is not properly trained and licensed perform it.  (*See, e.g.*, JX

124 at 2480; Doc. 191 at 190–91; Doc. 190 at 34.)

(F)     The medical benefits which would flow from Act 620 are minimal and are

outweighed by the burdens which would flow from this legislation.[43]

179. The relevance and weight of these factual findings in the context of the prevailing

Fifth Circuit test is discussed in more detail in this Ruling's final substantive sections. *See infra*

Parts X–XI.


## VIII.   Efforts of Doctors to Comply With Act 620 and the Results of Those Efforts

### A.     Doe 1

180. For over a year prior to his trial testimony on June 24, 2015, Doe 1 has been trying,

in various ways, to gain active admitting privileges at a hospital within 30 miles of Hope where

he performs abortions and thereby comply with Act 620. (Doc. 192 at 42–44.)

181. The Court finds that Doe 1 is a well qualified physician and a credible witness. (*See,
e.g.*, Doc. 192 at 7–14; JX 111 ¶ 1; 116 ¶ 5.)

182.  The Court finds that despite his good faith efforts to comply with Act 620, Doe 1 has

failed to get active admitting privileges at five different hospitals for reasons unrelated to his

---

[43] The burdens which would flow from Act 620 are discussed in more detail below. *See
infra* Part IX. The Court forgoes a discussion weighing these burdens against the benefits of the
Act since such a weighing is not legally relevant under Fifth Circuit jurisprudence. *See infra*
Parts XI–XII.

competence. (*See, e.g.*, JX 116 ¶ 27.)

183. Doe 1 has attempted to get privileges at five separate nearby hospitals and, despite his efforts and his qualifications, has not been given active admitting privileges at any of these hospitals, including University Health, Minden, North Caddo Regional ("North Caddo"), Christus, and Willis-Knighton. (*See, e.g.*, Doc. 192 at 47–51.)

184. Doe 1 contacted the director of the Family Medicine Department at University Health in Shreveport where he had done his residency in family medicine. Doe 1 was initially told that he would be offered a job as a faculty member teaching sports medicine which would "take care of the admitting privileges thing." Doe 1 was told that the application forms for admitting privileges would be forwarded to him. (*Id.* at 45; *see also* JX 186 ¶ 7.)

185. When Doe did not get the application forms and inquired, he was told by the director of the department that he would not be offered a position because "there was some objection from certain staff about [Doe 1] coming to work there because of where [he] work[ed], at Hope Medical." (Doc. 192 at 44–45; *see also* JX 186 ¶ 7.)[44]

186. The director suggested that he try with the OB/GYN Department but when that route was explored, Doe 1 was advised by email that it would be "inappropriate" to have a family medicine doctor on the OB/GYN staff. (Doc. 192 at 47.)

187. Based on these communications, Doe 1 did not file a formal application for admitting privileges to University. (*Id.*)

188. When Pittman, Hope's Administrator, made inquiries about admitting privileges to

---

[44] This testimony was objected to as hearsay, (Doc. 192 at 46), which objection was overruled for the reasons summarized above. *See supra* note 30.

North Caddo on behalf of Doe 1, she was told that they did not have the capacity for and could not accommodate transfers. (JX 116 ¶ 22; *see also* Doc. 192 at 49.) Therefore, Doe 1 did not file a formal application. (Doc. 192 at 49; *cf.* JX 116 ¶ 22.)

189. Doe 1 filed a formal application for privileges at Minden. (JX 50; Doc. 192 at 50–51.) Minden's Medical Staff Coordinator wrote to Doe 1 declining his application: "Since we do not have a need for a satellite primary care physician at this time, I am returning your application and check." (JX 50 at 318; *see also* Doc. 192 at 50–51.)

190. While the Court, like Doe 1, does not understand the meaning of the stated reason for declining the application, it is clear that the denial of privileges is unrelated to the qualifications and competence of Doe 1. (*See* Doc. 192 at 51.)

191. Doe 1's efforts to get admitting privileges at Christus reads like a chapter in Franz Kafka's *The Trial*. (*See, e.g.*, JX 71; Doc. 192 at 52–66.)

192. Doe 1 submitted his application for courtesy privileges to Christus on July 25, 2014, on a form provided by Christus. (JX 132 at 2772; JX 116 ¶ 23; Doc. 192 at 52.) Courtesy privileges gives a physician with such privileges the ability to admit patients. (Doc. 192 at 52–53.)

193. On August 25, 2014, Christus asked for additional information, (JX 71 at 1254; *see also* Doc. 192 at 54–55), which he provided on September 17, 2014, (JX 71 at 1267; JX 133; Doc. 192 at 55–56).

194.  Via a letter dated October 14, 2014, yet more information was sought from Doe 1 by Christus, (JX 71 at 1268; *see also, e.g.*, Doc. 192 at 58–59), which he supplied on October 20, 2014, (JX 71 at 1273; Doc. 192 at 59–60), and October 25, 2014, (JX 134 at 2802–03).

195. When Pittman called Christus to make an appointment for Doe 1 to get an identification badge, also a requirement of the application process, an appointment was refused because, Pittman was told, Doe 1 had submitted the wrong kind of application and that he should be submitting a "non-staff care giver" application. (Doc. 192 at 62; *cf*. JX 71 at 1268, 1270, 1276.)

196. On December 17, 2014, Doe 1 then received a letter stating that his application was incomplete because Doe 1 hadn't gotten the badge (the same badge Christus would not give him an appointment to get) and because more than 90 days had elapsed since his application was submitted, the application was "deemed withdrawn." (JX 71 at 1279; Doc 192 at 63.)

197. In a follow up conversation initiated by Doe 1 and in a subsequent email from Christus, Doe 1 was told that he needed to file an application for non-staff care giver privileges, a type of privilege that would not allow him to admit patients and therefore would not qualify as "active admitting privileges" under Act 620. (JX 190 at 3662; Doc. 192 at 63–66.)

198. While there was never a formal denial of Doe's application, Christus's delays and failure to formally act, as outlined above, constitutes a de facto denial of his application for the privileges required by Act 620.

199. Doe 1's experience was similar when he applied for courtesy privileges at Willis-Knighton beginning on June 15, 2014. (JX 53; JX 116 ¶ 27; Doc. 192 at 67–78.) These privileges would have allowed Doe 1 to admit patients. (Doc. 192 at 68–69.)

200. Because of his Board Certification in addiction medicine and because Willis-Knighton has an addiction recovery center, Doe 1 filed his application for privileges as an addiction medicine specialist. (*Id.* at 70.)

201. Doe 1's application was denied because he had not undergone a residency program in addiction medicine, despite his board certification in addiction medicine and even though there was no residency program available when he got his board certification. (JX 51 at 508; Doc. 192 at 72–73.)

202. On February 1, 2015, Doe 1 re-submitted an application, this time as a Family Practice specialist. (JX 97 at 2069–2117; Doc. 192 at 73–74.)

203. On March 11, 2015, Willis-Knighton requested information regarding documentation of "hospital admissions and management of patients 18 years old of age or older in the past 12 months." (JX 128; Doc. 192 at 75–76.)

204. On March 24, 2015, Doe 1 provided the requested information. (JX 189; Doc. 192 at 77–78.) Because of the nature of his practice, he had not admitted any patients in the last 12 months, but he did provide detailed information about his training and procedures done during that same time period. (*Id.*)

205. Despite the lapse of more than eight months since his second application and more than five months since he provided the information requested in support of that application, Willis-Knighton has neither approved nor denied his application. (*See, e.g., id.* at 78.) Under these circumstances, the Court finds that this application has been de facto denied.


**B.      Doe 2**

206. Currently, Doe 2 performs abortions at Bossier and Causeway Clinics. (Doc. 191 at 17; JX 112 at 2216.)

207. The Court finds Doe 2 to be a well qualified and competent physician and a credible

witness. (*Id.* at 13–17; JX 112 ¶ 1; *see also infra.*)

208. Doe 2 does not currently have active admitting privileges at a hospital within 30 miles of Bossier Clinic. (Doc. 191 at 19.)

209. Doe 2 has been unsuccessful in his good faith efforts to get admitting active admitting privileges within 30 miles of the Bossier Clinic. (*See, e.g.*, Doc. 191.)

210. Doe 2 worked as an Assistant Clinical Professor of Medicine at LSU Medical School, now known as University Health, at various times for approximately 18 years total, leaving LSU in 2004. (*Id.* at 14–15.)

211. While he was on staff at University and during the years in which he engaged in a general OB/GYN practice, Doe 2 had admitting privileges at various hospitals. (*Id.* at 24, 95.)

212. When he left the University staff in 2004, Doe 2 was given consulting privileges, which allow him to consult but not to admit patients. (Doc. 191 at 23–24, 84–88; JX 79 at 1708–09; JX 185.)[45]

213. Following the passage of Act 620, Doe 2 attempted to upgrade his privileges at University to allow him to admit patients in order to comply with the requirements of the Act. (Doc. 191 at 24–25.)

214. When he spoke to Dr. Lynne Groome ("Groome"), the head of the OB/GYN Department at University, about upgrading his privileges, he was told this would not happen because of his abortion practice. (*Id.* at 25–26; *cf.* JX 116 ¶ 27.)

215. In his testimony before this Court, he thusly described his communication with

---

[45] While Doe 2 initially thought that these were called "courtesy privileges," he corrected his mistake on cross examination. (Doc. 191 at 23, 81–87; JX 185.)

Groome:

> Q.      What's your understanding of why you were not able to upgrade your privileges at
>
> LSU?
>
> A.      Well, Dr. Groome told me that he was reluctant to even consider that, because it
>
> was such a controversial topic, but he would take it to the Dean and ask, which he
>
> did and he essentially said that you're not going to go beyond your [clinical]
>
> privileges.
>
> Q.      Were you surprised by that response?
>
> A.      No.
>
> Q.      Why weren't you surprised?
>
> A.      Just because of the political nature of what I do and the controversy of what I do.

(*Id.* at 25–26.)[46]

216. During the summer of 2014, Doe 2 also applied for privileges at WKB. (*Id.* at 26–27.)

217. On August 11, 2014, the Department of OB/GYN and Pediatrics Performance Peer Review Panel ("PPRP") at WKB wrote to Doe 2 asking for additional information: "In order for the Panel to sufficiently assess your clinical competence, you will need to submit documentation, which should include operative notes and outcomes, of cases performed within the last 12 months for the specific procedures you are requesting on the privilege request form." (JX 144 at 3445–46; *see also, e.g.*, Doc. 191 at 29.)

---

[46] This testimony was objected to as hearsay. (Doc. 191 at 25.) For the same reasons summarized above, *see supra* note 30, the objection was overruled.

218. After Doe 2 made information regarding his prior outpatient operations available to WKB, (Doc. 191 at 30), he received another letter from WKB dated November 19, 2014, stating in pertinent part:

> The data [you] submitted supports the outpatient procedures you perform, but does not support your request for hospital privileges. In order for the panel to evaluate and make recommendations for hospital privileges [,] they must evaluate patient admissions and management, consultations and procedures performed. Without this information your application remains incomplete and cannot be processed.

(JX 89 at 1950; *see also* Doc. 191 at 30–31.)

219. Because of the nature of his non-hospital based practice, Doe 2 was and is unable to provide the requested information. (*See, e.g.*, Doc. 191 at 29–31.) Thus, while Defendant is correct in arguing that Doe 2's application has not been formally denied, (Doc. 201 at 11), Doe 2's application cannot and will never be approved according to WKP's own letter, (JX 89; *see also, e.g.*, JX 144 at 3445–46).

220. As explained by Doe 2, "You know, they haven't formally denied me. . . . I'm in a Catch-22 basically. I can't provide information I don't have." (Doc. 191 at 79–80.)

221. This situation mirrors Doe 1's experience with three other Willis-Knighton-branded entities. Specifically, the Court also notes that although Doe 1, in response to a similar letter from WK Medical Center, WK South, and WK Pierremont, (JX 128), formally responded showing he had not had any hospital admissions in the last 12 months, (JX 189 at 3579; Doc. 192 at 77–78), WK still has not denied or approved his application, (Doc. 192 at 78).

222. The Court finds that, under these circumstances, Doe 2's inability to gain privileges at WKB are unrelated to his competence and that his application to WKB has been de facto

denied.

223. While Defendant argues that Willis-Knighton's inaction is related to Dr. Doe 2's competence because, due to the nature of his practice, he cannot demonstrate "current clinical competence" (Doc. 201 at 11), the Court is not persuaded. The reality is different. Doe 2, a Board Certified OB/GYN who spent many years as an Assistant Clinical Professor at LSU Medical School and who, by Willis-Knighton's admission, has demonstrated his ability regarding outpatient surgeries, is in what he correctly describes a "Catch-22" created by a combination of the Act's requirement and the nature of his practice as an abortion provider.

