UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF LOUISIANA

JUNE MEDICAL SERVICES LLC, *ET AL.*,

                                        Plaintiffs,

VERSUS

KATHY H. KLIEBERT, Secretary, Louisiana Department of Health and Hospitals,

                                        Defendant.

CIVIL ACTION

No. 3:14-00525-JWD-RLB

## RULING ON DEFENDANT'S MOTION FOR STAY PENDING APPEAL, FOR EXPEDITED CONSIDERATION, AND FOR TEMPORARY STAY

## I.      INTRODUCTION

Before the Court is the Defendant's Motion for Stay Pending Appeal, for Expedited Consideration, and for Temporary Stay ("Motion for Stay"), (Doc. 229), as well as the Defendant's Memorandum in Support of Her Motion for Stay Pending Appeal, for Expedited Consideration, and for Temporary Stay ("Supporting Memorandum"), (Doc. 229-1) (collectively, "Defendant's Motions"). These documents were filed by Doctor Rebekah Gee ("Gee," "Secretary," or "Defendant") in her official capacity as Secretary of the Louisiana Department of Health and Hospitals ("DHH"), who has replaced her predecessor, Ms. Kathy H.

Kliebert ("Kliebert").[1] To the request sought in the Motion for Stay and the points made in the Supporting Memorandum, Plaintiffs—June Medical Services LLC, d/b/a Hope Medical Group for Women ("Hope"); Bossier City Medical Suite ("Bossier"); Choice, Inc., of Texas, d/b/a Causeway Medical Clinic ("Causeway");[2] Doctor John Doe 1 ("Doe 1"); and Doctor John Doe 2 ("Doe 2"), (collectively, "Plaintiffs")—have responded with the Memorandum in Opposition to Defendant's Motion to Stay the Preliminary Injunction Pending Appeal ("Opposition"). (Doc. 232; *see also* Doc. 216 at 5, 9.)

So as to win her requested stay, Defendant bore the burden of proving four separate elements: (1) a strong showing that she will likely prevail on the merits, (2) proof that she will be irreparably harmed in a stay's absence, (3) the relative unlikelihood that other parties and persons interested in the proceeding would be substantially injured, and (4) that the public interest favors a stay's issue. Generally, a stay is an extraordinary remedy, and the burden to demonstrate that a stay is warranted is rather heavy, with the need to balance equities paramount. Having evaluated the arguments raised by Plaintiffs and Defendant (collectively, "Parties"), both at the telephonic conference held on February 10, 2016, and in their most recent filings, this Court concludes that Defendant has not shown she is likely to prevail. The Court's application of the undue burden test is amply supported by existing precedent and the weight of the evidence. Her other ground for reversal, that this Court must grant absolute deference to Defendant's statutory interpretation at odds with the plain and unambiguous wording of the statute, is

---

[1] This recent change may induce some confusion. Whenever this Ruling refers to the actions of the Secretary prior to Gee's appointment on January 5, 2016, Kliebert was the "Secretary." This Ruling will distinguish between the two women whenever practical.

[2] The three clinics are suing on behalf of themselves and their patients, physicians, and staff. (*See, e.g.*, Doc. 14 at 1–2; *see also* Doc. 232 at 1.) By stipulation, the Ruling covers Doctor John Doe 4. (Doc. 224.)

likewise unlikely to succeed. With her showing on these two points insufficiently convincing,

precedent compels the preservation of the status quo, "the last, peaceable, noncontested status of

the parties," *Kos Pharms., Inc. v. Andrx Corp.*, 369 F.3d 700, 708 (3d Cir. 2004). The harm to all

persons and parties will thereby be minimized, substantial injuries to many likely prevented,

until a final legal determination regarding the proper application of a well-established

constitutional right can definitively be made.

    For these reasons, as more fully stated below, this Court DENIES the Defendant's

Motion for Stay Pending Appeal, for Expedited Consideration, and for Temporary Stay, (Doc.

232).


## II.    BACKGROUND[3]

## A.    RELEVANT FACTS

    On January 26, 2016, this Court issued its Findings of Fact and Conclusions of Law

("Ruling"). (Doc. 216.) Briefly put, after reviewing the Parties' extensive evidentiary

submissions and six days' worth of testimony, this Court preliminarily enjoined Defendant from

enforcing Section A(2)(a) of Act Number 620 ("Act" or "Act 620"), which amended Louisiana

Revised Statutes § 40:1299.35.2. (*Id.* at 5.) The Court did so upon finding Act 620 to violate "the

substantive due process rights of Louisiana women to obtain an abortion, a right guaranteed by

the Fourteenth Amendment of the United States Constitution as established in *Roe v. Wade*, 410

U.S. 113, 93 S. Ct. 705, 35 L. Ed. 2d 147 (1973) . . ., and pursuant to the test first set forth in

*Planned Parenthood of Se. Pa. v. Casey*, 505 U.S. 833, 112 S. Ct. 2791, 120 L. Ed. 2d 674

---

[3] Only the facts relevant to the instant dispute are here recapped. An exhaustive summary
appears in the Court's Findings of Fact and Conclusions of Law. (Doc. 216.)

(1992), and subsequently refined by the Fifth Circuit." (*Id.* at 8.) The Supreme Court's major

cases total three: *Gonzales v. Carhart*, 550 U.S. 124, 127 S. Ct. 1610, 167 L. Ed. 2d 480 (2007);

*Casey*, 505 U.S. 833; and *Roe*, 410 U.S. 113. The key Fifth Circuit cases number at least five:

*Whole Woman's Health v. Cole*, 790 F.3d 563 (5th Cir. 2015); *Whole Woman's Health v. Lakey*,

769 F.3d 285 (5th Cir. 2014); *Jackson Women's Health Org. v. Currier*, 760 F.3d 448 (5th Cir.

2014); *Planned Parenthood of Greater Tex. Surgical Health Servs. v. Abbott*, 748 F.3d 583 (5th

Cir. 2014) ("*Abbott II*"); and *Planned Parenthood of Greater Tex. Surgical Health Servs. v.

Abbott*, 734 F.3d 406 (5th Cir. 2013) ("*Abbott I*").

On February 10, 2016, upon Defendant's request, "[f]or the reasons stated" in the Ruling

(Doc. 216), and pursuant to Federal Rule of Civil Procedure 58,[4] the Judgment ("Judgment")

issued. (Doc. 227.) Its second paragraph preliminarily enjoined

> Defendant Kathy H. Kliebert and her successors, as well as any and all
> employees, agents, entities, or other persons acting in concert with her, . . . from
> enforcing LA. R.S. § 40:1299.35.2 *et seq.* against the following persons: Doctor
> John Doe 1; Doctor John Doe 2; June Medical Services, LLC, d/b/a Hope
> Medical Group for Women, and its physicians and staff; Bossier City Medical
> Suite, as well as its physicians and staff; Choice, Inc. of Texas, d/b/a Causeway
> Medical Clinic, and its physicians and staff, including Doctor John Doe 4; and
> any and all others encompassed by the Parties' stipulations.

(*Id.* at 1–2.)

