**UNITED STATES DISTRICT COURT**

**MIDDLE DISTRICT OF LOUISIANA**

JUNE MEDICAL SERVICES LLC d/b/a HOPE
MEDICAL GROUP FOR WOMEN, on behalf of
its patients, physicians, and staff; BOSSIER
CITY MEDICAL SUITE, on behalf of its
patients, physicians, and staff; CHOICE, INC.,
OF TEXAS, d/b/a CAUSEWAY MEDICAL
CLINIC, on behalf of its patients, physicians,
and staff, JOHN DOE 1, M.D., AND
JOHN DOE 2, M.D.

                                                        **CIVIL ACTION**

VERSUS

                                                      **NO. 14-CV-00525-JWD-RLB**

KATHY KLIEBERT, in her official capacity as
Secretary of the Louisiana Department of Health
and Hospitals and MARK HENRY DAWSON,
M.D., in his official capacity as President of the
Louisiana State Board of Medical Examiners

**<u>FINDINGS OF FACTS AND CONCLUSIONS OF LAW</u>**

# TABLE OF CONTENTS

**OVERVIEW - 1**

**I.**      **Introduction - 1**

**FINDINGS OF FACT - 11**

**II.**      **Background and Procedural History - 11**

**III.**     **Contentions of the Parties - 18**

**IV.**     **The Factual Issues - 19**

**V.**      **Abortion in Louisiana - 20**

     **A.**     **Generally - 20**

     **B.**     **The Clinics - 21**

          *(1)*     *Hope* **- 21**

          *(2)*     *Bossier* **- 21**

          *(3)*     *Causeway* **- 22**

          *(4)*     *Women's Health* **-23**

          *(5)*     *Delta* **- 23**

     **C.**     **The Doctors - 24**

          *(1)*     *Doe 1* **- 24**

          *(2)*     *Doe 2* **- 25**

          *(3)*     *Doe 3* **- 26**

          *(4)*     *Doe 4* **- 27**

          *(5)*     *Doe 5* **- 27**

          *(6)*     *Doe 6* **- 28**

  **D.**  **Admitting Privileges in Louisiana - 28**

  **E.**  **The Climate - 41**

**VI.** **Act 620 - 46**

  **A.**  **Text of Act 620 and Related Provisions - 46**

  **B.**  **Louisiana's Policy and Past Legislation Regarding Abortion - 48**

  **C.**  **Drafting of Act 620 - 51**

  **D.**  **Official Legislative History of Act 620 - 52**

**VII.** **The Purpose and Medical Reasonableness of Act 620 - 56**

  **A.**  **Expert Testimony - 58**

  **B.**  **Abortion Safety - 61**

  **C.**  **Requiring Abortion Practitioners to Obtain Admitting Privileges Confers No Medical Benefit - 67**

**VIII.** **Efforts of Doctors to Comply With Act 620 and the Results of Those Efforts - 71**

  **A.**  **Doe 1 - 71**

  **B.**  **Doe 2 - 75**

  **C.**  **Doe 3 - 86**

  **D.**  **Doe 4 - 87**

  **E.**  **Doe 5 - 88**

  **F.**  **Doe 6 - 90**

  **G.**  **Post-Trial Updates - 92**

**IX.** **Effects of Act 620 - 92**

  **A.**  **The Effect of Act 620 on Doe 1–6 - 92**

**B.**     The Effect of Act 620 on the Clinics and Women of Louisiana - 97

**C.**     The Real-World Effect of Act 620 on Louisiana Women - 101

**<u>CONCLUSIONS OF LAW</u> - 105**

**<u>X.</u>     <u>Summary of Legal Arguments</u> - 105**

**<u>XI.</u>     <u>Test for Determining the Constitutionality of Act 620</u> 106**

**<u>XII.</u>     <u>Analysis</u> - 109**

**A.**     Act 620 Does Not Protect Women's Health -109

**B.**     The Burdens Imposed by Act 620 - 111

**C.**     The Burdens Imposed by Act 620 Vastly Outweigh its Benefits - 113

**<u>XIII</u>**.     **<u>Conclusion</u> - 113**

# OVERVIEW

## I. Introduction

Since this Court issued a preliminary injunction in this matter, the Supreme Court has held that the Fifth Circuit's interpretation of the undue burden test was incorrect. *Whole Woman's Health v. Hellerstedt*, 136 S. Ct. 2292, 2309 (2016) (hereinafter "*WWH*") ("The Court of Appeals' articulation of the relevant standard is incorrect."). In its ruling, this Court's conclusions of law applied the Fifth Circuit's legal standard, which *WWH* reversed. Specifically, this Court initially concluded, in line with Fifth Circuit precedent, that it could not consider evidence regarding whether the Act would actually serve its purported purpose to advance women's health and safety in practice, and could not weigh the Act's burdens against its benefits. (Doc. 216 ¶¶ 178, 333–35, 346, 351–52, 364–67, 372) (citing, *inter alia*, *Whole Woman's Health v. Cole*, 790 F.3d 563, 587 n.33 (5th Cir. 2015)). Accordingly, this Court ruled it could not resolve the parties' dispute over whether the Act is medically reasonable. (*Id*. ¶ 178(C) & n.41.)

In addition, this Court held the undue burden test, as applied in the Fifth Circuit, precluded consideration of evidence related to the challenges women would face in obtaining abortions under the Act in their "real-world" context. (*Id*. ¶¶ 340-43) (citing, *inter alia*, *Cole*, 790 F.3d at 589). This Court therefore did not consider evidence regarding how the Act, when considered in the real-world context of abortion patients' poverty and transportation challenges, providers' fear of anti-abortion violence, pre-existing regulations, and other obstacles to abortion access, would impose unique burdens on Louisiana women. (*Id*. ¶ 344.) The Supreme Court has now clarified that these facts should be considered when evaluating whether an abortion restriction is constitutional. *See WWH*, 136 S. Ct. at 2302, 2312–13.

The Supreme Court held in *WWH* that restrictions on access to abortion before viability must be subject to meaningful judicial scrutiny: rational basis review is simply not enough when "regulation of a constitutionally protected personal liberty" is at issue. *WWH*, 136 S. Ct. at 2309. Rather, under the undue burden analysis, a restriction must be shown to actually "further" its purported interest, and it is constitutional only if its benefits outweigh its burdens. *See id.* at 2309–10. Additionally, in evaluating a restriction's benefits and burdens, courts must not simply defer to a State's assertions about any purported benefits or burdens, but must consider actual evidence. *See id.* at 2310–12. The Court explained its reasons for rejecting the Fifth Circuit's analysis:

> The rule announced in [*Planned Parenthood of Southeast Pennsylvania v. Casey*, 505 U.S. 833 (1992)] . . . requires that courts consider the burdens a law imposes on abortion access together with the benefits those laws confer. And the [Court of Appeals was] wrong to equate the judicial review applicable to the regulation of a constitutionally protected personal liberty with the less strict review applicable where, for example, economic legislation is at issue. The Court of Appeals' approach simply does not match the standard that this Court laid out in *Casey*, which asks courts to consider whether any burden imposed on abortion access is "undue."

*Id*. at 2309–10 (citations omitted). Thus, *WWH* makes clear that courts have a "constitutional duty" to look beyond a State's assertions for restricting access to abortion to evaluate whether the restrictions at issue will actually advance any legitimate interests. *Id.* at 2310.

Further, the Supreme Court specifically affirmed the relevance of evidence related to medical reasonableness and "real-world" conditions in evaluating a law's furtherance of its purported interest and its burdens on women seeking abortion. *Id*. at 2301–03, 2312–13. Thus, the Court recounted with favor the finding of the District Court that "[t]he great weight of evidence demonstrates that, before the act's passage, abortion in Texas was extremely safe with particularly low rates of serious complications and virtually no deaths occurring on account of the procedure."

*Id.* at 2302. It affirmed that abortion "has been shown to be much safer, in terms of minor and serious complications, than many common medical procedures not subject to such intense regulation and scrutiny," and that the challenged laws would not decrease risks, improve outcomes, or result in better care. *Id.* It also relied upon the district court's findings that the "requirements erect a particularly high barrier for poor, rural, or disadvantaged women." *Id.* The Court also clarified that no single factor is determinative as to whether a restriction imposes an undue burden, but rather the burdens' impact must be evaluated cumulatively, and are undue if unjustified by the law's purported benefits. *Id*. at 2313.

While this Court determined that the challenged Act was unconstitutional even under the Fifth Circuit's now-rejected interpretation of the undue burden test, as a result of the *WHH* decision, certain facts that Defendant argued were not legally relevant are now indisputably relevant and, indeed, critical to the constitutional analysis. To summarize, under *WWH*, this Court must consider (a) evidence regarding whether and how the restriction furthers the legislature's purported interest, which in this case, includes the Act's medical reasonableness, and (b) evidence regarding the actual burdens the restriction places on women seeking abortions. The Court must then assess the burdens and benefits of the restriction, and weigh the former against the latter to ensure that the burden the law imposes is not "undue." A re-evaluation of certain of the Court's conclusions of law also necessarily flows from applying the standard articulated by the Supreme Court.

By Order dated January 26, 2016 (Doc. 216), and following a trial during which extensive evidence was submitted into the record, this Court preliminarily enjoined Defendant Rebekah Gee,

in her official capacity as Secretary of the Louisiana Department of Health and Hospitals, from enforcing Section A(2)(a) of Act Number 620, amending Louisiana Revised Statutes § 40:1299.35.2.3 ("the Act" or "Act 620"),[1] against Plaintiffs June Medical Services LLC, d/b/a Hope Medical Group for Women ("Hope" or "Hope Clinic"); Bossier City Medical Suite ("Bossier" or "Bossier Clinic"); Choice Inc., of Texas, d/b/a Causeway Medical Clinic ("Choice" or "Causeway") (collectively, "Plaintiff Clinics"); Dr. John Doe, M.D. 1 ("Doe 1")[2] and Dr. John Doe, M.D. 2 ("Doe 2") (collectively, "Plaintiff Doctors") (collectively, "Plaintiffs"). (Doc. 5.) Now before the Court are the parties' contentions with regard to a permanent injunction in this matter.

The Court requested supplemental proposed findings of fact and conclusions of law from the parties on a permanent injunction following the parties' agreement that the Court may proceed to rule on the permanent injunction – including additional findings of fact and conclusions of law required by *WWH* – based on the existing record (Doc. 253). The parties further agreed that no further evidence is needed, apart from short stipulations submitted jointly by the parties and accepted by the Court, (Docs. 255, 265, 271), and an affidavit of Dr. Doe 2. (Doc. 272.) Therefore, pursuant to Federal Rule of Civil Procedure 65(a), and with the consent and agreement of the parties, the Court advances to the merits of the permanent injunction, consolidating it with

---

[1] A copy of the final bill appears as a joint exhibit, (JX 115), and in other filings, (*See, e.g.*, Doc. 168-10 at 39–43). As the statute was subsequently codified, and as a statute's language need not be evidenced to be known, this Court will cite to Act 620 as codified. The Court does so throughout this opinion unless it is recounting, as it later does, *see infra* Part VI, Act 620's legislative history. In this Ruling, any and all references to "Section []" or "§ []" are to Act 620 as codified in Louisiana Revised Statutes. Act 620 also amended Sections 1299.35.2.1 and 2175.3(2) and (5).

[2] The identities of the Plaintiff Doctors as well as the other Louisiana abortion physicians who are not parties–Doctors. Doe 3, 4, 5, and 6 (individually, "Doe 3," "Doe 4," "Doe 5," "Doe 6")–are protected by virtue of two protective orders. (Docs. 24, 55.) Rather than repeating the formulation "Dr. Doe []," this Court opts for the simpler "Doe []" and, only occasionally, "Dr. Doe []."

the hearing on the preliminary injunction. The record from the preliminary injunction trial is part of the merits trial record, together with the stipulations of the parties.

The hearing on the Motion for Preliminary Injunction was held from June 22, 2015, through June 29, 2015. (Docs. 163–64, 166, 169, 174.) At the hearing, the Court received evidence in the form of live witness testimony, exhibits, stipulations, and designated deposition testimony agreed by Plaintiffs and Defendant (collectively, "Parties") to be received in lieu of certain witness' live testimony. Plaintiffs presented live testimony from the following witnesses:

- Doe 1;

- Doe 2;

- Doe 3;

- Ms. Kathaleen Pittman ("Pittman"), June's administrator; and

- Kliebert; and

- Three experts, specifically:

  - Doctor Christopher M. Estes ("Estes"), Chief Medical Officer of Planned Parenthood of South Florida and the Treasure Coast, (PX 92);

  - Doctor Sheila Katz ("Katz"), an assistant professor at the University of Houston, (JX 91); and

  - Doctor Eva Karen Pressman ("Pressman"), the Henry A. Thiede Professor and Chair of The Department of Obstetrics and Gynecology at The University of Rochester, (PX 94).

Defendant presented live testimony at trial from the following witnesses:

- Ms. Cecile Castello ("Castello"), Director of Health Standards Section ("HSS") for DHH; and

- Three other experts, specifically:

    - Doctor Robert Marier ("Marier"), Chairman of the Department of Hospital Medicine at Ochsner Medical Center in New Orleans, (DX 146);

    - Doctor Tumulesh Kumar Singh Solanky ("Solanky"), a professor and the chair of the Mathematics Department at the University of New Orleans, (DX 148); and

    - Doctor Damon Thomas Cudihy ("Cudihy"), an obstetrician-gynaecologist ("OB/GYN," "Ob/Gyn," "OBG," or "O&G") currently licensed to practice medicine in Louisiana and Texas, (DX 147).

A record of the exhibits admitted into evidence was filed. (Doc. 165.) A record of the deposition testimony designated by the Parties and offered into evidence was also docketed. (Doc. 168.[3]) In addition, the Parties submitted proposed findings of fact and conclusions of law, (Docs. 196, 200), and responses to each other's proposed findings and conclusions, (Docs. 201, 202). Additional stipulations of fact were submitted by the parties. (Docs. 224, 255, 265, 271.)

In making the following findings of fact and conclusions of law, the Court has considered the record as a whole. The Court has observed the demeanor of witnesses and has carefully weighed their testimony and credibility in determining the facts of this case and drawing conclusions from

---

[3] Cochran's deposition appears in Document 168-4, Doe 4's in Document 168-5, Doe 5's in Document 168-6, Ms. Hedra Dubea's in Document 168-7, Mr. Robert Gross' in Document 168-8, Ms. Dora Kane's in Document 168-9, Doctor Cecilia Mouton's in Document 168-10, and Ms. Jennifer Christine Stevens in Document 168-11.

those facts. All findings of fact contained herein that are more appropriately considered conclusions of law are to be so deemed.[4] Likewise, any conclusions of law more appropriately considered a finding of fact shall be so classified.[5]

After having considered the evidence, briefing, and record as a whole, for the reasons which follow, the Court declares Act 620 unconstitutional in all of its applications, and enters a permanent injunction barring its enforcement. The active admitting privileges requirement of Section A(2)(a) of Act 620 is found to be a violation of the substantive due process right of Louisiana women to obtain an abortion, a right guaranteed by the Fourteenth Amendment of the United States Constitution as established in *Roe v. Wade*, 410 U.S. 113 (1973), and pursuant to the test first set forth in *Planned Parenthood of Southeastern Pennsylvania v. Casey*, 505 U.S. 833 (1992) ("*Casey*"), and subsequently refined in *Whole Woman's Health v. Hellerstedt*, 136 S. Ct. 2292, 2319 (2016) (hereinafter "*WWH*"). Act 620 is therefore declared unconstitutional, and its enforcement enjoined in all of its applications.

## FINDINGS OF FACT

### II.     Background and Procedural History

1. Plaintiffs are:

-        Hope, a licensed abortion clinic located in Shreveport, Louisiana, suing on behalf of its physicians, staff and patients;

---

[4] For an example of such an approach, see Doc. 14021, No. 2:10-md-02179-CJB-SS (E.D. La. Jan. 15, 2015).

[5] *Id.*

- Bossier, a licensed abortion clinic located in Bossier City, Louisiana, suing on behalf of its physicians, staff, and patients;[6]

- Choice, a licensed abortion clinic suing on behalf of its physicians, staff, and patients;

- Doe 1, a physician licensed to practice medicine in the State of Louisiana and board-certified in Family Medicine and Addiction Medicine, suing on his own behalf and that of his patients; and

- Doe 2, a physician licensed to practice medicine in the State of Louisiana and board-certified in OB/GYN, suing on his own behalf and that of his patients.

2. Dr. Rebekah Gee, ("Defendant," "Gee," or "Secretary,") is the Secretary of DHH.[7] Pursuant to § 40.2175.6, Gee "has the authority to revoke or deny clinics' licenses for violation of this or any other law." (Doc. 109 at 5 (citing La. Rev. Stat. § 40:2175.6).)

3. On August 22, 2014, Plaintiffs filed the Complaint for Declaratory and Injunctive Relief, (Doc. 1), and the Application, (Doc. 5), seeking to enjoin various defendants from enforcing Act 620's Section (A)(2)(a). (Doc. 5-2 at 2–5.)

4. Act 620 has been codified at an amended Section 40:1299.35.2. LA. R.S. § 40:1299.35.2. Section A(2)(a) requires every doctor who performs abortions in Louisiana to have "active admitting privileges" at a hospital within 30 miles of the facility where abortions are performed. *Id.* § 40:1299.35.2A(2)(a). While the Act contains other requirements, this provision is the only one

---

[6] On or about March 30, 2017, Plaintiff Bossier ceased business and surrendered its license, returning it to DHH. (Doc. 271.)

[7] Secretary Gee took office in January 2016, replacing former Secretary of DHH Kathleen Kliebert, who was originally named in this lawsuit. Throughout these findings of fact and conclusions of law, references to "Secretary," "Secretary Gee," "Secretary Kliebert," "Gee" or "Kliebert," should be read as references to the Secretary of DHH.

being challenged. (Doc 5-1 at 8 n.1.) Act 620 was signed into law by the Governor of Louisiana, the Honorable Piyush "Bobby" Jindal ("Jindal" or "Governor"), on June 12, 2014. (Doc. 138 at 2; *see also, e.g.*, H.B. 388, 2014 Leg., Reg. Sess. (La. 2014) (signed by Governor, June 12, 2014).) Its effective date was set as September 1, 2014. (*See, e.g.*, Doc. 5-1 at 8; Doc. 5-2 at 6.) Shortly before trial, on April 20, 2015, DHH promulgated implementing regulations that include an admitting privileges requirement repeating the language of Act 620 and a penalty provision of $4,000 per violation. La. Admin. Code tit. 48, pt. I, §§ 4401 (definition of "active admitting privileges"), 4423(B)(3)(e), available at 41 La. Reg. 685, 696 (Apr. 20. 2015). These were accompanied by a statement averring that they "will only be enforced pursuant to Order" in the present case. *Id*. The Order the Court issues today thus embraces these regulations as well as the Act itself.

5. Hope is one of three remaining licensed abortion clinics in Louisiana still operating. (*See*, *e.g.*, Doc. 109 ¶¶ 4–5; Doc. 14 ¶ 10 at 3.) It is located in Shreveport. Causeway was an abortion clinic in Metairie. On January 26, 2016, this Court entered a preliminary injunction that did not encompass Causeway's primary physician, Doe 4, who immediately ceased providing abortions. (Doc. 216, at 112; Doc. 255 ¶ 1.) The parties entered into a stipulation that would extend the injunction to him, which this Court so ordered on February 5, 2016. (Doc. 224.) Causeway closed permanently. (Doc. 255 ¶ 2.) It returned its license to DHH, effective February 10, 2016. (Doc. 255 ¶ 3.) Bossier was an abortion clinic in Bossier City. On or about March 30, 2017, Bossier ceased business and surrendered its license, returning it to DHH. (*See* Doc. 271.) Does 1 and 2 are two of five remaining physicians performing abortions in Louisiana. Doe 1 performs abortions at Hope; Doe 2 performed abortion at Bossier, and now performs

abortions at Hope. (Doc. 109 ¶¶ 10–11; *see also*, *e.g.*, Doc. 14 ¶¶ 14–15; Doc. 272 ¶ 3.) Doe 4 no longer offers abortion care in Louisiana. (Doc. 255 ¶ 1.)

6. The Court issued the TRO on August 31, 2014, enjoining enforcement of Act 620 "until a hearing is held for the purpose of determining whether a preliminary injunction should issue." (Doc. 31 at 18.) Per this order, Plaintiffs were expected to continue seeking admitting privileges at the relevant hospitals. (*Id.* at 1–2.) Thus, the Act would be allowed to take effect, but the Plaintiffs would not be subject to its penalties and sanctions for practicing without the relevant admitting privileges during the application process. (*Id.* at 2, 18.) The Plaintiff Clinics were allowed to operate lawfully while the Plaintiff Doctors continued their efforts to obtain privileges. (*Id.*)

7. On September 19, 2014, three other plaintiffs–Women's Health Care Center, Inc. ("Women's Health" or "Women's Clinic"); Delta Clinic of Baton Rouge, Inc. ("Delta"); Doctor John Doe 5 ("Doe 5"); and Doctor John Doe 6 ("Doe 6") (collectively, "Women's Health Plaintiffs")–filed the Complaint for Declaratory and Injunctive Relief, thereby initiating a separate case, and a Motion for Preliminary Injunction. (Docs. 1, 5, No. 3:14-cv-00597-JWD-RLB.) On that same day, these parties tendered a motion to consolidate their case with this earlier proceeding. (Doc. 2, No. 3:14-cv-00597-JWD-RLB.) By this Court's order, these two cases were consolidated on September 24, 2014. (Doc. 8, No. 3:14-cv-00597-JWD-RLB.)

8. All the Parties agreed in briefs and orally at a status conference held on September 30, 2014, that significant discovery would need to be done to prepare for the hearing; therefore, the Court set the preliminary injunction hearing for March 30, 2015. (Doc. 45.) A Joint Proposed Scheduling Order was submitted by the Parties on October 8, 2014, (Doc. 49), and adopted as this Court's order on October 21, 2014, (Doc. 56).

9. On November 3, 2014, following the addition of the Women's Health Plaintiffs, this Court issued the Order Clarifying Temporary Restraining Order of August 31, 2014. (Doc. 57.) For the reasons given therein, the Court ruled: "It was and is the intention of this Court that the TRO remain in effect as to all parties before it until the end of the Preliminary Injunction Hearing." (*Id.* at 6.)

10. On December 5, 2014, the Women's Health Plaintiffs filed the Motion for Voluntary Dismissal. (Doc. 70.) With the consent of the Parties, the Court dismissed this suit without prejudice on December 14, 2014. (Doc. 77.) In light of that dismissal, the Court on January 15, 2015, issued the Second Order Clarifying Temporary Restraining Order of August 31, 2014. (Doc. 84.) In this order, for reasons explained therein, this Court ruled that "the TRO of August 31, 2014 (Doc. 31) remains in force until the Preliminary Injunction hearing on March 30, 2015 or as otherwise modified by this Court." (*Id.* at 4.)

11. On February 16, 2015, Defendants filed the Motion for Partial Summary Judgment ("Partial MSJ"), (Doc. 87), which was opposed, (Doc. 104). On February 24, 2015, Defendants filed an Unopposed Motion to Set Oral Argument on Motion for Partial Summary Judgment (Doc. 90.) On March 3, 2015, the Court granted that motion, (Doc. 92), and oral argument was set and heard on March 19, 2015, (Docs. 128, 137).

12. On May 12, 2015, the Partial MSJ was granted in part, finding that under then-binding Fifth Circuit jurisprudence, the admitting privileges requirement of Act 620 was "rationally related" to a legitimate state interest. (Doc. 138 at 25.) In all other respects, the motion was denied. (*Id.*)[8]

---

[8] WWH states that this Court must "consider the existence or nonexistence of medical benefits when considering whether a regulation of abortion constitutes an undue burden." WWH, 136 S. Ct. at 2309. Therefore, summary

13. Based on a stipulation reached among the Parties, the Joint Motion to Dismiss Defendant Mark Dawson was filed on March 17, 2015, (Doc. 110), and granted the same day, (Doc. 111). On March 20, 2015, the Parties conferred with the Court and agreed to a continuance of the hearing on the preliminary injunction until the week of June 22, 2015. (Doc. 129.) The Parties agreed that the TRO would remain in effect until the completion of the trial and ruling on the merits of the preliminary injunction. (*Id.*)

14. On April 1, 2015, oral argument was heard on motions in limine filed by the Parties. (Docs. 136, 151.) In the ruling issued that same day, the Court denied Plaintiffs' Motion in Limine to Preclude Expert Testimony of Dr. Tumulesh Solanky, (Doc. 96), and Defendant's Motion to Exclude Expert Testimony of Sheila Katz, Ph.D., (Doc. 99). (Doc. 136.) Plaintiffs' Motion in Limine to Preclude Expert Testimony of Dr. McMillan, (Doc. 97), was denied as moot. (Doc. 136.) Because of their connection to the Partial MSJ, Defendant's Motion in Limine to Exclude Irrelevant Evidence ("Defendant's Motion in Limine"), (Doc. 95), and Plaintiffs' Motion in Limine to Preclude Evidence of DHH Deficiency Reports and Related Evidence, (Doc. 98), were taken under advisement. (Doc. 136.) These two motions were ultimately denied. (Docs. 139, 140.)

