IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF LOUISIANA

| | |
|---|---|
| JUNE MEDICAL SERVICES LLC, *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> REBEKAH GEE, <br><br> Defendant. | Civil Action No. 3:14-CV-525- JWD-RLB |

**DECLARATION OF DAVID BROWN IN SUPPORT OF PLAINTIFFS'
PETITION FOR ATTORNEY'S FEES**

DAVID BROWN declares and states as follows:

1. I am a Senior Staff Attorney with the Center for Reproductive Rights (the "Center"). I have served as counsel for Plaintiffs on this case since December 2014.

2. I submit this declaration in support of Plaintiffs' Petition for Attorney's Fees. The information set forth herein is based on my personal knowledge, my review of records maintained by the Center, and information provided to me by my colleagues at the Center that I believe to be true.

**Summary of the Proceedings**

3. On June 12, 2014, Louisiana Governor Bobby Jindal signed into law Act 620 ("the Act"), requiring any physician who performs an abortion to have "active admitting privileges at a hospital that is located not further than thirty miles from the location at which the abortion is performed or induced and that provides obstetrical or gynecological health care services," with "active admitting privileges" defined to "mean[] that the physician is a member in good standing of the medical staff of a hospital that is currently licensed by the [D]epartment [of Health and

Hospitals], with the ability to admit a patient and to provide diagnostic and surgical services to such patient . . ." H.B. 388, 2014 Leg., Reg. Sess. (La. 2014) (signed by Governor, June 12, 2014) (codified at La. R.S. 40:1061.10 (formerly cited as La. R.S. § 40:1299.35.2)) (the "admitting privileges requirement"). The Act's effective date was September 1, 2014. *Id.*

4. Plaintiffs filed this case on August 22, 2014, seeking to declare unconstitutional and permanently enjoin the Act. Plaintiffs also moved for preliminary relief—either a temporary restraining order ("TRO") or preliminary injunction—to prevent the Act from taking effect during the pendency of proceedings.

5. The Court held a hearing on Plaintiffs' motion, and on August 31, 2014, granted a TRO, enjoining enforcement of the admitting privileges requirement until Plaintiffs' motion for a preliminary injunction could be decided. *June Med. Servs., LLC v. Caldwell*, No. 3:14-CV-00525-JWD-RLB, 2014 WL 4296679, at *10 (M.D. La. Aug. 31, 2014), ECF No. 31.

6. Plaintiffs also obtained a protective order, over Defendant's[1] objection, allowing Louisiana physicians offering abortion care to proceed pseudonymously in the case. *See id*. at *2 n.2.

7. With the parties' consent, a preliminarily injunction hearing date was set for March 30, 2015. Order Clarifying TRO of Aug. 31, 2014 and Setting Status Conference for Nov. 6, 2014, 3, ECF No. 57. The parties then engaged in several months of "significant discovery." *June Med. Servs., LLC v. Kliebert*, 105 F. Supp. 3d 611, 614-15 (M.D. La. 2015), ECF No. 138. Twenty-four depositions were undertaken; extensive written discovery was propounded and answered; and the

---

[1] I refer throughout to "Defendant" in the singular, although there were initially multiple defendants. All but one were progressively dismissed or stipulated out of the case, leaving Ms. Kathy Kliebert as sole defendant by March 17, 2015. Ms. Kliebert was succeeded on January 27, 2016, by Dr. Rebekah Gee.

2

parties made several motions in limine, which were briefed, argued and decided. *Id*.

8.  While discovery was ongoing, several other plaintiffs entered into and then exited the case, and the parties twice briefed and argued whether the scope of the TRO then in place had been or should be altered by changes in the parties and in the underlying facts in the case. *Kliebert*, 105 F. Supp. 3d. at 614–15; *see also* Second Order Clarifying TRO of Aug. 31, 2014, ECF. No. 84; Order Clarifying TRO, ECF No. 57.

9.  On February 16, 2015, Defendant made a motion for partial summary judgment. The parties agreed to continue the scheduled preliminary injunction hearing to June 22, 2015, to allow time for Defendant's motion to be fully briefed, argued, and decided. Minute Entry: March 19, 2015 at 2, ECF No. 129. The Court granted the motion in part and denied it in part on May 12, 2015. Ruling and Order 25, ECF No. 138.