224. Because Doe 2 also practices at Causeway Clinic in Metairie, he applied for admitting privileges at Tulane, within 30 miles of Causeway. (*See, e.g.*, Doc. 191 at 32–35, 230; JC 180.)

225. While Defendant has argued that the admitting privileges requirement is only about insuring competency of doctors who perform abortions and the process of gaining admitting privileges is neutral and devoid of considerations of the political, religous and social hostility against abortion, the email exchanges between Doe 2 and Dr. A at Tulane demonstrate a very different reality, even in a metropolitan, university-based hospital. (JX 169–78;[47] *see also* Doc. 191 at 49–54.)

226. In this exchange, Dr. A first feels the need to discuss Doe 2's request for privileges "with our lobbyists." (JX 169.) Because Doe 2 is a "low/no provider" in hospitals in the New Orleans area, Dr. A states: "This is truly a rock and a hard place." (JX 172.) When Doe 2 expresses frustration with the lack of success in the application process, Dr. A states: "This is just

---

[47] These exhibits, being jointly submitted, were admitted into evidence. (Doc. 191 at 54.)

ridiculous. I can't believe the state has come to this." (JX 174; *cf.* JX 170.) Dr. A continues: "I am working on an approach where you would get admitting privileges only for your patients . . . ." (JX 175.) When a proposed solution is found and Doe 2 expresses doubt that this will meet the requirements of the law, Dr. A responds: "Technically, you will have admitting privileges. Isn't that what the law says?" (JX 177). When discussing the need for a covering physician, Dr. A clarifies some of the problems surrounding Doe 2's application: "There were a few faculty who were not comfortable with covering; they were also concerned that 'Tulane as back up for an abortion clinic might not help our referrals.' Given this concern, Dr. B will cover for you formally." (JX 178.)

227. When privileges were finally granted by Tulane, Doe 2 was notified by Dr. A that the proposed privileges would have "the following limitations: 'Admissions of patients from the physician's clinical practice with complications of first and second trimester abortions with referral of those patients to an attending physician on the Tulane staff credentialed for OB/Gyn privileges who has agreed to provide for such care for the physician's patients.'" (JX 181; *see also* Doc. 191 at 57, 60–61.)

228. Consistent with this email, Tulane's formal grant circumscribed Doe 2's privileges in these terms: "Admission of patients from the physician's clinical practice . . . with referral of those patients to an attending physician on staff at [Tulane Medical Center] credentialed for Ob/Gyn privileges who has agreed to provide care for the physician's patients at TMS." (JX 183 at 3652–3; *see also* Doc. 191 at 33, 55–58.)

229. The Parties disagree as to whether these admitting privileges qualify as "active admitting privileges" within the meaning of Act 620. (*Compare* Doc. 200 at 46–47, *with* Doc. 196

at 19–20.)

230. Defendant has filed an affidavit in which she states that the admitting privileges granted to Dr. Doe 2 by Tulane "are sufficient to comply with the Act." (JX 191 at 3668; *see also* Doc. 196 at 20; Doc. 200 at 48.)

231. Plaintiffs argue:

Although Secretary Kliebert has taken the position that Dr. John Doe 2's privileges at Tulane satisfy Act 620, Dr. John Doe 2 has concerns that her position is inconsistent with the plain language of the Act, which requires that 'the physician is a member in good standing of the medical staff of a hospital . . . with the ability to admit a patient and to provide diagnostic and surgical services to such patient.' . . . Based on Tulane's letters, Dr. John Doe 2 cannot provide diagnostic and surgical services to patients admitted to Tulane as required by the plain language of the statute.

(Doc. 196 ¶ 47  at 20 (citing to Doc. 193 at 123; Doc. 191 at 38–40).)

232. Plaintiff further argues:

Dr. John Doe 2 has concerns that the position Secretary Kliebert has taken regarding his privileges at Tulane during the course of this litigation may change at a later date. As a result, he will not risk his medical license by performing abortions in Metairie if Act 620 is allowed to take effect.

(*Id.* ¶ 48 at 20 (citing Doc. 191 at 38–40; JX 191).)

233. Defendant makes two counters:

Plaintiffs' 'concerns' about the Defendant's determination that Dr. Doe 2's privileges at Tulane satisfy the Act are legally irrelevant, because Defendant is the state official charged with interpretation and enforcement of the Act. Furthermore, Plaintiffs' assertions regarding the nature of Dr. Doe 2's privileges at Tulane Medical Center are clearly wrong because they are contradicted by the overwhelming weight of the evidence.

(Doc. 201 ¶ 47 at 12.)

234. Defendant further argues:

Plaintiffs' 'concerns' that the Defendant's determination that Dr. Doe 2's Tulane privileges satisfy the Act "may change at a later date" are legally irrelevant. Plaintiffs have produced no evidence indicating that any such "change" in position by Defendant with respect to Dr. Doe 2's Tulane privileges is likely to occur. The evidence therefore does not show that the Act or the Defendant pose any credible, concrete threat to Dr. Doe 2's ability to continue his practice at Causeway clinic. If Dr. Doe 2 voluntarily ceases to perform abortions at Causeway because of his fears that the Defendant (or some future Secretary) will change her position, that cessation would be attributable to Dr. Doe 2 alone and not to the Act itself.

(*Id.* ¶ 48 at 12.)

235. In light of Defendant's argument, so as to resolve this dispute and determine whether Doe 2 has "active admitting privileges" at Tulane, the Court must first determine whether it is bound by the interpretation given by Defendant and, if not, compare the privileges granted by Tulane with Act 620's definition of "active admitting privileges."

236. Whatever discretion the Secretary may have in a law's enforcement, no deference is owed to an opinion contrary to the law's unambiguous and plain meaning. *See, e.g.*, *Util. Air Regulatory Grp. v. EPA*, 134 S. Ct. 2427, 2442, 189 L. Ed. 2d 372 (2014) (observing that "an agency interpretation that is inconsisten[t] with the design and structure of the statute as a whole . . . does not merit deference" (alteration in original) (citations omitted) (internal quotation marks omitted)); *Talk Am., Inc. v. Mich. Bell Tel. Co.*, 564 U.S. 50, 131 S. Ct. 2254, 2260–61, 180 L. E.d 2d 96 (2011) (reaffirming the interpretive principle that only "[i]n the absence of any unambiguous statute or regulation" does a court turn to an agency's interpretation"); *Robinson v. Shell Oil Co.*, 519 U.S. 337, 341, 117 S. Ct. 843, 846, 136 L. Ed. 2d 808 (1997) (emphasizing that a court's inquiry "must cease if the statutory language is unambiguous and the statutory scheme is

coherent and consistent" and explaining that "[t]he plainness or ambiguity of statutory language is determined by reference to the language itself, the specific context in which that language is used, and the broader context of the statute as a whole" (internal quotation marks omitted)). Quite simply, if the legislative intent is clear, as evidenced by the use of an unambiguous word, "that is the end of the matter; for the court, as well as the agency, must give effect to th[at] unambiguously expressed intent." *Chevron*, *U.S.A., Inc. v. NRDC, Inc.*, 467 U.S. 837, 842–43, 104 S. Ct. 2778, 2781, 81 L. Ed. 2d 694 (1984) ("*Chevron*"); *see also Miss. Poultry Ass'n v. Madigan*, 992 F.2d 1359, 1363 (5th Cir. 1993) (quoting *id.*).

237. If the relevant statute is ambiguous, however, at least some deference is owed. *See Nat'l Cable & Telecommc'ns Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 980, 125 S. Ct. 2688, 2699, 162 L. Ed. 2d 820 (2005). But such deference is only accorded if the statute is truly "ambiguous" regarding the precise "question at issue" and if the agency's interpretation is a "reasonable" and hence "permissible construction of the statute" at hand. *Orellana-Monson v. Holder*, 685 F.3d 511, 517 (5th Cir. 2012); *see also, e.g.*, *Siew v. Holder*, 742 F.3d 603, 607 n.27 (5th Cir. 2014) (citing *id.*); *United States v. Baptiste*, 34 F. Supp. 3d 662, 670 (W.D. Tex. 2014) (same). Thus, even if the pertinent statute is ambiguous, an agency's interpretation may be denied "controlling weight" if "arbitrary, capricious, or manifestly contrary to the statute." *Rodriguez-Avalos v. Holder*, 788 F.3d 444, 449 (5th Cir. 2015) (quoting *Orellana-Monson*, 685 F.3d at 517).

238. Critically, as federal courts are bound to "interpret a state statute as that state's courts would construe it," *Newman*, 305 F.3d at 696, the same type of measured deference is afforded to agency interpretations by this state's courts. *Compare Silva-Trevino v. Holder*, 742 F.3d 197, 199–200 (5th Cir. 2014), *with Zeringue v. State Dep't of Public Safety*, 467 So. 2d 1358, 1361

(La. Ct. App. 1985). Like their federal counterparts, Louisiana state agencies are "entitled to deference regarding . . .  interpretation and construction of the rules and regulations that . . . [they] promulgate[]." *Women's & Children's Hosp. v. State*, 2007 1157 (La. App. 1 Cir. 02/08/08); 984 So. 2d 760, 768–69; *see also Oakville Cmty. Action Grp. v. La. Dep't of Envtl. Quality*, 2005 1365 (La. App. 1 Cir. 5/5/06); 935 So. 2d 175, 186 (La. Ct. App. 2006) ("A state agency is charged with interpreting its own rules and regulations and great deference must be given to the agency's interpretation.")

239. However, as with *Chevron*, the statute itself must be ambiguous for such respect to be accorded. *Clark v. Bd. of Comm'rs*, 422 So. 2d 247, 251 (La. Ct. App. 1982) ("[A]lthough an agency's interpretation of a statute under which it operates is entitled to some deference, such deference is constrained by the court's obligation to honor the clear meaning of a statute, as revealed by its language, purpose and history."); *cf. Comm-Care Corp. v. Bishop*, 96-1711 (La. 07/01/97); 696 So. 2d 969, 973 ("The meaning and intent of a law is to be determined by consideration of the law in its entirety and all other laws on the same subject matter, and a construction should be placed on the provision in question which is consistent with the express terms of the law and with the obvious intent of the lawmaker in enacting it.").

240. Moreover, again as with a federal statute, "agency[] interpretations" lose any persuasive value, forfeiting any right to judicial deference, if "arbitrary, capricious or manifestly contrary to its rules and regulation." *In re Recovery I*, 93-0441 (La. App. 1 Cir. 04/08/94); 635 So. 2d 690, 696; *see also, e.g.*, *Doctors Hosp. of Augusta v. Dep't of Health & Hosps.*, 2013 1762 (La. App. 1 Cir. 09/17/14); 2014 La. App. Unpub. LEXIS 481, at *19–20, 2014 WL 4658202, at *7 (refusing to accord any deference to an interpretation by the same agency here, deeming it "an

abuse of discretion" that effectively rewrote the relevant statute); *Bowers v. Firefighters' Ret.*
*Sys.*, 2008-1268 (La. 03/17/09); 6 So. 3d 173, 176 ("Under the arbitrary and capricious standard,
an agency decision is entitled to deference in its interpretation of its own rules and regulations;
however, ***it is not entitled to deference in its interpretation of <u>statutes</u>*** and judicial decisions."
(emphasis added)).

241. The Court finds that Defendant's interpretation of Act 620 is contradicted by its plain
language. Expressly and unambiguously, the statute defines "active admitting privileges" to
include "the ability to admit a patient and to provide diagnostic and surgical services to such
patient consistent with the requirements of Paragraph (A)(1) of this Subsection [requiring a
physician performing abortions to be licensed and have completed or be enrolled in an OB/GYN
or family residency program]." LA. R.S. § 40:1299.35.2A(2)(a).[48]

242. Because the validity of Defendant's interpretation arose during trial, the Court asked
the following question to Marier, Defendant's expert witness, a physician who helped draft Act
620, (Doc. 193 at 94): "And I understood you to say that the doctor, in order to meet Act 620
would have to - - would not have to be able to perform all diagnostic and surgical services, but
*would have to perform some diagnostic and surgical services*. Did I understand that correctly?"
(Doc. 193 at 123 (emphasis added).) To this question, Marier answered: "Yes. Yes, Your Honor."
(*Id.*)

243. Because Doe 2's privileges are limited to "admission of patients" with the obligation
to refer his patient to a "Tulane staff Ob/Gyn" for surgery and other kinds of treatment as well as

---

[48] As already noted, *see supra* note 2, the text of Act 620 can be found in a joint exhibit.
(JX 115.)

diagnostic services, this arrangement does not allow Doe 2 to perform any (let alone "some") diagnostic, surgical or other kinds of treatment himself. Regardless of that fact that Tulane has chosen to label him an "admitting physician," (JX 184), he cannot "provide diagnostic and surgical services," and Act 620 expressly defines "active admitting privileges" as encompassing the ability to do so, LA. R.S. § 40:1299.35.2A(2)(a). Hence, Doe 2's privileges do not and cannot meet the plain language of Act 620.