On that same day, Defendant filed two separate documents. The first—Defendant's

Notice of Appeal ("Notice")—simply gave the required notice that the Defendant has appealed

the Judgment and the Ruling to the United States Court of Appeals for the Fifth Circuit. (Doc.

228.) The second was the Motion for Stay and the Supporting Memorandum, its requests three in

---

[4] Unless otherwise noted, any and all references to "Rules" or "Rule []" in this order are to the
Federal Rules of Civil Procedure.

number: (1) "for a stay of the Court's judgment (Doc. 227) and ruling (Doc. 216)," pending their appeal; (2) "for expedited consideration" of the Motion for Stay; and (3) "for a temporary stay pending the Court's disposition" of the Motion for Stay and, if denied, "pending disposition of any stay motion filed in the court of appeals." (Doc. 229 at 1.) At the telephonic conference held on February 10, 2016, bearing in mind both Plaintiffs' explicit opposition as well as the expiration of the temporary restraining order—and thus any protection that it afforded any and all parties and persons—upon the Ruling's release, (Doc. 233 at 8–9), this Court denied Defendant's request for a temporary stay pending consideration of the Motion for Stay. (Doc. 231 at 1–2.) In addition, with Defendant's consent, this Court authorized Plaintiffs to more formally respond to the Motion for Stay and the Supporting Memorandum on or before February 12, 2016, (*Id.* at 2), effectively denying Defendant's second request for a ruling on its recent motions on or before that date, (Doc. 229 at 1).

Following the hearing, one issue, the subject of this order, remained: whether this Court should stay its own Ruling and Judgment. (*See, e.g.*, Doc. 229-1.)

### B.    PARTIES' ARGUMENTS

### 1.    Defendant's Points

The Defendant correctly states the four factors which must be considered in determining whether a stay should issue —"(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies," *Abbott I*, 734 F.3d at 410 & n.10 (internal

quotation marks omitted)—and now maintains that all four favor her request. (Doc. 229-1 at 5–14.)

Initially, Defendant contends reversal of the Ruling and Judgment on "either of two grounds" is "likely." (*Id.* at 6.) First, as she has read the Ruling and this circuit's precedent, this "Court's 'large fraction' analysis departs from the Fifth Circuit's 'large fraction' analysis." (*Id.* at 6.) In making this conclusion, Defendant describes this Court's two alternative methods for calculating large fraction in the following terms. At first, the Court took the annual number of abortions provided in 2013 by the four Louisiana-based doctors who have yet to obtain the admitting privileges required by Act 620, divided by the total number of abortions provided in Louisiana in 2013 ("Method 1"). As an additional calculation, this Court then took the number of Louisiana women of reproductive age, minus the number of abortions performed in 2013 by non-privileged Louisiana doctors, divided by the Louisiana reproductive-age women ("Method 2"). (*Id.* at 7–8.) The controlling standard, by Defendant's reckoning, mandated that this Court "determine[] the fraction of women burdened by an admitting privileges law by (1) taking the number of women who must travel significantly farther to reach a qualified provider, and (2) dividing by all women of reproductive age in the state." (*Id.* at 6 (citing to *Abbott I*, 734 F.3d at 415, and *Abbott II*, 748 F.3d at 598, 600).

Defendant discerns fatal flaws in the Court's two methods. (*Id.*) In her view, this Court's Method 1 employed an "incorrect" numerator as well as an "incorrect" denominator. (*Id.* at 8.) The numerator should not have incorporated the actual and documented number of abortions provided by the relevant doctors in 2013. (*See* Doc. 216 ¶¶ 308, 311, at 82.) Instead, it should have used the number of abortions that these doctors could theoretically provide while working "at a considerably higher rate" and at a "higher capacity." (Doc. 229-1 at 8.) Next, the

denominator should not have been the total number of abortions provided in Louisiana. (*See* Doc. 216 ¶¶ 308, 311, at 82.) Rather, the number of abortions provided to non-Louisiana women in every Plaintiff clinic should have been subtracted. (Doc. 229-1 at 8.) Such a subtraction, she argues, would have necessarily led to a "significantly lower" denominator. (*Id.*) As to Method 2, Defendant contends it exhibits one defect. In Defendant's words, "[t]he numerator should have been the number of Louisiana women required to travel significantly farther to reach a qualified provider," (*Id.* at 7), not the number of women of reproductive age, (*See* Doc. 216 ¶ 311, at 82). In sum, Defendant concludes that reversal is likely "because the Court's analyses used incorrect numbers that significantly inflated the percentages of Louisiana women allegedly denied abortion access." (Doc. 229-1 at 8.)

Moving beyond the large fraction test, Defendant adds that she is likely to prevail due to this Court's incorrect application of administrative law's pendent principle. In her words, this Court "legally erred in disregarding the Secretary's determination that Doe 2 had qualifying privileges at Tulane" and "exceeded its jurisdiction" by doing so. (*Id.* at 9.) In support of this second "likely" ground, Defendant makes three points.

First, because the Secretary determined that one doctor, Doe 2, could continue legally providing abortions" at one of the three party clinics, this Court overstepped its rightful bounds. (*Id.*) Thus, even as she denies the applicability of this body of law's seminal case, *Chevron U.S.A., Inc. v. Natural Res. Defense Council*, 467 U.S. 837, 104 S. Ct. 2778, 81 L. Ed. 2d 694 (1984), describing any "*Chevron* analysis"[5] as "inappropriate," (Doc. 229-1 at 9, 10), she maintains that her interpretive decision "should have settled the question of the Act's impact on

---

[5] The Supporting Memorandum leaves it unclear whether this phrase is being used as a shorthand for all forms of agency deference, a fact noted by this Court in the Ruling. (*See* Doc. 216 ¶ 236, at 64.)

Doe 2's ability to continue providing abortions." (*Id.* at 9–10.) In other words, the law's

"indisputable" practical effect resolved any constitutional issues, for the then-Secretary, "the

state official charged with enforcing the Act, made a sworn declaration that Doe 2's privileges

were satisfactory and allowed him to continue providing abortions at Causeway." (*Id.* at 9

(referring to JX 191 ¶ 6).)  Even while this decision merited deference as the official charged

with enforcing Act 620, then, this case did not present the classic scenario suitable for the

application of a "*Chevron*-type analysis": "[A]ggrieved plaintiffs challeng[ing] an agency's

interpretation of a law as exceeding the agency's statutory authority." (*Id.* at 9 & n.2 (citing to

*Util. Air Regulatory Grp. v. EPA*, 134 S. Ct. 2427, 2439, 189 L. Ed. 2d 372 (2014), and *Women's

& Children's Hosp. v. State*, 2007-1157 (La. App. 1 Cir. 02/08/09); 984 So. 2d 760, 762, 766).)

Second, Defendant contends that this Court should have still accepted her interpretation

of the law as incontestable and unreviewable, her interpretive declaration obviating this Court's

authority to review Act 620's constitutionality. This is so, Defendant argues, because "[a] federal

court lacks independent authority to interpret state law or to bind state officials to its

interpretation of state law." (*Id.* at 10 (quoting *Pennhurst v. Halderman*, 465 U.S. 89, 106, 104 S.