15. On June 11, 2015, Defendant filed the Motion to Reconsider Rulings on Summary Judgment and Motion in Limine. (Doc. 144.) Plaintiffs submitted their response in opposition on June 16, 2015. (Doc. 150.) Because this was submitted for consideration only six days before trial, the motion was taken under advisement and deferred to trial.

---

judgment on the issue of whether Act 620 was "rationally related" to the State's asserted interest in maternal health is not a proper application of the undue burden standard. This Court will not revisit the summary judgment decision, but this opinion supersedes that ruling.

16. Trial on the Motion for Preliminary Injunction began on June 22, 2015, and ended on June 29, 2015. (Docs. 163, 164, 166–69, 174). The Redacted Transcript[9] of the trial was later docketed.[10] (Docs. 190–95.) On January 26, 2016, the Court declared Act 620 facially unconstitutional and entered a preliminary injunction against enforcement of Act 620 as to the Plaintiffs – Hope, Bossier, Causeway and Does 1 and 2.  (Doc. 216, at 111–112.)  The parties stipulated that the injunction would also include Doe 4.  (Docs. 224, 226.)  The Court's judgment was entered on February 10, 2016 (Doc. 227) and Defendant filed her notice of appeal with the Fifth Circuit. (Doc. 228.)  This Court denied Defendant's motions for a temporary stay and for a stay pending appeal (Doc. 229) on February 16, 2016 (Doc. 234).

17. On February 24, 2016, the Fifth Circuit granted Defendant's emergency motion for a stay pending appeal, *June Medical Services, L.L.C. v. Gee*, 814 F.3d 319 (5th Cir. 2016), with the result that, for the first time, the admitting privileges requirement of Act 620 became enforceable, requiring doctors without active admitting privileges to stop providing abortion care, and clinics without such doctors on staff, to stop providing abortion services.

18. On March 4, 2016, the United States Supreme Court granted Plaintiffs' emergency motion to vacate the Fifth Circuit's stay, reinstating this Court's preliminary injunction.  *June Med. Servs., L.L.C. v. Gee*, 136 S. Ct. 1354 (2016).

---

[9] The unredacted transcript was sealed on the joint motion of the Parties. (Doc. 183.)

[10] Each of the six volumes of testimony corresponds to the trial day in which the evidence was received: Document 190 is Volume I, June 22; Document 191 is Volume II, June 23; Document 192 is Volume III, June 24; Document 193 is Volume IV, June 25; Document 194 is Volume V, June 26; and Document 195 are Volume VI, June 29. Document 190 (or Volume I) contains the testimony of Pittman, Doe 3, and Estes; Document 191 (or Volume II), that of Doe 2, Katz, and Kliebert; Document 192 (or Volume III), that of Doe 1 and Castello; Document 193 (or Volume IV), that of Marier and Solanky; Document 194 (or Volume V), that of Cudihy; Document 195 (or volume VI), that of Pressman.

1 9 .   On August 8, 2016, the parties agreed at a status conference that the Court could proceed to rule on a permanent injunction based on the existing evidentiary record and a stipulation regarding Causeway and Doe 4, following submission of supplementary proposed findings of fact and conclusions of law (Doc. 253).   On August 24, 2016, the Fifth Circuit remanded Defendant's appeal "so that the district court can engage in additional fact finding required by the decision in *Whole Woman's Health v. Hellerstedt*."  (Doc. 254.)

20. The Court today reaffirms its declaration that the admitting privileges requirement of Act 620 is unconstitutional on its face, and enters a permanent injunction barring enforcement of the law in all of its applications.

### III.   Contentions of the Parties

21. The Court acknowledges that the following summary of the parties' contentions reflects the parties' positions on issues of fact relating to preliminary, rather than permanent injunctive relief, and were made prior to the *WWH* decision.  For the most part, however, the summary remains accurate. *See* Docs. 256 and 257-1.

22. In broad terms,[11] Plaintiffs contend that Act 620 is facially[12] unconstitutional first, because the Act places an undue burden on the right of Louisiana women seeking an abortion by placing substantial obstacles in their path, (*See, e.g.*, Doc. 202 at 46–53);[13] second, because the

---

[11] The Parties' specific contentions underlying these broad positions are discussed in connection with the individual issues to which they are relevant.

[12] Plaintiffs state emphatically that they are not making an "as-applied" challenge and that their only challenge is facial. (Doc. 202 at 53.)

[13] Page references to the Parties' briefs and other docketed documents are to the docketed document's page number and not its internal pagination. In contrast, for exhibits, this Court will employ their internal page number so as to permit a reader to more easily and quickly locate the relevant data.

purpose of the Act is to create those obstacles, (*see, e.g.*, *id.* at 53–58) and third, because Act 620 does not further a valid state interest, (*see*, *e.g.*, *id.* at 58–65).

23. Plaintiffs argue that a preliminary injunction should issue enjoining the enforcement of Act 620 because Plaintiffs are likely to succeed at trial, (Doc. 196 at 67–85); absent an injunction, irreparable harm will occur, (*id.* at 85–86); the balance of hardships weighs in Plaintiffs' favor, (*id.* at 86–87); and finally, granting the preliminary injunction will not adversely affect the public interest, (*id.*).

24. Defendant counters broadly that Act 620 places no substantial burden on a woman's right to seek an abortion in Louisiana, (*see, e.g.*, Doc. 200 at 59–66), and that the Act serves a valid purpose, (*see, e.g.*, *id.* at 66–74). Further, Defendant argues that this Court has already ruled that Act 620 serves a valid state interest and has a rational basis. (*See, e.g., id.* at 6–7.)

25. Defendant argues that Plaintiffs have failed to carry their burden that they are likely to succeed at trial and further, urge that no irreparable harm will occur by allowing the enforcement of Act 620. (*See*, *e.g.*, *id.* at 88–90.)

26. Finally, Defendant contends that the balance of hardships weighs in her favor and that the enforcement of Act 620 will not adversely affect the public interest. (*Id.*)

**IV.**    **The Factual Issues**

27. Four main issues of fact were tried at the June hearing:

(A)      What is the purpose of Act 620?

(B)      Is Act 620 medically necessary and reasonable?

(C)      How, if at all, will the implementation of Act 620 affect the physicians and clinics who perform abortions in the state of Louisiana?

(D)     How, if at all, will the implementation of Act 620 affect the ability of Louisiana women to obtain an abortion?

28. Whether these factual issues and their resolution are relevant under the applicable legal standard, and whether they play a role in this Court's ruling, is discussed in the Conclusions of Law section. *See infra* Parts XI–XII.

## V.     Abortion in Louisiana

### A.     Generally

29. According to DHH, approximately 10,000 women obtain abortions in Louisiana annually. (DX 148 ¶ 11.)

30. Nationally, approximately 42% of women who have abortions fall below the federal poverty level, and another 27% fall below 200% of that level. (JX 124 at 480; Doc. 191 at 190–91.)[14] That number is likely significantly higher for Louisiana women seeking abortions. (*Id.*) The expert and lay testimony on this issue are consistent. (*See*, *e.g.*, Doc. 190 at 34 (Testimony of Pittman) (testifying that 70% to 90% of patients at Hope are below the federal poverty level).)

31. Under Louisiana law, a patient must receive state-mandated counseling and an ultrasound at least 24 hours before an abortion. (JX 109 ¶ 18; JX 116 ¶ 11; JX 117 ¶ 8.)

32. Due to this notification and waiting period, patients who wish to obtain an abortion must make two trips to the clinic: the first to receive the ultrasound and state-mandated counseling, and the second to obtain the sought abortion. (JX 109 ¶ 19.)

---

[14] The Court accepted Katz as an expert in the sociology of gender and the sociology of poverty. (Doc. 191 at 123–26.) The Court found Katz well qualified and credible.

### B. The Clinics

33. At the time of trial, there were five women's reproductive health clinics in Louisiana that provided abortion services. (*See*, *e.*.*g.*, Doc. 109 at ¶ 3; JX 109 ¶ 13.) Since then, two of those clinics, Causeway and Bossier, have ceased operation. (Docs. 255 ¶¶ 2-3; 271.)

*(1)* *Hope*

34. Hope is a women's reproductive health clinic located in Shreveport, Louisiana, that has been operating since 1980 and offers abortion services. (Doc. 109 at 4; *see also* Doc. 14 ¶ 11 at 5.) Hope is a licensed abortion clinic suing on its own behalf and on behalf of its physicians, staff and patients. (Doc. 14 ¶ 11 at 5; Doc. 190 at 14.)

35. Hope provides medication abortions through eight weeks and surgical abortions through 16 weeks, six days LMP.[15] (Doc. 190 at 35, 119, 132.) Hope employs two doctors who perform abortions, Does 1 and 3. (*Id.* at 21.) Doe 1 performs approximately 71% of the abortions provided by Hope, and Doe 3 performs the remaining 29%. (*Id.*; JX 116 ¶ 5.)

36. 69% of Hope's patients are Louisiana residents, but the remainder travel from outside the state to Hope. (JX, 116 ¶ 10; Doc. 190 at 19, 34.)

*(2)* *Bossier*

37. On or about March 30, 2017, Bossier ceased business and surrendered its license, returning it to DHH. (Doc. 271.)

38. Bossier was a women's reproductive health clinic that had been operating in Bossier City since 1980 and provided first and second trimester abortions. (Doc. 109 at 4; Doc. 14 ¶ 12.)

---

[15] Throughout this opinion, the Court will define the length of pregnancy based on the time elapsed since the first day of a woman's last menstrual period, or LMP.

Bossier was a licensed abortion clinic and a plaintiff suing on its own behalf and on behalf of its physicians, staff, and patients. (Doc. 14 ¶ 12.)

39. Bossier provided medication abortions through eight weeks and surgical abortions through the state's legal limit of 21 weeks, six days LMP. (Doc. 191 at 22–23, 55–56; JX 117 ¶ 4.)

40. Bossier employed one doctor, Doe 2, who performs first and second trimester surgical procedures as well as medication abortions. (Doc. 191 at 21; JX 117 ¶ 5.) Doe 2 is the only doctor in Louisiana who performs abortions after 16 weeks, six days LMP. (JX 187 ¶ 4; Doc. 191 at 21–22.)[16]

41. Bossier's patients were primarily from Louisiana, but also traveled to the clinic from surrounding states. (Doc. 191 at 20.)

*(3)*     ***Causeway***

42. Causeway was a women's reproductive health clinic located in Metairie, Louisiana, and had provided abortion and reproductive health services since 1999. (Docs. 109 ¶ 7; 14 ¶ 13.) Causeway was a licensed abortion clinic that sued on its own behalf and on behalf of its physicians, staff, and patients. (Doc. 14 at 1.)

43. Causeway offered surgical abortions through 21 weeks, six days LMP, and did not offer medication abortions. (JX 117 ¶ 4).

44. Causeway employed two doctors who performed abortions, Does 2 and 4. (*See*, *e.g.*, Doc. 168-5 at 8.) Doe 2 performed approximately 25% of the abortions provided at Causeway, and Doe 4 performed the remaining 75%. (JX 117 ¶ 5.) Doe 4 refrained from

---

[16] There is testimony that Doe 5 has also performed abortions up to 18 weeks although it is unclear whether he is referring to the present or what he has done in the past. (Doc. 168-6 at 7–8.) The resolution of this issue is not critical to the Court's ruling.

performing any abortions at Causeway subsequent to the Court's January 26, 2016 preliminary injunction order. (Doc. 255 ¶ 1.) A joint stipulation was filed on February 1, 2016 (Doc. 224) regarding the applicability of the injunction to Doe 4 and so ordered by the Court on February 5, 2016 (Doc. 226.) Causeway returned its license to DHH, effective February 10, 2016. (Doc. 255 ¶ 3.)

*(4)* ***Women's Health***

45. Women's Health is a women's reproductive health care clinic located in New Orleans, Louisiana, and has provided abortion and women's reproductive health services since 2001. (Doc. 109 at 5; JX 168 ¶ 1; JX 110 ¶ 1.)

46. Women's Health employs two doctors who perform abortions, Does 5 and 6. (JX 110 ¶ 3; JX 168 ¶ 4.) Doe 5 performs approximately 40% of the abortions provided at Women's Clinic, and Doe 6 performs the remaining 60%. (JX 110 ¶ 3; JX 168 ¶ 4.)

47. Women's Health provides surgical abortions for women through 16 weeks and medication abortions through eight weeks. (Doc. 168-4 at 19.[17]) Doe 6 provides only medication abortions. (*Id.* at 55.)[18]

*(5)* ***Delta***

48. Delta is a women's reproductive health care clinic located in Baton Rouge, and has provided abortion and women's reproductive health services since 2001. (Doc. 109 at 5.)

49. Delta employs one doctor who performs abortions, Doe 5. (JX 110 ¶ 35.)

---

[17] The designated deposition testimony appears within the larger docketed document. (Doc. 168.) For the sake of consistency and ease, the Court continues to use the page numbers of the uploaded document and not of the deposition transcript itself.

[18] *See infra* note 18.

50. Delta provides surgical abortions for women through 16 weeks LMP, and medication abortions through eight weeks. (Doc. 168-4 at 13–14, 19.)[19]

51. The northern part of Louisiana is now served only by Hope in Shreveport. (Docs. 191 at 17; 190 at 110; 271.) The southern part of this state is served by Delta in Baton Rouge and Women's Health in New Orleans. (JX 110 ¶ 1; JX 114 ¶ 1; JX 109 ¶ 13.)

## C.    The Doctors

52. There are currently five doctors who perform all abortions in Louisiana.  (Doc. 109 ¶ 4; *see also*, *e.g.*, JX 109 ¶ 14; Doc. 255 ¶ 1.)

### (1) Doe 1[20]

53.  Doe 1 is a board-certified physician in Family Medicine and Addiction Medicine and is one of two clinic physicians at Hope. (Doc. 109 at 5).

54. Doe 1 has over 10 years of experience, seven of those as an abortion provider. (Doc. 190 at 139–40; Doc. 14 ¶ 14.) He provides medication abortions through eight weeks and surgical abortions through 13 weeks, six days LMP. (Doc. 192 at 21; Doc. 190 at 132.)

55. Doe 1 was trained to provide abortion services by Doe 3**,** the medical director of the Hope Clinic, where they both work. (Doc. 192 at 140–41.)

56. Despite beginning his efforts to get admitting privileges at a nearby hospital in July 2014, (*id.* at 52), Doe 1 still does not have active admitting privileges at a hospital within 30 miles

---

[19] *Id.*

[20] Pursuant to this Court's order, Plaintiffs have provided monthly updates to the Court beginning in March 2016 regarding the status of the doctors' applications for admitting privileges. There has been no material change to the privileges status of Dr. Does 1 through 6, except that Dr. Doe 4 no longer intends to pursue hospital admitting privileges in light of the closure of Causeway. (Letter of May 2, 2016, Doc. 246.)

of Hope Clinic. (Doc. 190 at 21.) The efforts of all six doctors to gain active admitting privileges and the results of those efforts are reviewed in more detail in another section of this Ruling. *See infra* Part VIII.

### (2)   *Doe 2*

57.  Doe 2 is a board-certified obstetrician-gynecologist and had been, until February 2016, one of two clinic physicians at Causeway and the only clinic physician at Bossier who, while that clinic was in operation, provided abortion services there.  (Doc. 109 at ¶ 11; Doc. 255 ¶ 3.)

58. Since Bossier's closure, Doe 2 has entered into a working agreement with Hope to provide abortion services when Hope's primary physicians, Doe 1 and Doe 3, are unavailable to perform abortions. (Doc. 272 ¶¶ 3—4.)

59.  Doe 2 has been performing abortions since 1980.  (Doc. 191 at 17:3-6.)  Doe 2 performs medication abortions through eight weeks and surgical abortions up through the state's legal limit of 21 weeks, six days LMP. (*Id.* 21:16-22:4; JX 187 ¶ 4). He performs medication and surgical abortions at Bossier, and had performed only surgical abortions at Causeway. (Id. at 22:3-11.)  In the year prior to trial, Doe 2 performed approximately 550 abortions at Bossier and 450 abortions at Causeway (Id. at 17:21-18:5).

60. Doe 2 performs first and second trimester surgical abortions through 21 weeks, six days LMP, and is the only one of two physicians in Louisiana to offer abortion after 16 weeks, six days LMP. (*Id.* at 21–22.)[21]

61. Doe 2 has been unsuccessful in getting active admitting privileges within 30 miles of Bossier and, prior to Causeway's closure, had been able to obtain only limited privileges, which

---

[21] *Id.*

did not meet the requirements of Act 620, within 30 miles of Causeway. (*See*, *e.g.*, Doc. 191 at 24:23-29:18.)

### (3) Doe 3

62. Doe 3 is a board-certified obstetrician-gynecologist and one of two clinic physicians at Hope. (Doc. 109 at 5.) He is also the medical director at Hope. (*Id.*)

63. Doe 3 has been licensed to practice medicine in Louisiana since 1976. (Doc. 190 at 109.) In addition to his abortion practice, he has an active general OB/GYN practice, where he delivers babies and routinely performs gynecological surgery including hysterectomies, laparoscopies, and dilation and curettages ("D&Cs"). (*Id.* at 110.)

64. Doe 3 is the chief medical officer of Hope Clinic, where he has worked since 1981. (Doc. 190 at 108, 117, 21.) He provides medication abortions through eight weeks and surgical abortions through 16 weeks, six days LMP. (*Id.* at 35, 119, 132.)

65. Doe 3 performs abortions at Hope Clinic on Thursday afternoons and all day on Saturday. He sees approximately 20 to 30 abortion patients a week. (*Id.* at 117–18, 153.) On occasion, he will cover for Doe 1 and will see more patients in those instances. (*Id.*)

66. Doe 3 currently has admitting privileges at Willis-Knighton Hospital in Bossier ("WKB") and at Christus Highland Medical Center in Bossier ("Christus"), both of which are within 30 miles of Hope Clinic. (*Id.* at 21–22, 120, 148–49.) Doe 3's current privileges at Christus require him to admit approximately 50 patients per year. (*Id.* at 150–52; JX 59.)

67. Doe 3 has his current admitting privileges because he regularly admits patients to the hospital as part of his private OB/GYN practice, not because of his work at Hope Clinic. (*Id.* at 124, 147.)

*(4)*     ***Doe 4***

68.  Doe 4 is a board-certified obstetrician-gynecologist and had been one of two clinic physicians at Causeway.  (Doc. 109 at 5, ¶ 13.)

69.  Doe 4 obtained his license to practice medicine in Maryland in 1959 and in Louisiana in 1965. (Doc. 168-5 at 5-6.)  He served as an assistant professor or assistant instructor in obstetrics and gynecology for seventeen years at Earl K. Long Hospital.  (*Id.* at 12.)

70.  When Doe 4 maintained a full OB/GYN practice, he had admitting privileges at four hospitals in the Baton Rouge area. (Doc. 168-5 at 6.) He was required to have admitting privileges to do OB/GYN surgery and, in his words, "to deliver babies." (*Id.*)  The existence of these privileges did not benefit his pregnancy termination patients because, to his knowledge, none of his abortion patients experienced any problem and required hospital admission.  (*Id.* at 19-20.)

71.  Doe 4 performed abortions at Causeway in Metairie until January 2016. (Doc. 109 at 5, ¶ 13; Doc. 168-5 at 8; Doc. 255 ¶ 1.)  He was not able to get admitting privileges at a hospital within 30 miles of Causeway.  (Doc. 191 at 18:6-19; see also, e.g., Doc. 168-5 at 16.)

*(5)*     ***Doe 5***

72.  Doe 5 is a board certified obstetrician-gynecologist. (Doc. 109 at 5; *see also* Doc. 168-6 at 4–5.) He is one of two clinic physicians at Women's Clinic and the only clinic physician at Delta Clinic. (Doc. 109 at 5; *see also* Doc. 168-6 at 4, 13–14, 22.)

73.  Doe 5 has been licensed to practice medicine in Louisiana since 2005. (Doc. 168-6 at 5.) He provides surgical abortions at Delta Clinic and Women's Health through 16 weeks LMP. (*Id.* at 20; *see also* JX 110 ¶ 1.)[22]

---

[22] *Id.*

74. Doe 5 has been successful in getting active admitting privileges within 30 miles of Women's Health in New Orleans but has been unsuccessful in his efforts to get active admitting privileges within 30 miles of Delta in Baton Rouge. (Doc. 168-6 at 11–13; *see also*, *e.g.*, JX 109 ¶¶ 33–34; JX 110 ¶¶ 15–19.)

*(6)* ***Doe 6***

75. Doe 6 is a board certified obstetrician-gynecologist and one of two clinic physicians at Women's Health. (Doc. 109 at 5; *see also* Doc. 168-4 at 13.)

76. Doe 6 has been practicing medicine for 48 years. (JX 109 ¶ 8.) He is currently the medical director of Women's Clinic and Delta Clinic. (*Id.*) Doe 6 provides only medication abortions and does so only at Women's Clinic. (*Id.* ¶¶ 8–9.)

77. Doe 6 has been unsuccessful in his efforts to get active admitting privileges within 30 miles of Women's. (*Id.* ¶¶ 23–26.)

**D.     Admitting Privileges in Louisiana**

78. In order to perform abortions legally in Louisiana, Act 620 requires an abortion doctor to have "active admitting privileges" at a hospital within 30 miles of the facility where he or she performs abortions. LA. R.S. § 40:1299.35.2A(2)(A). To have "active admitting privileges" the physician must be a "member in good standing of the medical staff" of a hospital "with the ability to admit a patient and to provide diagnostic and surgical services to such patient . . . ." *Id.* The phrase "member in good standing of the medical staff" is not separately defined. (*Cf.* Doc. 193 at 12.)

79. Thus, how a physician may obtain "medical staff" and "active admitting" privileges from a Louisiana hospital is critical in determining the effect, if any, that Act 620 has on abortion providers and, in turn, the women that they serve.

80. The expert testimony regarding hospital admitting privileges came primarily from two experts–Pressman, Plaintiffs' expert, (Doc. 195 at 11–96), and Marier, Defendant's (Doc. 193 at 4–124)–and, to a lesser extent, from the other physicians, including Does 1, 2, 3, 4, 5, and 6, who testified. *See supra* Part I. On the issue of admitting privileges and hospital credentialing, the Court found both Pressman and Marier to be generally well qualified.

81. Additional information about the credentialing process and the specific requirements of various hospitals came from certain hospital by-laws introduced into evidence. (*See*, *e.g.*, JX 46, 48, 67, 72, 76, 78–79, 81, 138, 140–43.)

82. Credentialing is a process that hospitals employ to determine what doctors will be allowed to perform what tasks within that hospital. (Doc. 193 at 11; *see also, e.g.*, Doc. 195 at 23–27; Doc. 168-5 at 24.)

83. Part of this process involves the hospital's granting or denying "admitting privileges." (*See*, *e.g.*, Doc. 193 at 20; Doc. 195 at 17, 23–25.) These privileges govern whether or not a physician is authorized to admit and treat a patient at that hospital and what care, services and treatment the physician is authorized to provide. (*See, e.g.*, Doc. 193 at 20–21; Doc. 195 at 23, 25–26.)

84. Admitting privileges are related to but not the same as being on the "medical staff" of a hospital. (Doc. 193 at 11; Doc. 195 at 25–26.)

85. There is no requirement that a physician have admitting privileges or be on the medical staff at a hospital in order to practice medicine. (*See*, *e.g.*, Doc. 195 at 26.) Many physicians who do not have a hospital based practice, i.e. do not intend to admit and treat their patients in a hospital setting, have neither as there is no need for staff or admitting privileges under those circumstances. (*See*, *e.g.*, Doc. 175 at 75; Doc. 192 at 41–42; Doc. 195 at 75.)