10. Between June 22 and June 29, 2015, a six-day preliminary injunction hearing was held, in which the testimony of twelve live witnesses was taken, and two-hundred forty-five exhibits were received into evidence. The testimony of a further eight witnesses was received into evidence via designation of deposition transcripts.

11. On January 26, 2016, the Court issued an opinion declaring the Act unconstitutional and preliminarily enjoining its application as to Plaintiffs. *June Med. Servs. LLC v. Kliebert*, 158 F. Supp. 3d 473, 483 (M.D. La. 2016), ECF No. 216. The Court found that, "[i]f Act 620 were to be enforced . . . Louisiana would be left with one provider and one clinic," who, "as a logistical matter," could not serve the nearly 10,000 patients annually seeking abortion in Louisiana. *Id*. at 520. Therefore, many women would be forced to forgo abortion altogether and carry an unwanted pregnancy to term, against their will. *Id*. at 521. Other women would turn to "self-performed, unlicensed and unsafe abortions." *Id*. at 522. And even women able to obtain an appointment with

3

the State's sole remaining doctor would face "unreasonable and dangerous delays in scheduling abortion procedures." *Id*. at 535. This would "caus[e] a higher risk of complications," and force many women to face "the burdens associated with increased travel distances." *Id*. at 522, 535. Conversely, the Court found that "[t]he medical benefits which would flow from Act 620 are minimal," because the Act would neither serve a function of credentialing physicians nor assuring continuity of care in the extremely rare event of a hospital transfer. *Id*. at 506, 533. Accordingly, the Court concluded that, those "minimal" benefits "are outweighed by the burdens which would flow from this legislation," imposing an unconstitutional undue burden on women in Louisiana. *Id*. at 506, 537.

12. The Court's opinion further directed Plaintiffs to file monthly status reports regarding their physicians' outstanding applications for admitting privileges as the case proceeded toward final judgment. *Id*. at 483.

13. Defendant subsequently filed a motion for a stay pending appeal, for expedited consideration, and for a temporary stay pending the consideration of her stay motion; this motion was briefed and argued on an accelerated basis, and the Court denied it on February 16. *June Med. Servs. LLC v. Kliebert*, No. CV-3-14-00525-JWD-RLB, 2016 WL 617444, at *14 (M.D. La. Feb. 16, 2016), ECF No. 234.

14. The same day as that decision, Defendant filed an emergency motion in the Fifth Circuit Court of Appeals to stay this Court's preliminary injunction, and for expedited consideration. This was fifteen days before the constitutionality of a Texas law nearly identical to the Act was set to be argued in *Whole Woman's Health v. Hellerstedt*, 135 S. Ct. 2292 (2016), and some eight months after the United States Supreme Court had stayed the Fifth Circuit's opinion upholding that provision, *see Whole Woman's Health v. Cole*, 136 S. Ct. 2923 (2015). Defendant's

4

motion (along with Plaintiffs' motion for additional time to respond) was again briefed on a highly accelerated basis. On February 24, the Fifth Circuit granted Defendant's motion. *June Med. Servs., L.L.C. v. Gee*, 814 F.3d 319, 320 (5th Cir. 2016).

15. Two days later, Plaintiffs made an emergency application to the United States Supreme Court to vacate the Fifth Circuit's opinion. The motion was once again briefed on a highly accelerated basis. On March 4, the Supreme Court granted Plaintiffs' application, "[c]onsistent with the Court's action granting a stay in *Whole Woman's Health v. Cole* . . . ." *June Med. Servs., L.L.C. v. Cole*, 136 S.Ct. 1354 (2016).

16. On March 7, Defendant suspended her emergency appeal of the preliminary injunction and moved to put the case into abeyance pending the outcome of *Whole Woman's Health*. The Court of Appeals granted that motion on March 9.

17. On June 26, the Supreme Court decided *Whole Woman's Health v. Hellerstedt*, 136 S. Ct. 2292 (2016), striking down the Texas law.