244. Here, as Defendant's own expert testified and as the statute's plain meaning makes clear, the Secretary's interpretation flies in the face of the law's basic text. The words are clear, their meaning patent, and, under these circumstances, the Defendant's interpretation is not entitled to deference. "It is emphatically the province and duty of the judicial department to say what the law is." *Marbury v. Madison*, 5 U.S. 137, 177, 2 L. Ed. 60 (1803); *see, e.g.*, *Harrah's Bossier City Inv. Co., LLC v. Bridges*, 2009-1916 (La. 05/11/10); 41 So. 3d 438, 449 ("Although courts may give due consideration to the administrative construction of a law, we are certainly not bound by them."); *Salazar-Regino v. Rominski*, 415 F.3d 436, 448 (5th Cir. 2005) (citing this maxim in the context of weighing the reasonableness of an agency's particular interpretation); *Sexton v. Panel Processing, Inc.*, 754 F.3d 332, 336 (6th Cir. 2014) (rejecting an agency interpretation as contrary to the statutory language as interpreted).

245. The Court also notes that the Defendant's interpretation allowing (and, in the case of Dr. Doe 2 and Tulane, requiring) the abortion provider to turn over the actual care of the patient to another doctor, flies in the face of one of Act 620's main purposes and purported medical benefits: "continuity of care," the ability of a the abortion provider to *treat* his patient in the

hospital if admission to the hospital is necessary.  (*See, e.g.*, Doc. 193 at 21–23; Doc. 200 ¶¶ 91 at 98–101.)

246.  While Defendant is correct that Secretary Kliebert is the person charged with enforcing this provision, it is also true that the Secretary of DHH often changes every few years.[49] (Doc. 191 at 198–99, 195–96.)

247. It is also true that the new Secretary may disagree with her predecessor and reverse course on her current interpretation of Act 620.[50]

248. The Court finds that Doe 2 has legitimate concerns about relying on the declaration of Defendant to practice as an abortion provider if Act 620 were to go into effect.

249. More importantly, the Court finds that Doe 2 does not have active admitting privileges within the meaning of Act 620 at a hospital within 30 miles of Causeway Clinic.

---

[49] Indeed, in the wake of the recent gubernatorial election, Doctor Rebekah Gee has become DHH's new head.

[50] At the time, Kliebert did not even say she will bind herself to this interpretation during her time in office. While not directly relevant to this matter, the Court notes that in a recent case, this same agency has submitted multiple inconsistent declarations and abruptly changed legal positions without much  explanation. *Planned Parenthood Gulf Coast, Inc. v. Kliebert*, No. 15-cv-00565-JWD-SCR, 2015 WL 6551836, at *8–9, *33, 2015 U.S. Dist. LEXIS 146988, at *27–29, *109–10 (M.D. La. Oct. 29, 2015). Though these inconsistencies do not appear in this case, this Court may take judicial notice of its own public docket. FED. R. EVID. 201; *see, e.g.*, *EduMoz, LLC v. Republic of Mozambique*, 968 F. Supp. 2d 1041, 1049 (C.D. Cal. 2013); *Richardson v. Monaco (In re Summit Metals, Inc.)*, 477 B.R. 484, 488 n.1 (Bankr. D. Del. 2012); *LeBlanc v. Salem (In re Mailman Steam Carpet Cleaning Corp.)*, 196 F.3d 1, 8 (1st Cir. 1999).

**C.    Doe 3**

250. Doe 3 currently has admitting privileges at the WKB and Christus, both of which are within 30 miles of Hope Clinic where he performs abortions. (Doc. 190 at 21–22, 120, 148–49; JX 188 ¶ 6; JX 116 ¶ 18.)

251. The Court finds that Doe 3 is a well qualified physician and a credible witness. (*See, e.g.*, JX 188 ¶ 1; Doc. 190 at 109–11.)

252. Doe 3's current privileges at Christus require him to admit approximately 50 patients per year. (Doc. 190 at 150–52; JX 59.)

253. Doe 3 has had admitting privileges at Christus since the 1990's and at WKB since late 1997 or early 1998. (Doc. 190 at 120–21.)

254. Doe 3 uses his admitting privileges primarily in connection with his busy obstetrics practice delivering babies and, to a lesser extent to his private practice in gynecology, not because of his work at Hope Clinic. (*Id.* at 124, 147; *see also* JX 188 ¶ 7.)

255. As a result of his fears of violence and harassment, Doe 3 has credibly testified that if he is the last physician performing abortion in either the entire state or in the northern part of the state, he will not continue to perform abortions. (Doc. 190 at 174–76; *see also, e.g.*, JX 188 ¶¶ 10–11.)

**D.    Doe 4**

256. Doe 4 performs abortions only at Causeway in Metairie. (*See, e.g.*, JX 114 ¶ 1; Doc. 168-5 at 8.)

257. He does not currently have admitting privileges at a hospital within 30 miles of that clinic. (Doc. 191 at 18.)

258. Doe 4 testified by deposition, (Doc. 168-5), and so the Court did not have the opportunity to directly measure his demeanor. However, the Court finds that Doe 4 is a well qualified physician, (*See, e.g.*, JX 114 ¶ 1; Doc. 168-5 at 5–6, 9, 12), and that his testimony is credible and consistent with the other testifying doctors who perform abortions.

259. On August 6, 2014, Dr. John Doe 4 applied for admitting privileges at Ochsner-Kenner Medical Center ("Ochsner"). (JX 57 at 762–808; *see also* Doc. 168-5 at 16–17.)

260. Doe 4 chose to apply to Ochsner because he knew a physician there who agreed to provide coverage for him. (Doc. 168-5 at 17.) Ochsner was the only hospital where Doe 4 knew a physician who would cover for him and who met the hospital's criteria to be a covering physician. (*Id.* at 85, 109–10.)

261. Ochsner requested additional information, which Doe 4 provided, (JX 98 at 2118; Doc. 121 at 3–4; JX 60 at 824), but he has not received a response at this time. (Doc. 168-5 at 17.)

262. Doe 4 did not apply for admitting privileges at Touro Infirmary or LSU New Orleans because both hospitals required Doe 4 to find an OB/GYN to cover for him, which Doe 4 has been unable to do. (*Id.* at 23.)

263. The Court finds that, despite a good faith effort to gain admitting privileges at a hospital within 30 miles of where he performs abortions, and given the fact that it has been well over a year since he applied for privileges with no response, the Court finds that Doe 4's inability to meet the requirements of Act 620 is unrelated to his competence and his request for privileges has been de facto denied.

**E.      Doe 5**

264. Doe 5 performs abortions at two facilities: Woman Health's in New Orleans and Delta in Baton Rouge. (*See, e.g.*, Doc. 168-6 at 4; JX 109 ¶ 7.)

265. Like Doe 4, Doe 5 testified by deposition, and this Court hence did not have the opportunity to directly measure his demeanor. However, in reviewing his deposition and related documentation, (*See, e.g.*, Doc. 168-6; JX 109), the Court finds the testimony to be credible and consistent with the other testifying doctors who perform abortions.

266. The Court finds that Doe 5 has active admitting privileges at Hospital C, a hospital within 30 miles of the Women's Clinic in New Orleans, but that he has been unable to get admitting privileges within 30 miles of Delta. (*See, e.g.*, JX 109 ¶ 32–5.)

267. On July 24, 2014, Doe 5 received admitting privileges at Hospital C, which is within 30 miles of Women's Clinic where he performs abortions. (Doc. 168-4 at 25–26; Doc. 168-6 at 11; JX 109 ¶ 34.)

268. The Parties have stipulated that Doe 5's privileges at Hospital C are "active admitting privileges" as defined in Act 620. (Doc. 176; Doc. 168-4 at 26; Doc. 168-6 at 11–13.)

269. Doe 5 does not currently have admitting privileges at a hospital within 30 miles of Delta in Baton Rouge. (*See, e.g.*, Doc. 168-6 at 22; JX 109 ¶ 23.)

270. Doe 5 has applied for admitting privileges at three hospitals in the Baton Rouge area: Woman's Hospital in April or May of 2014 and Lane Regional Medical Center and Baton Rouge General Medical Center in July of 2014. (Doc. 168-6 at 11; JX 109 ¶¶ 32–33.)

271. Doe 5 has been unable to find a local physician who is willing to provide coverage for him when he is not in Baton Rouge, which all three hospitals require. (JX 109 ¶¶ 32–33; Doc. 51; Doc. 168-6 at 11–12.)

272. The Court finds that Doe 5, despite good faith efforts to meet the requirements of Act 620, has been unable to do so in the Baton Rouge area for a period of well over a year for reasons unrelated to his competence. Under these circumstances, while his applications have not been finally acted upon and are therefore technically "pending," the Court finds that they have been de facto denied.

**F.    Doe 6**

273. Doe 6 is a Board Certified OB/GYN with 48 years of experience who is the Medical Director of Woman's Clinic in New Orleans and Delta Clinic in Baton Rouge. (JX 168 ¶ 1; *see also* JX 109 ¶ 8.)

274. Doe 6 provided his testimony by declaration, (JX 168), and so the Court did not have the opportunity to directly measure his demeanor. However, in reviewing his Declaration, the Court finds the testimony to be credible and consistent with the other testifying doctors who perform abortions in Louisiana.

275. While Doe 6 is Medical Director at both Women's and Delta, "[d]ue to [his] age and the demands of traveling back and forth between New Orleans and Baton Rouge, along with [his] private gynecology practice in New Orleans, [he is] no longer able to provide abortion[s] in Baton Rouge." (JX 168 ¶ 3; *see also* JX 109 ¶ 8.)

276. As a result, Doe 6 ceased performing abortions at Delta in Baton Rouge in April of 2012, leaving only Doe 5 performing abortions at that facility. (JX 168 ¶ 3; *see also* JX 109 ¶ 9.)

277. Doe 6 does not currently have admitting privileges at a hospital within 30 miles of Women's Clinic or Delta Clinic. (JX 168 ¶¶ 15, 21.)

278. From approximately 1973 to 2005, when he had an OB/GYN practice, Doe 6 had admitting privileges at various hospitals in New Orleans. (*Id.* ¶ 13.) As his private practice became solely a gynecology practice, and due to the low rate of abortion complications, he was unable to meet the hospitals' requirements to admit a minimum number of patients each year. (*Id.*) Doe 6 also did not need admitting privileges because he was not admitting patients to the hospital. (*Id.*) Consequently, when his admitting privileges expired, he did not apply to renew them. (*Id.*)

279. Doe 6 contacted Tulane about the possibility of obtaining admitting privileges and was told not to bother applying because he would not be granted privileges, as he had not had admitting privileges at any hospital since 2005. (JX 168 ¶ 12.)[51] Defendant argues that this testimony is inconsistent with that of Doe 2, who was able to get courtesy privileges at Tulane. (Doc. 201 at 14.) Especially given Doe 6's age and other differences in the professional circumstances of these two doctors, (*Compare* JX ¶ 8, *and* JX 168 ¶ 13, *with* Doc. 191 at 14–16, 22–23), this assertion is not supported and unpersuasive. In addition, Doe 6's limited privileges, like Doe 2's, do not meet the requirements of Act 620, read and construed as enacted. (*See supra* Part VIII.)

---

[51] While Defendant argues that this testimony is hearsay, (Doc. 201 at 14), Defendant did not make this objection prior to or at trial. Even if the objection would have been made, it would have been overruled for the same reasons as her other similar objections. *See supra* note 30.

280. Prior to September 1, 2014, Doe 6 applied for admitting privileges at East Jefferson Hospital in New Orleans, which is within 30 miles of Women's Clinic. (JX 109 ¶¶ 31–33; JX 168 ¶ 15.) On September 17, 2014, East Jefferson requested additional information, which he then provided. (Doc. 51 at 2.) Since that time, no action has been taken. (*Id.*; *see also, e.g.*, JX 168 ¶ 15.) That application, now pending for over a year, is considered by the Court to have been de facto denied.

281. Doe 6 testified that he did not apply to other hospitals within 30 miles of Women's Clinic because, due to the nature of his practice as an abortion provider, he did not admit a sufficient number of patients to receive active admitting privileges. (JX 168 ¶ 11.)