Ct. 900, 911, 79 L. Ed. 2d 67 (1984)), 10 n.3 (citing for support *Earles v. State Bd. of Certified

Pub. Accountants of La.*, 139 F.3d 1033, 1039 (5th Cir. 1998)); *Saahir v. Estelle*, 47 F.3d 758,

761 (5th Cir. 1995); and *Hughes v. Savell*, 902 F.2d 376, 378 & n.2 (5th Cir. 1990)).

Concededly, "a federal court has limited authority to interpret state law in a diversity case," but,

"[i]n a federal question case like this one, . . . a federal court has no authority to tell a state

official how to interpret state law, even if the court would reach a different conclusion on its

own." (*Id.* (citing to *Lelsz v. Kavanaugh*, 807 F.2d 1243, 1252 (5th Cir. 1987)).) By not

accepting the Secretary's interpretation of Act 620 in preliminarily adjudicating its apparent

unconstitutionality, Defendant contends that this Court therefore defied the rule set forth in *Pennhurst*.

Third, Defendant argues that this Court lacked any jurisdiction because Doe 2 himself has no standing to challenge the Secretary's application of Act 620 and even benefitted from her then chosen construction. (*Id.* at 10–11.) Doe 2 "merely speculated that a future Secretary might change her mind. . . . [, b]ut plaintiffs lack standing to challenge unknowable future applications of a law." (*Id.* at 11 (citing to *Clapper v. Amnesty Int'l USA*, 133 S. Ct. 1138, 1147, 185 L. Ed. 2d 264 (2013)). Like Doe 2, she argues, this Court "lacked jurisdiction to enjoin the Act based on speculation about how future Secretaries might apply it [to Doe 2 as well as other doctors]—especially on a facial challenge." (*Id.* at 10–11.) To summarize, the Court's alleged error was not to "accept[] as fact the Secretary's approval of Doe 2's . . . privileges" as consistent with Act 620's mandate or treat her construction of a plain law, as encapsulated in a single declaration, (*Id.* at 9), as that statute's singularly binding and conclusive reading. (*Id.* at 11.)

Thereupon, Defendant contends that the other three factors required for a stay pending appeal, when set against this professed likelihood, militate in her favor. As to the second—whether she will be irreparably harmed—she insists no reasonable doubt about this possibility can be raised, as "[w]hen a statute is enjoined, the State necessarily suffers the irreparable harm of denying the public interest in the enforcement of its laws." (*Id.* at 12 (citing *Abbott I*, 734 F.3d at 419).) As to the fourth—the public's interest—Louisiana's "interest and harm" has "merge[d]" with that of the public," by implication rendering any other public concern irrelevant. (*Id.* (quoting *Abbott I*, 734 F.3d at 419).) She explicitly discounts the pertinence of the third factor—

"whether the issuance of a stay will substantially injure the other parties interested in the proceeding"—based on her perceived likelihood of appellate success.[6] (*Id.*)

## 2.    Plaintiffs' Opposition

Filed on February 12, 2016, pursuant to this Court's order, (Doc. 231), the Opposition counters Defendant's every point with Plaintiffs' own ten reasons for why a stay must not be allowed, "[n]one of the relevant factors, nor consideration of equity, weigh[ing] in favor of a stay." (Doc. 232 at 2.)

The first five deal with the validity of this Court's large-fraction analyses. First, Plaintiffs argue that, since "this Court need[ed] only find that the challenged statute imposes an undue burden on the women whom Plaintiff serves," the large fraction test "need not even be met in order for the Fifth Circuit to affirm this Court's injunctive relief." (*Id.* at 3.) For this reason, Defendant's attack, (Doc. 229-1 at 6–8), on this Court's two mathematical computations, (*See* Doc. 216 ¶¶ 305–15, at 81–83), "misses the mark."  (Doc. 232 at 2.) Second, regardless of the foregoing, Plaintiffs contend that this Court properly applied the large fraction test. While Defendant "argues that the 'large fraction' test requires an analysis of distance traveled by women to reach an abortion provider," (*Id.* at 3 (construing Doc. 229-1 at 6)), she has "mistaken[ly]" construed this test, since "a substantial obstacle in the undue burden analysis can take different forms." (*Id.* at 3.) Rather, *Casey* "had nothing to do with driving distances." (*Id.* at

---

[6] The Supporting Memorandum's final substantive paragraph states the reasons for the Motion for Stay's expedited consideration. (Doc. 229-1 at 12.) Though this order was not issued by Friday, February 12, 2016, as requested, it was issued on the first business day thereafter so as to allow Plaintiffs to respond in the interest of fairness and justice. *Cf.* FED. R. CIV. P. 1. Regardless, the reasons summarized therein have no bearing on the Motion for Stay's substantive merits, as analyzed in this order. *See infra* Part III.B.

3–4 (construing *Casey*, 505 U.S. at 887–95).) As the Fifth Circuit has recognized, "*Casey* counsels against striking down a statute *solely* because women may have to travel long distances to obtain abortions," (*Id.* at 4 (emphasis added) (quoting *Abbott II*, 748 F.3d at 598).)

Third, Plaintiffs characterize "Defendant's assertion that a 'large fraction' of women who seek abortions from Louisiana" will not be impacted when one doctor, rather than six, can legally provide such operations as "def[ying] common sense." (*Id.* at 4–5.) Fourth, the Court's calculations (and related findings) "were supported by substantial record evidence." (*Id.* at 5.) Fifth, Plaintiffs address Defendant's argument that this Court should have excluded non-Louisiana women from its calculations by stressing *Casey*'s focus on "women for whom the law is a restriction, not *women of a particular state* for whom the law is a restriction." (*Id.* (emphasis in original)) *Casey* did not even "mention[] the residency of the women affected by the challenged requirements." (*Id.* (construing *Casey*, 505 U.S. at 894).) Thus, because "Act 620 restricts the rights of all Americans seeking an abortion in the state of Louisiana" and because the large fraction test "contains no residency test," Defendant's reading lacks any legal support. (*Id.*) As further support for this proposition, Plaintiffs note that the Constitution forbids a state from infringing on the fundamental rights of out-of-state residents. (*Id.* (citing U.S. CONST. art. IV, § 2, and *Corfield v. Coryell*, 6 F. Cas. 546, (C.C. E.D. Pa. 1823)).) Defendant has essentially asked this Court to treat such women as "having no weight" for ascertaining the constitutionality of a restriction on a fundamental right, (*Id.*), though "[a] law that deprives out-of-state women of their constitutional rights is flatly unconstitutional," (*Id.* (citing *Doe v. Bolton*, 410 U.S. 179, 200, 93 S. Ct. 739, 751–52, 35 L. Ed. 2d 201 (1973)).)