86. There is no state or federal statute which governs the rules for the granting or denial of hospital admitting privileges in Louisiana.[23] *Cf. Planned Parenthood of Wis., Inc. v. Van Hollen*, 738 F.3d 786, 792 (7th Cir. 2013) ("The criteria for granting admitting privileges are multiple, various, and unweighted."). Rather, partly as a consequence of this absence, these rules vary from hospital to hospital and are governed by each one's distinct by-laws.[24] (*See*, *e.g.*, Doc. 193 at 12, 15; Doc. 195 at 28.)

87. Specifically, there is no state or federal statute which defines or sets uniform standards for the categories of admitting privileges a hospital may grant. (Doc. 193 at 11–12.) Like other rules, these are therefore set by each hospital's by-laws. (*Id.*; *see also*, *e.g.*, Doc. 195 at 28; JX 81 at 1798.) To make matters more confusing, the terms used to describe those categories (e.g. "active admitting privileges", "courtesy admitting privileges", "clinical admitting privileges") vary from

---

[23] While one statute, commonly known as the Church Amendment, does impose a type of germane privileges requirement on hospitals accepting federal funds, 42 U.S.C. § 300a-7(c)(1)(B), this statute was not shown to apply to the hospitals involved in this case, *see infra* note 33.

[24] *Cf.* AM. MED. ASS'N, OPINION 4:07 - STAFF PRIVILEGES (June 1994) ("Privileges should not be based on numbers of patients admitted to the facility or the economic or insurance status of the patient. . . . Physicians who are involved in the granting, denying, or termination of hospital privileges have an ethical responsibility to be guided primarily by concern for the welfare and best interests of patients in discharging this responsibility."). The evidence presented in this case shows that these aspirational goals are not reflected in the by-laws of the Louisiana hospitals whose rules and practices are before the Court.

hospital to hospital. (*See*, *e.g.*, Doc. 190 at 167; Doc. 191 at 104; Doc. 193 at 11–12; Doc. 195 at 28.)

88. Similarly, terms like "medical staff", "active staff", "courtesy staff", "clinical staff" vary among hospitals. (Doc. 191 at 35; Doc. 193 at 12; Doc. 195 at 28; *cf.* JX 79 at 1707–12.)

89. For example, at some hospitals, an "active" staff appointment does not, alone, automatically entitle the physician to admit patients. (*See*, *e.g.*, JX 46 at 185; JX 79 at 1673; JX 141 at 3259–60.)

90. Because of the varying definitions given to the categories of admitting privileges and the varying requirements for the attainment of same, whether a physician has been given "active admitting privileges" or is a "member in good standing on the medical staff" within the meaning of Act 620 entirely depends upon the specific definition, requirements and restrictions imposed by a given hospital in a given circumstance. (*See*, *e.g.*, Doc. 193 at 12.)

91. Unlike some states,[25] there is also no statute or rule in Louisiana which sets a maximum time period within which a physician's application for admitting privileges must be acted upon. Thus, unless there is such a time limit in the hospital's by-laws, a hospital can effectively deny a doctor's application of privileges by never acting on it, a decision on any one doctor's application permanently delayed without a consequence being effected or a reason being given. A definite decision stays unreached–but, with his or her request suspended, the relevant doctor's privileges

---

[25] Texas sets a 170 day time limit within which a hospital's credentialing committee must take final action on a completed application for medical staff membership or privileges. TEX. HEALTH & SAFETY CODE § 241.101; *Planned Parenthood of Greater Tex. Surgical Health Servs. v. Abbott*, 748 F.3d 583, 600 (5th Cir. 2014)("*Abbot II*") (making this point).

remain, as a matter of fact and law, nonexistent. In this Ruling, the Court uses the term "de facto denial" of privileges to describe this circumstance.[26]

92. At some hospitals in Louisiana, there are suggested time frames in which hospitals should review admitting privileges applications. (JX 72 at 1320–23; *see also*, *e.g.*, JX 67 at 857–58; JX 76 at 1444–47.) However, those guidelines are not requirements, and there is no legal recourse for an applicant if the hospital fails to act on the application within the suggested time period. (*See*, *e.g.*, JX 67 at 858–59; JX 72 at 1320–24; JX 109 ¶ 27.) For example, Tulane University Medical Center ("Tulane") has an expectation, but has adopted no requirement, that applications will be processed within 150 days. (JX 78 at 1554.) If the Board of Trustees has not taken action on the application within 150 days, the applicant must repeat the verification process to ensure the information contained therein is still accurate. (*Id.*)

93. A hospital's failure to act on an application by either approving or denying it may result in the hospital considering the application withdrawn. (*See*, *e.g.*, Doc. 195 at 93; JX 71 at 1279.) In this additional respect, a hospital's failure to act is, in effect, a de facto denial of the application.

---

[26] In other contexts, this notion has appeared. *See, e.g.*, *Khorrami v. Rolince*, 539 F.3d 782, 786 (7th Cir. 2008) (observing that a judicial ruling's delay can sometimes be "so long . . . that the delay becomes a *de facto* denial"); *Morgan v. Gandalf, Ltd.*, 165 F. App'x 425, 431 (6th Cir. 2006) (construing a court's failure to explain its reason as a "*de facto* denial" and reviewing such a denial for abuse of discretion); *Omnipoint Commc'ns Enters., L.P. v. Zoning Hearing Bd. of Easttown Twp.*, 331 F.3d 386, 393 (3d Cir. 2003) (observing that under Pennsylvania law, a de facto exclusion exists "where an ordinance permits a use on its face, but when applied acts to prohibit the use throughout the municipality" (internal quotation marks omitted)); *Alexander v. Local 496, Laborers' Int'l Union*, 177 F.3d 394, 408–09 (6th Cir. 1999) (finding that a "longstanding and demonstrable policy" where the union's "working-in-the-calling" rule, which was memorialized in its constitution and bylaws, resulted in the "de facto exclusion" of African Americans from union membership). Seemingly, though also in other contexts, the Fifth Circuit has recognized such a possibility. *See Chevron USA, Inc. v. Sch. Bd. of Vermilion Parish*, 294 F.3d 716, 720 (5th Cir. 2002) ("Arguably, the district court's order was a de facto denial of class certification (although the parties have not treated it as such, and no motion for class certification was ever filed).").

94. While a physician's competency is a factor in assessing an applicant for admitting privileges, it is only one factor that hospitals consider in whether to grant privileges. (*See*, *e.g.*, Doc. 190 at 158–59; Doc. 195 at 25–26; Doc. 192 at 50–51; Doc. 168-5 at 17; Doc. 168-6 at 12; JX 110 ¶ 10; JX 168 ¶¶ 11–13, 17; PX 183.)

95. Defendant argues: "When Louisiana hospitals decide whether to grant a physician staff membership, privileges to admit patients, or privileges to perform particular procedures, hospital by-laws indicate that they may make such determinations based on the physician's prior and current practice, and indicia of the physician's clinical competence."[27] (Doc. 200 ¶ 114 at 38 (citing to JX 2873; JX 1838; JX 1542–43; JX 852–53).)

96. The Court finds that this is only partly true because both by virtue of by-laws and how privileges applications are handled in actual practice, hospitals may deny privileges or decline to consider an application for privileges for myriad reasons unrelated to competency. Examples include the physician's expected usage of the hospital and intent to admit and treat patients there, the number of patients the physician has treated in the hospital in the recent past, the needs of the hospital, the mission of the hospital, or the business model of the hospital. Furthermore, hospitals may grant privileges only to physicians employed by and on the staff of the hospital. And university-affiliated hospitals may grant privileges only to faculty members. These possible variances in causes and justification for any particular denial are attested to by this case's evidentiary submissions and testimony. (*See*, *e.g.*, Doc. 195 at 25–26; Doc. 190 at 123, 168–70; Doc. 193 at 82–83; JX 109 ¶¶ 27–28; JX 110 ¶ 10; JX 168 ¶¶ 11–13, 17; Doc. 168-5 at 6, 23.)

---

[27] The Defendant's briefing cites exhibits by Bates page numbers rather than exhibit numbers.

97. An apparently benign example of such a non-competency based, business driven reason for denying privileges is the denial of Doe 1's application to the Minden Medical Center ("Minden"). (JX 50 at 318; Doc. 192 at 50–51.) In declining his application for staff membership and clinical privileges, Minden's Medical Staff Coordinator wrote to Doe 1: "Since we do not have a need for a satellite primary care physician at this time, I am returning your application and check." (JX 50 at 318; *see also* JX 72 at 1323.)

98. When they had full OB/GYN practices delivering babies and performing gynecological surgery, Does 2, 4, and 6 had no problem obtaining and maintaining admitting privileges at a number of hospitals. (*See*, *e.g.*, Doc. 168-5 at 6–8; JX 109 ¶ 30.) However, under Act 620, for reasons unrelated to competency, they are now unable to secure active admitting privileges. (*See, e.g.*, Doc. 191 at 24–26; Doc. 168-5 at 16–17; JX 109 ¶¶ 23, 30, 31–34.)

99. Another example of a non-competency based application criteria is that some hospitals require the physician seeking privileges to live and/or practice within a certain distance of the hospital. (JX 83 at 1865; JX 139-a at 2925; JX 79 at 1679–83.) Does 2 and 5 travel significant distances from their respective homes to provide abortion services and would not be able to meet this criteria for hospitals within 30 miles of some or all of the clinics where they provide abortions. (Docs. 191 at 20–21; 168-6 at 4, 11–13; JX 109 ¶¶ 31–36.)

100. Defendant argues that "[t]here is no evidence suggesting that, in making the determinations about staff membership or privileges, Louisiana hospitals discriminate against physicians based on whether they provide elective abortions." (Doc. 200 ¶ 115 at 38 (citing Marier's testimony, as it appears on Doc. 193 at 83–86).) In his testimony, however, Marier only acknowledged that he personally knew of no hospitals which refused to extend privileges to a doctor

"simply because he or she performs an abortion." (Doc. 193 at 83–85.) Regardless, to the extent Marier's testimony can be so construed, the Court finds his testimony on this point to be not credible and contradicted by an abundance of evidence introduced at the hearing demonstrating that hospitals can and do deny privileges for reasons directly related to a physician's status as an abortion provider. (*See*, *e.g.*, Docs. 168-6 at 12; 190 at 53; JX 109 ¶¶ 28, 30, 39.)

101. For instance, Doe 1 contacted the director of the Family Medicine Department at University Health Hospital in Shreveport ("University" or "University Health")[28] where he had done his residency in family medicine. Dr. Doe 1 was initially told that he would be offered a job as a faculty member teaching sports medicine which would "take care of the admitting privileges thing." (Doc. 192 at 45.) Doe 1 was told that the application forms for admitting privileges would be forwarded to him. (*Id.*)

102. When Doe 1 did not get the application forms and inquired, he was told by the director of the department that he would not be offered a position because "there was some objection from certain staff about [Doe 1] coming to work there because of where [he] work[ed], at Hope Medical." (*Id.* at 45–46.)[29]

---

[28] This hospital is a teaching hospital associated with LSU Medical School and is sometimes referred to as LSU Shreveport Hospital. (*See*, *e.g.*, JX 79; Doc. 192 at 19, 47.)

[29] This testimony was objected to as hearsay, which objection was overruled. (Doc. 192 at 46:7-13.) It was overruled for two reasons. First, the ordinary rules of admissibility are relaxed in a preliminary injunction hearing and hearsay may be admitted. *See*, *e.g.*, *Sierra Club, Loan Star Chapter v. FDIC*, 992 F.2d 545, 551 (5th Cir. 1993); *Fed. Sav. & Loan Ins. Corp. v. Dixon*, 835 F.2d 554, 558 (5th Cir. 1987); *see also* 11A Charles Alan Wright & Arthur R. Miller, Federal Practice & Procedure § 2949 (3d. 2015). Although the present opinion is no longer considering a preliminary injunction, by virtue of their agreement to convert the preliminary injunction to a permanent injunction on the existing record, Doc. 253, *see also* Fed. R. Civ. P. 65(a)(2), the parties have waived further evidentiary objections. Second, as this testimony was presented so as to explain Doe 1's failure to make formal application for privileges at University, the testimony was not offered to prove its truth and was thus, for this limited purpose, not hearsay. Fed. R. Civ. P. 801(c)(2).

103. This same essential response was also given to Doe 2 when he attempted to upgrade his courtesy privileges at University Health. (Doc. 191 at 24–26.)

104. There is no Louisiana statute which prohibits a Louisiana hospital or those individuals charged with credentialing responsibilities from declining an application for admitting privileges based on the applicant's status as an abortion provider.

105. Section 40:1299.32 provides: "No hospital, clinic or other facility or institution of any kind shall be held civilly or criminally liable, discriminated against, or in any way prejudiced or damaged because of any refusal to permit or accommodate the performance of any abortion in said facility or under its auspices." LA. R.S. § 40:1299.32.[30]

106. The Court was surprised that Defendant's credentialing expert, Marier, was unaware of this provision, but Marier agreed that, by virtue of this provision, "a hospital, if it chooses to, may discriminate against any abortion provider with no consequence under Louisiana law." (Doc. 193 at 84.)

107. Section 40:1299.33(C) states: "No hospital, clinic, or other medical or health facility, whether public or private, shall ever be denied government assistance or be otherwise discriminated against or otherwise be pressured in any way for refusing to permit facilities, staff or employees to be used in any way for the purpose of performing any abortion." LA. R.S. § 40:1299.33(C).[31]

---

[30] The statute was introduced as an exhibit. (PX 183.) Not before the Court is the efficacy of this state statute in the face of the Church Amendment, which prohibits a hospital which receives funding under the Public Health Service Act, 42 U.S.C. § 201 *et seq.*, from discriminating in employment against those who perform abortions. 42 U.S.C. § 300a-7. Furthermore, no evidence was introduced as to whether any of the hospitals where credentials were sought in this case, or in Louisiana generally, receive such funds. The text of the Church Amendment was submitted as an exhibit. (DX 162.)

[31] This subsection was introduced as an exhibit. (PX 182.)

108. While Doe 2 ultimately received limited privileges at Tulane, the negotiations that led to these privileges being granted clearly demonstrate that Doe 2's status as an abortion provider was a central issue in the decision making process over whether to grant him privileges and the limitations those privileges would have. (*See* JX 161–81; *see infra* Part VIII.)

109. There are ways in which the hospital staff's and/or the general public's hostility to abortion and abortion providers can be injected into the credentialing process. For instance, many applications for privileges require references from at least two physicians who recently have observed the applying physician as to applicant's medical skill and "character." (JX 143 at 3357; JX 79 at 1680–81; JX 83 at 1873; JX 143 at 3351.) For example, Minden prefers that an applicant's peer recommendations come from physicians already on staff at that hospital. (JX 72 at 1300.) Although competent, an abortion provider can face difficulty in getting the required staff references because of staff opposition to abortion. (*See*, *e.g.*, Doc. 168-6 at 12; Doc. 190 at 53; JX 109 ¶¶ 28, 30, 39.)

110. Other hospitals' admitting privileges applications require the applying physician to identify another physician on staff who will "cover" his or her patients if the applying physician is unavailable, frequently called a "covering physician." (JX 78 at 1539; JX 79 at 1677; JX 138 at 2855; JX 83 at 1866.) As summarized below, the evidence shows that opposition to abortion can present a major, if not insurmountable hurdle, for an applicant getting the required covering physician.

111. For example, Doe 5 has applied for admitting privileges at three hospitals in the Baton Rouge area: Woman's Hospital in April or May of 2014 and Lane Regional Medical Center and Baton Rouge General Medical Center in July of 2014. (Doc. 168-6 at 11.) Doe 5 has been unable

to find a local physician who is willing to provide coverage for him when he is not in Baton Rouge, which all three hospitals require. (JX 109 ¶¶ 32–33; JX 110; Doc. 51; Doc. 168-6 at 11–12.)[32] Doe 3 also has had difficulty finding physicians to cover for him due to the animosity towards him as an abortion provider. (Doc. 190 at 11–13.) While Doe 2 ultimately got limited privileges at Tulane, (JX 183), the evidence therefore demonstrates that staff physicians who oppose abortion present a real obstacle, *see infra* Part VIII.B.

112. Some other non-competency based admitting privileges requirements create a particular obstacle for abortion providers whose practice is not hospital based, who do not admit patients to a hospital as a part of their practice, and who do not perform surgeries at a hospital.

113. As one example, hospitals often grant admitting privileges to a physician because the physician plans to provide services in the hospital. (*See, e.g.*, Doc. 195 at 24–25; Doc. 193 at 66.) In general, hospital admitting privileges are not provided to physicians who never intend to provide services in a hospital. (Docs. 195 at 23–25, 27, 74–75; 193 at 66–67.)

114. Thus, in connection with the applications of Does 1 and 2 at Willis-Knighton Medical Center ("WKMC"), Willis-Knighton South ("WKS"), and Willis-Knighton Pierremont Health Center ("WKP") in Shreveport, (JX 53, 144), the Willis-Knighton Health System ("Willis-Knighton"), which runs these three (as well as other) entities, has required these doctors to submit data on hospital admissions, patient management and consultations of patients in the past 12 months in a hospital. (Doc. 192 at 75–76; JX 128; JX 89 at 1950.)

---

[32] This continues to be an obstacle to Doe 5 getting privileges in Baton Rouge. (JX 193.) While Dr. Doe 2 was ultimately able to get limited privileges, it appears that this difficulty may have played a role in the limitations imposed on his privileges.

115. Because their abortion practice is not hospital based, neither doctor can possibly comply with that requirement. In the case of Doe 1, since he formally responded to a hospital's request for more information regarding his history of admitting patients during the preceding twelve months, saying he had no such information, he has never again heard from the hospital - there being neither a denial nor an approval of his application. (Doc. 192 at 75–78.) Similarly, when Doe 2 gave the hospital the only information in his possession, he received formal notice that this was insufficient and "[w]ithout that [additional] information, your application remains incomplete and cannot be processed." (JX 89 at 1950.) Doe 2 could do nothing else, explaining, "I'm in a Catch-22 basically. I can't provide information I don't have." (Doc. 191 at 79–80.)

116. Even if these Does and similar practitioners somehow got admitting privileges, it is unlikely they would be able to keep them. If over a period of two to three years, a physician has not admitted any patients to the hospital, a hospital credentialing committee is likely to understand that this physician no longer requires admitting privileges. (*See*, *e.g.*, Doc. 195 at 91.) Because, by all accounts, abortion complications are rare, (*See*, *e.g.*, Doc. 168-5 at 14, 16, 20–21; Doc. 193 at 81–82; Doc. 195 at 38–39), an abortion provider is unlikely to have a consistent need to admit patients.

117. Furthermore, surgical privileges are meant for providers who plan to perform surgeries at the hospital. (Doc. 195 at 95–96.)

118. For the reasons outlined above, the Court finds that the Louisiana practice of credentialing, i.e. a hospital's consideration of and acting (or not acting) upon applications for admitting privileges, creates particular hardships and obstacles for abortion providers.

119. The efforts made by Does 1–6 to comply with the admitting privileges requirement of Act 620, and the result of those efforts, is reviewed in another section of this Ruling. *See infra* Part

VIII. In this case, Act 620 requires abortion doctors to get "active admitting privileges," including being admitted as a member in good standing of the medical staff, at a nearby hospital. La. Rev. Stat. § 40:1299.35.2.

120. However, the Act does not set the criteria necessary for obtaining those privileges and there is no state law or other uniform standard that sets these criteria. *See infra* Parts VI-IX. Instead, the law relies on the highly variable requirements set in the bylaws of each hospital. *Id.*; *see also WWH*, 136 S. Ct. at 2312 (noting that hospitals often have "prerequisites to obtaining admitting privileges that have nothing to do with ability to perform medical procedures").

121. The Act therefore anticipates and relies upon existing private hospitals' varying bylaws' admitting privileges requirements as allowed under Louisiana law. It delegates to private hospitals the duty of granting (or withholding) active admitting privileges and thereby utilizes bylaws and private hospital credentialing committees as instruments for the implementation of the Act. Unquestionably then, the admitting privileges law and practices existing in Louisiana before Act 620 are related to Act 620. The inability of Does 1, 2, 4, 5 (in Baton Rouge), and 6 to get the kind of active admitting privileges which the Act itself mandates, *see supra* Part V.D (above), has been caused by Act 620 working in concert with existing laws and practices, as discussed in detail, *infra* Part IX.

122. As discussed here and in Part IX, the Court finds that Louisiana's credentialing process and the criteria found in some hospital bylaws work to preclude or, at least greatly discourage, the granting of privileges to abortion providers, including the following:

- There are no laws or regulations in Louisiana mandating certain minimum objective credentialing criteria to assure that credentialing decisions are made only on objective, competency-related factors, akin to the American Medical Association's guidelines;[33]

- The credentialing processes adopted by the hospitals in question permit them to deny privileges for reasons purely personal and unrelated to the competency of the physician including, specifically, anti-abortion views held by some involved in credentialing;

- Louisiana law does not prevent hospital or credentialing personnel from discriminating against abortion providers based on their status as abortion providers, regardless of their competency; and,

- By having no maximum time period within which applications must be acted upon, a hospital can effectively deny a physician's application without formally doing so and therefore affect a de facto denial without expressing the true reasons (or any reasons) for doing so.

- Indeed, the Court finds that, Act 620 was enacted, these specific aspects of how Louisiana hospitals grant, deny, or withhold hospital admitting privileges, have played a significant contributing role in Louisiana's abortion providers not being given privileges or being given only limited privileges.

E.     **The Climate**

123. The evidence is overwhelming that in Louisiana, abortion providers, the clinics where they work and the staff of these clinics, are subjected to violence, threats of violence, harassment and danger.

---

[33] *See supra* note 23.

124. Defendant offered no evidence to counter Plaintiffs' evidence on this point. Rather, Defendant makes two arguments: first, some of the Plaintiffs' evidence on this point is hearsay, and second, the violence is "legally irrelevant" to the undue burden analysis. (Doc. 201 at 14–15.) The issue of legal relevance is addressed in the Conclusions of Law section of this Ruling. *See infra* Parts XI–XII.

125. Defendant objects to the testimony and exhibits cited in Plaintiffs' proposed findings and conclusions (Doc. 196 ¶¶ 79, 84, 87, 89), as hearsay. However, almost all of this testimony was not objected to by Defendant at the time it was introduced. Moreover, in some instances, this testimony came in by way of exhibits offered jointly by the Parties or in questions asked by counsel for the Defendant.

126. But even if the objected-to evidence were excluded, there is a mountain of un-contradicted and un-objected to evidence supporting this conclusion, some of which is summarized below.

127. In addition to the harassment and violence, as was discussed briefly in the previous section and will be discussed in more detail in the section reviewing the doctors' efforts to gain admitting privileges, the personal and/or religious feelings against abortion by the public, some members of the medical profession and hospital administrators has had a negative effect on the doctors' efforts to gain admitting privileges. (*See*, *e.g.*, Docs. 168-6 at 12; 190 at 53; 191 at 24–26; 192 at 45–46; JX 109 ¶¶ 28, 30, 39.)

128. Indeed, after reviewing Plaintiffs' motion to allow the Plaintiff doctors to use pseudonyms as well as their supporting affidavits, the United States Magistrate Judge concluded: "The Court is satisfied that the potential for harassment, intimidation and violence in this case,

particularly recent instances of such conduct, both nationwide and in Louisiana, justifies the unusual and rare remedy of allowing the individual Plaintiffs to proceed anonymously." (Doc. 24 at 3; *see also* Docs. 190 at 108; 191 at 12; 192 at 6.) A similar order was signed when Does 3–6 were added as parties. (Doc. 55.)

129. Also recognizing these legitimate safety concerns, Defendant joined with Plaintiffs in a Joint Consent Motion Regarding Confidential Trial Procedures, (Doc. 158), granted on June 23, 2015. (Doc. 161). These procedures included allowing Does 1–3 to testify from behind a screen.[34] (Doc. 158 at 1.)

130. The security concerns even went beyond the Parties, however. A request for anonymity was made on behalf of a hospital which had granted privileges to Doe 5 and the non-party doctors who assisted in the privileges request. No objection was made by any party and the Court ordered this hospital to be called "Hospital C" and the doctor involved for that hospital," Dr. C." (*Id.*) Other doctors involved in granting the limited privileges to Doe 2 were ordered to be called "Dr. A" and "Dr. B." (*Id.*)

131. In order to insure the use of the pseudonyms and protect the identities of Plaintiff doctors as well as certain non-party doctors and hospitals, the Plaintiffs and Defendant filed a joint motion to redact portions of the trial transcript, which the Court granted. (Doc. 180.) By their filings in this case, therefore, Defendant and Plaintiffs have implicitly acknowledged the charged emotions generated by this particular issue within and outside this state.