18. On August 9, the parties and the Court agreed that a final decision on the merits could be reached on the existing record, applying the Supreme Court's recent articulation of the undue burden standard in *Whole Woman's Health*, with each side submitting supplemental proposed findings of fact and conclusions of law based largely on the existing record, and without further submission of evidence, apart from stipulations.

19. On April 26, 2017, the Court issued an opinion, again ruling that Act 620 violated the Constitution. Findings of Fact and Conclusions of Law at 11, ECF No. 274. The Court reiterated its preliminary injunction findings that Act 620 would shutter all but one of the state's abortion clinics, preventing women from accessing abortion in Louisiana, and threatening women's health and safety. *Id.* at ¶ 368; *see also supra* ¶ 11. The Court additionally ruled that,

although it had been prevented under earlier Fifth Circuit precedent from considering evidence of the Act's medical reasonableness and its impact on women's real-world ability to access abortion, the Supreme Court's *Whole Woman's Health* decision now required it to do so. *Id*. at 5. The court therefore additionally found that "there is no credible evidence in the record that Act 620 would further the State's interest in women's health," *id*. at ¶ 240, and that, by closing all but one of the state's remaining abortion clinics, the Act "would do little or nothing for women's health, but rather would create impediments to abortion, with especially high barriers set before poor, rural, and disadvantaged women," *id.* at ¶ 397. Accordingly, the Court ruled that "[t]he burdens imposed by Act 620 on abortion outweigh the benefits," declared it unconstitutional and permanently enjoined it, along with its implementing regulations. *Id*. at 105, 115–16.

20. The Court issued its final judgment the same day. Judgement, ECF No. 275. Defendant filed a Notice of Appeal, ECF No. 276, on May 5, 2017.

## Plaintiffs' Legal Team

21. This case entailed representing the interests of multiple plaintiffs, and an expedited schedule at multiple stages of the proceedings, including in response to multiple emergency motions filed by Defendant. This required the utilization of multiple attorneys working in concert to meet deadlines and ensure the adequate and accurate representation of each client's interests.

22. Plaintiffs have been represented by attorneys from the Center; Morrison & Foerster LLP ("Morrison & Foerster"); and Rittenberg, Samuel, & Phillips, LLC. The Center and Morrison & Foerster have acted as co-lead counsel on this case.

23. Demme Doufekias, a Morrison & Foerster partner, led the trial team, including managing the discovery process, overseeing trial strategy, and taking the lead in drafting pleadings and briefs. Marc Hearron, a partner in Morrison & Foerster's Appellate and Supreme Court

Practice Group, provided strategic guidance in appellate and Supreme Court proceedings.

24. Janet Crepps, a senior counsel at the Center, led the formation of case strategy in the case's opening phase. Ilene Jaroslaw, a senior staff attorney at the Center, subsequently took over as the lead Center attorney in the matter. In appellate and Supreme Court proceedings, I took the lead on the papers.

25. Throughout the case, the lead attorneys at the Center and Morrison & Foerster have been joined by other lawyers, as described in more detail below and in the accompanying declaration of Ms. Doufekias.

26. William Rittenberg, of Rittenberg, Samuel, & Phillips, has both advised the legal team about local practice and procedure and provided substantive input into strategy and pleadings and briefs.

## Need for Out-of-State Counsel

27. Abortion care is a highly stigmatized and politically divisive field. In my experience, it is difficult to find lawyers willing to represent abortion providers in many parts of the country, including Louisiana.

28. I am not aware of any Louisiana lawyers willing and able to serve as lead counsel in a case like this one, which requires not only tackling the topic of abortion, but also the complexity of a large, fact-intensive case, lasting several years, with uncertainty regarding the outcome and the expectation of any monetary recovery.

29. Mr. Rittenberg has worked as local counsel in lawsuits brought by Louisiana healthcare providers, partnering with the Center or others as lead counsel, on multiple occasions. However, neither he nor his firm, which is composed of four attorneys, two of whom are semi-retired, *cf. Ex Parte* Motion to Substitute Counsel, ECF. No 268 (motion to substitute Mr.