**G.    Post-Hearing Updates**

282. On September 17, 2015, the Court requested that Plaintiffs update the Court on or before September 24, 2015, on the status of the admitting privileges of the doctors and, if there were any changes, to provide the details of same. (Doc. 206.)

283. By letter of September 25, 2015, the Plaintiffs informed the Court and Defendants that, after making inquiries, they were unaware of any material changes in the status of the applications of Does 1–6. (Doc. 209.)

284. At a telephone status conference of September 28, 2015, this letter was received into evidence without objection as JX 193. (Doc. 210.)

**IX.**  **Effects of Act 620**

**A.**  **The Effect of Act 620 on Does 1-6**

285. The number and location of doctors and clinics providing abortions varies widely from state to state. The effect of an admitting privileges requirement on those providers and the concomitant effect on women's right to an abortion has also varied state to state.[52]

286. Before the passage of Act 620, doctors performing abortions in Louisiana were not required to and, for their practices, did not need to have admitting privileges at any hospital, let alone a nearby hospital, in order to safely provide services for their patients. (Doc. 190 at 25, 36–37, 39, 127, 197–98; Doc. 191 at 46; Doc. 195 at 32; JX 135 at 2804; JX 110 ¶ 7; JX 168 ¶ 8.)

287. As summarized above, at the time Act 620 was passed, only one of the six doctors performing abortions, Doe 3, had admitting privileges at a hospital and he maintained these admitting privileges for years in order to facilitate his general OB/GYN practice which was and is unrelated to that portion of his practice performing abortions at Hope.

288. Since the passage of Act 620, all five remaining doctors have attempted in good faith to comply with Act 620. All five have attempted to get admitting privileges at a hospital within 30 miles of where they perform abortions. All five have made formal applications to at least one nearby hospital and three of the five doctors have filed applications at multiple hospitals within thirty miles.

---

[52] *Compare, e.g., Jackson Women's Health v. Currier*, 760 F.3d 448 (5th Cir. 2014) ("*Currier*") (where the admitting privileges statute was found to place an undue burden on the constitutionally protected right to an abortion), *petition for cert. filed*, No. 14-997 (filed February 19, 2015), *with Cole*, 790 F.3d at 563 (where, at least as to the facial challenge, the plaintiffs were found to have failed to establish a constitutional violation).

289. Two of the doctors, Does 2 and 5, perform abortions in two separate cities and thus, each had to apply at hospitals in two different locales.

290. Based on a careful review of the evidence, the Court finds that, notwithstanding the good faith efforts of Does 1, 2, 4, 5 and 6 to comply with the Act by getting active admitting privileges at a hospital within 30 miles of where they perform abortions, they have had very limited success for reasons related to Act 620 and not related to their competence.

291. The five doctors have filed thirteen separate formal applications at nearby hospitals. In only one of those cases–Doe 5 at Hospital C[53]–were active admitting privileges granted. In another case, that of Doe 2 at Tulane, he was given admitting privileges that do not comport with the plain language of Act 620.

292. Of the thirteen formal applications filed, only one has been frankly denied, the application of Doe 1 at Minden.

293. The remaining ten applications have never been finally acted upon because the doctor applying, given the nature of his practice as an abortion provider, either cannot provide the information required or the information has been provided and the application remains in limbo for undisclosed reasons. In almost every instance, more than a year has passed since the original applications were filed.[54]

---

[53] It is noteworthy that Hospital C, a hospital in a major metropolitan area and not a party to this action, is so concerned about the ramifications of having its identity publically revealed, that it requested that it be named only through a pseudonym and, with the consent of all the Parties, this was allowed. *See supra* Part V.E.

[54] As of September 25, 2015, the status of "pending" applications is unchanged. (Doc. 209.)

294. Defendant argues that where these applications are "pending," the applications have not been denied and therefore Plaintiffs have failed to prove that Act 620 has caused the failure of these doctors to get admitting privileges.

295. The Court disagrees. Because Louisiana has no statutorily prescribed time limit within which a hospital must act on a physician's application, *see supra* Part V.D, a hospital can effectively deny the application by simply not acting upon it. Given the length of time involved in these applications, the Court finds that this is precisely what has occurred here.

296. Doe 3 has been threatened as a result of his work at Hope Clinic. (*See, e.g.*, JX 113 ¶ 3.) Last year, anti-abortion activists from outside Louisiana left fliers on neighbors' mailboxes calling him an abortionist and saying they wanted to convert him to Jesus. (Doc. 190 at 108–09; *see also* JX 113 ¶ 3.)

297. These individuals also approached Doe 3's regular medical practice patients as they tried to enter his office, requiring the building security officers to escort the activists off the premises. (Doc. 190 at 109; *see also* JX 113 ¶ 3.) These individuals told Doe 3's patients that he killed babies and that they should not see him. (Doc. 190 at 109.)

298. Doe 3, the only abortion doctor who had privileges at the time Act 620 was passed, (*See, e.g.*, JX 116 ¶ 18), fears that, if the other Louisiana abortion providers are not able to obtain admitting privileges, he will become an even greater target for anti-abortion violence. (*See, e.g.*, JX 113 ¶¶ 3–7.) He specifically testified that "all [these individuals] have to do is eliminate [him] as they have Dr. Tiller and some of the other abortion providers around the country" to eliminate abortion entirely in Northern Louisiana. (Doc. 190 at 174–75.)

299. Doe 3 is also concerned that such individuals could "cause a lot of other . . . problems that would affect [his] ability to perform the rest of [his] practice." (*Id.* at 174–75; *cf.* JX 113 ¶ 8.)

300. Doe 3 has difficulty arranging coverage for his OB/GYN practice because other OB/GYN doctors in the Shreveport area refuse to cover his practice as a result of his work at Hope Clinic performing abortions. (Doc. 190 at 111–13.)

301. Dr. Doe 3 testified that, as a result of his fears, and the demands of his private OB/GYN practice, if he is the last physician performing abortion in either the entire state or in the northern part of the state, he will not continue to perform abortions. (*Id.* at 174–76; *see also* JX 116 ¶ 19.) The Court finds his testimony credible and supported by the weight of other evidence in the record.[55]

302. To summarize,

- If Act 620 takes effect, Doe 1 will no longer be allowed to provide abortions in Louisiana because he does not have admitting privileges pursuant to the Act within 30 miles of Hope.

- If Act 620 takes effect, Doe 2 will no longer be allowed to provide abortions in Louisiana, because he does not have active admitting privileges pursuant to the Act within 30 miles of Bossier. His privileges at Tulane are limited such that they do not comply with Act 620 so that he does not have active admitting privileges within 30 miles of Causeway Clinic.

---

[55] The issue of whether this fact is legally relevant to the undue burden analysis is discussed in this Ruling's Conclusions of Law. *See infra* Parts XI–XII.

- If Act 620 takes effect, Doe 3, who does have admitting privileges pursuant to the Act within 30 miles of Hope, will no longer provide abortions in Louisiana because of well-founded concern for his personal safety.[56]

- If Act 620 takes effect, Doe 4 will no longer be allowed to provide abortions in Louisiana because he does not have admitting privileges pursuant to the Act within 30 miles of Causeway.

- If Act 620 takes effect, Doe 5 will be able to provide abortions at Women's Clinic, in New Orleans, where he has admitting privileges pursuant to the Act but, in all likelihood, Doe 5 will be the only physician available to provide abortion care in all of Louisiana.

- However, Doe 5 will not be able to provide abortions at Delta in Baton Rouge because he does not have admitting privileges pursuant to the Act within 30 miles of Delta and, despite good faith efforts to get same, has been unable to do so.

- If Act 620 takes effect, Doe 6 will no longer be allowed to provide abortions in Louisiana because he does not have admitting privileges pursuant to the Act within 30 miles of Women's Clinic.

303. The Court finds that the inability of Does 1, 4 and 6 to get active admitting privileges at any hospital is directly related to the requirements of Act 620 as they apply in concert with existing Louisiana law and the Louisiana rules and practices for getting admitting privileges.

304. The Court finds that the inability of Doe 2 to get active admitting privileges within 30 miles of Bossier and only limited privileges (not "active admitting privileges") within 30 miles

---

[56] *Id.*

of Causeway as well as Doe 5's inability to get active admitting privileges within 30 miles of the

Delta are also directly attributable to the requirements of Act 620 as they apply in concert with

the rules and practices for getting admitting privileges in Louisiana.

### B.     The Effect of Act 620 on the Clinics and Women of Louisiana

305. If Act 620 were to be enforced, four of the six doctors–Doe 1, 2, 4, and 6–would not

meet the requirements of Act 620. If Doe 3 quits the abortion practice, as he has testified he will,

Louisiana would be left with one provider and one clinic. As is analyzed in more detail below,

this would result in a substantial number of Louisiana women being denied access to an abortion

in this state.[57]

306. If Act 620 were to be enforced, four of the five clinics–Hope, Bossier, Delta, and

Causeway– would have no abortion provider, with the one remaining clinic (Woman's) without

one of the two doctors that normally serves its patients.

307. Women's Clinic would have only Doe 5 to handle not only all patients at that facility

but the patients at the other four. According to Cochran, the Administrator at Women's Health,

Doe 6 provided 60% of the abortion services at this center. As she testified, "[e]ven if Dr. Doe 5

were to commit all of his time to serving patients at Women's Clinic, I do not see how we could

serve all of the patients who [would] be coming to our doors once Delta Clinic closes . . . ." (JX

109 ¶ 37.)

---

[57] The question of whether this substantial number translates into a "large fraction" for purpose of the undue burden analysis is discussed later in this Ruling. *See infra* Parts XI–XII.

308. Furthermore, since Women's Health would be the only clinic to serve all the women of Louisiana, it clearly could not perform that task as a logistical matter. Doe 5 performed a total approximately 2,950 abortions in the year 2013 at Delta and Women's. (JX 110 ¶ 7.) Given the 9,976 abortions performed in Louisiana in that same year,[58] and putting aside the issue of the distance which would need to be traveled by women in north Louisiana, approximately 70% of the women in Louisiana seeking an abortion would be unable to get an abortion in Louisiana.

309. Given that the total number of women of reproductive age in Louisiana is 938,719 according to Defendant expert mathematician and statistician, Solanky, (DX 148; DX 151; Doc. 193 at 138–39),[59] this would mean that over 99% of women of reproductive age in Louisiana, regardless of location or distance to the physician, would be without any physician within the actual borders of this state to perform an abortion.

310. Even if one were to conclude that Doe 3 will not quit or that his quitting is legally irrelevant, Act 620's will nonetheless result in the inability of a substantial number of Louisiana to obtain an abortion in this state. Just the loss of Doe 1 on Hope would be, according to Pittman, Hope's administrator, "devastating" to its operations and viability. (Doc 190 at 29.)

311. Doe 3 sees about 20 to 30 abortion patients per week, or roughly 1,000 to 1,500 per year. (*Id.* at 118.) This would leave roughly 5,500 Louisiana women seeking an abortion (or 55%) without the ability to get one. When one uses women of reproductive age as the denominator, the percentage of Louisiana women unable to get an abortion is still over 99%.

---

[58] This data is taken from the affidavit of Defendant's expert, Solanky, who, in turn, took it from DHH's website. (DX 148 at 5.)

[59] This represents Louisiana women between the ages of 15 and 44. (DX 148 at 28–29.)

312. Even if one additionally assumes that Defendant's interpretation of Doe 2's privileges at Tulane is correct, so that he meets the requirements of Act 620 at Tulane, the Act's negative impact upon a woman's right to abortion in Louisiana would still be significant. Doe 2 performed a total of approximately 1,000 abortions last year at the two clinics where he worked. (Doc. 191 at 17–18.) Thus, if you combine his procedures with those of Does 3 and 5, there would still be some 4,500 women seeking an abortion (or about 45% of women seeking an abortion in a given year) who would otherwise be able to get abortion and who could not do so upon Act 620's enforcement. Utilizing the women of reproductive age as the denominator, that percentage would rise to over 99%.

313. Even if Doe 3 continued to practice and Doe 2's limited privileges at Tulane met the requirements of Act 620, two of Louisiana's five abortion clinics–Bossier and Delta–would be without an abortion provider.

314. The remaining three–Hope, Causeway and Woman's–would each be without one of the two providers who normally perform abortions, an insufficient number to service the patients in the region, let alone the number of patients who might come from other parts of the state because of similar insufficient capacity.

315. Analyzed regionally, if Act 620 were to be enforced, the Baton Rouge and Shreveport areas would have no facility, and the New Orleans area would have only one provider, rather than the two who currently work there. If, as Defendant argues, Doe 3's quitting is legally irrelevant and the Defendant's interpretation of Doe 2's privileges at Tulane is correct, Baton Rouge would be left with no facility, Shreveport with one (Hope) and New Orleans with two

(Causeway and Woman's). But each remaining facility would have only half the previous number of providers.