The next two reasons concern Defendant's second argued ground for reversal. While Defendant insists that this Court should have given "due deference" to the Secretary's "opinion,"

which would have in turn diminished its large fractions, Plaintiffs first recount the nature of this

opinion. (*Id.* at 6.) The declaration came only "one business day before the [relevant] evidentiary

hearing," and the Secretary later testified that she had "limited knowledge and understanding of

the hospital admitting privileges process, including what type of hospital admitting privileges

meet Act 620's requirements." (*Id.* (referencing Doc. 191 at 202–07).) In fact, argue Plaintiffs,

Defendant's own expert contradicted her construction. (*Id.* at 7.) Second, pursuant to well-

established principles of administrative law and statutory interpretation,[7] this Court was bound to

construe Act 620 according to "its plain meaning" and, if it found the law to be both plain and

unambiguous, this alone determines its constitutionality. (*Id.*) Because the Court did so, Plaintiffs

maintain that precedent did not compel this Court to "uncritically defer to Secretary Kliebert's

flawed interpretation of the law" or to disregard its terms "solely on the basis of . . . [her]

assertions." (*Id.*) For these two reasons, the perception that this Court exceeded its jurisdiction is

"frivolous." (*Id.* at 8.)

   Plaintiffs' last three arguments focus on the remaining three elements for a stay's issue,[8]

Plaintiffs holding that "Defendant cannot establish that *any* of these factors weigh in her favor."

(*Id.* (emphasis in original).) Frist, Defendant has not hinted at any "damage" that would follow

from the injunction's imposition.[9] (*Id.* at 9 (citing to Doc. 216 ¶ 408, at 110).) Second, regardless

of the harm to Defendant effected by the Ruling, a stay of the injunction would harm numerous

---

[7] These principles are discussed below, *see infra* Part III.B.2, as well as in the Ruling, (Doc. 216 ¶¶ 235–49, at 64–69).

[8] Plaintiffs also disparage Defendant's attempt to address these issues in "two desultory sentences." (Doc. 232 at 8.)

[9] This statement is somewhat inaccurate. While Defendant did not prove any type of damages at trial, she does now maintain that she will suffer a form of irreparable harm. (Doc. 229-1 at 12.) Whether that form of harm outweighs others' injuries or the totality of the public interest is an entirely separate question. *See infra* Part III.B.2–5.

parties and persons, including the Plaintiffs, their physicians, and their patients. (*Id.* (citing to Doc. 216 ¶¶ 403–06, at 109–10).) Third, even as Defendant states that the public interest has merged with the Secretary's own and "offers a circular complaint," "the public interest is *best* served by not enforcing an unconstitutional state law." (*Id.* (emphasis added) (citing to Doc. 216 ¶ 409, at 111).)

As Plaintiffs ultimately conclude, with only compelling circumstances sufficient to support a stay, Defendant's purported failure to make a "strong showing that she is likely to succeed on the merits" and "to meaningfully address the remaining factors" compels denial of the Motion for Stay. (*Id.* at 9–10.)


## III.     DISCUSSION

## A.     GOVERNING STANDARD

Pursuant to Federal Rule of Appellate Procedure 8(a)(1)(A), "[a] party must ordinarily move first in the district court for . . . a stay of the judgment or order of a district court pending appeal." FED. R. APP. P. 8(a)(1)(A); *Rivera-Torres v. Ortiz Velez*, 341 F.3d 86, 95 (1st Cir. 2003). The district court must thereupon consider four factors in deciding whether to grant such a stay: "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Abbott I*, 734 F.3d at 410 & n.9 (relying on, among others, *Nken v. Holder*, 556 U.S. 418, 425–26, 129 S. Ct. 1749, 1756, 173 L. Ed. 2d 550 (2009)); *see also, e.g.*, *Wilde v. Huntington Ingalls, Inc.*, 616 F. App'x 710, 712 (5th Cir. 2015) (quoting *id.*); *Woodfox v. Cain*, 789 F.3d 565, 568–69 (5th Cir. 2015) (same). The movant bears the burden of

showing each and every circumstance, and a stay "is not a matter of right, even if irreparable injury might otherwise result to the appellant." *Nken*, 556 U.S. at 433–34; *see also, e.g.*, *Lair v. Bullock*, 697 F.3d 1200, 1203 (9th Cir. 2012) (citing *id.*). Although a particularly strong likelihood of success may negate the need to prove extensive harm, "an adequate showing" as to all factors must still be made. *Abbott I*, 734 F.3d at 419; *cf. Golden Gate Rest. Ass'n v. City & Cnty. of San Francisco*, 512 F.3d 1112, 1119 (9th Cir. 2008) ("[T]he standard for granting a stay is a continuum." (internal quotation marks omitted)).

Like the injunctive remedy that it so resembles, a stay is "always an extraordinary remedy." *Bhd. of Ry. & S.S. Clerks, etc. v. Nat'l Mediation Bd.*, 374 F.2d 269, 275 (D.C. Cir. 1966); *accord, e.g.*, *Nabers v. Morgan*, No. 3:09-cv-00070-CWR-FKB, 2011 U.S. Dist. LEXIS 28408, at *3, 2011 WL 830217, at *3 (S.D. Miss. Mar. 4, 2011) (quoting *id.*). The burden upon the movant is accordingly a heavy one. *United States v. Philip Morris USA, Inc.*, 449 F. Supp. 2d 988, 990 (D.D.C. 2006); *see also, e.g.*, *Phoenix Global Ventures, LLC v. Phoenix Hotel Assocs., Ltd.*, No. 04 Civ. 4991 (RJH), 2004 U.S. Dist. LEXIS 24079, at *8, 2004 WL 2734562, at *2 (S.D.N.Y. Nov. 29, 2004); *U.S. v. Private Sanitation Indus. Ass'n of Nassau/Suffolk, Inc.*, 44 F.3d 1082, 1084 (2d Cir. 1995). In the course of this analysis, imperfectly and roughly, equities must be balanced. *See, e.g.*, *Winter v. NRDC, Inc.*, 555 U.S. 7, 23, 129 S. Ct. 365, 376, 172 L. Ed. 2d 249 (2008) ("Even if plaintiffs have shown irreparable injury . . . , any such injury is outweighed by the public interest and the [balance of the equities]."); *Cuomo v. U.S. Nuclear Regulatory Comm'n*, 772 F.2d 972, 978 (D.C. Cir. 1985) (denying motion for stay when "the petitioners . . . failed to establish that they have a substantial case on the merits, and . . . further failed to demonstrate that the balance of equities or the public interest strongly favors the granting of a stay").

**B.      APPLICATION**

**1.      Likely Success on the Merits**

*(a)      Likelihood of Reversal for Failure to Apply Defendant's Version of the Undue Burden Test*

For Defendant to merit a stay on this first ground, she must prove that the Court's application of the standard set forth in *Roe*, *Casey*, and their Fifth Circuit descendants was in error. Under that precedent, the ultimate question for the Court was whether a likely effect of Act 620 is to place an undue burden or substantial obstacle in the path of women's right to an abortion. As noted above, *see infra* Part II.B.1, Defendant reduces the relevant test to a single formulation: "the Fifth Circuit determines the fraction of women burdened by an admitting privileges law by (1) taking the number of women who must travel significantly farther to reach a qualified provider, and (2) dividing by all women of reproductive age in the state." (Doc. 229-1 at 6 (citing to *Abbott I*, 734 F.3d at 415).) Her entire brief as to the probability of success on this first ground depends upon the incontestable soundness of this particular construction.