132. The evidence, in turn, leaves no question about the dangers and hostility regularly endured by Plaintiffs.

---

[34] The screen was positioned so as to protect the identity of the witness from the public but allowed the Court to see and judge the demeanor of the witnesses.

133. Each of Louisiana's five clinics experiences frequent demonstrations by anti-abortion activists. (Docs. 190 at 24, 108; 191 at 13; JX 109 ¶¶ 10–12; JX 117 ¶ 6; JX 112 ¶ 2; JX 113 ¶ 2; Doc. 168-6 at 25.) These demonstrations require some clinics to have additional security on site. (Doc. 190 at 23.)

134. Hope Clinic in Shreveport has been the subject of three violent attacks: once by a man wielding a sledgehammer, once by an arsonist who threw a Molotov cocktail at the clinic, and once by having a hole drilled through the wall and butyric acid poured through it. (Doc. 190 at 23; JX 116 ¶ 8.)

135. In the fall of 2014, following passage of the Act, anti-abortion activists attempted to interfere with Doe 5's admitting privileges application at Woman's Hospital in Baton Rouge by sending threatening letters to the hospital. (JX 110 ¶ 14; JX 109 ¶ 29.) Woman's Hospital also had to remove anti-abortion activists from its medical staff offices due to the activists' disruptive conduct. (JX 110 ¶ 14.)

136. When Doe 5 worked as a hospital employed physician, protests outside the hospital caused the hospital administration to give him an ultimatum: quit performing abortions or resign from the hospital staff. (JX 110 ¶ 21; *see also* Doc. 168-6 at 23–24.) In his words, he "was therefore forced to stop working at the hospital so that . . . [he] could continue providing services at Women's Clinic and Delta Clinic." (JX 110 ¶ 21; *see also* JX 109 ¶ 30.)

137. After Doe 5 recently acquired privileges at a local hospital (Hospital C), anti-abortion activists began sending threatening letters to that hospital causing him to fear that he might lose the privileges that he acquired. (JX 110 ¶ 20; *see also* JX 109 ¶ 39.)

138. Anti-abortion activists picketed the school of the children of a doctor formerly affiliated with Delta, after which that doctor quit. (Doc. 168-4 at 23–24.)

139. A physician quit working at Causeway after receiving harassing telephone calls at his private practice and anti-abortion activists demonstrated outside the hospital where he worked. (Doc. 168-8 at 8.)

140. Doe 1 works at Hope–but he does so in fear of violence. (Doc. 192 at 78–79.)

141. Doe 2 has received threatening phone calls, has been followed into restaurants and accosted, and has been shouted at with profanity and told that he was going to hell. (Doc. 191 at 12–13.)

142. Doe 2 was forced to leave a private practice when the practice's malpractice insurer refused to cover him if he continued to perform elective pregnancy terminations. (*Id.* at 16–17.)

143. Doe 3 has been threatened as a result of his work at Hope Clinic. (JX 113 ¶ 3.) Last year, anti-abortion activists from outside Louisiana left fliers on neighbors' mailboxes calling him an abortionist and saying they wanted to convert him to Jesus. (Doc 190 at 108–09.) Local police have had to patrol his neighborhood and search his house before he entered. (JX 113 ¶ 4.)

144. These individuals also approached Doe 3's regular medical practice patients as they tried to enter his office, requiring the building security officers to escort the activists off the premises. (*Id.* ¶ 3.) These individuals told Doe 3's patients that he killed babies and that they should not see him. (Doc. 190 at 109.)

145. Doe 3 fears that, if the other Louisiana abortion providers are not able to obtain admitting privileges, he will become an even greater target for anti-abortion violence. (JX 113 ¶¶ 6–7.) He specifically testified that "all [these individuals] have to do is eliminate [him] as they

have Dr. Tiller and some of the other abortion providers around the country" to eliminate abortion entirely in northern Louisiana. (Doc. 190 at 174.)

146. Doe 3 also explicitly emphasized that he is concerned that such individuals could "cause a lot of other . . . problems that would affect [his] ability to perform the rest of [his] practice." (*Id.* at 174–75; *cf.* JX 113 ¶¶ 6–7.)

147. Doe 3 has difficulty arranging coverage for his OB/GYN practice because other OB/GYN doctors in the Shreveport area refuse to cover his practice as a result of his work at Hope. (Doc. 190 at 111–13.)

148. As a result of his fears, and the demands of his private OB/GYN practice, Doe 3 has testified that if he is the last physician performing abortion in either the entire state or in the northern part of the state, he will not continue to perform abortions. (*Id.* at 174–76.)

149. Anti-abortion activists have picketed the homes – and neighbors' homes – of Does 5 and 6, also distributing threatening flyers. (Doc. 168-6 at 24; JX 109 ¶ 11.)

150. Anti-abortion activists have targeted at least one physician who agreed to provide emergency care for abortion complications, even though he did not provide abortions himself. (Doc. 168-6 at 11, 24–25; JX 110 ¶ 20.)

## VI. Act 620

### A. Text of Act 620 and Related Provisions

151. The challenged statute is Act 620. LA. R.S. § 40:1299.35.2.

152. Act 620 amended Louisiana Revised Statutes § 40:1299.35.2(a), 1299.35.2.1, and 2175.3(2) and (5). (*Id.*)

153. On June 12, 2014, Governor Bobby Jindal signed Act 620 into law, with an effective date of September 1, 2014. (*See, e.g.*, Doc. 109 at 4.)

154. Act 620 provides that every physician who performs or induces an abortion shall "have active admitting privileges at a hospital that is located not further than thirty miles from the location at which the abortion is performed or induced and that provides obstetrical or gynecological health care services." LA. R.S. § 40:1299.35.2A(1).

155. The Act defines "active admitting privileges" to mean that "the physician is a member in good standing of the medical staff of a hospital that is currently licensed by the department, with the ability to admit a patient and to provide diagnostic and surgical services to such patient . . . ." *Id.* § 40:1299.35.2A(2)(a).

156. Regulations connected to the Act and promulgated after the commencement of this litigation by DHH use the same definition of "active admitting privileges." LA. ADMIN CODE tit. 46, § 4401.[35] These regulations note that federal litigation is pending on the issue of admitting privileges and that licensing provisions regarding admitting privileges will only be enforced pursuant to an order, judgment, stipulation, or agreement issued in this case. *Id.* § 4423.

157. The Act provides that any outpatient abortion facility that knowingly or negligently provides abortions through a physician who does not satisfy the Act is subject to denial, revocation, or non-renewal of its license by DHH. La. Rev. Stat. § 40:1299.35.2A(1).

158. The Act provides that a physician who fails to comply with the admitting privileges requirement can be fined $4,000 per violation. *Id.* § 40:1299.35.2A(2)(c).

---

[35] A copy of this regulation was submitted as a joint exhibit. (JX 137.)

159. In addition, discipline by the Board is made an enforcement provision in Act 620. *Id.* § 40:1299.35.2.1E. The Board has the authority to take disciplinary action against any physician. *Id.* § 37:1261 *et seq.* The Board has the authority to investigate physicians for violations of law, such as Act 620. *Id.* § 40:1299.35.2E. By violating this law, physicians could be subjected to fines or other sanctions, including the suspension or revocation of the physician's license to practice medicine. (Doc. 168-10 at 12, 14–15; *see also* Doc. 31 at 4 n.4.)

**B.     Louisiana's Policy and Other Legislation Regarding Abortion**

160. The Louisiana legislature has codified a statement of opposition to legalized abortion, stating:

> It is the intention of the Legislature of the State of Louisiana to regulate abortion to the extent permitted by the decisions of the United States Supreme Court. The Legislature does solemnly declare and find in reaffirmation of the longstanding policy of this State that the unborn child is a human being from the time of conception and is, therefore, a legal person for purposes of the unborn child's right to life and is entitled to the right to life from conception under the laws and Constitution of this State. Further the Legislature finds and declares that the longstanding policy of this State is to protect the right to life of the unborn child from conception by prohibiting abortion impermissible only because of the decisions of the United States Supreme Court and that, therefore, if those decisions of the United States Supreme Court are ever reversed or modified or the United States Constitution is amended to allow protection of the unborn then the former policy of this State to prohibit abortions shall be enforced.

La. Rev. Stat. § 40:1299.35.0; *see also State v. Aguillard*, 567 So. 2d 674, 676 (La. Ct. App. 1990) (observing that "the Louisiana legislature has expressed its disfavor for abortion" with this provision).

161. Consistent with this explicit statement of legislative intent, as shown below, Louisiana has enacted other laws that place restrictions on women seeking abortion in the state, and doctors and clinics who perform abortions.

48

162. In 2006, the Louisiana legislature passed a "trigger" ban – banning abortion with only a limited exception to save a woman's life – to take immediate effect should *Roe v. Wade* be overturned or a constitutional amendment be adopted to allow states to ban abortion. S.B. 33, 2006 Leg., Reg. Sess. (La. 2006) (codified as La. Rev. Stat. §§ 40:1299.30, 14.87). The trigger ban carries a criminal penalty of up to 10 years' imprisonment "at hard labor" for a physician performing an abortion. La. Rev. Stat. §§ 40:1299.30D, 14:87D(1).

163. Another law mandates that every woman undergo an ultrasound before an abortion, even when not medically necessary, and that she be required to listen to an oral description of the ultrasound image. *Id.* §§ 40:1299.35.2B–D, 40:1299.35.6, 40:1299.35.12.

164. Louisiana requires a two-trip, 24-hour waiting period for women, and further mandates that a physician – and not another medical professional – give certain state-mandated information designed to discourage abortion to his patient; violation of this provision carries criminal penalties. *Id.* §§ 40:1299.35.2D(2), 40:1299.35.6, 40:1299.35.19.

165. The Louisiana legislature prohibits public funding of abortion for victims of rape or incest unless the victim reports the act to law enforcement and certifies a statement of rape or incest that is witnessed by the physician. *Id.* §§ 40.1299.34.5, 40:1299.35.7.

166. Physicians who provide for the "elective termination of an uncomplicated viable pregnancy" are expressly excluded from malpractice reform provisions afforded to all other health care practitioners under the state's medical malpractice protection laws. *Id.* §§ 40.1299.31–39A, 40:1299.41(K).

167. The legislature has passed laws prohibiting insurance coverage of abortion in state exchanges under the Affordable Care Act. *Id.* § 22:1014. Louisiana does not allow women to obtain

insurance coverage for abortion even when a woman's life is endangered or when the pregnancy is a result of rape or incest. *Id.*

170. The Louisiana legislature permits hospitals to refuse to accommodate the performance of abortions. *Id.* § 40:1299.31–33.

169. Louisiana has no law which prohibits a hospital from discriminating against a physician applying for privileges there based on that physician's status as an abortion provider. *Compare* TEX. OCC. CODE § 103.002(b).

170. The effect of Act 620 is thus significantly different from admitting privileges requirements in states where physicians are protected from discrimination. *See*, *e.g.*, *Cole*, 790 F.3d at 563; *see also Abbott II*, 748 F.3d at 598 n.13.

171. Before the enactment of Act 620, Louisiana already had in force numerous laws and regulations covering abortion facilities, including requirements that facilities be inspected at least annually, *see*, *e.g.*, La. Rev. Stat. 40:1061 et seq. (re-designated from La. Rev. Stat. 40:1299 et seq.); La. Rev. Stat. 40:2175.1 et seq., and that they retain a readily accessible written protocol for managing medical emergencies and the transfer of patients requiring further emergency care to a hospital (i.e. a transfer agreement).[36] *See also generally* La. Admin. Code tit. 48, pt. I, §§ 4405, 4407(A).

---

[36] Louisiana regulations had previously provided: "[A licensed abortion] facility shall ensure that when a patient is in the facility for an abortion, there is one physician present who has admitting privileges or has a written transfer agreement with a physician(s) who has admitting privileges at a local hospital within the same town or city to facilitate emergency care"). Former La. Admin. Code tit. 48, pt. I, § 4407(A)(3), available at 29 La. Reg. 706-07 (May 20, 2003). Shortly before trial, Defendant Kliebert repealed the prior regulation, and replaced it with an admitting privileges requirement identical to the Act. La. Admin. Code, tit. 48, pt I., § 4423(B)(3)(e), available at 41 La. Reg. 696 (Apr. 20. 2015)

**C.      Drafting of Act 620**

172. Act 620 was modeled after similar laws which have had the result of closing abortion clinics in other states. On May 5, 2014, Ms. Dorinda Bordlee ("Bordlee"), the Vice President and Executive Counsel of the Bio Ethics Defense Fund, an anti-abortion advocacy group, sent the draft's primary legislative sponsor, Representative Katrina Jackson ("Jackson"), an email regarding a similar statute passed in Texas that had "tremendous success in closing abortion clinics and restricting abortion access in Texas." (Docs. 191 at 200; 196-5 at 2; 196-10 at 1.) Bordlee told Jackson that "[Act 620] follows this model." (Docs. 191 at 200; 196-5 at 2; 196-10 at 1.)

173. Evidence received demonstrates the coordination among advocacy groups, Jackson, and DHH employees regarding efforts to restrict abortion. (*See*, *e.g.*, Doc. 191 at 199–202, 211–13, 215–16, 220–21; JX 3, 6–16.)

174. In a press release regarding Act 620 released on March 7, 2014, Jindal declared his position that Act 620 was a reform that would "build upon the work . . . done to make Louisiana the most pro-life state in the nation." (PX 174 at 1; Doc. 191 at 224–27.) Jindal stated:

> Promoting a culture of life in Louisiana has been an important priority of mine since taking office, and I am proud to support [Act 620] this legislative session. In this state, we uphold a culture of life that values human beings as unique creatures who were made by our Creator. [Act 620] will build upon all we have done the past six years to protect the unborn.

(PX 174 at 1.)

175. Indirectly referencing the legislation just summarized, Jackson is quoted in this press release as saying that Act 620 "will build on our past work to protect life in our state." (*Id.* at 2.)

176. Similarly, in her testimony before the Louisiana House Committee in support of Act 620, Kliebert testified that Act 620 would strengthen DHH's ability to protect "unborn children." (Doc. 191; JX 140 at 1.)

177. The talking points prepared for Secretary Kliebert by Representative Jackson's office stated that DHH was "firmly committed to working with Representative Jackson and the Legislature to continue to work to protect the safety and well-being of Louisiana [women] and the most vulnerable among us, unborn children." (Doc. 191 at 222–23; *see also* JX 24 at 2–4.)

**D.     Official Legislative History of Act 620**[37]

178. Act 620 (at the time known as HB 388) was considered by the House Health and Welfare Committee on March 9, 2014, and the Senate Health and Welfare Committee on May 7, 2014. The House and Senate Committees heard extensive testimony regarding the purposes of proposed statute. (DX 119 at 1–30, 39–67.)

179. More specifically, the House and Senate Committees heard testimony that the proposed statute was intended to safeguard the health and safety of women undergoing abortions in outpatient clinics in Louisiana. (*Id.*)

180. For example, the House and Senate Committees heard testimony that:

-       Abortion carries the risk of serious complications that could require immediate hospitalization. (*Id.* at 3, 5.)

---

[37] The official legislative history, submitted as one document, (DX 119), contains the reports of the House and Senate as well as a transcript of various senators' comments, each of which commence with their own page number. Thus, for the sake of easy location, this Court cites to the page number of the pdf document itself. Within Document Number 119, the House report appears on pages 2 through 30, the Senate report on pages 33 through 67, and the transcript of the Senate floor debate on pages 69 through 73.

- Women who experience abortion complications frequently rely on the care of emergency room physicians, who often must call on the assistance of a specialist in obstetrics or gynecology. (*See id.* at 4, 5, 8.)

- "[M]ost emergency departments lack adequate on-call coverage for medical and surgical specialists, including obstetricians and gynecologists." (*Id.* at 48.)

- The history of health and safety violations by Louisiana abortion clinics raises concerns about the potential for serious abortion-related complications. (*Id.* at 10.)

- Requiring outpatient abortion providers to have admitting privileges benefits the safety of women seeking abortion and also enhances regulation of the medical profession. (*Id.* at 3, 48.)

- For instance, the admitting privileges requirement improves the "credentialing process" for physicians by "provid[ing] a more thorough evaluation mechanism of physician competency than would occur otherwise." (*Id.* at 48.)

- The requirement also "acknowledges and enables the importance of continuity of care" for an abortion patient. (*Id.*)

- Additionally, the requirement "enhances inter-physician communication and optimizes patient information transfer and complication management." (*Id.*)

- Finally, the requirement "supports the ethical duty of care of the operating physician to prevent patient abandonment." (*Id.* at 3, 48.)

- A virtually identical admitting privileges requirement in Texas had recently been upheld by the U.S. Fifth Circuit as a reasonable measure for achieving these health and safety goals. (*Id.* at 48.)

- There was no obstacle preventing abortion providers from obtaining admitting privileges at Louisiana hospitals. (*Id.* at 9 (testimony that one Louisiana abortion provider already had admitting privileges).)

- Louisiana hospitals grant or deny admitting privileges "based entirely on [the applicant's] medical training and experience." (*Id.* at 50.)

- Louisiana hospitals have recognized categories of staff membership to accommodate physicians who are expected to admit low numbers of patients for a variety of reasons. (*Id.* at 50.)

181. Additionally, the House and Senate Committees also heard testimony that, unlike physicians performing surgical procedures in ambulatory surgical centers in Louisiana, physicians performing abortions in outpatient clinics had not previously been required to have any kind of hospital privileges. The committees heard testimony explaining that the proposed statute was designed to close that loophole and thus achieve greater consistency in the overall regulation of outpatient surgical procedures in Louisiana. (*See id.* at 2–4 (House committee testimony regarding goal of achieving greater consistency with ASC regulations), 41–43 (Senate committee testimony regarding same subject).)

182. For example, the House and Senate Committees heard testimony that:

- The Act was intended to bring outpatient abortion facilities in line with "the standard that is currently in place for [ASCs] as set forth in Louisiana Administrative Code, Chapter 45 … Section 4535." (*Id.* at 4.)

- The Act intended to "close a loophole" in Louisiana regulation by requiring outpatient abortion providers to have privileges comparable to those required for physicians performing outpatient surgery in ASCs. (*Id.* at 41–42.)

- The Act's requirement of admitting privileges is consistent with requiring surgical privileges for ASC physicians. (*Id.* at 49 (explaining that "the effect is the same both in terms of … the credentialing process itself and in the application of the standards by the state").)

- In both cases, the privileges requirement is based on the "well-established principle … that a provider should not undertake a procedure unless he is qualified and able to take care of whatever complications there might be." (*Id.* at 49.)

183. The full House and Senate heard statements in support of HB 388 explaining that it was intended to protect "the safety of women" and ensure that "every physician performing any surgery, including abortions, does so in a prudent manner and with the best interest of each woman's health in mind," (*Id.* at 34–35), and also that it was intended to safeguard "the lives and safety of pregnant women who may experience short-term risk[s] of abortion, which can include hemorrhaging, uterine perforation, or infection," (*Id.* at 48).

184. The full House was informed that the proposed law tracked the Texas admitting-privileges law, HB 2, which had been upheld as constitutional by the U.S. Fifth Circuit Court of Appeals a week earlier. (*Id.* at 34–35 (referring to *Abbott II*).)

185. The Senate approved one amendment to the proposed statute, concerning the definition of admitting privileges, and rejected another amendment that would have eliminated the 30-mile radius requirement. (*Id.* at 69–70.)

186. The proposed statute passed both chambers, with 85 House members and 34 Senators voting in favor, and 88 House members concurring in the Senate amendment. *See* https://www.legis.la.gov/legis/ViewDocument.aspx?d=887948 (House final passage); https://www.legis.la.gov/legis/ViewDocument.aspx?d=903997 (Senate final passage); https://www.legis.la.gov/legis/ViewDocument.aspx?d=903981 (Senate amendment); https://www.legis.la.gov/legis/ViewDocument.aspx?d=906861 (House concurrence) (all legislative websites last visited Aug. 24, 2015).

## VII.   The Purpose and Medical Need for and Reasonableness of Act 620

187. The evidence introduced to show the purpose of Act 620 came in several forms. The Plaintiffs offered: (1) press releases, public statement, emails, and similar evidence produced by public officials, lobbyists, advocacy groups and others involved or interested in the drafting and passage of Act 620; (2) the testimony of some of those involved in these communications; (3) Louisiana's legislatively stated "longstanding policy . . . to protect the right to life of the unborn child from conception by prohibiting abortion impermissible only because of the decisions of the United States Supreme Court . . . .," La. R.S. § 40:1299.35.0; and (4) expert testimony  purporting to show two things: first, there is no medical need for Act 620 because legal abortion is safe, and second, that Act 620 is medically unreasonable in that Act 620 does not advance the health and safety of women undergoing abortions.

188. In support of her position, Defendant offered: (1) the text and legislative history of the Act, including testimony considered during the legislature's deliberations, and (2) expert testimony at trial purporting to show that the admitting privileges requirement is needed because of potential

complications from abortions and that the Act is medically necessary and beneficial for the health and safety of a woman undergoing an abortion.

189. In its original Ruling (Doc. 216, at 51-53), the Court made the findings of fact which follow. However, the Court did not detail its weighing of the evidence on these points because, under the then existing Fifth Circuit test, these conclusions were legally irrelevant. (*See* Doc. 216, footnotes 39-43.) Given the standard the Court must now apply, these findings of fact are relevant and the Court will follow its summary of findings with a review of how it reached them.

(A)     A purpose of the bill is to improve the health and safety of women undergoing an abortion.

(B)     Another purpose of the bill is to make it more difficult for abortion providers to legally provide abortions and therefore restrict a woman's right to an abortion.

(C)     There is a dispute medically and scientifically as to whether Act 620 serves a legitimate medical need and is medically reasonable.

(D)     Legal abortions in Louisiana are very safe procedures with very few complications.

(E)     The vast majority of women who undergo abortions in Louisiana are poor. (*See*, *e.g.*, JX 124 at 2480; Docs. 191 at 190–91; 190 at 34.) As a result of that poverty, the burden of traveling farther to obtain an abortion would be significant, fall harder on these women than those who are not poor and cause a large number of these women to either not get an abortion, perform the abortions themselves, or have someone who is not properly trained and licensed perform it. (*See*, *e.g.*, JX 124 at 2480; Docs. 191 at 190–91; 190 at 34.)

(F)     The medical benefits which would flow from Act 620 are minimal and are outweighed by the burdens which would flow from this legislation.

190. The relevance and weight of these factual findings in the context of the prevailing Supreme Court test is discussed in more detail in this Ruling's final substantive sections. *See infra* Parts X–XI. What follows is the Court's review of the evidence on these points including the weighing of the testimony and credibility of the witnesses which supports its findings.

## A. Expert Testimony

191. Evidence concerning the safety of abortion was adduced largely through expert testimony, which was borne out by the experience of Louisiana abortion providers who testified. The Court turns now to a discussion of its credibility findings concerning the parties' experts; the factual findings that stem from the experts' opinions follow.

192. The Court was impressed with the credibility and expertise of Plaintiffs' experts.[38] Dr. Eva Pressman is the Chair of the Department of Obstetrics and Gynecology at the University of Rochester Medical Center, where she is in charge of a department of 50 faculty members. (Doc. 195 at 11:13-12:16.) Subsequent to her residency, and before coming to the University of Rochester, Dr. Pressman served as a professor and Director of Fetal Assessment at Johns Hopkins. (*Id.* at 13:13-14:10; PX 94, 131 ¶¶ 3-4.) At Johns Hopkins, Dr. Pressman had a surgical abortion practice, up to 24 weeks gestation. (Doc. 195 at 13:6-12.) Dr. Pressman has published in excess of 70 research articles in peer-reviewed medical journals and received more than 20 research grants, including from the National Institutes of Health. (*Id.* at 14:11-15:5; *see generally* PX 94.) The

---

[38] *See* Doc. 216, footnote 42.

Court accepted Dr. Pressman as an expert in hospital credentialing, obstetrics, and abortion care. (*Id.* at 17:16-20:25.)