7

Rittenberg, in advance of his complete retirement), were able to provide the significant dedication of time and financial resources required to serve as lead counsel in this matter.

### Exercise of Reasonable Billing Judgment

30. As current lead Center attorney on this case, I have reviewed all time records submitted in support of the instant motion to ensure that all timekeepers exercised reasonable billing judgment. I reduced my own time entries, and I directed other timekeepers to reduce their time entries, where it appeared that time spent on a task was excessive, redundant, or otherwise unnecessary.

31. In addition, I made the decision to omit certain categories of time altogether.

32. For example, Plaintiffs have omitted some time spent by some senior attorneys at certain times where their work was supervisory, or tangential. At the Center, every strategic decision and substantive brief was reviewed by either Julie Rikelman, the Center's director of litigation, or Ms. Crepps, to ensure quality and consistency with overall case strategy, but Plaintiffs have chosen to seek recovery for these two attorneys' work only for the period when they were most involved with the case: during its first few months, and during appellate and Supreme Court proceedings. *See infra* ¶¶ 43, 45.

33. Similarly, the Center has not sought to recover for time spent by law clerks and junior attorneys working on discrete research projects, and have not sought to recover any paralegal time. Plaintiffs have also omitted all time spent by numerous junior attorneys, law clerks, and paralegals at Morrison & Foerster whose roles were limited to assisting with document review or ad hoc legal research and other tasks.

34. Because Ms. Jaroslaw kept time records rounded, in most cases, to the nearest hour, I decided to reduce the time for which Plaintiffs would seek recovery for her time by 0.5 hours for

8

each entry recorded as a whole hour, to ensure that this rounding does not inadvertently result in over-billing for any of her time entries. These reductions total just under 10% of the time that Ms. Jaroslaw recorded.

35. Finally, Plaintiffs are not seeking to recover for any work on this case, other than for time spent in preparing their fee application, from the date of the filing of the parties' Joint Stipulation and Proposed Order Regarding Causeway Medical Clinic, ECF No. 259-1, on September 22, 2016, until the date the Court issued its final judgment on April 26, 2017.

36. Altogether, Plaintiffs are seeking no recovery for about 2,200 hours of time recorded by attorneys, law clerks, and paralegals working on this matter before April 26, 2017 (and not including time spent preparing their fee application).

**Qualifications and Roles of Center for Reproductive Rights Timekeepers**

37. Plaintiffs seek a fee award for services provided by five current or former employees of the Center: me, Janet Crepps, Julie Rikelman, Ilene Jaroslaw, and Zoe Levine (collectively, the "Center timekeepers").

38. The Center is a public-interest legal organization dedicated to advancing reproductive rights in the United States and around the world. It was founded in 1992 by the attorneys who represented the plaintiffs in *Planned Parenthood of Southeastern Pennsylvania v. Casey*, 505 U.S. 833 (1992), including Kathryn Kolbert, who argued that case to the U.S. Supreme Court. Since that time, the Center's attorneys have served as lead counsel in every major Supreme Court case concerning the application of *Casey*'s undue burden standard. Most recently, Center attorneys, working together (as here) with attorneys from Morrison & Foerseter, litigated *Whole Woman's Health*. That legal team also included several timekeepers on this case, including myself and Ms. Crepps from the Center, as well as two Morrison & Foerster attorneys, Mr. Hearron, and

9

Marissa P. Harris. Other cases Center attorneys have taken to the Supreme Court include *Gonzales v. Carhart*, 550 U.S. 124 (2007); *Stenberg v. Carhart*, 530 U.S. 914 (2000); and *Mazurek v. Armstrong*, 520 U.S. 968 (1997). The Center's attorneys, including me, have also litigated myriad reproductive rights cases in the lower federal courts and in state courts.

39. I currently serve as a Senior Staff Attorney at the Center, where I have worked for approximately six years. In addition to my work on *Whole Woman's Health*, I have served as lead or co-lead counsel on numerous challenges to reproductive rights restrictions around the country, including most recently in a new case also captioned *Whole Woman's Health v. Hellerstedt*, challenging a Texas law enacted in retaliation for bringing that Supreme Court challenge, No. A-16-CV-01300-SS, 2017 WL 462400 (W.D. Tex. 2017). In total, I have participated in over a dozen successful or ongoing constitutional challenges to state laws and regulations. Before joining the Center, I served almost two years as a litigation associate at Cleary, Gottlieb, Steen & Hamilton, LLP ("Cleary Gottlieb"). I graduated *cum laude* from the University of Michigan Law School in 2009.