316. Abortion clinics in Louisiana routinely make efforts to recruit doctors to work at the clinics, such as placing advertisements throughout the state and working with reproductive health specialists to identify potential candidates. (Doc. 190 at 22, 24–25, 33, 87; Doc. 168-8 at 7–8.)

317. The anticipated admitting privileges requirement of Act 620 has made it difficult to recruit new doctors. (Doc. 190 at 24.)  In Pittman's words, "It definitely has." (*Id.*)

318.  For example, Hope recently identified an interested doctor, but this potential physician ultimately proved to be an unviable candidate as a result of Act 620's admitting privileges requirement. (*Id.* at 24–25.)

319. In addition, doctors who appear to be good candidates consistently express reluctance to be hired in Louisiana because of the numerous restrictions placed on abortion providers by Louisiana's existing laws and regulations. (*See id.* at 22–25.)

320. For the same reasons that Does 1, 2, 4, 5, and 6 have had difficulties getting active admitting privileges, reasons unrelated to their competence, the Court finds that it is unlikely that the effected clinics will be able to comply with the Act by recruiting new physicians who have or can obtain admitting privileges. A significant contributing factor to that inability is Act 620 and the difficulties it creates for a doctor with an abortion practice gaining active admitting privileges in the context of Louisiana's admitting privileges rules and practices.[60]

---

[60] While there was credible testimony that the hostile environment against abortion providers in Louisiana and nationally is another factor making recruiting difficult, (Doc. 190 at 22–25; JX 110 ¶¶ 16, 23 n.1; JX 109 ¶ 14), the Court did not consider this factor as being legally relevant under Firth Circuit jurisprudence. *See infra* Parts XI–XII.

321. The Court finds that the enforcement of Act 620 and the concomitant effect on restricted access to abortion doctors and clinics would result in delays in care, causing a higher risk of complications, as well as a likely increase in self-performed, unlicensed and unsafe abortions. (*See, e.g.*, *id.* at 222–24; Doc. 191 at 157–62.)


## CONCLUSIONS OF LAW

### X.      Summary of Legal Arguments

322. Plaintiffs challenge Act 620 as unconstitutional on three broad grounds. First, under the rational review prong of the *Casey* test, Act 620 does not serve a legitimate state interest. (Doc. 102 at 5–7; Doc. 196 ¶¶ 322–34). Second, the effect of Act 620 is to place an undue burden on the right of Louisiana women to have an abortion. (Doc. 102 at 7–16; Doc. 196 ¶¶ 297–307). And third, the purpose of Act 620 is to create a substantial obstacle to a Louisiana woman's right to an abortion. (Doc. 102 at 16–19; Doc. 196 ¶¶ 308–21).

323. In her Partial MSJ, (Doc. 87), Motion for Reconsideration, (Doc. 144), and post-trial briefs, (Docs. 200–01), Defendant argues that three issues should be eliminated as a matter of law: (1) whether Act 620 serves a legitimate state interest under the *Casey* rational review test; (2) whether Act 620 imposes a medically unreasonable requirement; and (3) whether Act 620 has the improper purpose of placing an undue burden on abortion access in Louisiana.

324. The essence of Defendant's argument is that  all three issues were decided as a matter of law in five recent Fifth Circuit decisions which are binding on this Court and require the granting of Defendant's motion for partial summary judgment. These decisions include: *Planned Parenthood of Greater Tex. Surgical Health Servs. v. Abbott,* 734 F.3d 406 (5th Cir. 2013)

("*Abbott I*"); *Abbott II*, 748 F.3d 583; *Currier*, 760 F.3d 448; *Whole Woman's Health v. Lakey*, 769 F.3d 285 (5th Cir. 2014) ("*Lakey*"), *vacated in part*, 135 S. Ct. 399, 190 L. Ed. 2d 247(2014); and *Cole*, 790 F.3d 563. Further, in the alternative, Defendant argues that Plaintiffs failed on the merits to offer admissible and relevant evidence in support of their position that Act 620 has an improper purpose.

325. In addition, Defendant argues that the above cited cases set the legal standard for determining whether and to what extent Plaintiffs have shown that an undue burden exists and, as that standard is properly applied in this case, Plaintiffs have failed to meet their burden of showing either improper purpose or undue burden.

326. The essence of Plaintiffs' response is that: (1) *Currier*, *Abbott I* and *II, Lakey*, and *Cole* do not bind this Court on rational review because that analysis is fact-specific and must be evaluated in the context of this specific statute as applied in this specific state; (2) that the medical need and reasonableness of Act 620 are relevant to the issue of the statute's alleged undue burden; and (3) that medical need and reasonableness of Act 620 are relevant to the statute's purpose, an issue related to but separate from rational basis or the statute's effect, and one not addressed in these Fifth Circuit cases or at least not addressed in the context of the specific facts of this case.

327. Both sides agree that the question of whether the effect of Act 620 is to create an undue burden was properly ripe for the preliminary injunction hearing. Plaintiffs argue that, under the proper standard, Plaintiffs have shown both improper purpose and undue burden. Defendant argues they have proven neither.

**XI.**     **Test for Determining the Constitutionality of Act 620**

328. "[F]or more than 40 years, it has been settled constitutional law that the Fourteenth Amendment protects a woman's basic right to choose an abortion." *Currier*, 760 F.3d at 453 (citing *Roe*, 410 U.S. 113).

329. The test to be applied in this circuit to determine the constitutionality of a law which arguably restricts a woman's right to an abortion is set out in five recent cases: *Currier*, *Abbott I*, *Abbott II*, *Lakey* and *Cole*. All five cases dealt, in part, with an admitting privileges requirement very similar to Act 620 as written and enacted. *Compare* La. R.S. § 40:1299.35.2, *with, e.g.*, H.B. 2, 83d Legis., 2d Spec. Sess. (Tex. 2013); H.B. 1390, 2012 Legis., Reg. Sess. (Miss. 2012).

330. In order to be deemed unconstitutional, a statute restricting a woman's right to abortion must fail at least one of two different tests: the "rational basis" test or the "undue burden" test. *Currier*, 760 F.3d at 453 ("In addition to creating no undue burden, an abortion restriction must pass a rational basis test." (relying in part on *Gonzales v. Carhart*, 550 U.S. 124, 158, 127 S. Ct. 1610, 1633, 167 L. Ed. 2d 480 (2007) ("*Carhart*")); *see also Cole*, 790 F.3d at 576, 576 (citing the "trio of widely-known Supreme Court decisions [which] provide[] the framework for ruling on the constitutionality" of an abortion law–*Roe, Casey*, and *Gonzalez*–and distinguishing between the rational basis and undue burden tests).

331. In making this dual analysis, the Court must use a "two-step approach," first making a rational basis inquiry followed by an analysis of whether the statute creates at undue burden. *Lakey*, 769 F.3d at 293, 297.

A.      **Rational Basis Review**

332. "The first-step of the analysis of an abortion regulation . . . is rational basis review, not *empirical* basis review." *Abbott II*, 748 F.3d at 596 (emphasis in original) (citing *Carhart*, 550 U.S. at 158).[61]

333. A statute passes the rational basis test if it  "is rationally related to a legitimate state interest [and, in deciding if it is], we do not second guess the legislature regarding the law's wisdom or effectiveness." *Lakey*, 769 F.3d at 294 (citing *Abbott II*, 748 F.3d at 594).

334. Crucially, while the Parties introduced a great deal of evidence on the effects of Act 620, that evidence is not relevant in the rational basis review. "[T]here is 'never a role for evidentiary proceedings' under rational basis review." *Abbott II*, 748 F.3d 596 (quoting *Nat'l Paint & Coatings Ass'n v. City of Chicago*, 45 F.3d 1124, 1127 (7th Cir. 1995)). "[L]egislative choice is not subject to courtroom fact-finding." *Id*. at 594 (quoting *F.C.C. v. Beach Commnc'ns, Inc*., 508 U.S. 307, 315, 113 S. Ct. 2096, 2102, 124 L. Ed. 2d 211, (1993) (citing cases)). In applying this part of the test, a district court is not to relitigate the facts that led to the passage of the law. *Id.* (citing *Heller v. Doe*, 509 U.S. 312, 320, 113 S. Ct. 2637, 2462, 125 L. Ed. 2d 257 (1993)).[62]

--------

[61] In *Currier*, the Fifth Circuit acknowledged that there is disagreement as to whether the rational review test is independent from and precedes the undue burden test but found it unnecessary to resolve the dispute. 760 F.3d at 454. *Lakey*, however, clearly reaffirmed *Abbott II* in what it calls the Fifth Circuit's "two-step approach: first determining whether the law at issue satisfies rational basis, then whether it places a substantial obstacle in the path of a large fraction of women seeking abortions." *Lakey*, 769 F.3d at 297 (citing *Abbott II*, 748 F.3d at 593, 597).

[62]  It is interesting, however, that the Fifth Circuit did discuss testimony and other evidence introduced at the trial in connection with its conclusion that the law passed rational review by serving a medical purpose and that the thirty mile geographic restriction requirement also passed rational review. *Abbott II*, 748 F.3d at 595 ("There is sufficient evidence here that

335. Rather, "the rational basis test seeks only to determine whether there is any conceivable basis for the enactment." *Id.* (citing *Beach Commc'ns*, 508 U.S. at 313). "A law 'based on *rational speculation* unsupported by evidence or empirical data' satisfies rational basis review." *Id.* (emphasis added) (quoting *Beach Commc'ns*, 508 U.S. at 315).

**B.     Undue Burden Test - Generally**

336. Even if the law regulating abortion has a rational basis, it can still be unconstitutional if it "has the purpose or effect of placing a substantial obstacle in the path of a woman seeking an abortion of a nonviable fetus." *Casey*, 505 U.S. at 877; *see also, e.g., Lakey*, 769 F.3d at 294; *Cole*, 790 F.3d at 572, 576.

337. Whether the law's "purpose" is to create an undue burden, or its "effect" does so unintentionally, are two different inquiries and are to be considered separately. *See Lakey*, 769 F.3d at 294 (emphasizing that this inquiry looks to whether the provision has " either 'the *purpose or effect*' of placing a substantial obstacle in the path of a woman seeking an abortion of a nonviable fetus" (emphasis in original)); *cf. Jane L. v. Bangerter*, 102 F.3d 1112, 116 n.5 (10th Cir. 1996) (commenting that "[n]either the district court nor the [s]tate has focused on the fact that under *Casey*, a law is invalid if either its purpose or effect is to place a substantial obstacle in the path of a woman seeking to abort a nonviable fetus").

338. Unlike the rational basis test, proof is not only allowed, but is required, in order to satisfy the two prongs of the undue burden test. *Lakey*, 769 F.3d at 294–95 (reversing the district

---

the geographic restriction has a rational basis."); *see also Cole,* 790 F.3d at 584 (in which the Fifth Circuit noted that Texas supported the rational basis of Texas H.B. 2 with evidence at trial).

court's finding that the admitting privilege requirement had an improper purpose because the court "cited no record *evidence* to support its determination that [this] provision was enacted for the purpose of imposing an undue burden on women seeking abortions, nor did it make any *factual finding* regarding an improper purpose" (emphasis added)); *Abbott II*, 748 F.3d at 597 ("[P]laintiffs offered no *evidence* implying that the State enacted the admitting privileges provision in order to limit abortions . . . ." (emphasis added)); *Cole*, 790 F.3d at 585 ("Plaintiffs bore the burden of proving . . . an improper purpose . . . [and] failed to proffer competent *evidence* contradicting the legislature's statement of a legitimate purpose." (emphasis added) (citation omitted)).

339. Therefore, two issues central to the undue burden test are (1) what *kind* of evidence is admissible to satisfy the purpose and effect prongs and (2) by what standard is this evidence to be measured in determining if the plaintiffs have met their burden?