When *Roe*, *Casey*, *Abbott* I, *Abbott* II, and other recent cases are examined in toto, however, one conclusion follows: Defendant has read too narrowly the Fifth Circuit's test for determining whether the burden is "undue" or the obstacle "substantial" by arguing that the *sole* method for determining undue burden or substantial obstacle rests on the distance a woman must travel to reach a qualified provider. (Doc. 229-1 at 6.)  While it is true that the Fifth Circuit's recent jurisprudence considered distance travelled as *a* factor, *see, e.g.*, *Abbott I*, 734 F.3d at 415; *Abbott II*, 748 F.3d at 597–98, these cases do not hold or suggest that this is the only way that undue burden can be measured, *see, e.g.*, *Currier*, 760 F.3d at 457–58 (holding that where the effect of the law is to remove all access to abortions within a state, the law is unconstitutional).

Instead, since *Casey*, whether an undue burden exists has always been more than just a question of miles traveled. *See, e.g.*, *Casey*, 505 U.S. at 878 ("Unnecessary health regulations that have the purpose or effect of presenting a substantial obstacle to a woman seeking an abortion impose an undue burden on the right."). The full panoply of "effects within the regulating state" must be considered; distance is only one salient factor. *See Currier*, 760 F.3d at 457, 458.

Here, the critical issue is not distance but availability and access. In this case, the evidence showed that the effect of implementing Act 620's admitting privileges requirement would be to eliminate altogether the ability at least four of Louisiana's six abortion providers to perform abortions in Louisiana. (Doc. 216 ¶¶ 305–21, at 405–06.)[10] Of the two remaining doctors able to perform abortions, one would be unable to do so at one of the two facilities where he now performs abortions. (*Id.*)

Further, no fewer than three of Louisiana's five abortion facilities would be left without any provider and therefore would likely close. (*Id.*)[11] This would leave, at most, two facilities with half their normal staff of physicians to serve the entire state which, the evidence showed, could not be done. (*Id.*) This would result, regardless of the distances to be travelled, in a large fraction of women being unable to get an appointment at a Louisiana abortion facility *at all.* This would cause significant and potentially dangerous delays for women seeking an abortion which, in turn, would cause an increased health risk for the patient. (*Id.*) It would also result in an

---

[10] In its Ruling, the Court found as a matter of fact that Act 620 would cause the loss of five of Louisiana's six abortion physicians. (Doc 216 ¶¶ 298–302 at 78–80, ¶ 305 at 81.) However, because the reasons given by Dr. Doe 3 for discontinuing his abortion practice cannot be considered under Fifth Circuit precedent, Doe 3's likely departure from abortion practice was not considered. (*Id.* ¶ 363, at 98.)

[11] If Doe 3's likely departure could be considered, four of five of Louisiana's six abortion facilities would close. (Doc. 216 ¶¶ 305–21, at 81–85.) However, for reasons stated above, it was not.

increased risk of self-performed, unlicensed and unsafe abortions. (*Id*.) These are but some of the deleterious effects likely to flow from Act 620's enforcement, all of which must be borne in mind pursuant to *Casey*'s clear terms.

In sum, the Court rejects Defendant's suggestion that distance travelled is the sole criteria for gauging undue burden. Regardless of the issue of travel distance, Act 620's admitting privileges requirement would place a substantial obstacle in the path of a large fraction of women seeking an abortion in Louisiana. *Casey* itself, as Plaintiffs persuasively stress, (*See* Doc. 232 at 5), did not make distance the sole lodestar for measuring an undue burden; even in highlighting the usefulness of distance in this limited regard, neither has the Fifth Circuit. As such, Defendant's first argument seems unlikely to prevail on appeal.

### (b)     *Viability of Defendant's Proposed Numerator and Denominators*

Without citing to a single case so holding, (*See* Doc. 229-1 at 7–8), Defendant next argues that comparing the number of women no longer able to get an abortion in Louisiana (because of the probable loss of two thirds of the abortion physicians in Louisiana) to either the number of women seeking abortions in Louisiana or the number of women of reproductive age is not an "analysis prescribed by circuit law." (*Id.* at 7.) As this Court explained in the Ruling, (Doc 216 ¶¶ 35–58), in determining whether a law has caused a substantial obstacle to be placed in the path of a large fraction of women seeking an abortion, the Fifth Circuit's "binding precedent" requires that the number of women of reproductive age be used as the denominator. *Cole*, 790 F.3d at 589 (citing *Abbott I*, 734 F.3d at 414; *Abbott II*, 748 F.3d at 598; and *Lakey*, 769 F.3d at 299). But, because there is some suggestion that the denominator can consist only of women

"seek[ing] an abortion," *Cole*, 790 F.3d at 589 (quoting *Lakey*, 769 F.3d at 299), this Court used both numbers, the results equally unconstitutional.

Defendant begins with criticism of the numerator used by the Court: the number of patients who would no longer have ready access to an abortion because of the severely reduced number of available physicians and clinics. (Doc. 229-1 at 7–8). This number was calculated by subtracting the number of women being treated by doctors who would no longer be able to provide abortions because of Act 620, from the number of women who seek abortions in Louisiana annually. Alternatively, the Court subtracted that number of women from the total number of women of reproductive age in Louisiana.

The first basis for Defendant's attack is factual: Defendant's contention that "undisputed testimony" shows that the two doctors unaffected by Act 620, Doctors John Doe 3 ("Doe 3") and John Doe 5 ("Doe 5"), could have performed more abortions than they were actually performing. (*Id.* at 8.) This, argues Defendant, "significantly inflate[s]" the percentage of women denied access to abortion. (*Id*. at 7.) The Court is unpersuaded by this argument.

The source for the Court's finding that Doe 5 performed  2,950 abortions in 2013, (Doc. 216 ¶ 308, at 82), was Doe 3's Declaration, (JX 110 ¶ 7), in which he stated that he performed approximately 2,000 abortions at Delta Clinic and 950 abortions at Woman's Clinic. (JX 110 ¶ 7). The testimony cited by Defendant is not inconsistent with this conclusion. Doe 5 testified that, "in a typical week" he performed between 40 to 60 surgical abortions and 20 to 30 chemical abortions. (Doc 168-6 at 8.) At another point of his testimony, he lowered his estimate to 40 to 60 procedures per week "on average." (*Id*. at 15.) Given the fact that it is likely that Doe 3 is not performing abortions 52 weeks per year, the estimated ranges given in his deposition are consistent with the *yearly* estimate given in his Declaration. The Court carefully weighed the

evidence on this point and concludes that this number used in the Court's calculation is well supported in the record.

Doe 3 has an active general obstetrical practice in addition to his abortion practice. (Doc. 216 ¶ 56, at 22.) In his abortion practice, he testified that he sees approximately 20-30 abortion patients per week. This testimony was the basis for the Court's conclusion that, (assuming a 50 week work year), Doe 3 was seeing approximately 1,000 to 1,500 patients per year (*Id.* ¶ 58, at 22.) Defendant points to Doe 3's testimony that "there have been occasions at Hope when you've provided between 40 and 50 abortions in one day []," (Doc. 190 at 155), to argue that the Court's conclusion was in error. However, to base Doe 3's yearly abortion rate on an aberrational single day number, as Defendant suggests, would fly in the face of the weight of the evidence, contravene both common sense and reality, and unrealistically deflate the number of women denied access to abortion. It is the Court's duty to predict the realistic effect of Act 620 on the right of women to obtain an abortion in Louisiana. It is not for the Court (or for the Defendant) to presume that a party will choose to make the exceptional into the typical or to somehow force a person to abandon their every other professional effort just so as to manufacture a better number. Rather than indulging in speculation, the Court carefully weighed the evidence on this point and concludes that its calculation is well supported by the record.