193. Dr. Christopher Estes is an OB/GYN with a master's degree in public health from Columbia University. (Doc. 190 at 186:8-189:10.) For seven years, he was a professor on the faculty of the University of Miami's Miller School of Medicine and an OB/GYN surgeon who performed, among other procedures, first and second trimester abortions, with a specialty in high-risk patients. (*Id.* at 189:16-191:8.) Dr. Estes is presently the Medical Director of Planned Parenthood of South, East, and North Florida, where he provides the full spectrum of family planning services and surgery. (*Id.* at 186:10-23, 192:8-193:12; *see generally* PX 92.) The Court accepted Dr. Estes as an expert in public health, obstetrics, and abortion care. (Doc. 190 at 194:7-196:23.)

194. Plaintiffs' expert medical witnesses are both experienced women's health practitioners, with extensive experience, research, and knowledge of peer-reviewed medical literature related to abortion. Both testified candidly on direct and cross-examination. (*Id.* at 197:1-268:6; Doc. 195 at 11:12-96:12.) While these physicians had personal opinions about abortion, the Court did not find their expert opinions skewed by those opinions, which were well-supported by reliable facts and data, and are fully credited by the Court as truthful and reliable.

195. Defendant presented expert testimony from Dr. Damon Cudihy and Dr. Robert Marier. The Court had serious concerns about the credibility and reliability of Dr. Cudihy's testimony.[39] His testimony and opinions were shown to be contradicted by his own prior inconsistent statements and the sources on which he purported to rely. (*E.g.* Doc. 194 at 73:18-88:16 (opining that D&C, a

---

[39] See Doc. 216 footnote 39 ("[T]he Court had serious concerns about the credibility and bias of defense expert Dr. Damon Cudihy…")

miscarriage treatment comparable to early surgical abortion, should always be performed in a hospital, but relying on sources stating "a D&C can be done in a healthcare provider's office, a surgery center, or a hospital" and "for uncomplicated cases curettage in an operating room adds to the costs and inconvenience yet offers no medical benefit over outpatient curettage")). He was evasive on the stand. (*E.g.*, *id.* at 133:18-134:8, 134:16-135:12, 141:2-142:3, 161:20-162:9, 173:6-176:5.). His testimony also demonstrated a bias against legal abortion, which he described as "appalling, horrifying, tragic, and unnecessary," and which he testified should be criminalized. (*Id.* at 205:12-206:3.).

196. Further, Dr. Cudihy lacks relevant experience regarding the matters on which he offered opinions. He testified that he has never performed an abortion, nor has he studied the provision of abortion. (Doc. 194 at 21:16-21.) He has not treated a single abortion complication in the two years he has practiced medicine in Louisiana. (*Id.* at 73:25-74:8.) He conceded that several of his opinions about abortion relied on no sources at all, (*e.g.*, *id.* at 100:15-106:10; 111:25-112:12), and that others were based on conversations with a non-testifying defense expert, Dr. John Thorp, (*id.* at 140:1-18), whose testimony has been discredited in other suits regarding abortion restrictions, e.g. *Planned Parenthood of Wisconsin, Inc. v. Van Hollen*, 94 F. Supp. 3d 949, 968-69 (W.D. Wis. 2015), *aff'd*, 806 F.3d 908 (7th Cir. 2015), *cert denied*, 136 S. Ct. 2545 (2016); *Planned Parenthood Se., Inc. v. Strange*, 33 F. Supp. 3d 1381, 1394 (M.D. Ala. 2014).

197. The Court accordingly gives Dr. Cudihy's testimony minimal weight. However, even if fully credited, Dr. Cudihy's testimony would not change the Court's findings of fact as the Court found the expert testimony of the Plaintiffs' experts to be reasoned and supported.

198. Dr. Marier was accepted by the Court as an expert in internal medicine, the regulation of physicians and other health care professionals in Louisiana, and hospital administration. (Doc. 193 at 9:24-10:23.)  He was Chairman of the Department of Hospital Medicine at Ochsner Medical Center and previously served as the Executive Director of the Louisiana State Board of Medical Examiners. (*Id.* at 4:16-9:21.)

199. Dr. Marier's testimony regarding hospital privileging was well within his area of experience and expertise, and the Court gives considerable weight to that testimony.

200. However, Dr. Marier's testimony regarding the purported benefits of Act 620 to abortion patients suffered from his paucity of knowledge or experience concerning medical or surgical abortion procedures.[40]  Dr. Marier has never performed an abortion and has not had any experience with obstetric or gynecological surgeries since medical school.  (*Id.* at 51:14-25.)

201. Dr. Marier's testimony was also diminished by his bias, manifested in his testimony that abortion, and even contraception methods such as emergency contraception and intrauterine devices, should be outlawed in the United States.  (*Id.* at 106:10-107:19, 27:9-18, 89:2-14, 94:1-19, 94:20-97:10, 99:12-100:16.)

202. The Court accordingly gives Dr. Marier's testimony regarding the purported benefits for Act 620 minimal weight.  However, even if fully credited, this portion of Dr. Marier's testimony would not change the Court's findings of fact.

**B. Abortion Safety**

203. The Court makes the following findings regarding abortion safety based on expert and lay testimony, supported by the exhibits received in evidence.

---

[40] See Doc. 216 footnote 39 ([T]he Court had serious concerns about…Marier's expertise as it pertained to the subject of abortion practice….").

204. Abortion is a common medical procedure in the United States, with nearly one million procedures performed each year. (Doc. 190 at 197:1-6, 232:7-13; JX 123 ¶ 24.) Approximately one in three women in the United States will have an abortion during their lifetimes. (Doc. 190 at 197:1-6; JX 123 ¶ 24.)

205. Abortion is one of the safest medical procedures in the United States. (Doc. 190 at 199:6-24; Doc. 195 at 32:7-10; JX 123 ¶ 24.) Dr. Marier acknowledged "that most first-trimester abortions are performed without serious complications." (JX 135 at 2804.) There is far more risk associated with carrying a pregnancy to term and delivering a baby than with abortion. (Doc. 190 at 129:22-130:5, 199:6-10; JX 123 ¶ 61; Doc. 195 at 32:4-10.)

206. Approximately 90% of abortion procedures occur in the first trimester, almost all of which are performed in an outpatient setting. (Doc. 190 at 197:7-15; JX 123 ¶ 13; Doc. 195 at 33:16—19.)

207. There are two types of abortion procedures, surgical abortion and medication abortion. (JX 123 ¶ 15.) Surgical abortion is a minimally invasive procedure that involves the use of instruments to evacuate the contents of the uterus, but does not require an incision or the use of general anesthesia. (Doc. 190 at 138:24-139:17; Doc. 195 at 32:11-20, 48:20-49:3; JX 123 ¶ 16.)

208. First trimester surgical abortions are nearly identical to D&Cs to complete a spontaneous miscarriage or for other diagnostic or therapeutic reasons. (JX 123 ¶ 19; Doc. 168-6 at 6.) Physicians are not required to have admitting privileges in order to perform D&Cs to complete a spontaneous miscarriage or for other diagnostic or therapeutic reasons in Louisiana. (Doc. 194 at 116:10-15.)

209. Virtually all surgical abortions require only mild or moderate sedation and/or local anesthesia. (Doc. 190 at 138:24-139:17.) Mild or moderate sedation and local anesthesia are much safer than the general anesthesia used in an operating room setting. (Doc. 190 at 197:24-198:12; Doc. 195 at 33:24-35:19; JX 123 ¶ 18; PX 185 ¶ 793.)

210. Complications from surgical abortion are rare and include infection, hemorrhage, retained tissue, incomplete abortion, and perforation of the uterus. (Doc. 190 at 36:21-37:25, 198:13-199:5.)

211. Most complications of surgical abortions can be managed in the clinic, including by administering medications that reduce bleeding or cause the uterus to contract, massaging the uterus, applying pressure, suturing, or administering oral antibiotics to treat infection. Surgical intervention is not commonly required. (Docs. 190 at 25:3-6, 89:15-90:1, 135:10-137:9, 201:15-207:22; 195 at 38:22-39:4.) Serious complications requiring transfer directly from the clinic to a hospital are extremely rare. (Doc. 190 at 39:25-40:5, 246:6-9.)

212. Medication abortion involves the use of a combination of two drugs, usually mifepristone and misoprostol. (Doc. 190 at 130:9-131:2; JX 123 ¶ 22.) Plaintiff clinics offer medication abortion up to eight weeks LMP. *See supra* Part V.B. A woman typically takes mifepristone at the clinic and then takes misoprostol at home. (Doc. 190 at 131:20-132:7, 208:23-209:15.) Medication abortion requires no anesthesia or sedation. (JX 123 ¶ 23.) Medication abortion is also used as a treatment option in connection with spontaneous abortion, also known as miscarriage. (Doc. 190 at 210:23-211:12.)

213. The most common complication from medication abortion is incomplete abortion or retained tissue, which is typically remedied by a return visit to the clinic for a suction curettage procedure. (Docs. 190 at 132:9-22, 209:16-210:16; 195 at 43:19-44:4.)

214. The prevalence of any complication in first trimester abortion in the outpatient setting is approximately 0.8%. The prevalence of major complications requiring treatment in a hospital is 0.05%. The risks of abortion remain low through the second trimester, but the risks increase with gestational age. The risk of complication requiring hospitalization in the second trimester is approximately 1.0%. (Docs. 190 at 198:13-199:5, 199:11-24, 199:25-200: 9; JX 123 ¶ 25; 195 at 42:2-44:18, 75:14-76:5, 95:3-18; PX 195 at 499.)

215. By comparison, a D&C procedure performed after a miscarriage carries greater risk than a first trimester surgical abortion because, during a miscarriage, the cervix is already open, allowing the passage of bacteria into the uterine cavity, which increases the risk of infection. (Doc. 195 at 31:20-32:3, 35:21-36:2.)

216. Patients who visit the emergency room after an abortion often are experiencing normal side effects of the procedure and can be observed and released, or treated and released without admission. (Doc. 190 at 212:1-17; Doc. 195 at 37:20-39:4.)

217. It is more common for women to present at the emergency room with symptoms of miscarriage than with complications following an induced abortion.  (Doc. 190 at 212:18-25.) Emergency room doctors are equipped to treat a patient who is experiencing complications from either. (Doc. 190 at 213:1-6, 213:18-22; Doc. 195 at 59:5-7.) When a complication from abortion requires surgical intervention in the hospital setting, emergency physicians stabilize the patient and

facilitate treatment by the appropriate specialist. This is the standard of care. (Docs. 190 at 213:7-17, 249:8-250:21; 195 at 39:5-40:3, 55:14-56:12, 57:25-58:3; 193 at 52:21-53:1.)

218. In Louisiana, it is not required by law nor is it standard practice for a physician to have admitting privileges in order to transfer a patient to another medical facility for emergency care: Doe 1, who previously worked as a rural emergency physician, routinely transferred patients with severe emergencies to other hospitals without admitting privileges. (Doc. 192 at 18:13-19:15.)

219. In the last 23 years, Hope Clinic, which serves in excess of 3,000 patients per year, had only four patients who required transfer to a hospital for treatment. (Doc. 190 at 25:14-18, 127:8-11.) In each instance, regardless of whether the physician had admitting privileges, the patient received appropriate care. (*Id.* at 127:11-23, 128:5-14, 128:15-129:8, 172:13-173:5, 129:9-21.) At Hope Clinic, if a physician determines that a patient needs to be transported to the hospital, he directs an employee to call for emergency transport. The administrator ensures that the chart is complete so that a copy can be sent to the hospital. The physician also contacts the hospital to alert the attending physician that the patient will be arriving and to provide information about the complication. (*Id.* at 25:19-26:14.)

220. From 2009 through mid-2014, approximately 4,171 abortions were performed at Bossier Clinic, and only two patients required direct hospital transfer following an abortion. (JX 117 ¶ 9.)

221. In the same period, approximately 10,836 abortions were performed at Causeway Clinic, and only one patient required direct hospital transfer after an abortion. (JX 117 ¶ 9.)

222. Dr. Doe 2, who has performed 30,000 to 40,000 abortions since 1980, has had no more than twenty patients who required hospitalization. (Doc. 191 at 46:12-21.)

223. From 2009 through mid-2014, Dr. Doe 2 directly cared for approximately 6,000 patients who received abortions. Only two of these patients experienced complications requiring direct hospital transfer. (JX 187 ¶ 6.) In both of those situations, he spoke with the hospital doctor who took over care when the patient was admitted to the hospital. Both of these patients received appropriate care. (Doc. 191 at 43:14-45:10, 45:11-46:11.) He has never sent a patient to another institution without calling the doctor taking over care for the patient and sending all available written patient medical records to that doctor. (*Id.* at 42:20-43:13.)

224. Dr. Doe 5 has performed thousands of abortions at Women's Clinic and Delta Clinic in the past three years and has never had to transfer a patient to the hospital. (JX 110 ¶ 7.)

225. Dr. Doe 6 has performed thousands of surgical and medical abortions over more than the past ten years and only two of those patients required a direct transfer to the hospital. (JX 168 ¶ 8.)

226. In sum, the testimony of clinic staff and physicians demonstrated just how rarely it is necessary to transfer patients to a hospital: far less than once a year, or less than one per several thousand patients. As stated by the Supreme Court in its affirmation of the District Court's findings in *WWH* and certainly true in Louisiana: "[T]here was no significant health-related problem that the new law helped to cure." 136 S. Ct. at 2311.

227. Louisiana physicians, even were they able to obtain admitting privileges, would rarely if ever have an occasion to use them, and would never need to, given that they are not required to admit patients to a hospital in the extremely unlikely event that a patient needs hospital transfer.

228. When women do not have access to safe abortion, because abortion is expensive or difficult to obtain, they may be forced to delay and seek an abortion at a later gestational age, which

increases the risks of the procedure.   (Doc. 190 at 200:20-201:6, 223:19-224:8; JX 123 ¶ 60.) Women may also resort to trying to self-induce abortions, seek unsafe abortions, or obtain medications through the internet, which can carry significant risk of death, complications, or poor health outcomes.  Women without financial resources are at the greatest risk of these consequences. (Doc. 190 at 224:9-225:3; JX 123 ¶¶ 60, 62.)

### C. Requiring Abortion Practitioners to Obtain Admitting Privileges Confers No Medical Benefit

229. The Act's requirement that abortion providers have active admitting privileges at a hospital within 30 miles does not conform to prevailing medical standards and will not improve the safety of abortion in Louisiana.  (Doc. 190 at 214:3-13, 225:4-6.)  It provides no benefits to women and is an inapt remedy for a problem that does not exist. (*Id.* at 222:13-16; Doc. 195 at 26:5-16, 28:13—20; Doc. 168-10 at 23-24.)

230. Defendant did not introduce any evidence showing that patients have better outcomes when their physicians have admitting privileges. Nor did Defendant proffer evidence of any instance in which an admitting privileges requirement would have helped even one woman obtain better treatment.

231. Admitting privileges requirements such as the Act's are opposed by the medical community.  Specifically, the American College of Obstetricians and Gynecologists ("ACOG") and the American Medical Association ("AMA") are opposed to these admitting privileges requirements.  (PX 142; JX 136; Doc. 190 at 215:4-15); *see also WWH*, 136 S. Ct. at 2312-13. Both ACOG and the AMA have taken the position that "there is simply no medical basis to impose a local admitting privileges requirement on abortion providers," and that such requirements are "out

of step with modern medical practice, which contemplates provision of emergency care by specially trained hospital physicians at a hospital near the patient's residence." (PX 142 at 16, 22); *see also WWH*, 136 S. Ct. at 2312.

232. Whether or not a patient's treating physician has admitting privileges is not relevant to the patient's care. Patients who present to the emergency room do not receive a lesser standard of care because their treating physician did not have admitting privileges. (Doc. 190 at 221:1-14.)

233. If a patient needs to be admitted to the hospital for care, the patient can present to the emergency room and will be admitted to the hospital. A hospital cannot turn away a patient experiencing an emergency because it is unethical and would be a violation of federal law. (Doc. 190 at 221:1-8); 42 U.S.C. § 1395dd (2011).

234. It is routine for emergency room doctors to assess patients, many of whom are experiencing the stress of injury, illness, or trauma. Patients, even when in significant levels of distress, are able to give emergency room doctors pertinent medical history. (Doc. 190 at 260:6-261:15, 265:2-20.)

235. If a patient needs emergency surgery, the patient will be treated by the specialist on call who is best qualified to perform the type of surgery needed. (*Id.* at 220:11-25; Doc. 191 at 15:16-16:2; Doc. 195 at 28:21-29:17.)

236. Admitting privileges do little to advance and are not necessary for continuity of care. In the medical community, continuity of care is understood to mean that if a physician is not able to continue providing care to a patient, the physician will make certain that another physician has the information needed to care for the patient. (Docs. 190 at 124:23—125:12; 191 at 40:24—41:19.) Continuity of care can be accomplished by communicating with the physician to whom the patient's

care is being turned over.  (Doc. 190 at 124:23—125:3.)  For example, physicians within an OB/GYN practice routinely care for each other's patients, including deliveries. (Doc. 190 at 124:15-125:12; Doc. 191 at 40:24-41:19.)   And, as Dr. Doe 2 testified, on the rare occasions when he transferred a patient to the hospital, he communicated directly with the physician assuming care and provided the patient's records.  (Doc. 191 at 42:20-43:13.)

237. Many physicians who practice in office settings are able to ensure continuity of care for their patients without having admitting privileges.  (Doc. 190 at 216:8-21; Doc. 195 at 28:21-30:10.)

238. Indeed, the normal practice of medicine involves physicians handing patients off from one shift to the next, from an office-based setting to an emergency room, and from an emergency room to an in-patient ward.  (Docs. 190 at 218:1-8; 195 at 79:1-6.)  When physicians rely on other physicians to assist in caring for their patients, it is not considered patient abandonment.  (Doc. 168-10 at 11.)   A physician's transfer agreement with another physician, which all abortion clinics must maintain under pre-existing law, is a mechanism to ensure continuity of care.  (Docs. 168-7 at 26; 168-9 at 17; 168-10 at 22.) Continuity of care for a patient is often maintained even without formal measures like transfer agreements.  (Doc. At 190 241:13-23, 242:19-243:1.)

239. Most complications from surgical abortion do not occur immediately at the clinic, which is why transfer directly to a hospital is so very rare. (*See generally* Doc. 190 at 90:23-91:15.) If a patient experiences a complication after she leaves the clinic, the clinic will advise her to go to the hospital closest to her, which is not necessarily a hospital within 30 miles of the clinic. (Doc. 190 at 90:23-91:15, 126:17-127:7; JX 159 at 3491; JX 162 at 3504; JX 165.)  This is the standard of care.  (Doc. 190 at 222:1-12.)

69

240. In conclusion, there is no credible evidence in the record that Act 620 would further the State's interest in women's health beyond that which is already insured under existing Louisiana law. Indeed, the overwhelming weight of the evidence demonstrates that, in the decades before the Act's passage, abortion in Louisiana has been extremely safe, with particularly low rates of serious complications, and as compared with childbirth and with medical procedures that are far less regulated than abortion.

241. Indeed, the Court notes that this Court's findings are consistent with that of other District Courts who have tried this issue. *See Whole Woman's Health v. Lakey*, 46 F. Supp. 3d 673, 684 (W.D.Tex. 2014) ("The great weight of the evidence demonstrates that, before the act's passage, abortion in Texas was extremely safe with particularly low rates of serious complications and virtually no deaths occurring on account of the procedure."), *quoted with approval in WWH,* 136 S.Ct. at 2302, 2311); *Planned Parenthood of Wis., Inc. v. Van Hollen*, 94 F. Supp. 3d 949, 953 (W.D. Wis. 2015) *aff'd sub nom. Planned Parenthood of Wis. Inc. v. Schimel*, 806 F.3d 908 (7th Cir. 2015); *Planned Parenthood Southeast, Inc. v. Strange*, 33 F. Supp. 3d 1330, 1378 (M.D. Ala. 2014), *cited with approval in WWH*, 136 S. Ct. at 2311-12.

242. In the preliminary injunction order, the Court refrained from making a finding as to whether Act 620 serves the State's purported interest in women's health because it was limited by then- prevailing Fifth Circuit precedent. In light of *WWH*, the Court now assesses the relevant evidence and resolves as a factual matter that Act 620 would do very little, if anything, to advance women's health and indeed would, by limiting access to legal abortions, substantially increase the risk of harm to women's health by increasing the risks associated with self-induced or illegal and unlicensed abortions.

**VIII.** **Efforts of Doctors to Comply With Act 620 and the Results of Those Efforts**

**A.** **Doe 1**

243. For over a year prior to his trial testimony on June 24, 2015, Doe 1 has been trying, in various ways, to gain active admitting privileges at a hospital within 30 miles of Hope where he performs abortions and thereby comply with Act 620. (Doc. 192 at 42–44.)

244. The Court finds that Doe 1 is a well-qualified physician and a credible witness. (*See*, *e.g.*, Doc. 192 at 7–14; JX 111 ¶ 1; 116 ¶ 5.)

245. The Court finds that despite his good faith efforts to comply with Act 620, Doe 1 has failed to get active admitting privileges at five different hospitals for reasons unrelated to his competence. (*See, e.g.*, JX 116 ¶ 27.)

246. Doe 1 has attempted to get privileges at five separate nearby hospitals and, despite his efforts and his qualifications, has not been given active admitting privileges at any of these hospitals, including University Health, Minden, North Caddo Regional ("North Caddo"), Christus, and Willis-Knighton. (*See*, *e.g.*, Doc. 192 at 47–51.)

247. Doe 1 contacted the director of the Family Medicine Department at University Health in Shreveport where he had done his residency in family medicine. Doe 1 was initially told that he would be offered a job as a faculty member teaching sports medicine which would "take care of the admitting privileges thing." Doe 1 was told that the application forms for admitting privileges would be forwarded to him. (*Id.* at 45; *see also* JX 186 ¶ 7.)

248. When Doe did not get the application forms and inquired, he was told by the director of the department that he would not be offered a position because "there was some objection from

certain staff about [Doe 1] coming to work there because of where [he] work[ed], at Hope Medical."
(Doc. 192 at 44–45; *see also* JX 186 ¶ 7.)[41]

249. The director suggested that he try with the OB/GYN Department but when that route was explored, Doe 1 was advised by email that it would be "inappropriate" to have a family medicine doctor on the OB/GYN staff. (Doc. 192 at 47.)

250. Based on these communications, Doe 1 did not file a formal application for admitting privileges to University. (*Id.*)

251. When Pittman, Hope's Administrator, made inquiries about admitting privileges to North Caddo on behalf of Doe 1, she was told that they did not have the capacity for and could not accommodate transfers. (JX 116 ¶ 22; *see also* Doc. 192 at 49.) Therefore, Doe 1 did not file a formal application. (Doc. 192 at 49; *cf.* JX 116 ¶ 22.)

252. Doe 1 filed a formal application for privileges at Minden. (JX 50; Doc. 192 at 50–51.) Minden's Medical Staff Coordinator wrote to Doe 1 declining his application: "Since we do not have a need for a satellite primary care physician at this time, I am returning your application and check." (JX 50 at 318; *see also* Doc. 192 at 50–51.)

253. While the Court, like Doe 1, does not understand the meaning of the stated reason for declining the application, it is clear that the denial of privileges is unrelated to the qualifications and competence of Doe 1. (*See* Doc. 192 at 51.)

254. Doe 1's efforts to get admitting privileges at Christus reads like a chapter in Franz Kafka's *The Trial*. (*See*, *e.g.*, JX 71; Doc. 192 at 52–66.)

---

[41] This testimony was objected to as hearsay, (Doc. 192 at 46), which objection was overruled for the reasons summarized above. *See supra* note 29.

255. Doe 1 submitted his application for courtesy privileges to Christus on July 25, 2014, on a form provided by Christus. (JX 132 at 2772; JX 116 ¶ 23; Doc. 192 at 52.) Courtesy privileges gives a physician with such privileges the ability to admit patients. (Doc. 192 at 52–53.)

256. On August 25, 2014, Christus asked for additional information, (JX 71 at 1254; *see also* Doc. 192 at 54–55), which he provided on September 17, 2014, (JX 71 at 1267; JX 133; Doc. 192 at 55–56).

257. Via a letter dated October 14, 2014, yet more information was sought from Doe 1 by Christus, (JX 71 at 1268; *see also, e.g.*, Doc. 192 at 58–59), which he supplied on October 20, 2014, (JX 71 at 1273; Doc. 192 at 59–60), and October 25, 2014, (JX 134 at 2802–03).