40. I am a member of the Bar of the State of New York. I am also admitted to practice in the following federal courts: the United States Supreme Court; the Second, Fifth, Eighth, and Ninth Circuits; and the District of North Dakota.

41. As my time log indicates, my responsibilities on this case, in addition to providing overall management of the Center's participation since taking over as the Center's lead counsel on this matter, have included: taking depositions; working with clients and witnesses on fact development; examining witnesses at trial; drafting appellate papers; and serving as counsel of record before the United States Supreme Court. I have also lead the process of developing the present petition for attorney's fees.

42. Ms. Rikelman, my supervisor, is the Center's Litigation Director. She is a 1997 graduate *cum laude* of Harvard Law School. She served as a law clerk for the Hon. Dana Fabe, Chief Justice of the Alaska Supreme Court, and the Hon. Morton I. Greenberg of the U.S. Court of Appeals for the Third Circuit, and in the eighteen years since her clerkships has worked entirely on complex civil litigation, including, for about half of that time, as a reproductive rights litigator at the Center. She has served as Litigation Director, overseeing our docket of some two dozen cases, supervising litigators, assisting in developing our cases' legal theories and factual bases, since 2012. Of the numerous cases she has lead, the most recent is the ongoing *Jackson Women's Health Organization v. Currier*, 760 F.3d 448 (5th Cir. 2014), *cert. denied*, 136 S. Ct. 2536 (2016). She is a member of the Bar of the State of New York and is admitted to practice in the Supreme Court and numerous other federal courts.

43. Ms. Rikelman reviews every brief on the merits filed by the Center for consistency with overall legal strategy, and assists the attorneys with developing case strategy. As is indicated in her time logs, Ms. Rikelman participated in that role in this case. Additionally, Ms. Rikelman provided substantive input and guidance on our Supreme Court papers. In an exercise of billing discretion, we are not seeking recovery for any of Ms. Rikelman's largely supervisory work on this case between early September 2014, shortly after the case was filed, and the middle of February 2016, when Defendant sought emergency appellate relief.

44. Ms. Crepps currently serves as a Senior Counsel at the Center, where she has worked since shortly after its founding in 1992. Prior to that, she served as a consultant for the ACLU Reproductive Freedom Project and a lobbyist for the ACLU of Idaho. Ms. Crepps has also served as a Public Defender in Anchorage, Alaska, and worked in private practice. She graduated from the University of Washington Law School in 1983 and clerked for the Honorable James

11

Singleton of the Alaska Court of Appeals. One of the top reproductive rights litigators in the United States, Ms. Crepps has unparalleled experience and expertise in litigating abortion-rights cases in federal and state courts. Ms. Crepps is a member of the state bars of Alaska and South Carolina, and is admitted to practice in the Supreme Court and numerous other federal courts.

45.   In this case, Ms. Crepps assisted with case strategy formation, fact development, and discovery. As her time log indicates, her responsibilities included providing advice about case strategy; working with clients and preparing them for depositions; defending client depositions; and providing substantive input on pleadings and briefs. In an exercise of billing discretion, we do not seek recovery for any of her largely supervisory work on this case from after the beginning of written discovery, in December 2014, until the Court's issuance of its preliminary injunction opinion, beginning the appeal process in January, 2016.

46.   Zoe Levine is currently a Staff Attorney at the Center. Ms. Levine graduated *magna cum laude* from the University of Michigan Law School in 2009, and subsequently clerked for the Hon. Philip R. Martinez of the U.S. District Court for the Western District of Texas and the Hon. Ronald M. Gould of the U.S. Court of Appeals for the Ninth Circuit. She worked for two years with The Bronx Defenders, a legal aid agency, and has been with the Center since 2014. Ms. Levine has participated in numerous Center cases in courts in Oklahoma, Louisiana, and Kansas. She is a member of the Bar of the State of New York, and is admitted to practice in the Supreme Court and other federal courts.