340. As a threshold matter, the Court observes that the answer to these two questions is dramatically different depending on the circuit in which the issue is considered. In utilizing this measure, some require the regulation to be examined in a "real-world context." *Planned Parenthood Se., Inc. v. Strange* , 33 F. Supp. 3d 1330, 1337 (M.D. Ala. 2014) ("*Strange*"); *see also Planned Parenthood of Wis., Inc. v. Van Hollen*, 94 F. Supp. 3d 949, 963 & n.14 (W.D. Wis. 2015) ("*Van Hollen*") (specifically rejecting the conclusion that the Fifth Circuit's reasoning in *Abbott II* is consistent with *Casey* and emphasizing that the Seventh Circuit, as well as the Ninth, favor "balancing of benefits and burdens"), *aff'd*, 806 F.3d 908 (7th Cir. 2015). As explained by one court, this kind of "careful, fact-specific analysis" focuses on "how the restrictions would impede women's ability to have an abortion, in light of the circumstances in their lives." *Strange*,

33 F. Supp. 3d at 1338 (quoting the earlier *Planned Parenthood Se., Inc. v. Strange*, 9 F. Supp. 3d 1272, 1285 (M.D. Ala. 2014)); *see also, e.g.*, *Planned Parenthood of Heartland, Inc. v. Iowa Bd. of Med.*, 865 N.W. 2d 252, 268–69 (Iowa 2015) (holding undue burden test must be "context-specific"); *Planned Parenthood of Ariz., Inc. v. Humble*, 753 F.3d 905, 914 (9th Cir. 2014) (criticizing the Fifth and Sixth Circuit approaches for not being context-specific).

341. Under this approach, "real-world" factors must be considered by the court, including the role of poverty in creating increased obstacles for poor women who seek abortions, and the negative effects of violence against abortion providers on the granting of admitting privileges and recruiting of doctors. *See, e.g., Strange,* 33 F. Supp. 3d at 1351–53, 1356–58; *Van Hollen*, 94 F. Supp. 3d at 965, 976.

342. Under the Fifth Circuit approach, however, poverty related issues, e.g. increased challenges for poor women to get an abortion far from their home caused by lack of availability of child care, unreliability of transportation, unavailability of time off from work, etc., cannot be considered in the undue burden analysis because these issues were not caused by or related to the admitting privileges requirement. *See Cole*, 790 F.3d at 589.

343. Similarly, the Fifth Circuit has found "fear [of] anti-abortion violence" to be unrelated to the abortion regulation at issue; such fears are therefore legally irrelevant. *Abbott II*, 748 F.3d at 599.

344. This Court, therefore, has not considered the evidence presented on these "real world" issues in reaching its decision.

345. A second major difference in the approach taken by the circuits in applying the undue burden test is the standard by which the evidence is measured. The Seventh and Ninth Circuits as

well as a district court in the Eleventh Circuit have applied a test whereby "the extent of the

burden a law imposes on a woman's right to abortion" must be compared to and weighed against

"the strength of the state's justification for the law." *Humble*, 753 F.3d at 912; *see also, e.g.*,

*Planned Parenthood of Wisconsin, Inc.*, 738 F.3d at 798; *Iowa Bd. of Med.*, 865 N.W.2d at 264;

*Strange*, 33 F. Supp. 3d at 1337.

346. The Fifth Circuit has specifically rejected this balancing or weighing test: "[O]ur

circuit does not incorporate a balancing analysis into the undue burden analysis." *Lakey*, 769 F.3d

at 305; *accord, e.g.*, *Abbott II*, 748 F.3d at 593–94; *Cole*, 790 F.3d at 587 n. 33; *see also, e.g.*,

*Planned Parenthood Sw. Ohio Region v. DeWine*, 696 F.3d 490, 513 (6th Cir. 2012) (Moore, J.,

dissenting in part) (noting that "a 'substantial obstacle' has never been defined as a total obstacle"

and that "in evaluating the impact of restrictions, rarely do courts rely exclusively on

percentages"); *Greenville Women's Clinic v. Bryant*, 222 F.3d 157, 170 (4th Cir. 2000) ("In

making this undue-burden assessment, the Supreme Court has repeatedly emphasized that the

focus must be aimed more directly at the ability to make a decision to have an abortion as distinct

from the financial cost of procuring an abortion." (emphasis in original)).

347. Rather, the Fifth Circuit has adopted another test which is detailed below. This Court

has used the Fifth Circuit test in reaching its decision.


**C.     Undue Burden - Purpose Prong**

348. *Casey* suggests that one challenging the statute's purpose must show that the statute

"serve[s] no purpose other than to make abortions more difficult." 505 U.S. at 901; *accord Cole*,

790 F.3d at 585–86; *see also Mazurek v. Armstrong*, 520 U.S. 968, 972, 117 S. Ct. 1865,

1866–67, 138 L. Ed. 2d 162 (1997) (per curium) (stressing that "[w]e do not assume unconstitutional legislative intent even when statutes produce harmful results" and faulting plaintiff for not offering at least "*some* evidence of that improper purpose" (emphasis in original)).

349. While Defendant argues that evidence of the purpose prong should be limited to the statute's text and official legislative history, (Doc. 87-1 at 18–22), the Court disagrees. In *Okpalobi v. Foster*, the Fifth Circuit found that a district court is "not to accept the government's proffered purpose if it is a mere 'sham.'" 190 F.3d 337, 354–56 (5th Cir. 1999) (quoting *Edwards v. Aguillard*, 482 U.S. 578, 586–87, 107 S. Ct. 2573, 2579, 96 L. Ed. 2d 510 (1987) (specifying the requirements for a law's analysis under the Constitution's Establishment Clause)), *superceded on other grounds*, 244 F.3d 405 (5th Cir. 2001); *see also, e.g., Croft v. Perry*, 624 F.3d 157, 166 (5th Cir. 2010) ("[W]e do review to ensure that the alleged secular purpose is the actual purpose[.]"); *cf. Planned Parenthood of Kan. & Mid-Mo. v. Moser*, 747 F.3d 814, 841 (10th Cir. 2014) ("[T]he Supreme Court has considered legislative motive or purpose in assessing whether a statute is valid under the Establishment Clause and the Equal Protection Clause.").  As stated by the Supreme Court in its most recent abortion case, a court should not "place dispositive weight on [legislative] factual findings . . . where constitutional rights are at stake." *Carhart*, 550 U.S. at 165; *see also Latta v. Otter*, 771 F.3d 456, 469 (9th Cir. 2014) ("Unsupported legislative conclusions as to whether particular policies will have societal effects of the sort at issue in this case—determinations which often, as here, implicate constitutional rights—have not been afforded deference by the Court."), *cert. denied*, 135 S. Ct. 2931 (2015). Instead, all federal courts "retain[] an independent constitutional duty to review . . . [those] findings, (*Id.*), for "the judicial

power of the United States," a power wielded by all Article III judges, "necessarily extends to the independent determination of all questions, both of fact and law, necessary to the performance of that supreme function," *Crowell v. Benson*, 285 U.S. 22, 60, 52 S. Ct. 285, 296, 76 L. Ed 598 (1932), *cited in Carhart*, 550 U.S. at 165. As such, "[u]ncritical deference to . . . [a legislature's] factual findings in these cases is inappropriate." 550 U.S. at 166; *see also Bowen v. Kendrick*, 487 U.S. 589, 601, 108 S. Ct. 2562, 2570, 101 L. Ed. 2d 520 (1988) (commenting that "in the course of determining the constitutionality of a statute, referred not only to the language of the statute but also to the manner in which it had been administered in practice"); *Northland Family Planning Clinic, Inc. v. Cox*, 487 F.3d 323, 332 (6th Cir. 2007) (citing *Carhart*, 550 U.S. at 166).

350. Therefore, in searching for a law's purpose as a part of the undue burden analysis, a court can look to "various types of evidence, including the language of the challenged act, its legislative history, and the social and historical context of the legislation or other legislation concerning the same subject matter as the challenged measure." *Okpalobi,* 190 F.3d at 354–56; *see also, e.g.,* Roy G. Speece, Jr., *The Purpose Prong of Casey's Undue Burden Test and Its Impact on the Constitutionality of Abortion Insurance Restrictions in the Affordable Care Act or Its Progeny*, 33 WHITTIER L. REV. 77, 99 (2011) ( where, reviewing *Okpalobi* and other cases, the author lists a "broad array of factors" considered by courts to determine purpose, including "a bill's social and historical context").

351. However, the Fifth Circuit in *Cole* ruled that evidence that the statute has no health benefits does not prove that the statute "must have had an invalid purpose." 790 F.3d at 585 (quoting *Mazurek,* 520 U.S. at 973). Furthermore, evidence that shows "medical and scientific

uncertainty" about the statute's health benefits, "does not lead to the conclusion that a law is unconstitutional." *Id.* (citing *Carhart*, 550 U.S. at 163).

352. Under the Fifth Circuit standard, an abortion regulation satisfies the purpose prong unless the regulation serves "no purpose other than to make abortions more difficult." *Id.* at 586 (quoting *Casey*, 505 U.S. at 901); *see also, e.g.*, *Women's Med. Prof'l Corp. v. Baird*, 438 F.3d 595, 607 (6th Cir. 2006) (quoting this same language from *Casey*).

### D.      Undue Burden - Effect Prong

353. In order for the plaintiffs to prevail under Fifth Circuit jurisprudence, they must prove, "at a minimum," that a "***large fraction***" of women of reproductive age in Louisiana have a substantial obstacle to an abortion placed in their paths as a result of the challenged law. *Cole*, 790 F.3d at 586, 588–89 (emphasis added) (relying on *Lakey*, 769 F.3d at 296, and *Abbott II*, 748 F.3d at 600); *see also, e.g.*, *Gonzales,* 550 U.S. at 167–68; *Casey*, 505 U.S. at 895.

354. This test begs two critical questions: what is a "large fraction"? And what is a "substantial obstacle"?

355. The Fifth Circuit has not provided a definition of the term "large fraction."  Rather, its  guidance comes by how that term has been applied.

356. As to the proper denominator, the Fifth Circuit's "binding precedent" requires this Court to use "all women of reproductive age or women who might seek an abortion . . . ." *Cole*, 790 F.3d at 589 (citing *Abbott I*, 734 F.3d at 414; *Abbott II*, 748 F.3d at 598; and *Lakey*, 769 F.3d at 299). However, language quoted from *Lakey* and relied upon by *Cole* suggests that the proper denominator might be the number of women who *actually* seek abortions, not the number who

"might" seek one, i.e. the entire population of women of reproductive age.[63] In any event, this Court has considered both.[64]

357. In *Cole*, the Court found that neither 16.7% nor 7.4% of Texas women of reproductive age constituted a large fraction. *Id.* at 588. *Abbott II* found that 10% did not. *See* 748 F.3d at 598. *Lakey* found that 17% was insufficient. 769 F.3d at 298 & n.13. *Currier* involved the closure of Mississippi's only abortion clinic, resulting in 100% of Mississippi women being adversely affected. 760 F.3d at 458–59. This was found sufficient. Thus, this Court has no specific mandate from the Fifth Circuit as to what percentage between 17% and 100% qualifies as a "large fraction."

358. In *Casey*, the Court also used the phrase "significant number" in describing the number of women who must be unduly burdened in order to render the statute unconstitutional. 505 U.S. at 894 ("The spousal notification requirement is thus likely to prevent a significant number of women from obtaining an abortion.").[65] *Cole* suggests that the two terms were used

---

[63] "Here, the ambulatory surgical center requirement applies to every abortion clinic in the State, limiting the options for *all women in Texas who seek an abortion*. The appropriate denominator thus includes all women affected by those limited options." *Lakey*, 769 F.3d at 299 (emphasis added), *quoted in Cole*, 790 F.3d at 589.

[64] This Court agrees with *Cole's* holding that the denominator should not be the population of women upon whom an undue burden is placed (as urged by the *Cole* plaintiffs) because this, as the Court points out, is a tautology and guarantees that 100% of women so described will be adversely affected. *Cole*, 790 F.3d at 589.  However, it seems to this Court that the most appropriate denominator would be the number of women who typically seek abortions; in Louisiana, that number is about 10,000 per year, (DX 148 ¶ 11). Regardless, "[h]owever much a district court may disagree with an appellate court, . . . [it] is not free to disregard the mandate or directly applicable holding of the appellate court." *Cole*, 790 F.3d at 581 (citing *United States v. Teel*, 691 F.3d 578, 582–83 (5th Cir. 2012)).

[65] Judge Stephen A. Higginson's concurring and dissenting opinion in *Lakey* notes that *Casey* used both terms, invalidating the spousal notification statute because it would prevent a "significant number" as well as a "large fraction" of women from obtaining an abortion. 769

synonymously, *Casey* stating that "significant number" amounted to a "large fraction." 790 F.3d at 586 n. 30 (citing *Casey*, 505 U.S. at 895). Unfortunately, neither term is defined. Nonetheless, this Court has considered both in the Ruling.

359. If the law results in the inability of all women of a given state to get an abortion within that state, the law has created a substantial obstacle, and the law is unconstitutional, even if those women can get an abortion in an adjoining state. *See Currier*, 760 F.3d at 457–58 (so holding, but cautioning that "[n]othing in this opinion should be read to hold that any law or regulation that has the effect of closing all abortion clinics in a state would inevitably fail the undue burden analysis"). *Cole* creates an exception to that rule where the out of state abortion facility is in "the same metropolitan area [as  the closed facility], though separated by a state line." 790F.3d at 597. A further complication arises from the first of the two concluding observations in *Currier*: "Whether . . . [a s]tate . . . regulation would impose an undue burden . . . is not a question that can be answered without reference to the ***factual context*** in which the regulation arose and operates." *Currier*, 760 F.3d at 458 (emphasis added).