Defendant thereafter contends that the Court erred in its alternative use of the total number of abortions performed in Louisiana in calculating the numerator because this population includes some patients from outside Louisiana. (Doc. 229-1 at 8.) Defendant points to evidence that non-Louisiana residents make up 31% of the patient population at one of the six clinics, (Hope in Shreveport). (Doc. 216 ¶ 31, at 18.) The cogency of this ground is undermined by three facts.

The first two are evidentiary. First, Defendant herself provided no additional evidence as to what percentage, if any, the other clinics' patients are from out of state, her present argument predicated on extrapolation. Relatedly, unless Louisiana somehow intends to bar its borders to out-of-state residents, Hope's *capacity* (and that of the other clinics) will remain practically circumscribed by its (and their) total number of patients, whether they come from within or without this state. Certainly, neither logic nor law compel this Court to pretend that such visits both do not happen and do not affect the ability of the clinics to provide abortion services to women *in* Louisiana as well as the women *of* Louisiana. *Cf. Cole*, 790 F.3d at 597–98 (describing it as "wholly inequitable to ignore . . . reality"). Second, even if one were to remove non-residents from the large fraction analysis, the percentage of Louisiana women denied access to an abortion remains the same, roughly 55%.[12] Mathematically, a fraction greater than 50% is still a large one.

Third (and more importantly), Defendant provides no legal support for her contention that non-residents must be excluded in the large fraction analysis, *Casey* holding to the contrary. As the Supreme Court there observed, "[l]egislation is measured for consistency with the

---

[12] For this analysis, the Court accepts Defendant's premise that 31% of the total annual patient population for all abortion facilities were nonresidents. This means that 69% of the total annual patient population for all abortion facilities were Louisiana residents. The total annual patient population for all abortion facilities was 9,976. 69% of this number is 6,883. The total number of women obtaining an abortion by Does 3 and 5 after Act 620 is enacted is 4,500. Critically, the same 31/69% ratio must be applied again at this point; this is critical because Louisiana women would have to compete with non-residents for the limited number of available abortion physicians, and access would likely be in the same proportion as with the total patient population. This means that 69% percent of women obtaining an abortion after Act 620 is implemented are Louisiana residents, and this total (69% of 4,500) is 3,105. Thus, the total number of women denied access to abortions after Act 620 - that is, 3,105 (total number of Louisiana women obtaining abortions after the Act) divided by 6,883 (total number of Louisiana women obtaining abortions before the Act) - is about 55%. 55% is, by any reasonable measure, a large fraction.

Constitution by its impact on those whose conduct if affects"; as it explicitly stated, "[t]he proper focus of constitutional inquiry is the group for whom the law is a restriction." *Casey*, 505 U.S. at 894. Similarly telling language appears in *Lakey*. *See Lakey*, 769 F.3d at 299 (emphasizing that the appropriate denominator includes "includes *all* women affected by these limited options," as the relevant requirement "applie[d] to every abortion clinic in the State, limiting the options for all women *in* Texas who seek an abortion" (emphases added)). Not to be understated, this understanding of the inviolability of a constitutional right can be partly justified by the Constitution's Privileges and Immunities Clause. U.S. CONST. art. IV, § 2, cl. 1; *see, e.g.*, *Sup. Ct. of N.H. v. Piper*, 470 U.S. 274, 281 n.11, 105 S. Ct. 1272, 1277, 84 L. Ed. 2d 205 (1985) ("The Court has never held that the Privileges and Immunities Clause protects only economic interests." (citing *Doe v. Bolton*, 410 U.S. 179 (1973) (concluding that a Georgia statute permitting only residents to secure abortions violated the Privileges and Immunities Clause))); *Bach v. Pataki*, 408 F.3d 75, 90 (2d Cir. 2005) ("The Supreme Court has never held that the Privileges and Immunities Clause protects only economic interests." (internal quotation marks omitted)). In fact, *Cole* itself cited to *Doe*, 790 F.3d at 569 n.5, in which the Supreme Court forbade a state from restricting the abortion access of out-of-state residents on the basis of this clause, *Doe*, 410 U.S. at 200.

For these reasons, this Court does not find that Defendant has made the strong showing of likely success on the merits as to this issue required for a stay to be granted.

### (c)   *Likelihood of Reversal on Basis of Non-deference*

Lastly, this Court finds that Defendant's administrative law argument is not a likely ground for reversal. In Defendant's view, the fact that she has once declared her intent to

interpret Act 620 in a way that minimizes its effects upon Doe 2 "settle[s] the question of the Act's impact," her authority to enforce the law affording her discretion to do so, and has deprived this Court of the power to deem the law as written to be unconstitutional. (Doc. 229-1 at 9–10.) To do otherwise, Defendant argues, is to impermissibly "bind state officials to . . . [a federal court's] interpretation of state law." (*Id.* at 10.)

Defendant's first point, however, cannot be squared with the binding principle that "[a]gencies exercise discretion only in the interstices created by statutory silence or ambiguity." *Util. Air Regulatory Grp.*, 134 S. Ct. at 2442; *see also, e.g.*, *Sexton v. Panel Processing, Inc.*, 754 F.3d 332, 336 (6th Cir. 2014) (rejecting an agency interpretation as contrary to the statutory language as interpreted). As this Court stressed in the Ruling, "no deference is owed to an opinion contrary to . . . [a] law's unambiguous and plain meaning." (Doc. 216 ¶ 236, at 64.) Under both Louisiana and federal law, deference is hence only given when the statute is truly "ambiguous" regarding the precise "question at issue" and if the agency's interpretation is a "reasonable" and hence "permissible construction of the statute" at hand. (*Id.* ¶¶ 237–38, at 65–66.) In other words, if the law's certain meaning can be discerned via the standard array of interpretive tools, *Robinson v. Shell Oil Co.*, 519 U.S. 337, 341, 117 S. Ct. 843, 846, 136 L. Ed. 2d 808 (1997), an administrative actor cannot imbue its text with any other meaning by exercising its supposed discretionary prerogative, *see, e.g.*, *Doctors Hosp. of Augusta v. Dep't of Health & Hosps.*, 2013 1762 (La. App. 1 Cir. 09/17/14); 2014 La. App. Unpub. LEXIS 481, at *19–20, 2014 WL 4658202, at *7. Despite the rise of the administrative state, then, what was said in 1803 remains equally true today: "It is the province and duty of the judicial department to say what the law is," *Marbury v. Madison*, 5 U.S. 137, 177, 2 L. Ed. 60 (1803), an agency accorded deference solely when a law's plain and unambiguous import is not susceptible to

definite derivation, *see Salazar-Regino v. Rominski*, 415 F.3d 436, 448 (5th Cir. 2005) (citing this maxim in the context of weighing the reasonableness of an agency's particular interpretation). Plainly and unambiguously, Act 620 does not recognize Doe 2's privileges as sufficient. Notwithstanding the Secretary's assessment, that plain meaning must control when a court must classify a physician's so-called "admitting privileges" for its purposes, a fact that depletes Defendant's second ground of its essential likelihood.