258. When Pittman called Christus to make an appointment for Doe 1 to get an identification badge, also a requirement of the application process, an appointment was refused because, Pittman was told, Doe 1 had submitted the wrong kind of application and that he should be submitting a "non-staff care giver" application. (Doc. 192 at 62; *cf.* JX 71 at 1268, 1270, 1276.)

259. On December 17, 2014, Doe 1 then received a letter stating that his application was incomplete because Doe 1 hadn't gotten the badge (the same badge Christus would not give him an appointment to get) and because more than 90 days had elapsed since his application was submitted, the application was "deemed withdrawn." (JX 71 at 1279; Doc 192 at 63.)

260. In a follow up conversation initiated by Doe 1 and in a subsequent email from Christus, Doe 1 was told that he needed to file an application for non-staff care giver privileges, a type of privilege that would not allow him to admit patients and therefore would not qualify as "active admitting privileges" under Act 620. (JX 190 at 3662; Doc. 192 at 63–66.)

261. While there was never a formal denial of Doe's application, Christus's delays and failure to formally act, as outlined above, constitutes a de facto denial of his application for the privileges required by Act 620.

262. Doe 1's experience was similar when he applied for courtesy privileges at Willis-Knighton beginning on June 15, 2014. (JX 53; JX 116 ¶ 27; Doc. 192 at 67–78.) These privileges would have allowed Doe 1 to admit patients. (Doc. 192 at 68–69.)

263. Because of his Board Certification in addiction medicine and because Willis-Knighton has an addiction recovery center, Doe 1 filed his application for privileges as an addiction medicine specialist. (*Id.* at 70.)

264. Doe 1's application was denied because he had not undergone a residency program in addiction medicine, despite his board certification in addiction medicine and even though there was no residency program available when he got his board certification. (JX 51 at 508; Doc. 192 at 72–73.)

265. On February 1, 2015, Doe 1 re-submitted an application, this time as a Family Practice specialist. (JX 97 at 2069–2117; Doc. 192 at 73–74.)

266. On March 11, 2015, Willis-Knighton requested information regarding documentation of "hospital admissions and management of patients 18 years old of age or older in the past 12 months." (JX 128; Doc. 192 at 75–76.)

267. On March 24, 2015, Doe 1 provided the requested information. (JX 189; Doc. 192 at 77–78.) Because of the nature of his practice, he had not admitted any patients in the last 12 months, but he did provide detailed information about his training and procedures done during that same time period. (*Id.*)

268. Despite the lapse of more than eight months since his second application and more than five months since he provided the information requested in support of that application, Willis-Knighton has neither approved nor denied his application. (*See*, *e.g.*, *id.* at 78.) Under these circumstances, the Court finds that this application has been de facto denied.

**B.    Doe 2**

269.  Before its closure on March 30, 2017, Doe 2 performed abortions at Bossier Clinic, and through January 30, 2016, also performed abortions at Causeway Clinic.  (Doc. 191 at 17:5-9; Doc. 255 ¶ 1.) Currently, Doe 2 has a working agreement with Hope under which he performs abortions when Hope's primary physicians, Doe 1 and Doe 3 are unavailable to perform abortion care. (Doc. 272 ¶¶ 3—4.)

270. The Court finds Doe 2 to be a well-qualified and competent physician and a credible witness. (*Id.* at 13–17; JX 112 ¶ 1.)

271. Doe 2 does not currently have active admitting privileges at a hospital within 30 miles of Bossier Clinic. (Doc. 191 at 19.)

272. Doe 2 has been unsuccessful in his good faith efforts to get admitting active admitting privileges within 30 miles of the Bossier Clinic. (*See*, *e.g.*, Doc. 191.)

273. Doe 2 worked as an Assistant Clinical Professor of Medicine at LSU Medical School, now known as University Health, at various times for approximately 18 years total, leaving LSU in 2004. (*Id.* at 14–15.)

274. While he was on staff at University and during the years in which he engaged in a general OB/GYN practice, Doe 2 had admitting privileges at various hospitals. (*Id.* at 24, 95.)

275. When he left the University staff in 2004, Doe 2 was given consulting privileges, which allow him to consult but not to admit patients. (Doc. 191 at 23–24, 84–88; JX 79 at 1708–09; JX 185.)[42]

276. Following the passage of Act 620, Doe 2 attempted to upgrade his privileges at University to allow him to admit patients in order to comply with the requirements of the Act. (Doc. 191 at 24–25.)

277. When he spoke to Dr. Lynne Groome ("Groome"), the head of the OB/GYN Department at University, about upgrading his privileges, he was told this would not happen because of his abortion practice. (*Id.* at 25–26; *cf.* JX 116 ¶ 27.)

278. In his testimony before this Court, he thusly described his communication with Groome:

> Q. What's your understanding of why you were not able to upgrade your privileges at LSU?
>
> A. Well, Dr. Groome told me that he was reluctant to even consider that, because it was such a controversial topic, but he would take it to the Dean and ask, which he did and he essentially said that you're not going to go beyond your [clinical] privileges.
>
> Q. Were you surprised by that response?
>
> A. No.
>
> Q. Why weren't you surprised?

---

[42] While Doe 2 initially thought that these were called "courtesy privileges," he corrected his mistake on cross examination. (Doc. 191 at 23, 81–87; JX 185.)

A. Just because of the political nature of what I do and the controversy of what I do.

(*Id.* at 25–26.)[43]

279. During the summer of 2014, Doe 2 also applied for privileges at WKB. (*Id.* at 26–27.)

280. On August 11, 2014, the Department of OB/GYN and Pediatrics Performance Peer Review Panel ("PPRP") at WKB wrote to Doe 2 asking for additional information: "In order for the Panel to sufficiently assess your clinical competence, you will need to submit documentation, which should include operative notes and outcomes, of cases performed within the last 12 months for the specific procedures you are requesting on the privilege request form." (JX 144 at 3445–46; *see also*, *e.g.*, Doc. 191 at 29.)

281. After Doe 2 made information regarding his prior outpatient operations available to WKB, (Doc. 191 at 30), he received another letter from WKB dated November 19, 2014, stating in pertinent part:

> The data [you] submitted supports the outpatient procedures you perform, but does not support your request for hospital privileges. In order for the panel to evaluate and make recommendations for hospital privileges [,] they must evaluate patient admissions and management, consultations and procedures performed. Without this information your application remains incomplete and cannot be processed.

(JX 89 at 1950; *see also* Doc. 191 at 30–31.)

282. Because of the nature of his non-hospital based practice, Doe 2 was unable to provide the requested information. (*See*, *e.g.*, Doc. 191 at 29:8-31:1.) Thus, while Defendant is correct that Doe 2's application was not formally denied (Doc. 201 at 11), Doe 2's application would never have been approved according to WKP's own letter. (JX 89; *see also*, *e.g.*, JX 144 at 3445-46.)

---

[43] This testimony was objected to as hearsay. (Doc. 191 at 25.) For the same reasons summarized above, *see supra* note 29, the objection was overruled.

283. As explained by Doe 2, "You know, they haven't formally denied me. . . . I'm in a Catch-22 basically. I can't provide information I don't have." (Doc. 191 at 79–80.)

284. This situation mirrors Doe 1's experience with three other Willis-Knighton-branded entities. Specifically, the Court also notes that although Doe 1, in response to a similar letter from WK Medical Center, WK South, and WK Pierremont, (JX 128), formally responded showing he had not had any hospital admissions in the last 12 months, (JX 189 at 3579; Doc. 192 at 77–78), WK still has not denied or approved his application, (Doc. 192 at 78).

285. The Court finds that, under these circumstances, Doe 2's inability to gain privileges at WKB are unrelated to his competence and that his application to WKB has been de facto denied.

286. While Defendant argues that Willis-Knighton's inaction is related to Dr. Doe 2's competence because, due to the nature of his practice, he cannot demonstrate "current clinical competence" (Doc. 201 at 11), the Court is not persuaded. The reality is different. Doe 2, a Board Certified OB/GYN who spent many years as an Assistant Clinical Professor at LSU Medical School and who, by Willis-Knighton's admission, has demonstrated his ability regarding outpatient surgeries, is in what he correctly describes a "Catch-22" created by a combination of the Act's requirement and the nature of his practice as an abortion provider.

287. Because Doe 2 also practiced at Causeway Clinic in Metairie, he applied for admitting privileges at Tulane, which is within 30 miles of Causeway. (*See*, *e.g.*, Doc. 191 at 32:24-35:21, 230:9-19; JX 180 at 3359.)

288. While Defendant has argued that the admitting privileges requirement is only about insuring competency of doctors who perform abortions and the process of gaining admitting privileges is neutral and devoid of considerations of the political, religious and social hostility

against abortion, the email exchanges between Doe 2 and Dr. A at Tulane demonstrate a very different reality, even in a metropolitan, university-based hospital. (JX 169–78;[44] *see also* Doc. 191 at 49–54.)

289. In this exchange, Dr. A first feels the need to discuss Doe 2's request for privileges "with our lobbyists." (JX 169.) Because Doe 2 is a "low/no provider" in hospitals in the New Orleans area, Dr. A states: "This is truly a rock and a hard place." (JX 172.) When Doe 2 expresses frustration with the lack of success in the application process, Dr. A states: "This is just ridiculous. I can't believe the state has come to this." (JX 174; *cf.* JX 170.) Dr. A continues: "I am working on an approach where you would get admitting privileges only for your patients . . . ." (JX 175.) When a proposed solution is found and Doe 2 expresses doubt that this will meet the requirements of the law, Dr. A responds: "Technically, you will have admitting privileges. Isn't that what the law says?" (JX 177). When discussing the need for a covering physician, Dr. A clarifies some of the problems surrounding Doe 2's application: "There were a few faculty who were not comfortable with covering; they were also concerned that 'Tulane as back up for an abortion clinic might not help our referrals.' Given this concern, Dr. B will cover for you formally." (JX 178.)

290. When privileges were finally granted by Tulane, Doe 2 was notified by Dr. A that the proposed privileges would have "the following limitations: 'Admissions of patients from the physician's clinical practice with complications of first and second trimester abortions with referral of those patients to an attending physician on the Tulane staff credentialed for OB/GYN privileges who has agreed to provide for such care for the physician's patients.'" (JX 181; *see also* Doc. 191 at 57, 60–61.)

---

[44] These exhibits, being jointly submitted, were admitted into evidence. (Doc. 191 at 54.)

291. Consistent with this email, Tulane's formal grant circumscribed Doe 2's privileges in these terms: "Admission of patients from the physician's clinical practice . . . with referral of those patients to an attending physician on staff at [Tulane Medical Center] credentialed for OB/GYN privileges who has agreed to provide care for the physician's patients at TMS." (JX 183 at 3652–3; *see also* Doc. 191 at 33, 55–58.)

292. The Parties disagree as to whether these admitting privileges qualify as "active admitting privileges" within the meaning of Act 620. (*Compare* Doc. 200 at 46–47, *with* Doc. 196 at 19–20.)

293. Defendant has filed an affidavit in which she states that the admitting privileges granted to Dr. Doe 2 by Tulane "are sufficient to comply with the Act." (JX 191 at 3668; *see also* Docs. 196 at 20; 200 at 48.)

294. Plaintiffs argue:

Although Secretary Kliebert has taken the position that Dr. John Doe 2's privileges at Tulane satisfy Act 620, Dr. John Doe 2 has concerns that her position is inconsistent with the plain language of the Act, which requires that 'the physician is a member in good standing of the medical staff of a hospital . . . with the ability to admit a patient and to provide diagnostic and surgical services to such patient.' . . . Based on Tulane's letters, Dr. John Doe 2 cannot provide diagnostic and surgical services to patients admitted to Tulane as required by the plain language of the statute.

(Doc. 196 ¶ 47 at 20 (*citing to* Doc. 193 at 123; Doc. 191 at 38–40).)

295. Plaintiff further argues:

Dr. John Doe 2 has concerns that the position Secretary Kliebert has taken regarding his privileges at Tulane during the course of this litigation may change at a later date. As a result, he will not risk his medical license by performing abortions in Metairie if Act 620 is allowed to take effect.

(*Id.* ¶ 48 at 20 (*citing* Doc. 191 at 38–40; JX 191).)

296. Defendant makes two counters:

Plaintiffs' 'concerns' about the Defendant's determination that Dr. Doe 2's privileges at Tulane satisfy the Act are legally irrelevant, because Defendant is the state official charged with interpretation and enforcement of the Act. Furthermore, Plaintiffs' assertions regarding the nature of Dr. Doe 2's privileges at Tulane Medical Center are clearly wrong because they are contradicted by the overwhelming weight of the evidence.

(Doc. 201 ¶ 47 at 12.)

297. Defendant further argues:

Plaintiffs' 'concerns' that the Defendant's determination that Dr. Doe 2's Tulane privileges satisfy the Act "may change at a later date" are legally irrelevant. Plaintiffs have produced no evidence indicating that any such "change" in position by Defendant with respect to Dr. Doe 2's Tulane privileges is likely to occur. The evidence therefore does not show that the Act or the Defendant pose any credible, concrete threat to Dr. Doe 2's ability to continue his practice at Causeway clinic. If Dr. Doe 2 voluntarily ceases to perform abortions at Causeway because of his fears that the Defendant (or some future Secretary) will change her position, that cessation would be attributable to Dr. Doe 2 alone and not to the Act itself.

(*Id.* ¶ 48 at 12.)

298. In light of Defendant's argument, so as to resolve this dispute and determine whether Doe 2 has "active admitting privileges" at Tulane, the Court must first determine whether it is bound by the interpretation given by Defendant and, if not, compare the privileges granted by Tulane with Act 620's definition of "active admitting privileges."

299. Whatever discretion the Secretary may have in a law's enforcement, no deference is owed to an opinion contrary to the law's unambiguous and plain meaning. *See*, *e.g.*, *Util. Air Regulatory Grp. v. EPA*, 134 S. Ct. 2427, 2442 (2014) (observing that "an agency interpretation that is inconsisten[t] with the design and structure of the statute as a whole . . . does not merit deference" (alteration in original) (citations omitted) (internal quotation marks omitted)); *Talk Am., Inc. v. Mich. Bell Tel. Co.*, 564 U.S. 50 (2011) (reaffirming the interpretive principle that only "[i]n

81

the absence of any unambiguous statute or regulation" does a court turn to an agency's interpretation"); *Robinson v. Shell Oil Co.*, 519 U.S. 337, 341, 117 S. Ct. 843, 846, 136 L. Ed. 2d 808 (1997) (emphasizing that a court's inquiry "must cease if the statutory language is unambiguous and the statutory scheme is coherent and consistent" and explaining that"[t]he plainness or ambiguity of statutory language is determined by reference to the language itself, the specific context in which that language is used, and the broader context of the statute as a whole" (internal quotation marks omitted)). Quite simply, if the legislative intent is clear, as evidenced by the use of an unambiguous word, "that is the end of the matter; for the court, as well as the agency, must give effect to th[at] unambiguously expressed intent." *Chevron, U.S.A., Inc. v. NRDC, Inc.*, 467 U.S. 837, 842–43, 104 S. Ct. 2778, 2781, 81 L. Ed. 2d 694 (1984) ("*Chevron*"); *see also Miss. Poultry Ass'n v. Madigan*, 992 F.2d 1359, 1363 (5th Cir. 1993) (quoting *id.*).

300. If the relevant statute is ambiguous, however, at least some deference is owed. *See Nat'l Cable & Telecommc'ns Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 980 (2005). But such deference is only accorded if the statute is truly "ambiguous" regarding the precise "question at issue" and if the agency's interpretation is a "reasonable" and hence "permissible construction of the statute" at hand. *Orellana-Monson v. Holder*, 685 F.3d 511, 517 (5th Cir. 2012); *see also*, *e.g.*, *Siew v. Holder*, 742 F.3d 603, 607 n.27 (5th Cir. 2014) (citing *id.*); *United States v. Baptiste*, 34 F. Supp. 3d 662, 670 (W.D. Tex. 2014) (same). Thus, even if the pertinent statute is ambiguous, an agency's interpretation may be denied "controlling weight" if "arbitrary, capricious, or manifestly contrary to the statute." *Rodriguez-Avalos v. Holder*, 788 F.3d 444, 449 (5th Cir. 2015) (quoting *Orellana-Monson*, 685 F.3d at 517).

301. Critically, as federal courts are bound to "interpret a state statute as that state's courts would construe it," *Newman*, 305 F.3d at 696, the same type of measured deference is afforded to agency interpretations by this state's courts. *Compare Silva-Trevino v. Holder*, 742 F.3d 197, 199–200 (5th Cir. 2014), *with Zeringue v. State Dep't of Public Safety*, 467 So. 2d 1358, 1361 (La. Ct. App. 5 Cir. 1985). Like their federal counterparts, Louisiana state agencies are "entitled to deference regarding . . . interpretation and construction of the rules and regulations that . . . [they] promulgate[]." *Women's & Children's Hosp. v. State*, 07-1157 (La. App. 1 Cir. 02/08/08); 984 So. 2d 760, 768–69; *see also Oakville Cmty. Action Grp. v. La. Dep't of Envtl. Quality*, 05-1365 (La. App. 1 Cir. 5/5/06); 935 So. 2d 175, 186 ("A state agency is charged with interpreting its own rules and regulations and great deference must be given to the agency's interpretation.")

302. However, as with *Chevron*, the statute itself must be ambiguous for such respect to be accorded. *Clark v. Bd. of Comm'rs*, 422 So. 2d 247, 251 (La. Ct. App. 1982) ("[A]lthough an agency's interpretation of a statute under which it operates is entitled to some deference, such deference is constrained by the court's obligation to honor the clear meaning of a statute, as revealed by its language, purpose and history."); *cf. Comm-Care Corp. v. Bishop*, 96-1711 (La. 07/01/97); 696 So. 2d 969, 973 ("The meaning and intent of a law is to be determined by consideration of the law in its entirety and all other laws on the same subject matter, and a construction should be placed on the provision in question which is consistent with the express terms of the law and with the obvious intent of the lawmaker in enacting it.").

303. Moreover, again as with a federal statute, "agency[] interpretations" lose any persuasive value, forfeiting any right to judicial deference, if "arbitrary, capricious or manifestly contrary to its rules and regulation." *In re Recovery I*, 93-0441 (La. App. 1 Cir. 04/08/94); 635 So.

2d 690, 696; *see also, e.g.*, *Doctors Hosp. of Augusta v. Dep't of Health & Hosps.*, 13-1762 (La. App. 1 Cir. 09/17/14); 2014 La. App. Unpub. LEXIS 481, at \*19–20, 2014 WL 4658202, at \*7 (refusing to accord any deference to an interpretation by the same agency here, deeming it "an abuse of discretion" that effectively rewrote the relevant statute); *Bowers v. Firefighters' Ret. Sys.*, 08-1268 (La. 03/17/09); 6 So. 3d 173, 176 ("Under the arbitrary and capricious standard, an agency decision is entitled to deference in its interpretation of its own rules and regulations; however, ***it is not entitled to deference in its interpretation of <u>statutes</u>*** and judicial decisions." (emphasis added)).

304. The Court finds that Defendant's interpretation of Act 620 is contradicted by its plain language. Expressly and unambiguously, the statute defines "active admitting privileges" to include "the ability to admit a patient and to provide diagnostic and surgical services to such patient consistent with the requirements of Paragraph (A)(1) of this Subsection [requiring a physician performing abortions to be licensed and have completed or be enrolled in an OB/GYN or family residency program]." LA. R.S. § 40:1299.35.2A(2)(a).[45]

305. Because the validity of Defendant's interpretation arose during trial, the Court asked the following question to Marier, Defendant's expert witness, a physician who helped draft Act 620, (Doc. 193 at 94): "And I understood you to say that the doctor, in order to meet Act 620 would have to - - would not have to be able to perform all diagnostic and surgical services, but *would have to perform some diagnostic and surgical services*. Did I understand that correctly?" (Doc. 193 at 123 (emphasis added).) To this question, Marier answered: "Yes. Yes, Your Honor." (*Id.*)

306. Because Doe 2's privileges are limited to "admission of patients" with the obligation to refer his patient to a "Tulane staff OB/GYN" for surgery and other kinds of treatment as well as

---

[45] As already noted, *see supra* note 2, the text of Act 620 can be found in a joint exhibit. (JX 115.)

diagnostic services, this arrangement does not allow Doe 2 to perform any (let alone "some") diagnostic, surgical or other kinds of treatment himself. Regardless of that fact that Tulane has chosen to label him an "admitting physician," (JX 184), he cannot "provide diagnostic and surgical services," and Act 620 expressly defines "active admitting privileges" as encompassing the ability to do so, La. Rev. Stat. § 40:1299.35.2A(2)(a). Hence, Doe 2's privileges do not and cannot meet the plain language of Act 620.

307. Here, as Defendant's own expert testified and as the statute's plain meaning makes clear, the Secretary's interpretation flies in the face of the law's basic text. The words are clear, their meaning patent, and, under these circumstances, the Defendant's interpretation is not entitled to deference. "It is emphatically the province and duty of the judicial department to say what the law is." *Marbury v. Madison*, 5 U.S. 137, 177, 2 L. Ed. 60 (1803); *see*, *e.g.*, *Harrah's Bossier City Inv. Co., LLC v. Bridges*, 09-1916 (La. 05/11/10); 41 So. 3d 438, 449 ("Although courts may give due consideration to the administrative construction of a law, we are certainly not bound by them."); *Salazar-Regino v. Rominski*, 415 F.3d 436, 448 (5th Cir. 2005) (citing this maxim in the context of weighing the reasonableness of an agency's particular interpretation); *Sexton v. Panel Processing, Inc.*, 754 F.3d 332, 336 (6th Cir. 2014) (rejecting an agency interpretation as contrary to the statutory language as interpreted).

308. The Court also notes that the Defendant's interpretation allowing (and, in the case of Dr. Doe 2 and Tulane, requiring) the abortion provider to turn over the actual care of the patient to another doctor, flies in the face of one of Act 620's main purposes and purported medical benefits: "continuity of care," the ability of a the abortion provider to *treat* his patient in the hospital if admission to the hospital is necessary.  (*See*, *e.g.*, Doc. 193 at 21–23; Doc. 200 ¶¶ 91 at 98–101.)

309. While Defendant is correct that Secretary Kliebert was the person charged with enforcing this provision, it is also true that the Secretary of DHH often changes every few years.[46] (Doc. 191 at 198–99, 195–96.)

310. It is also true that the new Secretary may disagree with her predecessor and reverse course on her current interpretation of Act 620.[47]

311. The Court finds that Doe 2 has legitimate concerns about relying on the declaration of Defendant to practice as an abortion provider if Act 620 were to go into effect.

312. More importantly, the Court finds that Doe 2 does not have active admitting privileges within the meaning of Act 620 at a hospital within 30 miles of Causeway Clinic. In any event, Causeway closed and returned its license to DHH, effective February 10, 2016. (Doc. 255 ¶3.)

## C. Doe 3

313. Doe 3 currently has admitting privileges at the WKB and Christus, both of which are within 30 miles of Hope Clinic where he performs abortions. (Doc. 190 at 21–22, 120, 148–49; JX 188 ¶ 6; JX 116 ¶ 18.)

314. The Court finds that Doe 3 is a well-qualified physician and a credible witness. (*See*, *e.g.*, JX 188 ¶ 1; Doc. 190 at 109–11.)

---

[46] Indeed, in the wake of the recent gubernatorial election, Dr. Rebekah Gee has become DHH's new head.

[47] At the time, Kliebert did not even say she will bind herself to this interpretation during her time in office. While not directly relevant to this matter, the Court notes that in a recent case, this same agency has submitted multiple inconsistent declarations and abruptly changed legal positions without much explanation. *Planned Parenthood Gulf Coast, Inc. v. Kliebert*, No. 15-cv-00565-JWD-SCR, 2015 WL 6551836, at *8–9, *33, 2015 U.S. Dist. LEXIS 146988, at *27–29, *109–10 (M.D. La. Oct. 29, 2015). Though these inconsistencies do not appear in this case, this Court may take judicial notice of its own public docket. FED. R. EVID. 201; *see, e.g., EduMoz, LLC v. Republic of Mozambique*, 968 F. Supp. 2d 1041, 1049 (C.D. Cal. 2013); *Richardson v. Monaco (In re Summit Metals, Inc.)*, 477 B.R. 484, 488 n.1 (Bankr. D. Del. 2012); *LeBlanc v. Salem (In re Mailman Steam Carpet Cleaning Corp.)*, 196 F.3d 1, 8 (1st Cir. 1999). Of course, there is now a new Secretary whose position is not declared in this record.