47.   Ilene Jaroslaw was a Senior Staff Attorney at the Center from July 2014, until September 2016. As a Senior Staff Attorney, Ms. Jaroslaw led the Center's trial team on this case. She received an A.B. from Harvard University in Cambridge, Massachusetts; an M.S. from the Georgetown University School of Foreign Service in Washington, D.C.; and a J.D. from the

Georgetown University Law Center in Washington, D.C. Prior to working at the Center, she worked at the United States Attorney's Office for the Eastern District of New York in several roles, including Chief of the General Crimes Section and Senior Litigation Counsel. In twenty-three years at the U.S. Attorney's Office, she handled approximately thirty federal criminal trials, hundreds of hearings, and dozens of appeals. Prior to her appointment as an Assistant U.S. Attorney, from 1988 to 1991, she was a litigation associate at Paul, Weiss, Rifkind, Wharton & Garrison. Ms. Jaroslaw left the Center to become a partner at the firm of Hoguet, Newman, Regal & Kenney.

48. During all times representing Plaintiffs in this litigation, Ms. Jaroslaw was a member in good standing of the Bar of the State of New York, where she was admitted in 1989. She was also admitted to the bar of numerous federal courts, including the U.S. Supreme Court.

**Reasonable Hourly Rates for the Center Timekeepers**

49. The chart below indicates reasonable hourly rates for the legal services that the Center timekeepers performed in this case.

*Rates of the Center Timekeepers*

| Timekeeper | Title | Law School Grad. Yr. | Relevant Legal Market | 2014 Rate | 2015 Rate | 2016 Rate |
|---|---|---|---|---|---|---|
| David Brown | Senior Staff Attorney | 2009 | S.D. N.Y. | $670 | $720 | $770 |
| Janet Crepps | Senior Counsel | 1983 | D. S.C. | $480 | n/a | $580 |
| Ilene Jaroslaw | Senior Staff Attorney | 1988 | S.D. N.Y. | $800 | $850 | $900 |
| Zoe Levine | Staff Attorney | 2009 | S.D. N.Y. | $670 | $720 | $770 |
| Julie Rikelman | Litigation Director & Vice President | 1997 | S.D. N.Y. | $800 | n/a | $900 |

13

50. Throughout the case, Ms. Jaroslaw, Ms. Rikelman, Ms. Levine, and I were based in the Center's New York City office. The rates assigned to us are rates that attorneys of comparable skill, experience, and reputation in the New York City legal market charged their clients for matters involving complex federal litigation during the years indicated. The rates Ms. Levine and I seek are lower than the $810 hourly rate currently being awarded by the United States District Bankruptcy Court for the District of Delaware to associates at my former law firm, Cleary Gottlieb, for work done by lawyers from our cohort of 2009 law school graduates, on a matter that I worked on while I was associated with the firm.[2]

51. At all relevant times, Ms. Crepps was based in Greenville, South Carolina. The rate assigned to her is the rate that attorneys of reasonably comparable skill, experience, and reputation in the District of South Carolina legal market charge their clients for matters involving complex federal litigation.[3] This is a significantly lower rate than she would seek were she based in Washington, D.C., or New York City.

**Lodestar Amounts for Center Timekeepers**

52. The Center timekeepers kept detailed records of the time we spent working on this case. Based on a review of those records, I prepared Exhibit A, which sets forth all time entries by Center timekeepers for which Plaintiffs reasonably seek an award of attorney's fees. The total lodestar amount for all Center timekeepers is **$2,007,913**.

---

[2] *See* "Twenty-Ninth Quarterly Fee Application Request of Cleary Gottlieb Steen & Hamilton LLP, as Attorneys for Debtors and Debtors-in-Possession, for the Period February 1, 2016 through April 30, 2016," *In re Nortel Networks*, 09-10138-KG, ECF No. 16843, at 4 (D. Del, May 25, 2016), *approval recommended by* "Fee Examiner's Final Reporting Regarding Twenty-Ninth Quarterly Fee Application of Cleary Gottlieb Steen & Hamilton LLP," *In re Nortel Networks*, 09-10138-KG, ECF No. 16995 (D. Del, July 15, 2016).