360. In measuring "substantial obstacle", the recent Fifth Circuit cases have primarily considered the increased travel distance required for a woman to get an abortion caused by the closure or anticipated closure of abortion facilities within the state. For instance, the court in *Cole* focused on "women who would face travel distances (one way) of over 150 miles in light of *Abbott II's* holding that 'an increase of travel of less than 150 miles for some women is not an undue burden under *Casey*.'" *Cole*, 790 F.3d at 588 (quoting *Abbott II*, 748 F.3d at 598).

F.3d at 308 (Higginson, J., concurring in part and dissenting in part) (citing *Casey*, 505 U.S. at 893-95).

361. However, *Cole* "recognize[d] that any statement of 'how far is too far' will involve some imprecision." *Id.* at 594. *Cole* also suggested that "no distance, standing alone, could be too far." *Id.* at 594 (citing *Abbott II*, 748 F.3d at 598 (so reading *Casey*)). In holding the ambulatory surgical center provision unconstitutional as applied to a clinic in McAllen, Texas, *Cole* held that the 235 mile distance to the nearest clinic, *combined with* the "difficulties" and "practical concerns"[66] of McAllen women after the closure of that clinic, was a sufficient basis for finding the statute unconstitutional. *Cole*, 790 F.3d at 593–594, 585 n.29, 594 n.42.

362. Fifth Circuit jurisprudence does not allow this Court to consider the poverty of many Louisiana women and its effect in creating additional burdens and obstacles to utilizing an abortion facility farther away from their home. *Cole*, 790 F.3d 589 (citing *Lakey*, 769 F.3d at 299, and *Abbott I*, 734 F.3d at 415 (holding that "obstacle[s] that are unrelated to the hospital-admitting-privileges requirement" are irrelevant to the undue-burden inquiry in a facial challenge)).

363. This same jurisprudence, moreover, does not allow the Court to consider the very real violence and threats of violence towards abortion providers and its effect in the decision of Doe 3 to quit his abortion practice if Act 620 becomes effective. *Abbott II*, 748 F.3d at 599.  Nor can the Court consider the very real difficulties this violence creates on the ability of abortion clinics to recruit new doctors. *Id.*

---

[66] These "difficulties" and "practical concerns" included evidence that some women would be unable to make the trip from McAllen to San Antonio or Houston to obtain an abortion and, further, that the closure of the McAllen clinic would result in an increase in self-attempted abortions. *Cole*, 790 F.3d at 593; *see also supra* Part V. The Fifth Circuit provided no more guidance as to what other kinds of difficulties and practical concerns might properly be considered.

## XII.    Analysis

### A.    Rational Basis

364. Plaintiffs argue that Act 620 does not further a valid state interest. (Doc. 196 ¶¶

322–27; Doc. 202 ¶¶ 153–57.) This issue was disposed of in the Court's earlier ruling on

Defendant's Partial MSJ. (Doc. 138.)

365. In particular, this Court there held:

> The admitting privileges requirement of Act 620 is substantially similar to both Texas
> H.B. 2 and Miss. H.B. 1390. To the extent that Plaintiffs contend that Act  620 is not
> rationally related to a legitimate state interest because it is medically unreasonable or
> unnecessary, this Court is bound by the Fifth Circuit's previous rulings in *Abbott II*,
> *Currier* and *Lakey*. . . . [These cases] make clear that the admitting privileges provision of
> Act 620 passes rational basis review. *Abbott II*, 748 F.3d at 599-600; *Currier*, 760 F.3d at
> 454; *Lakey*, 769 F.3d at 293.

(Doc. 138 at 17.)

366. In *Cole,* the Fifth Circuit reaffirmed its position on this issue, as summarized by this

Court. 790 F.3d at 584.

367. Therefore, this Court holds (again) that Act 620 passes rational basis review.[67]

### B.    Undue Burden - Purpose of Act 620

368. Plaintiffs argue that the true purpose of Act 620 is to eliminate or unduly burden

Louisiana women's access to abortions by imposing a medically meaningless requirement that

---

[67] However, in its argument on this point, (Doc. 201 at 3–4), Defendant mischaracterizes
this Court's earlier ruling. The Court did not, as suggested by Defendant, "reject Plaintiffs' claim
that Act 620 imposes a medically unreasonable requirement that fails to protect women's
health." (*Id.*) Rather, using the non-evidence-based "rational speculation" standard, the Court
found that Act 620 meets rational basis review without regard to evidence on this issue. (Doc.
138 at 17–21.)

most, if not all, abortion doctors can not meet for reasons which are unrelated to their competency. Thus, Plaintiffs argue, the statute violates the purpose prong of the undue burden test and is unconstitutional.

369. Plaintiffs argue that the Court is not required to accept at face value Act 620's official purpose as stated in the legislation and that its true and improper purpose was proven at trial by a) public statements by the Governor and the author of the bill which demonstrate that the true purpose of the legislation is to eliminate, not regulate, abortion; b) evidence that those participating in the drafting of the bill are associated with groups dedicated to the elimination of abortion; c) evidence that Act 620 is medically unnecessary and unreasonable; and, finally, d) evidence that any limited medical benefits brought by the Act are far outweighed by the burden that it places on a woman's right to an abortion.

370. Defendant argues that (1) the Act's legislative history, including the medical testimony received by the Legislature, shows that the true purpose of the bill is to further the health and safety of women undergoing an abortion; (2) the intention of individual legislators or lobbyists is legally irrelevant to the bill's purpose and cannot be considered by this Court; (3) the evidence at trial proved that the bill was medically necessary, beneficial and reasonable; (4) even if there is a legitimate debate about the Act's medical necessity and reasonableness, this "medical uncertainty" cannot render the Act unconstitutional and (5) Fifth Circuit jurisprudence forecloses this Court from weighing the Act's benefits against its harms.

371. The Court's factual findings on these issues have been summarized above. *See supra* Parts V–IX.

372. The rule in the Fifth Circuit, which this Court is bound to follow, is where there is medical and scientific uncertainty about the need or benefits of an abortion restricting law, Plaintiffs have failed to meet their burden in establishing an improper purpose. The Court is not permitted to weigh the benefits of the law against its burdens. It is only where the sole purpose of the law is an improper one, can Plaintiffs succeed on this prong. Plaintiffs have failed to make this showing.

## C.      Undue Burden - Effect of Act 620

373. The Court finds that Act 620 will have the effect of placing an undue burden on (i.e. placing a substantial obstacle in the path of) a large fraction of Louisiana women of reproductive age seeking an abortion.

374. As summarized in the Findings of Fact, *see supra* Parts V–IX, Act 620 will have the effect of making abortions unavailable to approximately 55% of women seeking abortion in Louisiana and over 99% of women of reproductive age. The Court concludes that either percentage is a large fraction and a significant number.

375. Even if one were to assume that Doe 2's privileges at Tulane meet the requirements of Act 620, which this Court finds is not the case, *see supra* Part VIII.B, this undue burden would still exist. Under this scenario, the reduced number of abortion providers would result in some 45% of women seeking abortions–and over 99% of Louisiana women of reproductive age–being unable to get an abortion at a Louisiana facility. The Court concludes that either percentage is a large fraction and a significant number.

376. In addition to the increased distance some women would have to travel to find a facility with the capacity to perform their abortion, there are the practical concerns and difficulties of increased risk of complications caused by delays in care, as well as a likely increase in self-performed, unlicensed and unsafe abortions. (Doc. 190 at 223–24.)

377. Defendant argues that Act 620 is not unconstitutional because any undue burden that it has created is not caused by or related to the statute.

378. In order for an undue burden or substantial obstacle to render a law unconstitutional, that burden or obstacle must be *created by or related to* the statute in question, in this case, the admitting privileges requirement. *K. P. v. LeBlanc*, 729 F.3d 427, 442 (5th Cir. 2013) (relying on, among others, *Harris v. McRae,* 448 U.S. 297, 316, 100 S. Ct. 2671, 2688, 65 L. Ed. 2d 784 (1980)); *accord, e.g.*, *Collins v. Hoke*, 705 F.2d 959, 962 (8th Cir. 1983) (quoting and applying *Harris*, 448 U.S. at 316); *W. Va. Ass'n of Cmty. Health Ctrs. v. Sullivan*, 737 F. Supp. 929, 944 (S.D. W. Va. 1990) (same).

379. Consequently, a facial challenge can be sustained only if "the law itself imposes an undue burden on at least a large fraction of women."  *Cole,* 790 F.3d at 589 (quoting *Lakey*, 769 F.3d at 299; *Abbott I*, 734 F.3d at 415; *Harris,* 448 U.S. at 316; and *Maher v. Roe*, 432 U.S. 464, 474, 97 S. Ct. 2376, 2382–83, 53 L. Ed. 2d 484 (1977)).

380. Where the relevant obstacle was *"neither created nor in any way affected by* the . . . regulation," then it is not the law itself which imposes the burden. *Maher*, 432 U.S. at 474 (emphasis added). Stated another way, "although government may not place obstacles in the path of a woman's exercise [of her right], it need not remove those not of its own creation." *Harris*, 448 U.S. at 316 (quoting *Maher*, 432 U.S. at 474).

381. In this case, Act 620 requires abortion doctors to get "active admitting privileges," including being admitted as a member in good standing of the medical staff, at a nearby hospital. LA. R.S. § 40:1299.35.2; *see also supra* Part VI. However, the Act does not set the criteria necessary for obtaining those privileges and there is no state law or other uniform standard that sets these criteria. *See supra* Parts V–VI, IX. Instead, the law relies on the highly variable requirements set in the by-laws of each hospital. *Id.*

382. The Act therefore anticipates and relies upon existing private hospital's varying by-laws' admitting privileges requirements as allowed under Louisiana law. It delegates to private hospitals the duty of granting (or withholding) active admitting privileges and thereby utilizes by-laws and private hospital credentialing committees as instruments for the implementation of the Act. Unquestionably then, the admitting privileges law and practices existing in Louisiana before Act 620 are "related to" Act 620. As is discussed in detail above, it is the two working in concert that has created the inability of Doe 1, 2, 4, 5 (in Baton Rouge), and 6 to get the kind of active admitting privileges which the Act itself mandates. *See supra* Parts V.D, IX.

383. While not raised by Plaintiffs in this case, another court has held that a law essentially identical to Act 620 denied due process "based on the State delegating decisionmaking over the plaintiffs' right to their chosen profession to private entities, namely hospitals, without adequate oversight or a mechanism to waive or appeal the hospitals' denial of admitting privileges . . . ." *Van Hollen*, 94 F. Supp. 3d at 954.

384. Specifically, the district court in *Van Hollen* held that a hospital's business needs did not further any legitimate state interest nor did the requirement of some hospitals that the applying doctor show a record of in-patient care. *Id.* at 963–64. Necessarily, this Court holds,

based on the law of this circuit, that Act 620 furthers a legitimate state interest. Nevertheless, *Van Hollen*'s logic bolsters its own decision that the effective discrimination against abortion providers growing out of the admitting privileges requirements of Louisiana hospitals (especially in the absence of the protection against discrimination provided under other state laws) are related to and caused by Act 620.

385.  As already noted, *see supra* Part VIII.B, in interpreting a state or federal statute, courts traditionally focus not only on "the language itself [and] the specific context in which the language is used [but also] the broader context of the statute as a whole." *Robinson*, 519 U.S. at 341; *see also, e.g.*, *Trout Point Lodge, Ltd. v. Handshoe*, 729 F.3d 481, 486–87 (5th Cir. 2013) (citing *id.*).

386. An analysis of the statute's broader context is, in turn, informed by another cardinal rule of statutory construction: Congress, and by implication, any state legislature is "presumed to know the [existing] law, including judicial interpretation of that law, when it legislates." *Day v. Persels & Assocs.*, LLC, 729 F.3d 1309, 1332 (11th Cir. 2013); *see also, e.g.*, *Wiersum v. U.S. Bank, N.A.*, 785 F.3d 483, 488 n.5 (11th Cir. 2015)*; cf. Hernandez-Miranda v. Empresas Diaz Masso, Inc*., 651 F.3d 167, 175 (1st Cir. 2011) ("The understanding of a term employed by Congress is ordinarily determined at the time of enactment."); Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 322–26 (2012) (outlining the prior-construction canon).