Defendant's second claim, meanwhile, misconstrues the modest effect of the Ruling and Judgment. In deeming the Secretary's interpretation unpersuasive due to its inconsistency with the Act's express text, her own expert's statements, and her less than clear testimony, this Court did not order her to conform to its own view of state law, as *Pennhurst* and its progeny forbid, *see, e.g.*, *Pennhurst*, 465 U.S. 89. Whether she would or would not act as the statute plainly commands was not relevant to whether Act 620, as written and enacted, imposed an undue burden upon the exercise of a recognizable constitutional right. As such, this Court did not order the Secretary to adhere to a particular state law or enforce its own construction of that statute. Subject to a later trial, it preliminarily held the admitting privileges requirement to be unconstitutional. The result of such a determination—that the Secretary cannot enforce an unconstitutional state law—does not mean she was ordered to enforce it in accordance with this Court's own terms, as no enforcement was actually demanded.

In addition, Defendant has misread *Pennhurst*. In this seminal case, the Supreme Court held that the Eleventh Amendment bars federal injunctive relief against a state official if (1) "the judgment sought would expend itself on the public treasury or domain, or interfere with the public administration, or if the effect of the judgment would be to restrain the Government from acting, or to compel it to act," and (2) "if the conduct to be restrained is within the scope of

authority delegated to the official by state law." *Pennhurst*, 465 U.S. at 101 n.11, 102 (internal quotation marks omitted). Thus, in other circumstances, federal jurisdiction over a claim based on the existence of a federal question is not barred under *Pennhurst* even when "the resolution of . . . constitutional issues . . . requires this court to ascertain what state law means." *Coalition of N.J. Sportsmen, Inc. v. Whitman*, 44 F. Supp. 2d 666, 673 (D.N.J. 1999). For this very reason, in soundly rejecting an argument akin to Defendant's own, the Third Circuit has observed—"The ascertainment of state law is an everyday function of the federal court"—and clarified: "[A]scertaining state law is a far cry from compelling state officials to comply with it." *Everett v. Schramm*, 772 F.2d 1114, 1119 (3d Cir. 1985); *cf., e.g.*, *Okpalobi v. Foster*, 190 F.3d 337, 349 (5th Cir. 1999) ("We are convinced that Article III does not require a plaintiff to plead or prove that a defendant state official has enforced or threatened to enforce a[n abortion-related] statute in order to meet the case or  controversy requirement when that statute is immediately and coercively self-enforcing."), *superseded on other grounds*, 244 F.3d 405 (5th Cir. 2001). No less and no more was done by this Court in the Ruling when it rejected Kliebert's construal, embodied in a single declaration lacking in the formal trappings of the most considered agency interpretations.

Three more observations are in order. First, even as she makes a plea for deference based on her role as Secretary of DHH, Defendant simultaneously demands to be released from the obligations to earn such deference. As emphasized above, as a matter of state and federal law, such deference can only come when the law in question has a meaning neither plain nor unambiguous. (*See also* Doc. 216 ¶ 236, at 64 (collecting the relevant cases).) The Secretary, however, has insisted upon such deference without meeting a single predicate; more colloquially put, she wishes to have her cake and eat it too. Second, no exercise of discretion can suddenly

transform an unconstitutional law into a constitutional stricture, and no administrative agent can insulate a plain law from constitutional scrutiny by demanding that a court forsake its duty under Article III. *Cf., e.g.*, *Int'l Soc'y for Krishna Consciousness v. Eaves*, 601 F.2d 809, 818 (5th Cir. 1979) (noting that "there is clear Supreme Court authority that the probability of enforcement is not relevant to a court" jurisdiction over an anticipatory challenge" to a statute). Due to this reason, the extent to which the Secretary's interpretation benefitted Doe 2 is irrelevant, as is his possible lack of standing to sue her. Regardless of her opinion, his privileges still do not satisfy the law as naturally construed, and as this Court is bound to apply the law's plain and unambiguous meaning, the beneficent effects of her construction cannot justify disregarding Act 620's language. Just as surely, the questionable claim that Doe 2 may lack standing to sue the Secretary[13] does not mean he was not impacted by Act 620's passage or enforcement,[14] and the fact that Kliebert's successor could change her mind about how to enforce the law does not deprive this Court of the power to declare it unconstitutional. *Cf., e.g.*, *Virginia v. Am.*

---

[13] "[W]here the plaintiff faces a credible threat of enforcement," standing exists. *Consumer Data Indus. Ass'n v. King*, 678 F.3d 898, 907 (10th Cir. 2012); *cf. Babbitt v. UFW Nat'l Union*, 442 U.S. 289, 298 99 S. Ct. 2301, 2308, 60 L. Ed. 2d 895 (1979) (finding standing where "a realistic danger of sustaining a direct injury as a result of a statute's operation *or* enforcement" existed (emphasis added)). In these situations, a plaintiff is typically "not . . . required to await and undergo [enforcement] as the sole means of seeking relief." *Consumer Data Indus. Ass'n*, 678 F.3d at 907; *see also, e.g.*, *Sindicato Puertorriqueño de Trabajadores v. Fortuño*, 699 F.3d 1, 9 (1st Cir. 2012) ("[T]he Supreme Court has made clear that when a plaintiff alleges an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder, he should not be required to await and undergo a criminal prosecution as the sole means of seeking relief." (internal quotation marks omitted)); *R.I. Ass'n of Realtors v. Whitehouse*, 199 F.3d 26, 33 (1st Cir. 2002) ("[T]he Supreme Court repeatedly has found standing to mount pre-enforcement challenges to laws that had never been enforced.").

[14] In fact, that possibility strengthens the argument for denying deference to the Secretary's decision. To wit, if he could not "challenge the Secretary's application of the Act under *Chevron*," (Doc. 229-1 at 10–11), whatever it is, the legal foundation for her exercise of discretion should be clearly defined. Otherwise, injury with impunity may follow though both Louisiana and federal law bar "arbitrary" and "capricious" administrative action.

*Booksellers Ass'n, Inc.*, 484 U.S. 383, 392-93, 108 S. Ct. 636, 98 L. Ed. 2d 782 (1988) (holding

that the injury-in-fact requirement was met, in part, because "plaintiffs have alleged an actual

and well-founded fear that the law will be enforced against them"); *Steffel v. Thompson*, 415

U.S. 452, 459, 94  S. Ct. 1209, 39 L. Ed. 2d 505 (1974) ("[I]t is not necessary that [a party] first

expose himself to actual arrest or prosecution to be entitled to challenge a statute that he claims

deters the exercise of his constitutional rights."). That variability is irrelevant when the plain

meaning leaves no other course open. Finally, even as it is still unclear what kind of deference

the Secretary would like this Court to give her, her opinion appears in a single declaration

submitted to this Court shortly before a hearing as a tool of litigation.[15] (*See* Doc. 232 at 6.)