315. Doe 3's current privileges at Christus require him to admit approximately 50 patients per year. (Doc. 190 at 150–52; JX 59.)

316. Doe 3 has had admitting privileges at Christus since the 1990's and at WKB since late 1997 or early 1998. (Doc. 190 at 120–21.)

317. Doe 3 uses his admitting privileges primarily in connection with his busy obstetrics practice delivering babies and, to a lesser extent to his private practice in gynecology, not because of his work at Hope Clinic. (*Id.* at 124, 147; *see also* JX 188 ¶ 7.)

318. As a result of his fears of violence and harassment, Doe 3 has credibly testified that if he is the last physician performing abortion in either the entire state or in the northern part of the state, he will not continue to perform abortions. (Doc. 190 at 174–76; *see also*, *e.g.*, JX 188 ¶¶ 10–11.)

**D.     Doe 4**

319. Doe 4 performed abortions at Causeway Clinic in Metairie.  (*See*, *e.g.* JX 114 ¶ 1; Doc. 168-5 at 8.)

320. He does not currently have admitting privileges at a hospital within 30 miles of that clinic. (Doc. 191 at 18.)

321. Doe 4 testified by deposition, (Doc. 168-5), and so the Court did not have the opportunity to directly measure his demeanor. However, the Court finds that Doe 4 is a well-qualified physician, (*See*, *e.g.*, JX 114 ¶ 1; Doc. 168-5 at 5–6, 9, 12), and that his testimony is credible and consistent with the other testifying doctors who perform abortions.

322. On August 6, 2014, Dr. John Doe 4 applied for admitting privileges at Ochsner-Kenner Medical Center ("Ochsner"). (JX 57 at 762–808; *see also* Doc. 168-5 at 16–17.)

323. Doe 4 chose to apply to Ochsner because he knew a physician there who agreed to provide coverage for him. (*Id.* at 17.) Ochsner was the only hospital where Doe 4 knew a physician who would cover for him and who met the hospital's criteria to be a covering physician. (*Id.* at 85, 109–10.)

324. Ochsner requested additional information, which Doe 4 provided. (JX 98 at 2118; JX 60 at 824), but he did not receive a response over the subsequent year prior to the closure of Causeway Clinic. (Doc. 240.)

325. Doe 4 did not apply for admitting privileges at Touro Infirmary or LSU New Orleans because both hospitals required Doe 4 to find an OB/GYN to cover for him, which Doe 4 has been unable to do. (*Id.* at 23.)

326. The Court finds that, despite a good faith effort to gain admitting privileges at a hospital within 30 miles of where he performs abortions, and given the fact that it has been well over a year since he applied for privileges with no response, the Court finds that Doe 4's inability to meet the requirements of Act 620 is unrelated to his competence and his request for privileges has been de facto denied.

**E.     Doe 5**

327. Doe 5 performs abortions at two facilities: Woman Health's in New Orleans and Delta in Baton Rouge. (*See*, *e.g.*, Doc. 168-6 at 4; JX 109 ¶ 7.)

328. Like Doe 4, Doe 5 testified by deposition, and this Court hence did not have the opportunity to directly measure his demeanor. However, in reviewing his deposition and related documentation, (*See*, *e.g.*, Doc. 168-6; JX 109), the Court finds the testimony to be credible and consistent with the other testifying doctors who perform abortions.

329. The Court finds that Doe 5 has active admitting privileges at Hospital C, a hospital within 30 miles of the Women's Clinic in New Orleans, but that he has been unable to get admitting privileges within 30 miles of Delta. (*See*, *e.g.*, JX 109 ¶ 32–5.)

330. On July 24, 2014, Doe 5 received admitting privileges at Hospital C, which is within 30 miles of Women's Clinic where he performs abortions. (Docs. 168-4 at 25–26; 168-6 at 11; JX 109 ¶ 34.)

331. The Parties have stipulated that Doe 5's privileges at Hospital C are "active admitting privileges" as defined in Act 620. (Docs. 176; Doc. 168-4 at 26; 168-6 at 11–13.)

332. Doe 5 does not currently have admitting privileges at a hospital within 30 miles of Delta in Baton Rouge. (*See*, *e.g.*, Doc. 168-6 at 22; JX 109 ¶ 23.)

333. Doe 5 has applied for admitting privileges at three hospitals in the Baton Rouge area: Woman's Hospital in April or May of 2014 and Lane Regional Medical Center and Baton Rouge General Medical Center in July of 2014. (Doc. 168-6 at 11; JX 109 ¶¶ 32–33.)

334. Doe 5 has been unable to find a local physician who is willing to provide coverage for him when he is not in Baton Rouge, which all three hospitals require. (JX 109 ¶¶ 32–33; Doc. 51; Doc. 168-6 at 11–12.)

335. The Court finds that Doe 5, despite good faith efforts to meet the requirements of Act 620, has been unable to do so in the Baton Rouge area for a period of well over a year for reasons unrelated to his competence. Under these circumstances, while his applications have not been finally acted upon and are therefore technically "pending," the Court finds that they have been de facto denied.

## F.     Doe 6

336. Doe 6 is a Board Certified OB/GYN with 48 years of experience who is the Medical Director of Woman's Clinic in New Orleans and Delta Clinic in Baton Rouge. (JX 168 ¶ 1; *see also* JX 109 ¶ 8.)

337. Doe 6 provided his testimony by declaration, (JX 168), and so the Court did not have the opportunity to directly measure his demeanor. However, in reviewing his Declaration, the Court finds the testimony to be credible and consistent with the other testifying doctors who perform abortions in Louisiana.

338. While Doe 6 is Medical Director at both Women's and Delta, "[d]ue to [his] age and the demands of traveling back and forth between New Orleans and Baton Rouge, along with [his] private gynecology practice in New Orleans, [he is] no longer able to provide abortion[s] in Baton Rouge." (JX 168 ¶ 3; *see also* JX 109 ¶ 8.)

339. As a result, Doe 6 ceased performing abortions at Delta in Baton Rouge in April of 2012, leaving only Doe 5 performing abortions at that facility. (JX 168 ¶ 3; *see also* JX 109 ¶ 9.)

340. Doe 6 does not currently have admitting privileges at a hospital within 30 miles of Women's Clinic or Delta Clinic. (JX 168 ¶¶ 15, 21.)

341. From approximately 1973 to 2005, when he had an OB/GYN practice, Doe 6 had admitting privileges at various hospitals in New Orleans. (*Id.* ¶ 13.) As his private practice became solely a gynecology practice, and due to the low rate of abortion complications, he was unable to meet the hospitals' requirements to admit a minimum number of patients each year. (*Id.*) Doe 6 also did not need admitting privileges because he was not admitting patients to the hospital. (*Id.*) Consequently, when his admitting privileges expired, he did not apply to renew them. (*Id.*)

342. Doe 6 contacted Tulane about the possibility of obtaining admitting privileges and was told not to bother applying because he would not be granted privileges, as he had not had admitting privileges at any hospital since 2005. (JX 168 ¶ 12.)[48] Defendant argues that this testimony is inconsistent with that of Doe 2, who was able to get courtesy privileges at Tulane. (Doc. 201 at 14.) Especially given Doe 6's age and other differences in the professional circumstances of these two doctors, (*compare* JX ¶ 8, *and* JX 168 ¶ 13, *with* Doc. 191 at 14–16, 22–23), this assertion is not supported and unpersuasive. In addition, Doe 6's limited privileges, like Doe 2's, do not meet the requirements of Act 620, read and construed as enacted. (*See supra* Part VIII.)

343. Prior to September 1, 2014, Doe 6 applied for admitting privileges at East Jefferson Hospital in New Orleans, which is within 30 miles of Women's Clinic. (JX 109 ¶¶ 31–33; JX 168 ¶ 15.) On September 17, 2014, East Jefferson requested additional information, which he then provided. (Doc. 51 at 2.) Since that time, no action has been taken. (*Id.*; *see also*, *e.g.*, JX 168 ¶ 15.) That application, now pending for over a year, is considered by the Court to have been de facto denied.

344. Doe 6 testified that he did not apply to other hospitals within 30 miles of Women's Clinic because, due to the nature of his practice as an abortion provider, he did not admit a sufficient number of patients to receive active admitting privileges. (JX 168 ¶ 11.)

---

[48] While Defendant argues that this testimony is hearsay, (Doc. 201 at 14), Defendant did not make this objection prior to or at trial. Even if the objection would have been made, it would have been overruled for the same reasons as her other similar objections. *See supra* note 30.

## G.     Post-Hearing Updates

345. On September 17, 2015, the Court requested that Plaintiffs update the Court on or before September 24, 2015, on the status of the admitting privileges of the doctors and, if there were any changes, to provide the details of same. (Doc. 206.)

346. By letter of September 25, 2015, the Plaintiffs informed the Court and Defendants that, after making inquiries, they were unaware of any material changes in the status of the applications of Does 1–6. (Doc. 209.)

347. At a telephone status conference of September 28, 2015, this letter was received into evidence without objection as JX 193. (Doc. 210.) Since the issuance of the preliminary injunction on January 26, 2016, the Plaintiffs advised the Court that, after making inquiries, they are unaware of any material changes in the status of the applications of Does 1, 2, 4, 5 and 6, beyond the fact the Doe 4 is no longer pursuing privileges due to the February 2016 closure of Causeway clinic. (Doc. 249; Doc. 255 ¶¶ 2—3.) Additionally, Plaintiffs informed the Court that on March 30, 2017, Bossier ceased business and returned its license to DHH, but that Doe 2 is still performing abortions at Hope when Does 1 and 3 are unavailable to provide abortion care. (Docs. 270; 272 ¶¶ 3—4.)

## IX.     Effects of Act 620

## A.     The Effect of Act 620 on Does 1-6

348. The number and location of doctors and clinics providing abortions varies widely from state to state. The effect of an admitting privileges requirement on those providers and the concomitant effect on women's right to an abortion has also varied state to state.

349. Before the passage of Act 620, doctors performing abortions in Louisiana were not required to and, for their practices, did not need to have admitting privileges at any hospital, let

alone a nearby hospital, in order to safely provide services for their patients. (Docs. 190 at 25, 36–37, 39, 127, 197–98; 191 at 46; 195 at 32; JX 135 at 2804; JX 110 ¶ 7; JX 168 ¶ 8.)

350. As summarized above, at the time Act 620 was passed, only one of the six doctors performing abortions, Doe 3, had admitting privileges at a hospital and he maintained these admitting privileges for years in order to facilitate his general OB/GYN practice which was and is unrelated to that portion of his practice performing abortions at Hope.

351. Since the passage of Act 620, all five remaining doctors have attempted in good faith to comply with Act 620. All five have attempted to get admitting privileges at a hospital within 30 miles of where they perform abortions. All five have made formal applications to at least one nearby hospital and three of the five doctors have filed applications at multiple hospitals within thirty miles.

352. Two of the doctors, Does 2 and 5, performed abortions in two separate cities and thus, each had to apply at hospitals in two different locales.

353. Based on a careful review of the evidence, the Court finds that, notwithstanding the good faith efforts of Does 1, 2, 4, 5 and 6 to comply with the Act by getting active admitting privileges at a hospital within 30 miles of where they perform abortions, they have had very limited success for reasons related to Act 620 and not related to their competence.

354. The five doctors have filed thirteen separate formal applications at nearby hospitals. In only one of those cases–Doe 5 at Hospital C[49]–were active admitting privileges granted. In another case, that of Doe 2 at Tulane, he was given admitting privileges that do not comport with the plain language of Act 620.

---

[49] It is noteworthy that Hospital C, a hospital in a major metropolitan area and not a party to this action, is so concerned about the ramifications of having its identity publically revealed, that it requested that it be named only through a pseudonym and, with the consent of all the Parties, this was allowed. *See supra* Part V.E.

355. Of the thirteen formal applications filed, only one has been frankly denied, the application of Doe 1 at Minden.

356. The remaining ten applications have never been finally acted upon because the doctor applying, given the nature of his practice as an abortion provider, either cannot provide the information required or the information has been provided and the application remains in limbo for undisclosed reasons. In almost every instance, more than a year has passed since the original applications were filed.

357. Defendant argues that where these applications are "pending," the applications have not been denied and therefore Plaintiffs have failed to prove that Act 620 has caused the failure of these doctors to get admitting privileges.

358. The Court disagrees. Because Louisiana has no statutorily prescribed time limit within which a hospital must act on a physician's application, *see supra* Part V.D, a hospital can effectively deny the application by simply not acting upon it. Given the length of time involved in these applications, the Court finds that this is precisely what has occurred here.

359. Doe 3 has been threatened as a result of his work at Hope Clinic. (*See*, *e.g.*, JX 113 ¶ 3.) Last year, anti-abortion activists from outside Louisiana left fliers on neighbors' mailboxes calling him an abortionist and saying they wanted to convert him to Jesus. (Doc. 190 at 108–09; *see also* JX 113 ¶ 3.)

360. These individuals also approached Doe 3's regular medical practice patients as they tried to enter his office, requiring the building security officers to escort the activists off the premises. (Doc. 190 at 109; *see also* JX 113 ¶ 3.) These individuals told Doe 3's patients that he killed babies and that they should not see him. (Doc. 190 at 109.)

361. Doe 3, the only abortion doctor who had privileges at the time Act 620 was passed, (*See*, *e.g.*, JX 116 ¶ 18), fears that, if the other Louisiana abortion providers are not able to obtain admitting privileges, he will become an even greater target for anti-abortion violence. (*See*, *e.g.*, JX 113 ¶¶ 3–7.) He specifically testified that "all [these individuals] have to do is eliminate [him] as they have Dr. Tiller and some of the other abortion providers around the country" to eliminate abortion entirely in Northern Louisiana. (Doc. 190 at 174–75.)

362. Doe 3 is also concerned that such individuals could "cause a lot of other . . . problems that would affect [his] ability to perform the rest of [his] practice." (*Id.* at 174–75; *cf.* JX 113 ¶ 8.)

363. Doe 3 has difficulty arranging coverage for his OB/GYN practice because other OB/GYN doctors in the Shreveport area refuse to cover his practice as a result of his work at Hope Clinic performing abortions. (Doc. 190 at 111–13.)

364. Dr. Doe 3 testified that, as a result of his fears, and the demands of his private OB/GYN practice, if he is the last physician performing abortion in either the entire state or in the northern part of the state, he will not continue to perform abortions. (*Id.* at 174–76; *see also* JX 116 ¶ 19.) The Court finds his testimony credible and supported by the weight of other evidence in the record.[50]

365. To summarize,

- If Act 620 takes effect, Doe 1 will no longer be allowed to provide abortions in Louisiana because he does not have admitting privileges pursuant to the Act within 30 miles of Hope.

- If Act 620 takes effect, Doe 2 will no longer be allowed to provide abortions in Louisiana, because he does not have active admitting privileges pursuant to the Act within 30 miles of Bossier

---

[50] The issue of whether this fact is legally relevant to the undue burden analysis is discussed in this Ruling's Conclusions of Law. *See infra* Parts XI–XII.

or Hope. The privileges Doe 2 obtained at Tulane in an attempt to be able to provide abortions at Causeway Clinic prior to its closure, were limited such that they did not comply with Act. Causeway, in any event, is now closed.

- If Act 620 takes effect, Doe 3, who does not have admitting privileges pursuant to the Act within 30 miles of Hope, will no longer provide abortions in Louisiana because of a well-founded concern for his personal safety. Since Doe 2 has been unable to get active admitting privileges within 30 miles of Hope or Bossier, Doe 3 would be the sole remaining provider.

- If Act 620 takes effect, Doe 4 would not be able to provide abortions in Louisiana because he could not obtain admitting privileges pursuant to the Act, based on his unsuccessful efforts to do so prior to the closure of Causeway Clinic.

- If Act 620 takes effect, Doe 5 will be able to provide abortions at Women's Clinic, in New Orleans, where he has admitting privileges pursuant to the Act but Doe 5 will be the only physician available to provide abortion care in southern Louisiana, and in all likelihood, the only physician available to provide abortion care in the entire state.

- However, Doe 5 will not be able to provide abortions at Delta in Baton Rouge because he does not have admitting privileges pursuant to the Act within 30 miles of Delta and, despite good faith efforts to get same, has been unable to do so.

- If Act 620 takes effect, Doe 6 will no longer be allowed to provide abortions in Louisiana because he does not have admitting privileges pursuant to the Act within 30 miles of Women's Clinic.

366. The Court finds that the inability of Does 1, 4 and 6 to get active admitting privileges at any hospital is directly related to the requirements of Act 620 as they apply in concert with existing Louisiana law and the Louisiana rules and practices for getting admitting privileges.

367. The Court finds that the inability of Doe 2 to get active admitting privileges within 30 miles of Bossier and only limited privileges (not "active admitting privileges") within 30 miles of Causeway as well as Doe 5's inability to get active admitting privileges within 30 miles of the Delta are also directly attributable to the requirements of Act 620 as they apply in concert with the rules and practices for getting admitting privileges in Louisiana.

**B.    The Effect of Act 620 on the Clinics and Women of Louisiana**

368. If Act 620 were to be enforced, three of the five doctors currently providing abortions in Louisiana – Does 1, 2, and 6 - would not meet the admitting privileges requirement. If Doe 3 quits the abortion practice, as he has testified he will, Louisiana would be left with one provider and one clinic.  As is analyzed in more detail below, this would result in a substantial number of Louisiana women being denied access to abortion in this state.  A single remaining physician providing abortion services in Louisiana cannot possibly meet the level of services needed in the state.  The Court finds that this one physician will not be able to perform 10,000 procedures per year.  (Doc. 168-6 at 8; DX 148 ¶ 11.)

369. If Act 620 were to be enforced, two of the three remaining clinics – Hope and Delta – would have no abortion provider, with the one remaining clinic (Women's) without one of the two doctors that normally serves its patients.

370. Women's Clinic would have only Doe 5 to handle not only all patients at that facility but the patients at the other four. According to Cochran, the Administrator at Women's Health, Doe

6 provided 60% of the abortion services at this center. As she testified, "[e]ven if Dr. Doe 5 were to commit all of his time to serving patients at Women's Clinic, I do not see how we could serve all of the patients who [would] be coming to our doors once Delta Clinic closes . . . ." (JX 109 ¶ 37.)

371. Furthermore, since Women's Health would be the only clinic to serve all the women of Louisiana, it clearly could not perform that task as a logistical matter. Doe 5 performed a total approximately 2,950 abortions in the year 2013 at Delta and Women's. (JX 110 ¶ 7.) Given the 9,976 abortions performed in Louisiana in that same year,[51] and putting aside the issue of the distance which would need to be traveled by women in north Louisiana,[52] approximately 70% of the women in Louisiana seeking an abortion[53] would be unable to get an abortion in Louisiana.

372. Even if one were to conclude that Doe 3 will not quit or that his quitting is legally irrelevant, Act 620 will nonetheless result in a substantial number of Louisiana women being unable to obtain an abortion in this state. Just the loss of Doe 1 at Hope would be, according to Pittman, Hope's administrator, "devastating" to its operations and viability. (Doc. 190 at 29:15-21.)

---

[51] This data is taken from the affidavit of Defendant's expert, Solanky, who, in turn, took it from DHH's website. (DX 148 at 5.)

[52] The Court in WWH noted that "increases [in distance travelled] are but one additional burden [] which [] [should be] taken together with others that the closings brought about, and [] viewed in light of the virtual absence of any health benefit…" *WWH*, 136 S. Ct. 2313.

[53] The Court in *WWH* rejected Texas' position that the proper denominator in measuring whether a "large fraction" of women are unduly burdened should be Texan women of reproductive age. 136 S. Ct at 2320. "[] *Casey* used the language 'large fraction' to refer to 'a large fraction of cases in which [the provision at issue is relevant,' a class narrower than 'all women," "pregnant women.' Or even 'the class of women seeking abortions identified by the State.' 505 U.S. at 894-895, 112 S. Ct. 2791 (opinion of the Court) (emphasis added) Here, as in *Casey*, the relevant denominator is 'those [women] for whom [the provision] is an actual rather than an irrelevant restriction.' *Id.*, at 895, 112 S. Ct 2791." *WWH* 136 S. Ct at 2320.

373. Doe 3 sees about 20 to 30 abortion patients per week, or roughly 1,000 to 1,500 per year. (*Id.* at 118:1-4.) This would leave roughly 5,500 Louisiana women seeking an abortion (or 55%) without the ability to get one.

374. Even if one additionally assumes that Defendant's interpretation of Doe 2's privileges at Tulane is correct, so that he meets the requirements of Act 620 at Tulane, Causeway closed in January 2016. The Bossier clinic is now closed, but even if it reopened, Doe 2 would not be permitted to perform abortions there were Act 620 to go into full effect.

375. Hope and Women's, the two clinics that would remain, assuming Doe 3 did not quit or that his quitting was (incorrectly, in this Court's view) determined to be insufficiently related to Act 620, would each be without one of the two providers who normally perform abortions, an insufficient number to service the patients in the region, let alone the number of patients who might come from other parts of the state because of insufficient capacity.

376. Analyzed regionally, if Act 620 were to be enforced, the Baton Rouge and Shreveport areas would have no facility, and the New Orleans area would have only one provider. If, as Defendant argues, Doe 3's quitting is legally irrelevant, Baton Rouge and Bossier City would be left with no facility, Shreveport with one (Hope) and New Orleans with one (Woman's). But both remaining facilities would have only half the previous number of providers. Doe 3 and Doe 5 cannot possibly meet the demand of 10,000 abortion patients in Louisiana each year.

377. Although the court did not receive additional evidence beyond the stipulation of the parties regarding the closure of Causeway Clinic, and therefore draws no inferences regarding the cause of the closure, the fact that women seeking abortions now have one fewer clinic available,

does not change, and, if anything, further supports the Court's findings regarding the impact of Act 620 on access.

378. Similarly, the Court did not receive evidence regarding the reason for Bossier's closure and draws no inference as to the reason for it. But, regardless of the reason, its closure reinforces the Court's findings regarding access.

379. Common sense dictates that the result of two fewer clinics will be greater demand on the remaining clinics, thus amplifying the impact of any change that will result in additional closures or fewer physicians providing abortions. It is plain that Act 620 would result in the closure of clinics, fewer physicians, longer waiting times for appointments, increased crowding and increased associated health risks.

380. Abortion clinics in Louisiana routinely make efforts to recruit doctors to work at the clinics, such as placing advertisements throughout the state and working with reproductive health specialists to identify potential candidates. (Doc. 190 at 22, 24–25, 33, 87; Doc. 168-8 at 7–8.)

381. The anticipated admitting privileges requirement of Act 620 has made it difficult to recruit new doctors. (Doc. 190 at 24.) In Pittman's words, "It definitely has." (*Id.*)

382. For example, Hope recently identified an interested doctor, but this potential physician ultimately proved to be an unviable candidate as a result of Act 620's admitting privileges requirement. (*Id.* at 24–25.)

383. In addition, doctors who appear to be good candidates consistently express reluctance to be hired in Louisiana because of the numerous restrictions placed on abortion providers by Louisiana's existing laws and regulations. (*See id.* at 22–25.) The hostile environment against abortion providers in Louisiana and nationally is another factor making recruiting difficult. (Doc.

190 at 22:17-25:2; JX 110 ¶¶ 16, 23 n.1; JX 109 ¶ 14.) This includes harassment and violence towards abortion providers, including the murders of eight abortion providers across the country. (Doc. 190 at 22:20-23:12, 23:21-24:1, 87:9-11.)  As one of the physicians noted, in light of "the hostile environment in Louisiana towards abortion providers and the extreme harassment and intimidation by anti-abortion activists, most doctors are simply too afraid." (JX 110 ¶ 16.)

384. For the same reasons that Does 1, 2, 4, 5, and 6 have had difficulties getting active admitting privileges, reasons unrelated to their competence, the Court finds that it is unlikely that the effected clinics will be able to comply with the Act by recruiting new physicians who have or can obtain admitting privileges. A significant contributing factor to that inability is Act 620 and the difficulties it creates for a doctor with an abortion practice gaining active admitting privileges in the context of Louisiana's admitting privileges rules and practices.

385. The Court finds that the enforcement of Act 620 and the concomitant effect on restricted access to abortion doctors and clinics would result in delays in care, causing a higher risk of complications, as well as a likely increase in self-performed, unlicensed and unsafe abortions. (*See*, *e.g.*, *id.* at 222–24; Doc. 191 at 157–62.)