[3] *See, e.g., Doe v. Kidd*, 656 F. App'x 643, 654–58 (4th Cir. Aug. 9, 2016) (awarding an hourly rate of $480 to a South Carolina attorney of "national reputation" for work done in 2013 and prior years), *cert. denied*, 137 S. Ct. 638 (2017).

53. The lodestar amount for each Center timekeeper is set forth in the chart below. I arrived at those figures by multiplying the number of hours for which each Center timekeeper reasonably seeks an award of attorney's fees in a given year by the reasonable hourly rate for that timekeeper for that year, then adding together the annual subtotals.

*Rates and Lodestar Amounts of the Center Timekeepers*

| Time-keeper | 2014 | | | 2015 | | | 2016 | | | Lodestar |
|---|---|---|---|---|---|---|---|---|---|---|
| | Hrs. | Rate | Total | Hrs. | Rate | Total | Hrs. | Rate | Total | |
| David Brown | .1 | $670 | **$67** | 326.5 | $720 | **$235,080** | 182.8 | $770 | **$140,756** | **$375,903** |
| Janet Crepps | 60.1 | $480 | **$28,848** | n/a | n/a | **n/a** | 27.6 | $580 | **$16,008** | **$44,856** |
| Ilene Jaroslaw | 373.75 | $800 | **$299,000** | 833.3 | $850 | **$708,305** | 160.25 | $900 | **$144,225** | **$1,151,530** |
| Zoe Levine | 16.6 | $670 | **$11,122** | 347.7 | $720 | **$250,344** | 155.4 | $770 | **$119,658** | **$381,844** |
| Julie Rikelman | 53.5 | $800 | **$42,800** | n/a | n/a | **n/a** | 12.2 | $900 | **$10,980** | **$53,780** |
| | | | | | | | | | Total: | **$2,007,913** |

**Expenses and Costs Incurred by the Center**

54. The Center incurred reasonable, out-of-pocket expenses in the amount of **$16,221.48** in connection with this case. An itemized list of these expenses is set forth in Exhibit B. Receipts and other documentary evidence concerning these expenses are set forth in Exhibit C. (I have redacted those receipts to remove financial and personal information, including credit card numbers and home addresses and telephone numbers).

55. The expenses listed in Exhibit B consist of attorney travel expenses, overtime expenses, research fees, shipping fees, and conference call fees. All of these expenses are part of

the costs that attorneys would normally charge a fee-paying client.

### Plaintiffs' Pending Supplemental Motion for Attorney's Fees

56. Plaintiffs expect to file a supplemental motion for attorney's fees regarding all aspects of the litigation that have not yet concluded.

57. As of the date of this filing, Plaintiffs have not presented a request for compensation for time spent in preparing their fee application. Plaintiffs retain the right to do so, and intend to do so at the conclusion of all ongoing proceedings. *See Cruz v. Hauck*, 762 F.2d 1230, 1233, 1235 (5th Cir. 1985) (recognizing that "prevailing parties are entitled to attorney's fees under § 1988 for time spent establishing and litigating a fee claim as well as for time spent prosecuting the merits of the civil rights action" and holding fees are recoverable by means of a "supplemental motion for attorney's fees").

58. Likewise, Plaintiffs have not yet presented a request for compensation for attorney's fees incurred defending against Defendant's appeal, but retain the right to do so, and intend to do so at the conclusion of all ongoing proceedings. *See, e.g.*, *Norris v. Hartmarx Specialty Stores, Inc.*, 913 F.2d 253, 256-57 (5th Cir. 1990) (affirming district court's decision to award fees, awarding fees on appeal, and remanding with instructions for further fact finding regarding the proper amount of each).

59. The recovery of attorney's fees in ongoing aspects of the litigation, in an amount which cannot yet be determined, is necessary for Plaintiffs to obtain a fully compensatory attorney's fee.

    I declare under penalty of perjury that the foregoing is true and correct. Executed on May 10, 2017.

/s/ *David Brown*
David Brown