387. In effect, therefore, courts customarily impute to the legislature an awareness of any legal strictures relevant to a particular enactment's application. *See, e.g.*, *Cannon v. Univ. of Chicago*, 441 U.S. 677, 696–97, 99 S. Ct. 1946, 1957–58, 60 L. Ed. 2d 560 (1979); *see also, e.g.*,

*Johnson v. Hous. Auth. of Jefferson Parish*, 442 F.3d 356, 362 n.33 (5th Cir. 2006) ("It is always

appropriate to assume that our elected representatives, like other citizens, know the law." (internal

quotation marks omitted) (citing *id.*)); *Trigon Ins. Co. v. United States*, 215 F. Supp. 2d 687, 698

(E.D. Va. 2002) ("Congress is presumed to know the existing statutory framework into which an

amending statute fits."); *cf. Texas v. United States*, 497 F.3d 491, 501 (5th Cir. 2007) (explaining

that, under *Chevron*, a court must determine whether the relevant "regulations reasonably flow

from the statute when viewed in context of the overall legislative framework and the policies that

animated Congress's design").

388. In other words, statutory interpretation does not take place in a vacuum, and any

reasonable understanding of the statute's effect requires awareness of the preexisting legal

regime.

389. As discussed above, *see supra* Parts V, IX, the Court finds that Louisiana's

credentialing process and the criteria found in some hospital by-laws work to preclude or, at least

greatly discourage, the granting of privileges to abortion providers, including the following:

- There are no laws or regulations in Louisiana mandating certain minimum

   objective credentialing criteria to assure that credentialing decisions are made only

   on objective, competency-related factors, akin to the American Medical

   Association's guidelines.[68]

- The credentialing processes adopted by the hospitals in question permit them to

   deny privileges for reasons purely personal and unrelated to the competency of the

---

[68] *See supra* note 25.

physician including, specifically, anti-abortion views held by some involved in

credentialing;

-       Louisiana law does not prevent a hospital or credentialing personnel from

discriminating against abortion providers based on their status as abortion

providers, regardless of their competency; and

-       By having no maximum time period within which applications must be acted upon,

a hospital can effectively deny a physician's application without formally doing so

and therefore affect a de facto denial without expressing the true reasons (or any

reasons) for doing so.

390. Indeed, the Court finds that, since Act 620 was enacted, these specific aspects of how

Louisiana hospitals grant, deny, or withold hospital admitting privileges, have played a significant

contributing role in Louisiana's abortion providers not being given privileges or being given only

limited privileges. *See supra* Parts V–VI, IX.

391. The Court therefore finds that Act 620, acting in concert with existing Louisiana law

on abortion and Louisiana law and practice as it pertains to hospital admitting privileges, is

facially unconstitutional in placing an undue burden on the right of a large fraction of Louisiana

women to an abortion.


**XIII.   Conclusion**

**A.       Motion to Reconsider Rulings on Summary Judgment and Motion in Limine**

392. As explained above, *see supra* Part II, Defendant moved for partial summary

judgment, (Doc. 87), which was opposed, (Doc. 104). In the Partial MSJ, Defendant maintained

that Act 620 met both the rational basis and the purpose prong of the undue burden test as a matter of law. (Doc. 87 at 7 (summarizing Defendant's argument).)  The Court granted the motion as to rational basis but held there were questions of fact which precluded the granting of the motion as it pertained to the purpose prong. (Doc. 138.)

393. For the same basic reasons, Defendant's Motion in Limine sought to exclude Plaintiffs' proposed evidence of Act 620's purpose including evidence of medical reasonableness and the evidence regarding the drafting of Act 620. (Doc. 95.) This was denied. (Doc. 139.)

394. Based on the intervening *Cole* case, Defendant moved for reconsideration of that part of the summary judgment ruling that dealt with the purpose prong and the Court's rulings denying Defendant's Motion in Limine. (Doc. 144.) This request was also opposed. (Doc. 150.) Because of the complexity of the issue and the proximity of the upcoming trial date, the matter was taken under advisement and deferred to trial.

395. Set forth in Federal Rule of Civil Procedure 56, FED. R. CIV. P. 56, the standard for deciding a summary judgment is well known and was set forth in the Court's original ruling. (Doc. 138 at 8–9.) It is the standard used in the current motion.

396. *Cole* holds that where there is conflicting medical testimony regarding the medical need for and reasonableness of the law, the law meets the purpose prong. 790 F.3d at 585. However, this narrow and tailored legal conclusion does not mean that medical testimony on these issues is not relevant and admissible. Thus, while this Court ultimately held that Act 620 meets the purpose prong, this was only after a consideration of the evidence on this issue.

397. Similarly, while this Court found that emails and public statements of those involved in drafting and supporting the legislation was not sufficient to establish Act 620's purpose as

unconstitutionally illicit, the evidence was nonetheless relevant. *See Okpalobi*, 190 F.3d at 355–56 (stating that involvement of an anti-abortion group in the drafting of the legislation is insufficient by itself, but not inadmissible, to show the statute's purpose).

398.  In light of these distinctions, with the substantive law applied by this Court left unchanged after *Cole* and with no newly discovered evidence having been presented, the Court therefore denies Defendant's Motion for Reconsideration. *See, e.g.*, *Waltman v. Int'l Paper Co.*, 875 F.2d 468, 473–75 (5th Cir. 1989) (commentating that Rule 59(e) motions "serve the narrow purpose of allowing a party to correct manifest errors of law or fact or to present newly discovered evidence" (internal quotation marks omitted) (citing *Keene Corp. v. Int'l Fidelity Ins. Co.*, 561 F. Supp. 656, 665 (N.D. Ill. 1982))); *see also Circuit City Stores, Inc. v. Mantor*, 417 F.3d 1060, 1064 n.1 (9th Cir. 2005) ("A Rule 59(e) motion is appropriate if the district court: (1) is presented with newly discovered evidence, (2) committed clear error or the initial decision was manifestly unjust, or (3) if there is an intervening change in controlling law." (internal quotation marks omitted)).

## B.    Preliminary Injunction

### *(1)    Preliminary Injunction Standard*

399. "[T]he burden of proving the unconstitutionality of abortion regulations falls squarely on the plaintiffs." *Abbott II*, 748 F.3d at 597.

400. The four prerequisites which Plaintiffs must show are: (1) they are substantially likely to succeed on the merits; (2) absent the injunction, there is a significant risk of irreparable

harm; (3) the balance of hardships weighs in their favor; and (4) granting the preliminary injunction will not adversely affect the public interest. *See, e.g.*, *Opulent Life Church v. City of Holly Springs, Miss.* 697 F.3d 279, 288 (5th Cir. 2012); *Hoover v. Morales,* 164 F.3d 221, 224 (5th Cir. 1998)*; Vaughn v. St. Helena Parish Police Jury*, 192 F. Supp. 2d 562, 575 (M.D. La. 2001) (citing *Women's Med. Ctr. of N.W. Houston v. Bell*, 248 F.3d 411, 419 (5th Cir. 2001)).

401. A preliminary injunction is "an extraordinary and drastic remedy which should not be granted unless the movant clearly carries the burden of persuasion on all four (4) pre-requisites[.]" *Ledet v. Fischer*, 548 F. Supp. 775, 784 (M.D. La. 1982) (citations omitted); *accord Kliebert*, 2015 U.S. Dist. LEXIS 146988, at *71–73, 2015 WL 6551836, at *21–22; *see also, e.g.*, *Anderson v. Jackson*, 556 F.3d 351, 360 (5th Cir. 2009) (emphasizing that the movant must "clearly carr[y]" burden to obtain "extraordinary and drastic remedy" of preliminary injunction and quoting the four elements as formulated in *Canal Auth. v. Callaway*, 489 F.2d 567, 572 (5th Cir. 1974)).

402. This heavy burden applies when plaintiffs seek to enjoin regulations that may impact abortion access. *See Mazurek*, 520 U.S. at 972 ("'[A] preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion.'") (quoting 11A CHARLES WRIGHT *ET AL.*, FEDERAL PRACTICE AND PROCEDURE § 2948 (2nd ed. 1995))).

*(2)*     ***Application of Preliminary Injunction Standard***

403. There is a substantial threat that, were Act 620 to be enforced, irreparable injury would result to the Plaintiffs and their patients.

404. As explained in detail above, *see supra* Part XII, the Act will violate the constitutional right of Louisiana women to abortion. This is, by definition, irreparable harm. *Deerfield Med. Ctr. v. Deerfield Beach*, 661 F.2d 328, 338 (5th Cir. 1981) (holding that the fact that if a woman's right to an abortion is "'either threatened or in fact being impaired' . . . mandates a finding of irreparable injury") (citing to *Elrod v. Burns*, 427 U.S. 347, 373–74, 96 S. Ct. 2673, 2689–90, 49 L. Ed. 2d 547 (1976))).

405. Likewise, the severely restricted access to abortion care by a large fraction of Louisiana women caused by Act 620, and the resulting unreasonable and dangerous delays in scheduling abortion procedures, constitute irreparable harm for  Louisiana women seeking abortions. *See Jackson Women's Health Org. v. Currier*, 940 F. Supp. 2d 416, 424 (S.D. Miss. 2013), *aff'd in part*, 760 F.3d 448.

406. Many Louisiana women will also face irreparable harms from the burdens associated with increased travel distances in reaching an abortion clinic with sufficient capacity to perform their abortions. These burdens include the risks from delays in treatment including the increased risk of self-performed, unlicensed and unsafe abortions.

407. The Court therefore finds that Plaintiffs have shown that the failure to grant the injunction will likely result in irreparable injury.

408. Plaintiffs have shown that the injury threatened by enforcement of Act 620 outweighs any damage the injunction may cause Defendant. While Plaintiff has given clear evidence of harm,  Defendant, by contrast, has not shown that any damage would result from the issuance of a preliminary injunction. A preliminary injunction will preserve the status quo, and permit the clinics and physicians to continue to provide safe, needed abortion care to their patients. The

substantial injury threatened by enforcement of the Act – namely irreparable harm to women and the violation of their constitutional rights – clearly outweighs the impact of an injunction on Defendant. *See Currier*, 940 F. Supp. 2d at 424.

409. A preliminary injunction is also in the public interest. The public interest is not served by allowing an unconstitutional law to take effect. *Currier*, 940 F. Supp. 2d at 424 ("[T]he grant of an injunction will not disserve the public interest, an element that is generally met when an injunction is designed to avoid constitutional deprivations."); *see also, e.g.*, *Nobby Lobby, Inc. v. Dallas*, 970 F.2d 82, 93 (5th Cir. 1992) ("[T]he public interest always is served when public officials act within the bounds of the law and respect the rights of the citizens they serve") (citing *Nobby Lobby, Inc. v. Dallas*, 767 F. Supp. 801, 821 (N.D. Tex. 1991))).

410. Without an injunction, Louisiana women will suffer significantly reduced access to constitutionally protected abortion services, which will likely have serious health consequences.

411. The Court concludes that Plaintiffs have demonstrated that the threatened injury of Act 620 outweighs any damages the injunction may cause Defendant, and that the injunction will not disserve the public interest.

## C.    Judgment

For the reasons stated above, IT IS ORDERED that

1. Defendant's Motion to Reconsider Rulings on Summary Judgment and Motion in Limine, (Doc. 144), is DENIED.

2. The active admitting privileges requirement of LA. R.S. § 40:1299.35.2 is declared unconstitutional as violating the substantive due process rights of Louisiana women seeking abortions.

3.    Plaintiff's Motion for Preliminary Injunction is GRANTED to the extent that any

enforcement of LA. R.S. § 40:1299.35.2 is preliminarily enjoined as to the Plaintiffs:

specifically, Doctor John Doe 1, Doctor John Doe 2, June Medical Services, LLC, d/b/a

Hope Medical Group for Women; Bossier City Medical Suite; and Choice, Inc. of Texas,

d/b/a Causeway Medical Clinic.[69] This injunction will remain in effect until further notice

from this Court.

4.    Because there are applications for active admitting privileges which technically remain

"pending," the Court orders Plaintiffs to provide to the Court and Defendant on a monthly

basis beginning March 1, 2016, with a notification of any changes in the status of the

applications.

5.    Should the applications status change, the Parties are free to seek any other relief that they

may deem appropriate.

6.    A status conference will be held on January 29, 2016, at 11:30 a.m., so as to consider,

among other matters, what other proceedings must still take place and whether this Court

should convert the preliminary injunction issued by this Ruling to a permanent one.

Signed in Baton Rouge, Louisiana, on <u>January 26, 2016</u>.

**JUDGE JOHN W. deGRAVELLES**
**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**

---

[69] An order enjoining enforcement of Act 620 against parties other than Plaintiffs herein would be overly broad. *Currier*, 760 F.3d at 459.