Even putting aside its dubiousness in light of the Secretary's subsequent questioning, it simply

does not resemble the kind of formal agency opinions to which the greatest deference is owed.

*See United States v. Mead Corp.*, 533 U.S. 218, 121 S.Ct. 2164, 150 L. Ed. 2d 292 (2001)

(explicating the various forms of agency deference).

When controlling principles are applied, it is clear that Act 620, as drafted and signed,

does "pose[]" a "present barrier to Doe 2's abortion practice in the New Orleans area," (Doc.

229-1 at 11), an interpretation consistent with that of Defendant's own expert, (*See, e.g.*, Doc.

193 at 94, 123; Doc. 216 ¶¶ 241–42, at 67), and not strongly alleviated by her one declaration.

While well-established law compels this result, binding precedent clinches it: as the Fifth Circuit

itself has written, "[t]o determine the constitutionality of a state law, we ask whether the Act,

*measured by its text* in this facial attack, imposes a substantial obstacle to . . . previability[]

abortions." *Lakey*, 769 F.3d at 293 (alteration in original) (emphasis added) (internal quotation

---

[15] The relevant declaration was submitted on June 19, 2015, (Doc. 154), and her entire opinion is
embodied in a single paragraph, (*Id.* ¶ 6, at 3).

marks omitted). Hence, upon careful scrutiny, this final purported error thus does not form a likely ground for reversal.

**2.      Irreparable Harm to the Appellant**

On this issue, the law is clear. "When a statute is enjoined, the State necessarily suffers the irreparable harm of denying the public interest in the enforcement of its laws." *Abbott I*, 734 F.3d at 419; *see also, e.g.*, *Veasey v. Perry*, 769 F.3d 890, 895 (5th Cir. 2014). The second element for a stay pending appeal has thus been suitably shown.

**3.      Injury to Others**

Yet, as the Ruling makes clear, Plaintiffs and other persons will also endure great harm if Act 620 is enforced and thus if the Motion for Stay is granted. (Doc. 216 ¶¶ 364–91 at 99–106, ¶¶ 404–06 at 110.) The plaintiff clinics will face nearly insurmountable hurdles and may find themselves without a doctor able to provide abortions to a single woman, operations so sharply curtailed as to possibly prompt their closure; logically, their medical and administrative staff will suffer derivative yet equally harmful effects. *See, e.g.*, *Jackson Women's Health Org. v. Currier*, 940 F. Supp. 2d 416, 424 (S.D. Miss. 2013), *aff'd in part*, 760 F.3d 448. Most significantly, the women of Louisiana will face irreparable harms from the burdens associated with finding an abortion clinic with sufficient capacity to perform their abortions; "unreasonable and dangerous delays in scheduling abortion procedures" will likely follow from a decrease in the total number of available doctors. (Doc. 216 ¶¶ 404–06 at 110.) Crucially, "the deprivation of [any and all] constitutional rights," whether arising from the First, Second, or Fourteenth Amendment, has always "constitute[d] irreparable harm as a matter of law." *Cohen v. Coahoma Cnty., Miss.*, 805

F. Supp. 398, 406 (N.D. Miss. 1992) (citations omitted); *see also, e.g.*, *Deerfield Med. Ctr. v. Deerfield Beach*, 661 F.2d 328, 338 (5th Cir. 1981). Consequently, as with Act 620, the issuance of a stay will likely inflict an array of substantial injuries on the sundry parties interested in this proceeding, likely subjecting many to economic and physical injury and thousands of women to harm as irreparable as Defendant's own.[16] These are harms to which Defendant has given no persuasive response, (*See* Doc. 232 at 8–9), no "adequate" demonstration of this factor made, (*See* Doc. 229-1 at 12).

### 4.    Public Interest

In addressing the final factor, Defendant maintains that its interest in enforcing Act 620 "merge[s] with that of the public." (Doc. 229-1 at 12 (citing *Abbott I*, 734 F.3d at 419).) True, "[a]ny time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." *Maryland v. King*, 133 S. Ct. 1, 3, 183 L. Ed. 2d 667 (2012). But the public interest, for purposes of ordering a stay, is never so monolithic. In declaring its apparent desire, no state entity, whether legislature or governor or both, annuls the countervailing concerns and rights of a state's every citizen. If so, this final factor will always favor the issuance of a stay when a state law, though found to be likely unconstitutional, is

---

[16] Thus, the Defendant misapplies *Abbott I* when she says that "[g]iven the State's likelihood of success on the merits, *any* showing of harm plaintiffs might make is not enough, standing alone to outweigh the other factors." (Doc. 229-1 at 12 (emphasis added) (citing *Abbott I*, 734 F.3d at 419).) First, Defendant has failed to show a likelihood of success on the merits. Further, in *Abbott I*, the Fifth Circuit expressly stated that the appellant had "adequate[ly]" shown every other factor, including "whether issuance of the stay will substantially injure the other parties interested in the proceeding." 734 F.3d at 419. The Fifth Circuit did not suggest that a strong likelihood of success, even if found, somehow made "any showing of harm" irrelevant. (Doc. 229-1 at 12.) It simply stated the "strong harm" shown by a plaintiff was not itself enough considering defendant's sufficient showing of every other factor. (*Id.*)

challenged, no further analysis ever required. As case law well shows, however, the public interest to be weighed is broader than a state's asserted claim. Indeed, as the Fifth Circuit has noted, "it is always in the public interest to prevent the violation of a party's constitutional rights," *Currier*, 760 F.3d at 458 n.9 (quoting *Awad v. Ziriax*, 670 F.3d 1111, 1132 (10th Cir. 2012)), and not too much forbearance is required when the relevant law has never gone into effect, *cf. R.I. Med. Soc'y v. Whitehouse*, 66 F. Supp. 2d 288, 303 (D.R.I. 1999). Thus, two different public interests here exist and must be set against each other, the state's asserted claim but one amidst many equally viable others.

**5.      The Balance**

As the foregoing shows, the balance of factors clearly calls for the denial of the Motion for Stay. Defendant has failed to make the required strong showing of a likelihood of success on the merits, and thus the first factor favors denial. Per binding precedent, the second factor favors Defendant, but the third favors Plaintiffs as the injuries which others will endure with a stay's granting are likely to be substantial in comparison to Defendant's lone form of irreparable injury. As to the fourth factor, while there are competing public interests involved, preventing the violation of a constitutional right, in this case, prevails, especially since denying the Motion for Stay merely maintains the status quo.

**IV.      CONCLUSION**

For the foregoing reasons, the overall balance of factors and justice counsels against a stay of the Ruling and Judgment. Based on the Supporting Memorandum, Defendant's probability of success is too low relative to the likely harms that will be inflicted upon Plaintiffs

(and others) and in light of the public interest, fully and holistically considered. Accordingly,

**Defendant's Motion for Stay Pending Appeal, for Expedited Consideration, and for**

**Temporary Stay, (Doc. 229), is DENIED**.

      Signed in Baton Rouge, Louisiana, on <u>February 16, 2016</u>.


                                       _____

**JUDGE JOHN W. deGRAVELLES**
**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**