## C.     The Real-World Effect of Act 620 on Louisiana Women

386. All women seeking an abortion in Louisiana would face greater obstacles than they do at present were Act 620 to be fully implemented, due to the dramatic reduction in the number of providers and the overall capacity for services, especially given the context in which this Act will operate.  In addition, the clinic closures that will result from the Act's enforcement will have additional, acute effects for several significant subgroups of women of reproductive age in Louisiana.

387. There would be no physician in Louisiana providing abortions between 17 weeks and 21 weeks, six days gestation. Women seeking abortion at this stage of their pregnancies would be denied all access to abortion in Louisiana and will be unable to exercise their constitutional right. *See supra*, Part V.B.

388. The heaviest burdens of Act 620 would fall disproportionately upon poor women. To illuminate these burdens, the Court credits Dr. Sheila Katz, an Associate Professor of Sociology at the University of Houston, as an expert in the sociology of gender and the sociology of poverty. (Doc. 191 at 110:11-114:12, 123:23-126:4.) Dr. Katz's academic scholarship is focused on qualitative research on low-income women's lived experiences with poverty. (*Id.* at 110:25-115:21.)

389. Louisiana is one of the poorest states in the country, with the nation's third-highest levels of overall and child poverty. Twenty-six parishes are classified by the U.S. Department of Agriculture as persistently poor. (*Id.* at 128:5-8, 130:14-131:3, 131:25-132:4, 133:8-136:3; JX 124 ¶¶ 7, 9, 10; PX 166; PX 167.) Approximately 230,000 Louisiana women of childbearing age live below the federal poverty line. (Doc. 191 at 135:15-17.)

390. Women who seek abortion in Louisiana come from all socioeconomic and ethnic backgrounds (Doc. 190 at 18:17-23; Doc. 191 at 19:12-20:4) but are disproportionately poor. (Doc. 191 at 191:23-192:9; JX 124 ¶¶ 8, 13, 14.) Approximately 42% of women having abortions in the U.S. in 2008 subsisted at or below the federal poverty line, and another 27% had incomes at or below 200% of the poverty line. Given the high rate of poverty, in Louisiana these figures are likely to be much higher. Few women seeking an abortion in Louisiana have medical insurance

that covers the procedure. (Doc. 190 at 20:11-21:5.) In some instances, poor women must choose between paying for an abortion and paying for other basic necessities, such as rent. (*Id.* at 18:17-19:14, 34:6-23, 89:9-14; Doc. 191 at 135: 5-14, 158:10-23; JX 116 ¶ 14.) Nearly 75% of women who obtain abortions in Louisiana already have one or more children, which is higher than the national average. (Docs. 190 at 94:7-12; 191 at 152:20-153:2; JX 192 at 3.)

391. The Court also finds that, with just one or two providers remaining, many more women will be forced to travel significant distances to reach a clinic, which also imposes a substantial burden.

392. Many Louisiana women have difficulty affording or arranging for transportation and childcare on the days of their clinic visits, in addition to the challenge of affording the abortion itself. (Doc. 190 at 18:17-19:14; Doc. 191 at 142:25-143:22, 145:19-146:1.) Increased travel distance to clinics exacerbates the difficulty of securing transportation. (Doc. 191 at 20:17-24.) This will be particularly burdensome for women living in northern Louisiana, who will face substantially increased travel distances to reach an abortion provider in New Orleans, either because Doe 3 stops providing and Hope Clinic closes, or the clinic remains open with very limited capacity. For example, many or all women in Shreveport or Bossier City who once could access a clinic in their own area will now have to travel approximately 320 miles to New Orleans.

393. Due to the 24-hour notification and waiting period, patients must make two trips to the clinic: the first to receive the ultrasound and state-mandated counseling and the second to obtain an abortion. (JX 109 ¶ 19.) Women who must travel increased distances to access abortion will in many cases have to take at least two days off from work, which has financial costs if the time off is

unpaid, as is often the case in low-wage jobs. (Doc. 191 at 149:18-50:3; JX 124 ¶ 30.) Many women are even at risk of losing their jobs for taking time off. (Doc. 191 at 150:4-17; JX 124 ¶ 31.)

394. Intercity travel for low-income women presents a number of significant hurdles, including the logistics and cost of transportation, the costs associated with time off from work, and childcare costs. (JX 124 ¶¶ 16, 17.) Low-income women are likely to live in households that have no vehicles. (Doc. 191 at 142:15-24; 146:2-10.) Even under current law, patients frequently call to reschedule appointments due to transportation and childcare issues, thus delaying their access to abortion. (Doc. 190 at 17:20-20:8.)

395. Women who cannot afford to pay the costs associated with travel, childcare, and time off from work may have to make sacrifices in other areas like food or rent expenses, rely on predatory lenders, or borrow money from family members or abusive partners or ex-partners, sacrificing their financial and personal security. (Doc. 191 at 158:10-159:23; JX 124 ¶¶ 37-38.) Travel to a different city to seek a medical procedure also imposes significant socio-psychological hurdles on low income women. (Doc. 191 at 160:16- 161:3; JX 124 ¶¶ 16, 17, 35.)

396. Based on all of the evidence, the Court makes the common-sense inference that those women who can access an abortion clinic will face lengthy delays, pushing them to later gestational ages with associated increased risks. Those who would be candidates for medication abortion would have difficulty obtaining an appointment before that method becomes unavailable because of later gestational age; many women toward the end of the first trimester would have difficulty obtaining an appointment before they reach 16 weeks. Women past 16 weeks LMP will be left without any provider at all. As the Supreme Court has recognized, patients seeking services at

overtaxed facilities are "less likely to get the kind of individualized attention, serious conversation, and emotional support that doctors at less taxed facilities may have offered." *WWH*, 136 S. Ct. at 2318. Facilities "attempting to accommodate sudden, vastly increased demand . . . may find that quality of care declines." *Id.* (citation omitted). Women have the right not to be forced to "travel long distances to get abortions in crammed-to-capacity superfacilities," "in the face of no threat to [their] health." *Id.*

397. In short, Act 620 would do little or nothing for women's health, but rather would create impediments to abortion, with especially high barriers set before poor, rural, and disadvantaged women. These burdens would have the effect on increasing health risks among the State's poorer women. The burdens imposed by Act 620 on abortion outweigh the benefits, particularly given this Court's finding that the Act would do little, if anything, to promote women's health.

## CONCLUSIONS OF LAW

## X.     Summary of Legal Arguments

398. Both parties recognize the change to Fifth Circuit law brought by *WWH*, requiring a weighing of "the asserted benefits and burdens of the regulations in question." (Doc. 256 at 45; Doc. 257-1 at 28.) Plaintiffs emphasize the benefits and minimize the burdens. Defendant does the opposite.

399. Specifically, Plaintiffs challenge Act 620 as unconstitutional as a violation of *Casey* and *WWH*. They argue that Act 620 imposes substantial obstacles to Louisiana women in accessing abortion, without offering any countervailing health benefits. Act 620 places an undue burden on a woman's right to choose abortion, they assert, because the admitting privileges requirement fails to confer any health benefit, but has dramatic implications for the availability of abortion in the state.

Given this imbalance, Plaintiffs urge this Court to declare Act 620 unconstitutional in all of its applications and enter a permanent injunction against its enforcement.

400. Defendant, on the other hand, argues that Plaintiffs have failed to establish that Act 620 imposes an undue burden on women seeking abortion in Louisiana and argues that the benefits of the Act are significant. (Doc. 257-1 at 28-38.) Defendants urge the Court to find that Plaintiffs have failed to show an undue burden and declare Act 620 constitutional. (*Id*. at 36.) The Court now considers the question in the light of the test as clarified in *WWH*.

## XI.    Test for Determining the Constitutionality of Act 620

401. "[F]or more than 40 years, it has been settled constitutional law that the Fourteenth Amendment protects a woman's basic right to choose an abortion." *Jackson Women's Health Org. v. Currier*, 760 F.3d 448, 453 (5th Cir. 2014) (citing *Roe*, 410 U.S. at 153).  A state may enact regulations "to foster the health of a woman seeking abortion" or "to further the State's interest in fetal life," provided that these regulations do not impose an "undue burden" on the woman's decision. *Casey*, 505 U.S. at 877-78 (plurality opinion).   "A finding of an undue burden is shorthand for the conclusion that a state regulation has the purpose or effect of placing a substantial obstacle in the path of a woman seeking an abortion of a nonviable fetus."  *Id*. at 877.

402. "[A] statute which, while furthering [a] valid state interest, has the effect of placing a substantial obstacle in the path of a woman's choice cannot be considered a permissible means of serving its legitimate ends."  *Id.*; *WWH*, 136 S. Ct. at 2309.  "Moreover, '[u]nnecessary health regulations that have the purpose or effect of presenting a substantial obstacle in the path of a woman seeking abortion impose an undue burden on the right.'" *WWH*, 136 S. Ct. at 2309 (quoting *Casey*, 505 U.S. at 878).

403. "The rule announced in *Casey* . . . requires that courts consider the burdens a law imposes on abortion access together with the benefits those laws confer." *WWH*, 136 S. Ct. at 2309 (citing *Casey*, 505 U.S. at 887). This balancing of benefits and burdens is central to addressing the question of whether "any burden imposed on abortion access is 'undue.'" *Id*. at 2310.

404. When evaluating the constitutionality of laws regulating abortion and conducting this balancing, courts may "place[] considerable weight upon evidence and argument presented in judicial proceedings," rather than leaving questions of medical uncertainty to the legislature to resolve. *Id*. at 2310. The courts have an "independent constitutional duty to review factual findings where constitutional rights are at stake." *Id*. (quoting *Gonzales v. Carhart*, 550 U.S. 124, 165 (2007)) (affirming that the district court correctly placed "significant weight" on the evidence in the record, and properly "weighed the asserted benefits against the burdens," in striking down Texas's admitting privileges requirement).

405. In assessing the burdens imposed by a restriction, courts must consider not only the impact of the law with respect to closure of clinics and reduction in the number of available providers in the state, but also the "additional burden[s]" imposed on women by reducing abortion access, including longer wait times, increased crowding, and longer travel distances. *Id*. at 2313. Additionally, "[c]ourts are free to base their findings on commonsense inferences drawn from the evidence." *Id.* at 2317 (accepting the district court's "commonsense inference" that closing four-fifths of the abortion clinics in a state would render the remaining fifth unable to meet demand).

406. In *WWH*, for example, the Supreme Court evaluated the constitutionality of Texas's admitting privileges restriction by carefully reviewing the evidence in the record and the District Court's findings on its benefits and burdens. The Court noted that prior to passage of the admitting

privileges requirement, abortion clinics in Texas were already required "to meet a host of health and safety requirements," *id*. at 2314, and concluded that "[w]e have found nothing in Texas' record evidence that shows that, compared to prior law (which, required a 'working arrangement' with a doctor with admitting privileges), the new law advanced Texas' legitimate interest in protecting women's health." *Id*. at 2311.

407. Turning to the burdens, the Supreme Court clarified that no single factor is determinative as to whether a restriction imposes an undue burden, but rather the burdens' impact must be evaluated cumulatively, and are undue if unjustified by the law's purported benefits; it explained:

> In our view, the record contains sufficient evidence that the admitting-privileges requirement led to the closure of half of Texas' clinics, or thereabouts. Those closures meant fewer doctors, longer waiting times, and increased crowding. Record evidence also supports the finding that after the admitting-privileges provision went into effect, the "number of women of reproductive age living in a county . . . more than 150 miles from a provider increased from approximately 86,000 to 400,000 . . . and the number of women living in a county more than 200 miles from a provider from approximately 10,000 to 290,000." We recognize that increased driving distances do not always constitute an "undue burden." But here, those increases are but one additional burden, which, when taken together with others that the closings brought about, and when viewed in light of the virtual absence of any health benefit, lead us to conclude that the record adequately supports the District Court's "undue burden" conclusion.

*Id*. at 2313 (citations omitted).

408. The Court concluded that Texas's admitting privileges requirement (alone and in combination with another challenged law requiring abortion clinics to comply with regulations applicable to ambulatory surgical facilities) "vastly increase[d] the obstacles confronting women seeking abortions in Texas" in a variety of ways. *Id.* at 2319. The requirement decreased the number and geographic locations of legal abortion providers, thereby increasing the distances that

women would need to travel to access care, delaying that care, forcing women to seek care in facilities that are overtaxed and pushed beyond their capacity, and preventing some women from accessing abortion care at all. *See id*. at 2313, 2315-18. Because these burdens vastly outweighed the "virtual absence" of any benefits, the Court held both requirements unconstitutional under *Casey*. *See id.* at 2313.

**XII.    Analysis**

409. In light of WWH, the Court has made additional findings of fact.   Under the Supreme Court's current guidance, this Court has found that Act 620 confers only minimal, at best, health benefits for women seeking abortions, and that enforcement of the Act will increase the risk of harm to women's health. *See supra* at Parts VII.C, X.

410. Having now weighed the evidence of the substantial burdens imposed by Act 620, and their cumulative impact on abortion services in the state, as well as the evidence regarding the Act's lack of any significant health benefits, the Court again finds that Act 620 places an unconstitutional undue burden on women seeking abortion in Louisiana.

**A.  Act 620 Does Not Protect Women's Health**

411. Based on the evidence admitted to the record, the facts found herein, and all reasonable inferences drawn from those facts, the Court concludes that the admitting privileges requirement does provides no significant health benefits to women. As in *WWH*, Defendant has presented no credible evidence showing that, compared to prior law, Act 620 advances the state's interest in protecting women's health and safety.  WWH, 136 S. Ct. at 2311.

412. As explained *supra*, Part V.B, abortion in the state of Louisiana is safe, with extremely low rates of complication.[54]

413. As the Supreme Court explained with regard to the nearly-identical Texas statute, there "was no significant health-related problem that the new law helped to cure." *WWH*, 136 S. Ct. at 2311. The record does not contain any evidence that complications from abortion were being treated improperly, nor any evidence that any negative outcomes could have been avoided if the abortion provider had admitting privileges at a local hospital.

414. In short, this Court concludes that Act 620 will not further the State's asserted interest in the health of women seeking abortions as admitting privileges do not improve health outcomes in the event of complications. This conclusion is consistent with the Supreme Court's conclusion in *WWH* and the conclusions of other federal district courts that have considered the health benefits of similar admitting privileges laws. *WWH*, 136 S. Ct. 2311-12 (citing *Planned Parenthood of Wis., Inc. v. Van Hollen* ("*Van Hollen*"), 94 F. Supp. 3d 949, 953 (W.D. Wis. 2015), *aff'd sub nom. Planned Parenthood of Wis., Inc. v. Schimel* ("*Schimel*"), 806 F.3d 908 (7th Cir. 2015), *cert. denied*, 136 S. Ct. 3545 (2016); *Planned Parenthood Se., Inc. v. Strange* ("*Strange*"), 33 F. Supp. 3d 1330, 1378 (M.D. Ala. 2014).).

415. Admitting privileges also do not serve "any relevant credentialing function," *WWH*, 136 S. Ct. at 2313, *see supra* Part V.D. The Louisiana State Board of Medical Examiners ensures physician competency through licensing and discipline. Hospitals grant privileges to physicians to promote the smooth functioning of the hospital, or to serve other goals or priorities of the particular

---

[54] There is broad consensus for this proposition among federal courts analyzing admitting privileges restrictions. See *WWH*, 136 S. Ct. at 2311-12; *Planned Parenthood of Wis., Inc. v. Van Hollen*, 94 F. Supp. 3d 949, 953 (W.D. Wis. 2015), *aff'd sub nom. Planned Parenthood of Wis., Inc. v. Schimel*, 806 F.3d 908 (7th Cir. 2015), *cert. denied*, 136 S. Ct. 3545 (2016); *Planned Parenthood Se., Inc. v. Strange*, 33 F. Supp. 3d 1330, 1378 (M.D. Ala. 2014).

hospital. As the record in this case demonstrates, physicians are sometimes denied privileges, explicitly or de facto, for reasons unrelated to competency.

416. In summary, the record in this case demonstrates that Act 620 does not advance Louisiana's legitimate interest in protecting the health of women seeking abortions. Instead, Act 620 would increase the risk of harm to women's health by dramatically reducing the availability of safe abortion in Louisiana. *See supra* Parts IX. Under *WWH* and in light of the medical evidence in the record in this case, the Court holds that Act 620 is not medically necessary and fails to actually further women's health and safety. While the Court is able to reach this conclusion based on the medical evidence alone, the findings of fact related to the legislative history of the Act, and the circumstances of its passage, *see supra* Parts VI.D, VII, provide additional support.

## B. The Burdens Imposed by Act 620

417. Turning to the burdens imposed by Act 620, the Court finds that the Act places substantial obstacles in the path of a woman's choice to seek an abortion. Act 620 will result in a drastic reduction in the number and geographic distribution of abortion providers, reducing the number of clinics to one, or at most two, and leaving only one, or at most two, physicians providing abortions in the entire state. *See supra* Part IX.

418. Currently, about 10,000 women per year seek abortions in the state. Plaintiffs have shown that, should the Act take effect, there will be just one physician left, Dr. John Doe 5, providing abortions in the state. Working four to five days per week, he is able to provide fewer than 3,000 abortions per year. Even working an implausible seven-day week, it would be impossible for him to expand his practice to meet even half the state's need for abortion services.

419. Even if Doe 3 continued to provide at Hope in Shreveport—which is not consistent with this Court's factual findings that Doe 3 is unlikely to continue to provide, and in any event the loss of Doe 1 would likely not allow his clinic to remain open—the demand for services would vastly exceed the supply.

420. Viewing all of the evidence together, the Court concludes that the remaining abortion providers—whether one facility or two—would not be able to meet the demand for abortion services in Louisiana. If allowed to take effect, Act 620 would therefore cripple women's ability to have an abortion in Louisiana.

421. In addition to these practical concerns and difficulties of increased risk of complications caused by delays in care, the reduction in availability of abortion would lead to an increase in self-performed, unlicensed and unsafe abortions. (Doc. 190 at 223–24.)

422. For these reasons, the Court concludes that Act 620 would have a negative impact on women's health.

423. Act 620 would also substantially increase the burden on women who are able to receive licensed, safe abortions. As discussed *supra* in Part IX, many women will have to travel much longer distances to reach the few providers who will continue to provide abortions, and that travel will impose severe burdens, which will fall most heavily on low-income women.

424. The result of these burdens on women and providers, taken together and in context, is that many women seeking a safe, legal abortion in Louisiana will be unable to obtain one. Those who can will face substantial obstacles in exercising their constitutional right to choose abortion due to the dramatic reduction in abortion services.

## C. The Burdens Imposed by Act 620 Vastly Outweigh its Benefits

425. *WWH* "requires that courts consider the burdens a law imposes on abortion access together with the benefits those laws confer." *WWH*, 136 S. Ct. at 2309 (citing *Casey*, 505 U.S., at 887-898). The record is devoid of any credible evidence that the Act will have a measurable benefit to women's health, but it is clear that the Act will drastically burden women's right to choose abortion. The Supreme Court found that "when taken together . . . , and when viewed in light of the virtual absence of any health benefit," the burden created by the nearly-identical Texas admitting privileges requirement was undue. *WWH*, 136 S. Ct. at 2313. As in *WWH*, Act 620 "does not benefit patients and is not necessary." *Id.* at 2315. Even if Act 620 could be said to further women's health to some marginal degree, the burdens it imposes far outweigh any such benefit, and thus the Act imposes an unconstitutional undue burden.

426. This result is consistent with the decision in *WWH* as well as other decisions addressing similar or identical admitting privileges requirements.[55] Indeed, there is no legally significant distinction between this case and *WWH*: Act 620 was modeled after the Texas admitting privileges requirement, and it functions in the same manner, imposing significant obstacles to abortion access with no countervailing benefits. The Court is bound by the Supreme Court's clear guidance to reach the same result and strike down the Act.

## XIII. Conclusion

427. "The party seeking a permanent injunction must . . . establish (1) success on the merits; (2) that a failure to grant the injunction will result in irreparable injury; (3) that said injury outweighs any damage that the injunction will cause the opposing party; and (4) that the injunction will not

---

[55] *WWH*, 136 S. Ct. at 2313; *Van Hollen*, 94 F.Supp.3d 949; *Strange*, 33 F.Supp.3d 1330.

disserve the public interest." *VRC LLC v. City of Dallas*, 460 F.3d 607, 611 (5th Cir. 2006) (citations omitted).

428. For the reasons outlined above, the Court finds that Act 620 is unconstitutional on its face under *Casey* and *WWH*. The Act would create substantial obstacles for women seeking abortion in Louisiana without providing any demonstrated benefit to women's health or safety. Any marginal health benefits would be dramatically outweighed by the obstacles the restriction erects to women's access to their constitutional right to abortion. The Act therefore cannot withstand the scrutiny mandated by *WWH*. Plaintiffs have succeeded on the merits of their constitutional claim that the Act violates the Fourteenth Amendment.

429. Given that the Act violates women's constitutional right to abortion, Plaintiffs have established that irreparable injury will result in the absence of an injunction barring its enforcement. *See Deerfield Med. Ctr. v. Deerfield Beach*, 661 F.2d 328, 338 (5th Cir. 1981) (finding that the conclusion that the right to abortion is "'either threatened or in fact being impaired' . . . mandates a finding of irreparable injury") (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)). Further, some women's total inability to access abortion care, and unreasonable and dangerous delays experienced by others in scheduling an abortion procedure, will constitute irreparable harm for Louisiana women seeking abortions. *See Jackson Women's Health Org. v. Currier*, 940 F. Supp. 2d 416, 424 (S.D. Miss. 2013) (finding that closure of the State's only clinic constitutes irreparable harm), *aff'd*, 760 F.3d 448 (5th Cir. 2014) *cert. denied*, 136 S. Ct. 2536 (2016). Many women will also face irreparable harms from the burdens associated with increased travel distances and costs in reaching an abortion clinic. *See WWH*, 136 S. Ct. at 2313. These harms outweigh any damage to the State by the entry of an injunction.

430. Given the substantial injury threatened by enforcement of the Act, a permanent injunction will serve the public interest. *See Currier*, 940 F. Supp. 2d at 424 ("[T]he grant of an injunction will not disserve the public interest, an element that is generally met when an injunction is designed to avoid constitutional deprivations."); *see also Nobby Lobby, Inc. v. Dallas*, 970 F.2d 82, 93 (5th Cir. 1992) ("the public interest always is served when public officials act within the bounds of the law and respect the rights of the citizens they serve") (citation omitted). The Court will therefore enter an order permanently enjoining the enforcement of the Act.

431. An order permanently enjoining enforcement of Act 620 in all of its applications is the appropriate remedy. As with the Texas abortion restrictions enjoined in all their applications by the decision in *WWH*, Act 620 would close most of the abortion facilities in Louisiana and "place added stress on those facilities able to remain open." *WWH*, 136 S. Ct. at 2319. Act 620 "vastly increase[s] the obstacles confronting women seeking abortions" in Louisiana "without providing any benefit to women's health capable of withstanding any meaningful scrutiny." *Id*. Therefore, Act 620 is unconstitutional on its face. Pursuant to this Court's authority under 28 U.S.C. §§ 2201 and 2202, and Rules 57 and 65 of the Federal Rules of Civil Procedure, this Court will enter orders declaring Act 620 unconstitutional and permanently enjoining the Act in all of its applications.

In light of the foregoing findings of fact and conclusions of law, IT IS HEREBY ORDERED THAT:

1. The active admitting privileges requirement of La. R.S. § 40:1299.35.2 (Act 620) is DECLARED unconstitutional as a violation of the Fourteenth Amendment to the United States Constitution;

2. A PERMANENT INJUNCTION is ENTERED barring enforcement of La. R.S. §40:1299.35.2 (Act 620);

3.    Any implementing regulations of Act 620, including La. Admin. Code tit. 48, pt. I,

§4423(B)(3)(e) and La. Admin. Code tit. 48, pt. I, 4401 (definition of "active admitting privileges"),

are, for the foregoing reasons, likewise DECLARED UNCONSTITUTIONAL and

PERMANENTLY ENJOINED.

4.    Judgment shall be entered in favor of the Plaintiffs and against the Defendant by separate

document in conformity with Rule 58.

Signed in Baton Rouge, Louisiana, on <u>April 26, 2017</u>.

_____
**JUDGE JOHN W. deGRAVELLES**
**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**